**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF HAWAI'I, STATE OF ILLINOIS, STATE OF MAINE, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF NORTH CAROLINA, STATE OF OREGON, COMMONWEALTH OF PENNSYLVANIA, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, STATE OF WASHINGTON, STATE OF WISCONSIN; CITY OF CENTRAL FALLS, CITY OF CHICAGO, CITY OF COLUMBUS, CITY OF NEW YORK, CITY OF PHILADELPHIA, CITY OF PHOENIX, CITY OF PITTSBURGH, CITY OF PROVIDENCE, CITY AND COUNTY OF SAN FRANCISCO, CITY OF SEATTLE; CAMERON COUNTY, EL PASO COUNTY, HIDALGO COUNTY, HOWARD COUNTY, MONTEREY COUNTY; and the UNITED STATES CONFERENCE OF MAYORS, | 20 Civ. 5770 (JMF)  AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, *in his official capacity as President of the United States*; UNITED STATES | |

1

DEPARTMENT OF COMMERCE;
WILBUR L. ROSS, JR., *in his official
capacity as Secretary of Commerce*;
BUREAU OF THE CENSUS; and
STEVEN DILLINGHAM, *in his
official capacity as Director of the
United States Census Bureau*,

                  Defendants.

## INTRODUCTION

1.      This lawsuit challenges President Donald J. Trump's blatant disregard of an unambiguous constitutional command.  The Fourteenth Amendment provides that "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed." U.S. Const. amend. XIV, § 2.  The Framers of the Fourteenth Amendment deliberately chose the phrase "whole number of persons" to refer to *all persons living* in each State—including the "entire immigrant population not naturalized."  Cong. Globe, 39th Cong., 1st Sess. 432 (1866) (Rep. John Bingham).

2.      For 150 years—since the United States recognized the whole personhood of those formerly bound in slavery—the unambiguous requirement that all persons be counted for apportionment purposes, regardless of immigration status, has been respected by every executive official, every cabinet officer, and every President.

3.      Until now.  On July 21, 2020, President Trump issued a "Memorandum on Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census."  85 Fed. Reg. 44,679 (July 23, 2020) (attached as Ex. 1).  For the first time in our history, the Memorandum announces a "policy of the United States to exclude from the apportionment base aliens who are not in a lawful immigration status."  *Id.* at 44,680.  It directs the Secretary of

Commerce to provide the President with information to carry out this policy.  And it declares the President's intent to make a determination of the "whole number of persons in each State" that will in fact exclude the undocumented immigrants he has targeted throughout his administration.

4.      The President's new policy and any actions Defendants take to implement it unequivocally violate the Fourteenth Amendment.  The constitutional mandate to base apportionment on "the whole number of persons in each State" could hardly be clearer, and the Supreme Court has long recognized that undocumented immigrants are "persons" under the Fourteenth Amendment, *Plyler v. Doe*, 457 U.S. 202, 210 (1982).  The Memorandum's open disregard of the Constitution's plain text is reason enough to invalidate it and to prevent Defendants from taking steps to carry out its unlawful policy.

5.      But Defendants' decision to exclude undocumented immigrants from apportionment also violates the Constitution and federal statutes in multiple additional ways. Defendants' decision unlawfully discriminates against Hispanics and immigrant communities of color in violation of the Due Process Clause of the Fifth Amendment.  By explicitly targeting and punishing States that refuse to assist in this administration's enforcement of federal immigration law, Defendants' decision violates the Tenth Amendment.  Further, Defendants' decision to exclude undocumented immigrants from apportionment—as well as any action they take to implement or further that decision—is both contrary to law and arbitrary and capricious, in violation of the Administrative Procedure Act.  And the Memorandum violates statutes Congress enacted to require the enumeration in the census of the whole number of persons in each State, and to command the President to provide a statement with a mathematical apportionment based solely on that enumeration.

6.     Defendants' decision harms Plaintiffs' sovereign, quasi-sovereign, economic, and proprietary interests.  If Defendants succeed in excluding undocumented immigrants from apportionment, some Plaintiffs will suffer severe injury to their most basic rights under our Constitution's representational form of government: they will improperly lose one or more Members in the House of Representatives and one or more corresponding electors in the Electoral College.  And removing undocumented immigrants from the apportionment base will further harm Plaintiffs by, for example, undermining their ability to conduct congressional and state-level redistricting, depriving them of critical federal funding, and eroding the quality of census data on which they rely to perform essential government functions.

7.     Plaintiffs the State of New York, State of Colorado, State of Connecticut, State of Delaware, District of Columbia, State of Hawai'i, State of Illinois, State of Maine, State of Maryland, Commonwealth of Massachusetts, State of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, State of North Carolina, State of Oregon, Commonwealth of Pennsylvania, State of Rhode Island, State of Vermont, Commonwealth of Virginia, State of Washington, State of Wisconsin, City of Central Falls, City of Chicago, City of Columbus, City of New York, City of Philadelphia, City of Phoenix, City of Pittsburgh, City of Providence, City and County of San Francisco, City of Seattle, Cameron County, El Paso County, Hidalgo County, Howard County, Monterey County, and the United States Conference of Mayors therefore bring this action seeking declaratory and injunctive relief to hold Defendants to their obligation to base apportionment on "the whole number of persons in each State" and to forbid them from excluding undocumented immigrants—or any other person—from the apportionment base.

## JURISDICTION AND VENUE

8.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).

9.      Declaratory and injunctive relief is sought as authorized in 28 U.S.C. §§ 2201 and 2202.

10.      Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities.  Plaintiffs the State of New York and the City of New York are residents of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred and are continuing to occur within the Southern District of New York.

## PARTIES

11.      Plaintiff the State of New York, represented by and through its Attorney General, is a sovereign state of the United States of America.  The Attorney General is New York State's chief law enforcement officer and is authorized under N.Y. Executive Law § 63 to pursue this action.

12.      Plaintiff the State of Colorado is a sovereign state of the United States of America.  The State of Colorado brings this action by and through its Attorney General, Philip J. Weiser.  The Attorney General has authority to represent the state, its departments, and its agencies, and "shall appear for the state and prosecute and defend all actions and proceedings, civil and criminal, in which the state is a party."  Colo. Rev. Stat. § 24-31-101.

13.      Plaintiff the State of Connecticut, represented by and through its Attorney General, William Tong, is a sovereign state of the United States of America.  The Attorney General brings this action as the state's chief civil legal officer under Conn. Gen. Stat. § 3-124 *et seq*.

14.     Plaintiff the State of Delaware is represented by and through its Attorney General

Kathleen Jennings, and is a sovereign state of the United States of America.  Attorney General

Jennings is Delaware's chief law enforcement officer, *see* Del. Const., art. III, and is authorized

to pursue this action under 29 Del. Code § 2504.

15.     Plaintiff the District of Columbia is a municipal corporation empowered to sue

and be sued, and is the local government for the territory constituting the permanent seat of the

federal government.  The District brings this case through the Attorney General for the District

of Columbia, who is the chief legal officer for the District and possesses all powers afforded the

Attorney General by the common and statutory law of the District.  The Attorney General is

responsible for upholding the public interest and has the authority to file civil actions in order to

protect the public interest.  D.C. Code § 1-301.81.

16.     Plaintiff the State of Hawai'i, represented by and through its Attorney General, is

a sovereign state of the United States of America.  Attorney General Clare E. Connors is the

chief legal officer of the State of Hawai'i and is authorized to appear, personally or by deputy, on

behalf of the state in all courts and in all cases in which the state is a party.  Haw. Const. art. V,

§ 6; Haw. Rev. Stat. Chapter 28; Haw. Rev. Stat. § 26-7.

17.     Plaintiff the State of Illinois, represented by and through its Attorney General,

Kwame Raoul, is a sovereign state of the United States of America.  The Attorney General is

Illinois's chief law enforcement officer and is authorized under 15 ILCS 205/4 to pursue this

action.

18.     Plaintiff, the State of Maine, represented by and through its Attorney General

Aaron M. Frey, is a sovereign state of the United State of America.  The Attorney General of

Maine is a constitutional officer with the authority to represent the State of Maine in all matters

and serves as its chief legal officer with general charge, supervision, and direction of the State's legal business.  Me. Const. art. IX, Sec. 11; Me. Rev. Stat. tit. 5, §§ 191 *et seq.*  The Attorney General's powers and duties include acting on behalf of the State and the people of Maine in the federal courts on matters of public interest.  The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maine residents as a matter of constitutional, statutory, and common law authority.

19.     Plaintiff the State of Maryland, by and through its Attorney General, Brian E. Frosh, is a sovereign state of the United States of America.  The Attorney General is Maryland's chief legal officer with general charge, supervision, and direction of the State's legal business. The Attorney General's powers and duties include acting on behalf of the State and the people of Maryland in the federal courts on matters of public concern.  Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maryland residents.  Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, Joint Resolution 1.

20.     Plaintiff the Commonwealth of Massachusetts, represented by and through its Attorney General, is a sovereign state of the United States of America.  The Attorney General is authorized to pursue this action under Mass. Gen. Laws ch. 12, §§ 3 and 10.

21.     Plaintiff the State of Michigan, represented by and through its Attorney General, is a sovereign state of the United States of America.  The Attorney General is Michigan's chief law enforcement officer and is authorized under Michigan law, Mich. Comp. Laws §§ 14.28 and 14.29, to pursue this action.

22.    Plaintiff the State of Minnesota, represented by and through its Attorney General, is a sovereign state of the United States of America.  The Attorney General is Minnesota's chief legal officer and is authorized to pursue this action on behalf of the State.  Minn. Stat. § 8.01.

23.    Plaintiff the State of Nevada, represented by and through its Attorney General, is a sovereign state of the United States of America.  Attorney General Aaron D. Ford is the chief legal officer of the State of Nevada and has the authority to commence actions in federal court to protect the interests of Nevada.  Nev. Rev. Stat. § 228.170.  Governor Stephen F. Sisolak is the chief executive officer of the State of Nevada.  The Governor is responsible for overseeing the operations of the State and ensuring that its laws are faithfully executed.  Nev. Const., art. 5, § 1.

24.    Plaintiff the State of New Jersey, represented by and through its Attorney General Gurbir S. Grewal, is a sovereign state of the United States of America.  The Attorney General is New Jersey's chief legal officer and is authorized to pursue this action on behalf of the State. *See* N.J. Stat. Ann. § 52:17A-4(e), (g).

25.    Plaintiff the State of New Mexico, represented by and through its Attorney General Hector Balderas, is a sovereign state of the United States of America.  The Attorney General is authorized to bring an action on behalf of New Mexico in any court when, in his judgment, the interests of the State so require, N.M. Stat. Ann. § 8-5-2.

26.    Plaintiff the State of North Carolina, represented by and through Attorney General Joshua H. Stein, is a sovereign state of the United States of America.  The Attorney General is the State of North Carolina's chief law enforcement officer and brings this challenge pursuant to his independent constitutional, statutory, and common-law authority.

27.    Plaintiff the State of Oregon, acting by and through the Attorney General of Oregon, Ellen F. Rosenblum, is a sovereign state of the United States of America.  The Attorney

General is the chief law officer of Oregon and is empowered to bring this action on behalf of the State of Oregon, the Governor, and the affected state agencies under Or. Rev. Stat. §§ 180.060, 180.210, and 180.220.

28.     Plaintiff the Commonwealth of Pennsylvania is a sovereign state of the United States of America.  This action is brought on behalf of the Commonwealth by Attorney General Josh Shapiro, the "chief law officer of the Commonwealth."  Pa. Const. art. IV, § 4.1.  Attorney General Shapiro brings this action on behalf of the Commonwealth pursuant to his statutory authority under 71 Pa. Stat. § 732-204.

29.     Plaintiff the State of Rhode Island, represented by and through its Attorney General, is a sovereign state of the United States.  Attorney General Peter F. Neronha is the chief legal advisor to the State of Rhode Island and is authorized to pursue this action pursuant to his constitutional, statutory, and common law authority.  R.I. Const. art. IX § 12, R.I. Gen. Laws §§ 42-9-1 *et seq.*

30.     Plaintiff the State of Vermont, represented by and through its Attorney General, Thomas J. Donovan, is a sovereign state in the United States of America.  The Attorney General is the state's chief law enforcement officer and is authorized to pursue this action pursuant to Vt. Stat. Ann. tit. 3, §§ 152 and 157.

31.     Plaintiff the Commonwealth of Virginia brings this action by and through its Attorney General, Mark R. Herring.  The Attorney General has the authority to represent the Commonwealth, its departments, and its agencies in "all civil litigation in which any of them are interested."  Va. Code Ann. § 2.2-507(A).

32.     Plaintiff the State of Washington, represented by and through its Attorney General, Robert W. Ferguson, is a sovereign state of the United States of America.  The Attorney

General is the chief legal adviser to the State of Washington and is authorized to pursue this action pursuant to RCW 43.10.030.  The Attorney General's powers and duties include acting in federal court on matters of public concern.

33.     Plaintiff State of Wisconsin is a sovereign state of the United States of America and brings this action by and through its Attorney General, Joshua L. Kaul, who is the chief legal officer of the State of Wisconsin and has the authority to file civil actions to protect Wisconsin's rights and interests.  *See* Wis. Stat. § 165.25(1m).  The Attorney General's powers and duties include appearing for and representing the State, on the governor's request, "in any court or before any officer, any cause or matter, civil or criminal, in which the state or the people of this state may be interested."  *Id.*

34.     Plaintiff the City of Central Falls is a municipal corporation organized pursuant to the laws of the State of Rhode Island.

35.     Plaintiff the City of Chicago is a municipal corporation and home rule unit organized and existing under the constitution and laws of the State of Illinois.

36.     Plaintiff the City of Columbus is a municipal corporation and home rule unit organized and existing under the constitution and laws of the State of Ohio and the City's Home Rule Charter.

37.     Plaintiff the City of New York is a municipal corporation organized pursuant to the laws of the State of New York.  New York City is a political subdivision of the State and derives its powers through the New York State Constitution, New York State laws, and the New York City Charter.  New York City is the largest city in the United States by population.

38.     Plaintiff the City of Philadelphia is a municipal corporation organized pursuant to the laws of the Commonwealth of Pennsylvania.  The City is a political subdivision of the

Commonwealth with powers derived from the Pennsylvania Constitution, Commonwealth law, and the City's Home Rule Charter.

39.     Plaintiff the City of Phoenix is a municipal corporation organized pursuant to the laws of the State of Arizona.

40.     Plaintiff the City of Pittsburgh is a municipal corporation organized pursuant to the laws of the Commonwealth of Pennsylvania.  The City is a political subdivision of the Commonwealth with powers derived from the Pennsylvania Constitution, Commonwealth law, and the City's Home Rule Charter.

41.     Plaintiff the City of Providence is a municipal corporation organized pursuant to the laws of the State of Rhode Island.

42.     Plaintiff the City and County of San Francisco, represented by and through its City Attorney, is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city and county.

43.     Plaintiff the City of Seattle is a first-class charter city, incorporated under the laws of the State of Washington, empowered to sue and be sued, and represented by and through its elected City Attorney, Peter S. Holmes.

44.     Plaintiff Cameron County, Texas is a political subdivision of the State of Texas.

45.     Plaintiff El Paso County, Texas is a political subdivision of the State of Texas.

46.     Plaintiff Hidalgo County, Texas is a political subdivision of the State of Texas.

47.     Plaintiff Howard County, Maryland, represented by and through its County Solicitor, Gary W. Kuc, is a body corporate and politic and a charter county and political subdivision of the State of Maryland, organized and existing under the Constitution and Laws of the State of Maryland and the Howard County Charter, with the power to bring this action.

48.     Plaintiff Monterey County, California is a political subdivision of the State of California.

49.     Plaintiff United States Conference of Mayors is the official nonpartisan organization of cities with populations of 30,000 or more.  There are nearly 1,400 such cities in the country today, and each member city is represented in the Conference by its chief elected official, the mayor.

50.     Plaintiffs are aggrieved by Defendants' decision and conduct and have standing to bring this action because Defendants' decision and actions to exclude undocumented immigrants from the apportionment base harm Plaintiffs' sovereign, quasi-sovereign, economic, and proprietary interests and will continue to cause injury unless and until the challenged decision and conduct are enjoined.

51.     Defendant Donald J. Trump is the President of the United States.  He is responsible for the actions and decisions that are being challenged by Plaintiffs in this action and is sued in his official capacity.

52.     Defendant the United States Department of Commerce is a cabinet agency within the executive branch of the United States government.  The Commerce Department is responsible for planning, designing, and implementing the 2020 Census.  13 U.S.C. § 4.

53.     Defendant Wilbur L. Ross, Jr. is the Secretary of Commerce.  He is responsible for overseeing the Census Bureau, conducting the decennial census of the population, and reporting to the President the tabulation of total population by States for the apportionment of Representatives in Congress.  13 U.S.C. § 141.  He is sued in his official capacity.

54.     Defendant Bureau of the Census is an agency within, and under the jurisdiction

of, the Department of Commerce.  13 U.S.C. § 2.  The Census Bureau is responsible for planning

and administering the decennial census.

55.     Defendant Steven Dillingham is Director of the Census Bureau.  He is sued in his

official capacity.

## ALLEGATIONS

**I.      Constitutional and statutory background.**

     **A.      The Constitution requires apportioning Members of the House of Representatives among the States based on the total number of persons living in each State.**

56.     The Constitution requires that the Members of the House of Representatives

"shall be apportioned among the several States according to their respective numbers, counting

the whole number of persons in each State, excluding Indians not taxed."  U.S. Const. amend.

XIV, § 2; *see id.* art. I, § 2, cl. 3.

57.     The number of Representatives apportioned to each State, along with the two

Senators given to each State, determines the allocation among the States of electors in the

Electoral College.  *Id.* art. II, § 1, cl. 2; *see also* 3 U.S.C. § 3.

58.     To apportion Representatives among the States properly (and ultimately to

allocate electors among the States properly) the Constitution requires an "actual Enumeration" of

the total population every ten years, *id.* art. I, § 2, cl. 3.

59.     "By its terms, therefore, the Constitution mandates that every ten years the federal

government endeavor to count every single person residing in the United States, whether citizen

or noncitizen, whether living here with legal status or without," and to use that enumeration of

the total population "to apportion Representatives among the states."  *New York v. Dep't of

Commerce*, 351 F. Supp. 3d 502, 514 (S.D.N.Y. 2019).

13

60.     More than two hundred years of history, practice, and judicial and administrative precedents establish that the apportionment of Representatives must be based on *all persons living* in each State, regardless of their citizenship or immigration status.

61.     During the country's founding, the Framers debated the proper basis on which to apportion Representatives and declared that Representatives "shall be apportioned among the several States which may be included within this Union, according to their *respective Numbers*." U.S. Const. art. I, § 2, cl. 3 (emphasis added).  The Framers repeatedly made clear that the basis for apportionment of Representatives was thus all persons.  For example, as James Madison explained in 1788, the "fundamental principle of the proposed constitution" ensured that "the aggregate number of representatives allotted to the several states, is to be . . . founded on the aggregate number of inhabitants."  The Federalist No. 54, p. 284 (G. Carey & J. McClellan eds. 2001).

62.     The original Apportionment Clause provided for only two exceptions to the use of total population for apportionment.  First, "Indians not taxed" were excluded from the apportionment base.  U.S. Const. art. I, § 2, cl. 1, § 3.  Second, slaves were counted as only three-fifth of a person.  *Id.*  No other exceptions were provided, making clear that all other persons living in the United States needed to be counted by the decennial enumeration and included in the apportionment base.

63.     When debating what is now the Fourteenth Amendment, Congress reconsidered the proper basis for apportioning House seats among the States and reaffirmed that apportionment must be based on *all persons living* in each State—citizens and noncitizens alike. The Framers of the Fourteenth Amendment rejected numerous proposals to change the basis of apportionment from total population to voter population.  *See, e.g.*, Cong. Globe, 39th Cong., 1st

Sess. 10 (1865) (proposal to apportion representatives among the States "according to their respective legal voters").

64.     Instead, the Framers amended the Constitution to remove the provision that counted slaves as three-fifths of a person and declared that apportionment of Representatives must be based on the "whole number of persons in each State."  U.S. Const. amend. XIV, § 2. As the Fourteenth Amendment's Framers explained, "numbers," *i.e.*, all persons living in each State, is "the most just and satisfactory basis, and this is the principle upon which the Constitution itself was originally framed, that the basis of representation should depend upon numbers; and such . . . is the safest and most secure principle upon which the Government can rest. Numbers, not voters; numbers, not property; this is the theory of the Constitution."  Cong. Globe, 39th Cong., 1st Sess. 2767 (1866) (Jacob Howard).

65.     Basing apportionment on all persons, the Framers further emphasized, ensured that each State's representation in the House reflected all persons regardless of whether they could then vote, including women, children, and the "entire immigrant population not naturalized."  *Id.* at 432 (Rep. John Bingham); *see, e.g.*, *id.* at 411 (representation based on number of voters improperly "takes from the basis of representation all unnaturalized foreigners" (Rep. Burton Cook)).

66.     Since 1790, in accordance with the Constitution's express requirement to base apportionment on all persons living in each State, the decennial actual enumeration has *always* counted all persons living in the United States based on where they "usually reside[]."  *See* Census Act of 1790, § 5, 1 Stat. 101 (1790); *2020 Decennial Census Residence Rule and Residence Situations*, 80 Fed. Reg, 28,950, 28,950 (May 20, 2015) ("The Census Act of 1790

established the concept of 'usual residence' as the main principle in determining where people are to be counted. This concept has been followed in all subsequent censuses.").

67.     Under the Census Bureau's well-settled practice and a final rule that it promulgated pursuant to notice-and-comment rulemaking for the 2020 Census, usual residence means the place where a person lives and sleeps most of the time.  *See Final 2020 Census Residence Criteria and Residence Situations*, 83 Fed. Reg. 5525, 5533 (Feb. 8, 2018).

68.     Accordingly, the decennial enumeration and apportionment base includes all noncitizens who live and sleep most of the time in the United States, regardless of their place of citizenship or immigration status.  *See, e.g.*, *id.*  The enumeration likewise counts noncitizens who are "members of the diplomatic community" "at the embassy, consulate, United Nations' facility, or other residences where diplomats live."  *Id.*

69.     By contrast, noncitizens who are temporarily visiting the United States, such as on a vacation or business trip, are not included in the decennial enumeration and apportionment base because they do not live and sleep most of the time in the United States.  *See, e.g.*, *id.*

70.     The millions of undocumented immigrants who do live in the United States have an established presence here.  These immigrants have moved to the United States, and they are members of their state and local communities.

71.     For example, the Migration Policy Institute has estimated, based on data from 2012 to 2016, that more than nine million undocumented immigrants have lived in the United States for five years or more.  The Migration Policy Institute estimated that more than seven

million undocumented immigrants have lived in this country for ten years or more, and that

nearly four million undocumented immigrants have lived here for twenty years or more.[1]

72.     Undocumented immigrants residing here both contribute to and participate in their

communities and in many public programs.  For example, millions of undocumented immigrants

work here and pay taxes.[2]  Many undocumented immigrants live here with their family members,

including children who are United States citizens.[3]

73.     Based on the Constitution's text, more than two centuries of history, and well-

settled census practice, the Supreme Court and other courts have repeatedly made clear that the

Fourteenth Amendment requires apportionment of Representatives based on the total number of

all persons living in each State.  *See, e.g.*, *Wesberry v. Sanders*, 376 U.S. 1, 10-18 (1964);

*Evenwel v. Abbott*, 136 S. Ct. 1120, 1127-29 (2016).  Courts have also repeatedly determined

that the "whole number of persons" used to apportion Representatives includes all noncitizens

who are living in the United States regardless of their immigration status.  *See, e.g.*, *Fed'n for

Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 576-78 (D.D.C. 1980) (three-judge

court).

---

[1] Migration Policy Institute, *Profile of the Unauthorized Population: United States*, https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/US.

[2] *See, e.g.*, Jens Manuel Krogstad et al., Pew Research Center, *5 facts about illegal immigration in the U.S.* (June 12, 2019), https://www.pewresearch.org/fact-tank/2019/06/12/5-facts-about-illegal-immigration-in-the-u-s (estimating that in 2017, the United States' civilian workforce included 7.6 million undocumented immigrants); American Immigration Council, *Adding Up the Billions in Tax Dollars Paid by Undocumented Immigrants* 1, https://www.americanimmigrationcouncil.org/sites/default/files/research/adding_up_the_billions _in_tax_dollars_paid_by_undocumented_immigrants.pdf; Hunter Hallman, Bipartisan Policy Center, *How do Undocumented Immigrants Pay Federal Taxes? An Explainer* (Mar. 28, 2018), https://bipartisanpolicy.org/blog/how-do-undocumented-immigrants-pay-federal-taxes-an-explainer/.

[3] Migration Policy Institute, *supra* (estimating that more than 3 million undocumented immigrants over the age of 15 resided with a citizen child under the age of 18).

74.    The federal government, and several of the Defendants here, have conceded that the decennial enumeration that constitutes the apportionment base must count all persons living in the United States.

75.    For example, on March 14, 2019, Secretary Ross testified under oath during a congressional committee hearing, stating "The constitutional mandate, sir, for the census is to try to count *every person residing* in the U.S. at their place of residence on the dates when the census is conducted." *Hearing Before the H. Comm. on Oversight & Reform*, 116th Cong. 31 (Mar. 14, 2019) (emphasis added).  Secretary Ross further testified that "the Department of Commerce is fully committed to administering as complete and accurate decennial census as we can.  We intend to try to *count every person* taking all necessary actions to do so." *Id.* (emphasis added).

76.    During a congressional committee hearing in February 2020, Census Bureau Director Dillingham stated that the Bureau will "*count everyone*, wherever they are living," including undocumented immigrants.  *Hearing Before the H. Comm. on Oversight & Reform*, 116th Cong. 12 (Feb. 12, 2020) (emphasis added).

77.    The federal government has repeatedly argued that excluding undocumented immigrants from the decennial enumeration or the apportionment base violates the Constitution and applicable statutes.  For example, in *Federation for American Immigration Reform v. Klutznick*, the government urged a district court to reject claims demanding exclusion of undocumented immigrants from the "whole number of persons" that constitutes the apportionment base.  The government explained that "the plain language of the Constitution, as

18

well as the intent of its framers, establishes that *all* inhabitants, including illegal aliens, must be enumerated for the purpose of apportioning Representatives."[4]

78.     Similarly, the Department of Justice's Office of Legislative Affairs has opined that the Constitution requires inclusion of undocumented immigrants in the decennial enumeration that constitutes the apportionment base.  *See, e.g.*, Letter from Carol T. Crawford, Assistant Attorney General, to Senator Jeff Bingham (Sept. 22, 1989).

79.     The population count derived from the census is used not only to apportion representatives and ultimately electors "but also to allocate federal funds to the States and to draw electoral districts."  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2561 (2019).

80.     For these reasons, the "decennial enumeration of the population is one of the most critical constitutional functions our Federal Government performs."  Pub. L. No. 105-119, § 209(a)(5), 111 Stat. 2440, 2481 (1997).

**B.      The Census Act requires that the total population count used for congressional apportionment include all persons living in the United States.**

81.     The Constitution provides that an "actual Enumeration shall be made" every ten years "in such manner as [Congress] shall direct by law."  U.S. Const. art. I, § 2. Congress has exercised its authority over the census by enacting various statutory provisions ("Census Act").

82.     Congress has assigned the responsibility of conducting the decennial enumeration to the Secretary of Commerce, and the Secretary may delegate authority for establishing procedures to conduct the census to the Census Bureau.  13 U.S.C. §§ 2, 4, 141.

---

[4] Defs.' Mem. of Points & Authorities in Support of Mot. to Dismiss or for Summary Judgment, No. 79-3269 (D.D.C.), *reprinted in 1980 Census: Counting Illegal Aliens*, *Hr'gs Before the S. Subcomm. on Energy, Nuclear Proliferation and Federal Services*, 96th Cong. 125-156 (1980).

83.     The Census Act requires that the decennial census be taken on April 1, 2020, the "decennial census date."  13 U.S.C. § 141(a).  The Secretary of Commerce has no discretion to delay the decennial census date under the Census Act.  *Id.*

84.     Within nine months of the decennial census date, *i.e.*, by January 1, 2021, the Secretary of Commerce must report to the President "[t]he tabulation of total population by States" that is "required for the apportionment of Representatives in Congress among the several States."  *Id.* § 141(b).

85.     Then, between January 3 and January 8, 2021, the President must transmit to Congress "a statement showing the whole number of persons in each State, excluding Indians not taxed, as ascertained under the . . . decennial census of the population, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives by the method known as the method of equal proportions, no State to receive less than one Member."  2 U.S.C. § 2a(a).

86.     Within fifteen days of receiving the President's statement, the Clerk of the House of Representatives must transmit "to the executive of each State a certificate of the number of Representatives to which such State is entitled."  *Id.* § 2a(b).

**II.     Defendants' unlawful attempt to add a citizenship question to the decennial census.**

87.     Defendants' decision and actions to exclude undocumented immigrants from the apportionment base are directly related to Secretary Ross's earlier and unlawful attempt to alter the decennial census that provides the apportionment count by adding a question inquiring about citizenship status.

88.     On March 26, 2018, Secretary Ross directed the Census Bureau to use the 2020

Census to demand information on the citizenship status of every resident in the country.[5]

Secretary Ross stated that he had decided to add the citizenship question because doing so was

"necessary to provide complete and accurate data" that would aid enforcement of the Voting

Rights Act (VRA) by the Department of Justice.

89.     Many of the plaintiffs here filed a lawsuit challenging the addition of the

citizenship question as, among other things, arbitrary and capricious and contrary to law, in

violation of the Administrative Procedure Act, 5 U.S.C. § 706(2).  *See* Second Am. Compl., *New*

*York v. U.S. Dep't of Commerce*, No. 18-cv-2921, Doc. No. 210 (S.D.N.Y. filed July 23, 2018).

90.     After an eight-day bench trial, the United States District Court for the Southern

District of New York vacated Secretary Ross's decision to add a citizenship question to the 2020

census questionnaire.  *New York*, 351 F. Supp. 3d at 679.  In so ruling, the court concluded that

the plaintiffs had standing to sue because the inclusion of a citizenship question would deter

participation in the census by households with a noncitizen and lead to a differential undercount

of noncitizens and Hispanics that would concretely harm plaintiffs in various ways.  *Id.* at 578-

593.  For example, the court found that adding a citizenship question would cause some plaintiffs

to lose congressional seats, impair state and local redistricting efforts that rely on census

numbers, harm the quality and accuracy of census data, and reduce federal funding to plaintiffs'

jurisdictions.  *Id.* at 593-98, 607-15.

---

[5] Memorandum from Sec'y of Commerce Wilbur Ross to Under Sec'y of Commerce for Econ.
Affairs Karen Dunn Kelley, *Reinstatement of a Citizenship Question on the 2020 Decennial
Census Questionnaire* 7 (Mar. 26, 2018), https://www.commerce.gov/sites/commerce.gov/files"
/2018-03-26_2.pdf.

91.     The court also determined that Secretary Ross's decision violated the Administrative Procedure Act for several reasons, including because his rationale for adding the citizenship question was pretextual.  *Id.* at 660-64.  As the court explained, the evidence was "clear that Secretary Ross's rationale was pretextual—that is, that the real reason for his decision [to add the citizenship question] was something other than the sole reason he put forward in his Memorandum, namely enhancement of DOJ's VRA enforcement efforts."  *Id.* at 660.  The court noted that it was "unable to determine—based on the existing record, at least—what Secretary Ross's real reasons for adding the citizenship question were."  *Id.* at 569-70.

92.     The Supreme Court granted certiorari before judgment and affirmed, in relevant part, the district court's final judgment setting aside the Secretary's decision to add a citizenship question. The Supreme Court held that "the Secretary's decision must be set aside because it rested on a pretextual basis."  *Dep't of Commerce*, 139 S. Ct. at 2573.  The Court reasoned that the Secretary's decision "cannot be adequately explained in terms of DOJ's request for improved citizenship data to better enforce the VRA" because there was "a significant mismatch between the decision the Secretary made and the rationale he provided."  *Id.* at 2575.  In short, Secretary Ross's "VRA enforcement rationale—the sole stated reason—seems to have been contrived."  *Id.*

93.     After the Supreme Court remanded the case to the district court, the court entered a permanent injunction that enjoined the defendants "from including a citizenship question on the 2020 decennial census questionnaire; from delaying the process of printing the 2020 decennial census questionnaire after June 30, 2019 for the purpose of including a citizenship question; and from asking persons about citizenship status on the 2020 census questionnaire or

22

otherwise asking a citizenship question as part of the 2020 decennial census." Order, *New York v. Dep't of Commerce*, No. 18-cv-2921, Doc. No. 634 (S.D.N.Y. July 16, 2019).

94. On July 11, 2019, President Trump issued an Executive Order to "ensure that accurate citizenship data is compiled in connection with the census" notwithstanding the Supreme Court's decision and the district court's order precluding the use of a citizenship question in the 2020 Census. *Collecting Information About Citizenship Status in Connection with the Decennial Census*, Exec. Order 13,880, § 1, 84 Fed. Reg. 33,821, 33,821 (July 16, 2019).

95. To achieve that goal, President Trump directed all executive departments and agencies to provide to the Department of Commerce "the maximum assistance permissible, consistent with law, in determining the number of citizens and noncitizens in the country." *Id*.

96. In a public statement accompanying the issuance of the Executive Order, given from the White House's Rose Garden, President Trump made clear that the federal government would not be "backing down on our effort to determine the citizenship status of the United States population." President Donald Trump, *Remarks by President Trump on Citizenship and the Census* (July 11, 2018), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-citizenship-census/. President Trump stated that "[t]here used to be a time when you could proudly declare, 'I am a citizen of the United States.' Now they're trying to erase the very existence of a very important word and a very important thing: citizenship." *Id.*

97. President Trump further stated that, pursuant to the Executive Order, the federal government will be taking steps "to ensure that citizenship is counted so that we know how many citizens we have in the United States." *Id.*

### III.     The July 21, 2020 Memorandum directing exclusion of undocumented immigrants from the apportionment count.

98.     Recent events have now laid bare the real reasons driving Secretary Ross's decision to add a citizenship question to the 2020 Census: to exclude undocumented persons from the "whole number of persons" that constitutes the apportionment base and to discriminate against Hispanics and noncitizens.

99.     On July 21, 2020, President Trump issued a memorandum (i) declaring that undocumented immigrants will be excluded from the "whole number of persons in each State" enumerated by the 2020 Census and used to apportion the number of Representatives to each State, and (ii) directing the Secretary to take "all appropriate action" to provide the President with information to exclude undocumented immigrants from the apportionment base. *Memorandum on Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census*, 85 Fed. Reg. 44,679 (July 23, 2020) (attached as Ex. 1).

100.     The Memorandum declares that "[f]or the purpose of the reapportionment of Representatives following the 2020 Census, it is the policy of the United States to exclude from the apportionment base aliens who are not in a lawful immigration status under the Immigration and Nationality Act, as amended (8 U.S.C. 1101 et seq.), to the maximum extent feasible." *Id.* at 44,680.

101.     The Memorandum asserts that the Executive branch has purported "discretion" to exclude from the apportionment base all undocumented immigrants who reside in the United States, *id.* at 44,679—no matter how long they have been living here.

102.     The Memorandum acknowledges that the Constitution explicitly requires apportionment of Representatives based on the "whole number of persons in each State." *Id.*  It states that not every person who is physically present on the decennial census date is living in the

United States.  *Id.*  For example, the Memorandum states, noncitizens who are temporarily visiting on vacation or for business are not "inhabitants" of the United States and are thus not included in the apportionment base.  *Id.*  Without any plausible basis, the Memorandum then asserts that purported "discretion delegated to the executive branch to determine who qualifies as an 'inhabitant' includes authority to exclude from the apportionment base aliens who are not in a lawful immigration status"—even if those persons have been living in the United States for many years.  *Id.*

103.    In the Memorandum, President Trump targets States (including some of the plaintiff States) that have many undocumented immigrants living in their jurisdictions or that have declined to affirmatively assist the federal government's immigration enforcement efforts.

104.    For example, President Trump stated that "[a]ffording congressional representation, and therefore formal political influence, to States on account of the presence within their borders of aliens who have not followed the steps to secure a lawful immigration status under our laws undermines those principles."  *Id.* at 44,680.  The Memorandum further stated that States that decline to adopt state laws or policies to assist federal efforts to enforce the immigration laws passed by Congress should essentially be stripped of any "representation in the House of Representatives" that is based on undocumented immigrants living in their jurisdictions.  *Id.*

105.    The Memorandum requires Secretary Ross, in preparing his § 141(b) report of the actual enumeration on which apportionment must be based, to take actions "to provide information" to the President to exclude undocumented immigrants from apportionment.  *Id.* The Memorandum thus directs the Secretary (and by extension the Commerce Department and Census Bureau) to take actions to enable the President to exclude undocumented immigrants

from his § 2a(a) report of both the "whole number of persons in each State" and the corresponding number of Representatives that each State receives.  *Id.*

106.    On the same day that he issued the Memorandum, President Trump issued a public statement making clear that Defendants' decision and actions to exclude undocumented immigrants from the apportionment base are a continuation of the federal government's prior unlawful attempt to add a citizenship question to the 2020 Census.  President Donald Trump, *Statement from the President Regarding Apportionment* (July 21, 2020), https://www.whitehouse.gov/briefings-statements/statement-president-regarding-apportionment/.

107.    As President Trump's statement explained, he had previously asserted during his Rose Garden statements in July 2019 that he "would not back down in [his] effort to determine the citizenship status of the United States population."  *Id.*  He further explained that he was now following "through on that commitment by directing the Secretary of Commerce to exclude illegal aliens from the apportionment base following the 2020 census."  *Id.*  Echoing his earlier statements about the citizenship question, Trump further asserted that "[t]here used to be a time when you could proudly declare, 'I am a citizen of the United States'" and that "the radical left is trying to erase the existence of this concept and conceal the number of illegal aliens in our country."  *Id.*  He stated that his Memorandum directing exclusion of undocumented immigrants from the apportionment base responds to a purported "broader left-wing effort to erode the rights of Americans citizens."  *Id.*

108.    Upon information and belief, following receipt of the Memorandum, the Secretary or Department of Commerce has issued (or will imminently issue) directives to the Census Bureau, constituting final agency action, to implement President Trump's directive to exclude noncitizens from the enumeration and apportionment base.

IV.   **Defendants' decision to exclude undocumented immigrants from the apportionment base is motivated by discriminatory animus toward Hispanics and immigrant communities of color.**

109.   The Memorandum explicitly states that its goal is to reduce political influence and congressional representation to jurisdictions with a larger share of undocumented immigrants. 85 Fed. Reg. at 44,680.

110.   President Trump has repeatedly articulated concerns about the growth of immigrant communities and the impact of that growth on political power, and has sought to minimize the power of Hispanic and immigrant communities to increase the power of non-Hispanic whites.

111.   During the 2016 presidential campaign, for example, President Trump tweeted: "How crazy—7.5% of all births in U.S. are to illegal immigrants, over 300,000 babies per year. This must stop."[6]

112.   On April 5, 2018, when discussing his opposition to family-based immigration systems, President Trump claimed that Democrats favor "chain migration" because the party believes the immigrants will "vote Democratic."  Three weeks later, on April 28, President Trump revisited this topic, stating that Democrats favor undocumented immigration because "all of these people that are pouring across are going to vote for Democrats, they're not going to vote for Republicans."[7]

113.   Defendants' exclusion of undocumented immigrants from the apportionment base is of a piece with President Trump's anti-immigrant and anti-Hispanic rhetoric and his

---

[6] Donald Trump (@realDonaldTrump), Twitter (Aug. 21, 2015 6:56 AM), https://twitter.com/realdonaldtrump/status/634725641972248576.

[7] Fox News (@FoxNews), Twitter (Apr. 28, 2018), https://twitter.com/foxnews/status/990383288232620032.

Administration's targeting of immigrant and Hispanic communities, which reflect animus towards those groups.

114.    President Trump has long engaged in rhetoric that disparages Hispanics and immigrants of color.  In statements stretching back to the beginning of his campaign, President Trump has repeatedly dehumanized, devalued, and vilified immigrants in general, and specifically immigrants from Latin America.  For instance:

   a.   During his campaign launch in June 2015, President Trump claimed that "[w]hen Mexico sends its people. . . .  They're sending people that have lots of problems, and they're bringing those problems with us.  They're bringing drugs.  They're bringing crime.  They're rapists. . . .  It's coming from more than Mexico.  It's coming from all over South and Latin America."[8]

   b.   During a meeting about recent immigrants in the Oval Office in June 2017, President Trump stated that 15,000 immigrants from Haiti "all have AIDS" and that 40,000 immigrants from Nigeria would never "go back to their huts" in Africa after seeing the United States.[9]

   c.   During a January 2018 meeting with lawmakers, while discussing protections for immigrants from Haiti, El Salvador and other African countries, President Trump asked why the United States is "having all these people from shithole countries

---

[8] *Full text: Donald Trump announces a presidential bid*, Wash. Post, June 16, 2015, https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/.

[9] Michael D. Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. Times, Dec. 23, 2017, https://www.nytimes.com/2017/12/23/us/politics/trump-immigration.html.

come here" and suggested that the United States should have more immigrants from countries like Norway.[10]

    d.   In a May 16, 2018 speech, President Trump stated that "[w]e have people coming into the country, or trying to come in . . . .  You wouldn't believe how bad these people are.  These aren't people, these are animals."[11]

    e.   Speaking on the topic of migrant groups travelling to the United States from Central America at a rally on May 8, 2019, President Trump, stated, "[W]hen you see these caravans starting out with 20,000 people, that's an invasion."[12]

115.    President Trump has acted on this rhetoric by adopting policies that seek to isolate, exclude, and instill fear in Hispanic immigrants and other immigrants of color.  For instance, the Trump Administration has:

    a.   Attempted to rescind the Deferred Action for Childhood Arrivals program, which protected 800,000 individuals, 90% of whom were Hispanic and 80% of whom were Mexican-American;

    b.   Banned travel from several majority-Muslim countries;

    c.   Suspended refugee admissions to the United States;

---

[10] Ali Vitali, Kasie Hunt & Frank Thorp V, *Trump referred to Haiti and African nations as 'shithole' countries*, Jan. 12, 2018, https://www.nbcnews.com/politics/white-house/trump-referred-haiti-african-countries-shithole-nations-n836946.

[11] Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. Times, May 16, 2018, https://www.nytimes.com/2018/05/16/us/politics/trump-undocumented-immigrants-animals.html.

[12] *President Trump Holds Rally in Panama City Beach, Florida*, C-SPAN (May 8, 2019) (video), https://www.c-span.org/video/?460412-1/president-trump-holds-rally-panama-city-beach-florida.

d.  Terminated special protections from removal for migrants from nations experiencing war and natural disasters, including Nicaragua, Honduras, Haiti and El Salvador;

e.  Increased actual and threatened raids and deportations of undocumented migrants, including, as recently as June 17, 2019, when President Trump tweeted a threat that "[n]ext week ICE will begin the process of removing the millions of illegal aliens who have illicitly found their way into the United States.  They will be removed as fast as they come in";[13]

f.  Attempted to build a physical wall along the Mexico-U.S. border;

g.  Adopted policies of separating children from their families when entering the United States from Mexico, and detaining children separate from their parents and families thereafter; and

h.  Maintained children and other migrants across the U.S.-Mexico border in detention facilities that the United Nations Children's Fund has described as "dire" and as causing "irreparable harm" to children housed in them.[14]

116.  These public statements and actions from Defendant Trump establish that the rationale for excluding undocumented immigrants from the apportionment base is motivated by racial animus against immigrants of color, and a desire to curb the political power of immigrant communities of color.

---

[13] Nick Miroff & Maria Sacchetti, *Trump vows mass immigration arrests, removals of 'millions of illegal aliens' starting next week*, Wash. Post, June 17, 2019, https://www.washingtonpost.com/immigration/trump-vows-mass-immigration-arrests-removals-of-millions-of-illegal-aliens-starting-next-week/2019/06/17/4e366f5e-916d-11e9-aadb-74e6b2b46f6a_story.html?utm_term=.ece5e6a6b7e6.

[14] *After Rio Grande tragedy, UNICEF chief highlights "dire" detention centres on US-Mexico border*, UN News (June 27, 2019), https://news.un.org/en/story/2019/06/1041421.

V.      **Plaintiffs are harmed by Defendants' decision to exclude undocumented immigrants from the apportionment base.**

117.    Defendants' decision and actions to exclude undocumented immigrants from the apportionment base harm Plaintiffs' sovereign, quasi-sovereign, economic, and proprietary interests because they will cause some Plaintiffs to lose congressional seats and decrease their share of presidential electors in the Electoral College; skew the division of electoral districts within Plaintiffs' jurisdictions by impairing state and local redistricting efforts that rely on the census count; reduce federal funds to Plaintiffs' jurisdictions by deterring immigrants from responding to the decennial census that is currently underway; and degrade the quality of census data that Plaintiffs rely on to perform critical governmental functions.

118.    First, excluding undocumented immigrants from the apportionment count will likely cause several States to lose one or more Representatives in Congress, directly harming those Plaintiff States, as well as those Plaintiff counties and cities within affected States, by diluting their political power and undermining their interest in fair congressional representation.

119.    For example, large numbers of undocumented immigrants reside in California, Texas, New York, New Jersey, and Illinois.[15]  Defendants' decision to exclude undocumented immigrants from the apportionment count is likely to directly reduce representation for those jurisdictions in Congress, injuring the representational interests of Plaintiffs the State of New York, State of New Jersey, State of Illinois, City of Chicago, City of New York, City and County of San Francisco, Cameron County, El Paso County, Hidalgo County, and Monterey County.

---

[15] Pew Research Center, November 27, 2018, *U.S. Unauthorized Immigrant Total Dips to Lowest Level in a Decade*, https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2019/03/Pew-Research-Center_2018-11-27_U-S-Unauthorized-Immigrants-Total-Dips_Updated-2019-06-25.pdf.

Other Plaintiffs may also suffer direct representational harms if undocumented individuals are excluded from the apportionment count.

120.    The Memorandum itself acknowledges and intends these harms.  *See* 85 Fed. Reg. at 44,680 (recognizing that excluding undocumented immigrants will "result in the allocation" of fewer congressional seats "than would otherwise be allocated" to some states).

121.    The loss of a congressional seat will also cause the affected Plaintiff States, counties, and cities to lose one or more votes in the Electoral College, impairing their ability to elect the President and Vice President and harming their political power.

122.    Second, excluding undocumented immigrants from the apportionment base will harm Plaintiffs' representational interests by directly impairing Plaintiffs' ability to draw accurate districting lines for congressional, state, or local legislative districts.

123.    To comply with the Fourteenth Amendment's one-person, one-vote requirement, States must use total population as the population base for congressional redistricting.  *Wesberry v. Sanders*, 376 U.S. 1, 18 (1964) (describing "our Constitution's plain objective of making equal representation for equal numbers of people the fundamental goal for the House of Representatives"); *see Evenwel*, 136 S. Ct. at 1129.  Defendants' decision to exclude undocumented immigrants from the apportionment base will undermine Plaintiff States' ability to comply with this Constitutional mandate.

124.    Certain Plaintiffs are required by state constitutional or statutory provisions to use the total population count from the decennial census as the basis for redistricting within their jurisdictions.  New York state law provides, for example, that "each federal census taken decennially . . . shall be controlling as to the number of inhabitants in the state or any part thereof for the purposes of the apportionment of members of assembly and readjustment or alteration of

senate and assembly districts."  N.Y. Const. art. III, § 4(a); *see also id.* §§ 3-5, 5-a.  Many of the

other Plaintiffs have comparable laws.[16]

125.    Third, excluding undocumented immigrants from the apportionment base will

deprive Plaintiffs of critical federal funding and inflict substantial financial harms on Plaintiffs.

126.    Political science literature establishes that States that lose seats in Congress

typically see a decrease in their share of federal outlays in subsequent years due to the reduction

in their voting power in Congress.  *See, e.g.*, Roy Elis, Neil Malhotra, & Marc Meredith,

*Apportionment Cycles as Natural Experiments*, Political Analysis 358-76 (2009).  Those

Plaintiffs likely to lose representation in Congress therefore also stand to lose critical federal

resources as a result.

127.    All Plaintiffs will further suffer financial harm because Defendants' decision to

exclude undocumented immigrants from the apportionment base will deter participation in the

ongoing decennial census, undermining the Census Bureau's efforts to count immigrants and

their families, and depriving Plaintiffs of their fair share of census-derived federal funds.

128.    Plaintiffs are home to some of the hardest-to-count communities in the nation,

including significant populations of authorized and undocumented immigrants.[17]  Many of these

immigrants live in mixed-status families, with U.S. citizen children, siblings, or spouses.  These

---

[16] *See, e.g.*, Chicago Municipal code § 2-8-300; D.C. Code § 1-1011.01; Mass. Const. Amend. art. CI, §§ 1, 2, arts. CIX, CXVII, CXIX; Nev. Const. art. IV, § 5, art. XV, § 13; Tex. Const. art. 3, § 26; Va. Code Ann. § 30-265; Vt. Const. Ch. II, §§ 13, 18, 73; Vt. Stat. tit. 17, § 1902; Wash. Const. art. II, § 43; Wash. Rev. Code §§ 29A.76.010, 44.05.090.

[17] Jeffrey S. Passel & D'Vera Cohn, *U.S. Unauthorized Immigrant Total Dips to Lowest Level in a Decade*, Pew Research Center (Nov. 27, 2018), https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2019/03/Pew-Research-Center_2018-11-27_U-S-Unauthorized-Immigrants-Total-Dips_Updated-2019-06-25.pdf.

households are already less likely to respond to the census questionnaire; this Administration's ongoing efforts to target immigrants—including Defendants' failed efforts to add a citizenship question to the decennial census—have engendered substantial fear within these communities.[18]

129.    The COVID-19 pandemic has further hampered efforts to ensure that all people— including hard-to-count populations—are counted.  For example, the census relies upon non-response follow up operations (NRFU) to contact potential respondents and increase the census response rate.  But NRFU operations were suspended and delayed during the pandemic, and the Government Accountability Office has raised concerns that even when resumed, these efforts will be less effective in light of the virus.[19]

130.    Defendants' decision to exclude undocumented immigrants from the apportionment base was announced just weeks before Census Bureau enumerators were finally scheduled to go into the field to encourage households to respond to the census,[20] creating confusion and further increasing the risk of an undercount.

---

[18] *See, e.g.*, Alexandra Schmidt, *Citizenship question is gone. Michigan immigrants still distrust the Census*, (Mar. 2, 2020), https://www.bridgemi.com/michigan-government/citizenship-question-gone-michigan-immigrants-still-distrust-census (noting ongoing "fear among immigrants about what the government will do with information collected in the count").

[19] *See* U.S. Government Accountability Office, *2020 Census: COVID-19 Presents Delays and Risks to Census Count* https://www.gao.gov/products/GAO-20-551R#summary.

[20] U.S. Census Bureau, *2020 Census Operational Adjustments Due to COVID-19*, https://2020census.gov/en/news-events/operational-adjustments-covid-19.html (last visited July 24, 2020).

131.     Moreover, Defendants' decision on or about July 30 to drastically curtail NRFU

operations further jeopardizes the Bureau's ability to enumerate hard-to-count populations,

including immigrants.  Field data collection and self-response operations are now set to conclude

by September 30, 2020, rather than October 31, 2020. The Bureau had previously requested an

extension of the October deadline in order to complete the enumeration in light of the pandemic;

instead the Bureau has been directed to substantially abbreviate their operations.[21]  Accordingly,

limited time remains to ensure that hard-to-count populations respond to the census.

132.     Against this backdrop, the announcement of Defendants' decision was intended to

promote fear and deter participation in the census by immigrants and their families, including

through the President's remarks that he "will not stand" for efforts to "conceal the number" of

immigrants.[22]

133.     The Census Bureau has repeatedly emphasized that "[e]veryone counts," citizens

and noncitizens alike.[23]  But Defendants' decision and actions to exclude undocumented

---

[21] *See* Hansi Lo Wang, *Census Door Knocking Cut A Month Short Amid Pressure To Finish Count*, Nat'l Pub. Radio (July 30, 2020, 12:29 PM), https://www.npr.org/2020/07/30/896656747/when-does-census-counting-end-bureau-sends-alarming-mixed-signals; *see also See 2020 Census Operational Adjustments Due to COVID-19*, U.S. Census Bureau, https://2020census.gov/en/news-events/operational-adjustments-covid-19.html (last visited on July 31, 2020); Albert E. Fontenot, Jr., *Adjustment of 2020 Census Operations in Response to COVID-19*, U.S. Census Bureau (May 18, 2020), https://www2.census.gov/programs-surveys/decennial/2020/program-management/memo-series/2020-memo-2020_08.pdf.

[22] President Donald Trump, *Statement from the President Regarding Apportionment* (July 21, 2020), https://www.whitehouse.gov/briefings-statements/statement-president-regarding-apportionment/.

[23] *See, e.g.*, Census Bureau, *Setting the Record Straight*, https://2020census.gov/en/news-events/rumors.html.

immigrants from the apportionment base do the opposite.  Excluding undocumented immigrants

from the apportionment count communicates to immigrants that their census responses are less

valuable and less important than those of citizens.

134.    As John Thompson, a former Director of the Census Bureau, testified to

Congress, the Presidential Memorandum "has a high potential to reduce the likelihood of census

participation in hard to count populations, including non-citizens and immigrants." The

Presidential Memorandum "will increase the fears of many in the hard to count community that

their data will not be safe," likely resulting in "increased nonparticipation and increased

undercounts of these populations."[24]

135.    Many federal programs rely on the population figures collected in the decennial

census to distribute federal funds among states and local governments.  At least 320 federal

domestic financial assistance programs rely on census data to allocate money; in fiscal year

2016, these programs "allocated about $900 billion using census-derived data."  *New York*, 351

F. Supp. 3d at 596.  These programs support essential services for Plaintiffs, including

healthcare, public education, social services, and infrastructure development.  The reduction in

census participation caused by Defendants' announcement that they will exclude undocumented

immigrants from the apportionment base will harm Plaintiffs by depriving them of their statutory

fair share of federal funding and removing crucial resources for important government services.

136.    Finally, by deterring immigrants and their families from responding to the

decennial census, Defendants' decision to exclude undocumented immigrations from the

---

[24] *Counting Every Person: Safeguarding the 2020 Census Against the Trump Administration's Unconstitutional Attacks: Hearing Before the H. Comm. on Oversight & Reform*, 116th Cong. 8 (2020) (statement of Rep. Carolyn B. Maloney, Chairwoman, H. Comm. on Oversight & Reform).

apportionment base will degrade the quality of census data.  As census self-response rates decline, the quality of the data—including information relating to population subgroups and their characteristics—worsens.  But Plaintiffs "rely on accurate data to perform essential governmental functions," including to draw school zones, deploy health care resources, and make infrastructure decisions.  *Id.* at 600.  Defendants' decision will therefore undermine Plaintiffs' interests in using accurate census data to perform critical governmental functions.

## VI. Defendants have not identified any reliable method to accurately enumerate the population of undocumented immigrants.

137.    Defendants cannot reliably exclude undocumented immigrants from the apportionment count.  Just months ago, the Federal Government represented in separate litigation that there is a "lack of accurate estimates of the resident undocumented population" on a state-by-state basis.[25]

138.    Although a previous executive order suggests that the Census Bureau may rely on administrative records to identify *noncitizens*, *see* 84 Fed. Reg. at 33,821, many noncitizens are lawfully present; and administrative records cannot provide sufficiently reliable or accurate information about whether noncitizens are *undocumented*, particularly for actual enumeration and apportionment purposes.  Indeed, administrative records are "weak in their coverage of undocumented aliens because programs typically require documentation that many

---

[25] Decl. of Census Bureau Senior Advisor Enrique Lamas, Defs.' Supp. Rule 26(a)(1) Disclosures and Rule 26(a)(2)(C) Disclosures, *Alabama v. Dep't of Commerce*, No. 2:18-cv-00772-RDP (N.D. Ala. Mar. 13, 2020).

undocumented aliens do not have."[26]  The limited administrative records available with respect to undocumented immigrants are incomplete, outdated, and often inaccurate.

139.    For example, the Department of Homeland Security (DHS) recently acknowledged that determining immigration status from their records is "challenging," given the "the decentralized nature of admission and immigration information, as well as the lack of a nationwide departure control system."[27]  DHS has acknowledged that time lags between collecting and reporting data mean that "data accuracy issues may arise."[28]  Even when used in combination, existing administrative records are inadequate to ascertain reliably whether individuals are undocumented.

140.    Although the federal government has already suggested that they may resort to "statistical modeling" to estimate the undocumented population in furtherance of the Presidential Memorandum, the Census Bureau has not yet "formulated a methodology,"[29] and Defendants have not articulated how such statistical modeling will comport with their constitutional obligation to conduct an "actual Enumeration."  U.S. Const. art. 1, § 2, cl. 3.

141.    Despite Defendants' failure to identify any reliable method to accurately enumerate the population of undocumented immigrants, Defendants have already decided to report that population to the President and to exclude that population from the tabulation of total

---

[26] John L. Czajka, *Can Administrative Records Be Used to Reduce Nonresponse Bias?*, 645 Annals Am. Acad. Pol. & Social Sci. 171, 175 (2013).

[27] Department of Homeland Security, *Privacy Impact Assessment for the Department of Homeland Security Immigration-Related Information Sharing with the U.S. Census Bureau*, 2, 11 (Dec. 20, 2019), https://www.dhs.gov/sites/default/files/publications/privacy-pia-dhs079-sharingwithcensus-december2019.pdf.

[28] *Id.* at 6.

[29] Hansi Lo Wang (@hansilowang), Twitter (July 22, 2020, 10:58 AM), https://twitter.com/hansilowang/status/1285952274410409985.

population reported to Congress.  Defendants' commitment to proceeding on this course of

action without regard to the unreliability or inaccuracy of their underlying enumeration

demonstrates that they have prejudged the decision, violates their statutory obligations to report

total population, and confirms the irrational and arbitrary nature of their decision and actions to

exclude undocumented immigrants from the actual enumeration and apportionment base.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**(U.S. Constitution article I, section 2, clause 3;
U.S. Constitution amend. XIV, sec. 2)**

142.    Plaintiffs incorporate by reference the allegations set forth in each of the

preceding paragraphs of this Complaint.

143.    The Constitution requires that "Representatives shall be apportioned among the

several States according to their respective numbers, counting the whole number of persons in

each State."  U.S. Const. amend. XIV, § 2; *see id.* art. I, § 2, cl. 3.  The Constitution also requires

that the number of persons in each State that constitute the apportionment base "shall be

determined" according to an "actual Enumeration."  *Id.* art. I, § 2, cl. 3.

144.    Undocumented immigrants are persons.  *Plyler*, 457 U.S. at 210 ("Whatever his

status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that

term.").

145.    Defendants' decision to exclude undocumented immigrants from the

apportionment base for the purpose of reapportionment of Representatives following the 2020

Census, as well as any action they take to implement or further that decision, violates the

constitutional command to apportion Representatives "counting the whole number of persons in

each State."  U.S. Const. amend. XIV, § 2.  Defendants' decision further violates the

39

Constitution by apportioning Representatives following the 2020 Census based on information other than the total numbers of persons in each State determined by the "actual Enumeration."

146.    Defendants' violation causes ongoing harm to Plaintiffs and their residents.

## SECOND CLAIM FOR RELIEF

### (U.S. Constitution amend. V—Due Process Clause)

147.    Plaintiff States incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

148.    Under the equal protection component of the Due Process Clause of the Fifth Amendment to the United States Constitution, the federal government cannot deny to any person the equal protection of its laws.  The Due Process Clause specifically prohibits the federal government from discriminating against individuals on the basis of race, ethnicity, and national origin.  U.S. Const. amend. V.

149.    Defendants' decision to exclude undocumented immigrants from the apportionment base is motivated by discriminatory animus toward Hispanics and immigrant communities of color.  This animus is reflected in Defendants' repeated statements vilifying these communities.

150.    The highly unusual chronology of events, sharp departure from centuries of past practice, articulation of a pretextual reason for Defendants' now-enjoined efforts to demand citizenship information on the decennial census questionnaire, and disproportionate burden of Defendants' decision on Hispanics and immigrant communities of color further indicate that Defendants' decision is motivated by unconstitutional discriminatory purpose.

151.    By excluding undocumented immigrants from the apportionment base, Defendants intend to reduce political power, influence, and funding resources among Hispanic and immigrant communities as compared to non-Hispanic whites.

40

152.    Defendants' violation causes ongoing harm to Plaintiff States and their residents.

## THIRD CLAIM FOR RELIEF

### (U.S. Constitution amend. X)

153.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

154.    The Tenth Amendment prohibits the federal government from coercing states and localities to legislate or promote policies that capitulate to federal interests.

155.    Defendants' decision to exclude undocumented immigrants from the apportionment count punishes Plaintiffs for refusing to assist in the enforcement of federal immigration law, in an attempt to coerce Plaintiffs to change their policies.  85 Fed. Reg. at 44,680.

156.    The Tenth Amendment requires the federal government to respect the equal sovereignty of the sovereign states.

157.    Without adequate justification, Defendants' decision to exclude undocumented immigrants from the apportionment count impermissibly targets certain states for unfavorable treatment because of their refusal to assist in the enforcement of federal immigration law.  85 Fed. Reg. at 44,680.

158.    Defendants' violation causes ongoing harm to Plaintiffs and their residents.

## FOURTH CLAIM FOR RELIEF

### (Administrative Procedure Act, 5 U.S.C. § 706)

159.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

41

160.    The Administrative Procedure Act provides that the Court "shall" "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

161.    Defendants' decision to exclude undocumented immigrants from the apportionment base, as well as any action they take to implement or further that decision, is arbitrary and capricious because it is contrary to the evidence before the agency and fails to consider important aspects of the problem, including that Defendants lack data reliably to exclude undocumented immigrants from the apportionment base.

162.    Defendants' decision and any implementing actions they undertake are also not in accordance with law because the Census Act requires the Secretary to tabulate and report to the President a tabulation of "total population by States . . . as required for apportionment of Representatives in Congress."  13 U.S.C. § 141(b).

163.    Defendants' violation causes ongoing harm to Plaintiffs and their residents.

## FIFTH CLAIM FOR RELIEF
### (*Ultra Vires*—Violation of Census Act, 2 U.S.C. § 2a; 13 U.S.C. § 141)

164.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

165.    The President's Memorandum violates 2 U.S.C. § 2a and 13 U.S.C. § 141, which together comprise a statutory scheme enacted by Congress to govern the decennial Census and associated reapportionment of seats in the House of Representatives.

166.    These provisions unambiguously require the President to use only a single source of information for purposes of his or her statutorily required apportionment statement: the decennial census's count of total population by state.

167.     The report the President must receive is required to state "[t]he tabulation of total population by States under subsection (a) of this section," with that subsection requiring the "decennial census of population" as of April 1 of a census year. 13 U.S.C. § 141(a), (b).  So the report the President receives must be a report of "total population" based on census results.

168.     The President's apportionment report likewise must be based on the "whole number of persons in each State . . . *as ascertained under [the census]*," 2 U.S.C. § 2a (emphasis added), and contain an apportionment of representatives based on a mathematical method "known as the method of equal proportions."

169.     Other than the exclusion for "Indians not taxed" (as also provided for in the Fourteenth Amendment), there is no statutory basis for any other exclusion from the apportionment base.  Nor is there any basis to conclude these statutory commands leave any room for exclusion from a State's total population of any person based on alienage or immigration status.  Indeed, in the 150 years since the ratification of the Fourteenth Amendment, neither Congress nor the Executive has ever done so.  Each State's total population has long been understood to rely on a person's usual residence. *Franklin v. Massachusetts*, 505 U.S. 788, 804-05 (1992) (describing use of "usual residence," "usual place of abode," "inhabitant," and "usual resident" in the "first enumeration Act") (citing Act of Mar. 1, 1790, § 5, 1 Stat. 103).

170.     By requiring one or more Commerce Department reports to the President estimating population to be used for apportionment purposes that is different from the enumeration of total population determined in the Census, the Memorandum violates section 141.

171.     Similarly, by stating that the President will transmit to Congress total population figures for each State, and an apportionment of House seats, with an excluded population of

certain aliens, the Memorandum violates 2 U.S.C. § 2a because it unambiguously would rely on data that is not the "whole number of persons in each State" as ascertained in the census and would not compute an apportionment based on the "method of equal proportions" Congress adopted.

172.    The President is simply not free to take Congress's assignment of an essentially mathematical function—to perform, based on the method of equal proportions, an apportionment based solely on the decennial census count of population—but exclude any category of enumerated persons that the Constitution and the Congress have instructed be included.

173.    The President's Memorandum thus is *ultra vires.  See, e.g., Mountain States Legal Foundation v. Bush*, 306 F. 3d. 1132, 1136 (D.C. Cir. 2002); *Chamber of Commerce of United States v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("When an executive acts ultra vires, courts are normally available to reestablish the limits on his authority. . . .  That the executive's action here is essentially that of the President does not insulate the entire executive branch from judicial review.").

174.    Defendants' violation causes ongoing harm to Plaintiffs and their residents.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

1.    Declare that Defendants' decision to exclude undocumented immigrants from the apportionment base following the 2020 Census, as well as any action they take to implement or further that decision, is unauthorized by and contrary to the Constitution and laws of the United States;

2.    Declare that Defendants' decision to exclude undocumented immigrants from the apportionment base following the 2020 Census is intentionally discriminatory in violation of the equal protection component of the Due Process Clause of the Fifth Amendment;

44

3.      Declare that Defendants' decision and any implementing actions they take are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A);

4.      Enjoin Defendants and all those acting on their behalf from excluding undocumented immigrants from the apportionment base following the 2020 Census, or taking any action to implement or further such a policy;

5.      Issue an order holding unlawful, vacating, and setting aside the decision to exclude undocumented immigrants from the apportionment base, as well as any action taken to implement or further that decision;

6.      Issue a writ of mandamus compelling the Secretary of Commerce to tabulate and report to the President the total population by States under 13 U.S.C § 141(b) based solely on the total number of persons in each State, including undocumented immigrants, without providing any information about the number of undocumented immigrants in each State.

7.      Issue a writ of mandamus compelling the President to transmit to Congress pursuant to 2 U.S.C. § 2a(a) a statement of the whole number of persons in each State, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives by the method known as the method of equal proportions, based on the total number of residents of each state, including undocumented immigrants.

8.      Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees; and

9.      Grant such other and further relief as the Court deems just and proper.

DATED:  August 3, 2020                          Respectfully submitted,

                                                LETITIA JAMES
                                                *Attorney General of the State of New York*

                                                By: */s/Elena Goldstein*
Steven C. Wu                                    Elena Goldstein
   *Deputy Solicitor General*                      *Deputy Chief, Civil Rights Bureau*
Judith N. Vale                                  Matthew Colangelo
   *Senior Assistant Solicitor General*            *Chief Counsel for Federal Initiatives*
                                                Office of the New York State Attorney
*Of Counsel*                                    General
                                                28 Liberty Street
                                                New York, NY 10005
                                                Phone: (212) 416-6057
                                                Matthew.Colangelo@ag.ny.gov

                                                *Attorneys for the State of New York*

PHILIP J. WEISER                                WILLIAM TONG
*Attorney General of the State of Colorado*     *Attorney General of Connecticut*

By: */s/ Eric R. Olson*                         By: */s/ Joshua Perry*
Eric R. Olson,* Solicitor General              Joshua Perry
Office of the Attorney General                  Special Counsel for Civil Rights
Colorado Department of Law                      Office of the Attorney General
1300 Broadway, 10th Floor                       165 Capitol Avenue
Denver, CO 80203                                Hartford, CT  06106
Phone: (720) 508-6548                           Phone: (860) 808-5020
eric.olson@coag.gov                             Joshua.Perry@ct.gov

*Attorney for the State of Colorado*            *Attorney for the State of Connecticut*

KATHLEEN JENNINGS
*Attorney General of Delaware*

By: */s/ Vanessa L. Kassab*
Christian Douglas Wright
  Director of Impact Litigation
Vanessa L. Kassab
  Deputy Attorney General
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
Phone: (302) 577-8600
vanessa.kassab@delaware.gov

*Attorneys for the State of Delaware*

KARL A. RACINE
*Attorney General for the District of Columbia*

By: */s/ Kathleen Konopka*
Kathleen Konopka
  Deputy Attorney General
Brendan B. Downes*
James Graham Lake*
  Assistant Attorneys General
Public Advocacy Division
Office of the Attorney General
441 4th Street NW
Suite 600 South
Washington, DC 20001
Phone: (202) 724-6610
Fax: (202) 741-0444
Kathleen.Konopka@dc.gov

*Attorneys for the District of Columbia*

CLARE E. CONNORS
*Attorney General of the State of Hawai'i*

*/s/ Nicholas M. McLean*
Nicholas M. McLean
  Deputy Solicitor General
Department of the Attorney General
State of Hawai'i
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
nicholas.mclean@hawaii.gov

*Attorney for the State of Hawai'i*

KWAME RAOUL
*Attorney General of the State of Illinois*

*/s/ Jeffrey J. VanDam*
Jeffrey J. VanDam, Public Interest Counsel
Office of the Illinois Attorney General
100 W. Randolph Street
Chicago, IL 60601
Tel. (312) 814-3400
Fax (312) 814-3212
jvandam@atg.state.il.us

*Attorney for the State of Illinois*

AARON M. FREY
*Attorney General of the State of Maine*

*/s/ Susan P. Herman*
Susan P. Herman*
Chief Deputy Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8814
susan.herman@maine.gov


*Attorney for Plaintiff State of Maine*

MAURA HEALEY
*Attorney General of the Commonwealth of Massachusetts*

*/s/ Ann E. Lynch*
Ann E. Lynch*
Miranda M. Cover*
  *Assistant Attorneys General*
Public Protection & Advocacy Bureau
Massachusetts Attorney General's Office
One Ashburton Place
Boston, MA 02108
Phone: (617) 727-2200
Fax: (617) 727-5762
ann.lynch@mass.gov
mercy.cover@mass.gov


*Attorneys for the Commonwealth of Massachusetts*

BRIAN E. FROSH
*Attorney General of the State of Maryland*

*/s/ Andrea Trento*
Andrea Trento, Assistant Attorney General
Civil Litigation Division
Maryland Office of the Attorney General
200 St. Paul Place, 20th Floor
Baltimore, Maryland 21202
Phone: (410) 576-6472
atrento@oag.state.md.us

*Attorney for the State of Maryland*

DANA NESSEL
*Attorney General of the State of Michigan*

*/s/ Christina M. Grossi*
Christina M. Grossi (P67482)
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa Street
Lansing, MI 48934
GrossiC@michigan.gov

*Attorney for the State of Michigan*

KEITH ELLISON
*Attorney General of the State of Minnesota*

/s/ *Jacob Campion*
Jacob Campion,* Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101-2128
(tel) 651-757-1459
(fax) 651-282-5832
jacob.campion@ag.state.mn.us

*Attorney for the State of Minnesota*


AARON D. FORD
*Attorney General of the State of Nevada*

By: /s/ *Heidi Parry Stern*
Heidi Parry Stern, Solicitor General
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
(775) 684-1136
HStern@ag.nv.gov

*Attorney for the State of Nevada*


GURBIR S. GREWAL
*Attorney General of the State of New Jersey*

By: /s/ *Mayur P. Saxena*
Mayur P. Saxena, Assistant Attorney General
Marie Soueid, Deputy Attorney General
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
Phone: (609) 376-2564
Marie.Soueid@law.njoag.gov

*Attorneys for the State of New Jersey*


HECTOR BALDERAS
*Attorney General of New Mexico*

By: /s/ *Tania Maestas*
Tania Maestas
Chief Deputy Attorney General
P.O. Drawer 1508
Santa Fe, New Mexico 87504-1508
tmaestas@nmag.gov

*Attorney for the State of New Mexico, by and through Attorney General Hector Balderas*


JOSHUA H. STEIN
*Attorney General of the State of North Carolina*

By: /s/ *Sripriya Narasimhan*
Sripriya Narasimhan*
Deputy General Counsel
North Carolina Department of Justice
114 W. Edenton Street
Raleigh, NC 27603
Tel. (919) 716-6421
SNarasimhan@ncdoj.gov

*Attorney for the State of North Carolina*


ELLEN F. ROSENBLUM
*Attorney General of the State of Oregon*

/s/ *Brian de Haan*
Brian de Haan, Assistant Attorney General
Trial Attorney
Tel. (971) 673-1880
Fax (971) 673-5000
brian.a.dehaan@doj.state.or.us

*Attorney for the State of Oregon*

JOSH SHAPIRO
*Attorney General of the Commonwealth of Pennsylvania*

Michael J. Fischer
Chief Deputy Attorney General

*/s/ Aimee D. Thomson*
Aimee D. Thomson
Jacob B. Boyer
Deputy Attorneys General
1600 Arch Street, Suite 300
Philadelphia, PA 19103
Tel. (267) 940-6696
athomson@attorneygeneral.gov

*Attorneys for the Commonwealth of Pennsylvania*

THOMAS J. DONOVAN, JR.
*Attorney General of the State of Vermont*

*/s/ Benjamin D. Battles*
Benjamin D. Battles, Solicitor General
Julio A. Thompson*
   Assistant Attorney General, Civil Rights Unit
Office of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
Tel. (802) 828-5500
Fax (802) 828-3187
Benjamin.Battles@vermont.gov

*Attorneys for the State of Vermont*

PETER F. NERONHA
*Attorney General of the State of Rhode Island*

*/s/ Justin J. Sullivan*
Justin J. Sullivan*, Special Assistant Attorney General
Office of the Rhode Island Attorney General
150 South Main St.
Providence, RI 02903
Phone: (401) 274-4400, ext. 2007
Fax: (401) 222-2995
jjsullivan@riag.ri.gov

*Attorneys for the State of Rhode Island*

MARK R. HERRING
*Attorney General of the Commonwealth of Virginia*

*/s/ Michelle S. Kallen*
Michelle S. Kallen,* Deputy Solicitor General
202 North Ninth Street
Richmond, VA 23219
Tel. (804) 786-7704
Fax (804) 371-0200
MKallen@oag.state.va.us

*Attorneys for the Commonwealth of Virginia*

ROBERT W. FERGUSON
*Attorney General of the State of Washington*

/s/ *Laura K. Clinton*
Laura K. Clinton*
Assistant Attorney General
Complex Litigation Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
LauraC5@atg.wa.gov
(206) 233-3383

Peter Gonick, Deputy Solicitor General
Office of the Attorney General
PO Box 40100
Olympia, WA  98504-0100
Tel. (360) 753-6245
peterg@atg.wa.gov

*Attorneys for the State of Washington*

JOSHUA L. KAUL
*Attorney General of the State of Wisconsin*

s/ Steven C. Kilpatrick
Steven C. Kilpatrick*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
Tel. (608) 266-1792
Fax (608) 267-2223
kilpatricksc@doj.state.wi.us

*Attorney for State of Wisconsin*

MATTHEW JERZYK
*City Solicitor for the City of Central Falls*

/s Matthew Jerzyk
Matthew Jerzyk*
City Solicitor
City of Central Falls
580 Broad Street
Central Falls, RI 02863
Tel. (401) 727-7422
MJerzyk@CentralFallsRI.us

MARK A. FLESSNER
*Corporation Counsel of the City of Chicago*

/s Stephen J. Kane
Stephen J. Kane,* Deputy Corporation Counsel
Rebecca Hirsch,* Assistant Corporation Counsel
City of Chicago Law Department
121 North LaSalle Street, Room 600
Chicago, IL 60602
Tel. (312) 744-8143
Stephen.kane@@cityofchicago.org
Rebecca.hirsch2@cityofchicago.org

ZACH KLEIN
*Columbus City Attorney*

*/s Richard N. Coglianese*
Richard N. Coglianese,* Assistant City
Attorney
Lara N. Baker-Morrish,* Assistant City
Attorney
77 North Front Street, 4th Floor
Columbus, Ohio 43215
 (tel) 614-645-7385
(fax) 614-645-6949
rncoglianese@columbus.gov
lnbaker-morrish@columbus.gov

JAMES E. JOHNSON
*Corporation Counsel of the City of New York*

*/s Aaron Bloom*
Aaron Bloom
Joseph Pepe
Tonya Jenerette
100 Church Street
New York, NY 10007
Tel. (212) 356-4055
abloom@law.nyc.gov

MARCEL S. PRATT
*Solicitor of the City of Philadelphia*

*/s Marcel S. Pratt*
Marcel S. Pratt,* *City Solicitor*
Diana P. Cortes*
   *Chair, Litigation Group*
Eleanor N. Ewing,* *Chief Deputy Solicitor*
Benjamin H. Field*
   *Divisional Deputy City Solicitor*
Michael W. Pfautz, *Assistant City Solicitor*
City of Philadelphia Law Department
1515 Arch Street, 17th Floor
Philadelphia, PA 19102
Tel. (215) 683-5000
Fax  (215) 683-5299
marcel.pratt@phila.gov

OFFICE OF THE PHOENIX CITY
ATTORNEY
*Cris Meyer, City Attorney*

*/s Patricia J. Boland*
Patricia J. Boland*
Assistant Chief Counsel
City of Phoenix Law Department
200 West Washington, Suite 130
Phoenix, AZ 85003-1611
Tel. (602) 262-6761
Patricia.Boland@phoenix.gov

YVONNE S. HILTON
*City Solicitor of the City of Pittsburgh*

*/s Emily C. McNally*
Emily C. McNally,* Assistant City Solicitor
Michael E. Kennedy, Associate City Solicitor
City of Pittsburgh Law Department
414 Grant Street
313 City-County Building
Pittsburgh, PA 15219
Tel. (412)255-2613
Fax. (412)255-0711
emily.mcnally@pittsburghpa.gov

JEFFREY DANA
*City Solicitor for the City of Providence*

/s *Jeffrey Dana*
Jeffrey Dana,* City Solicitor
City of Providence
444 Westminster Street
Providence, RI 02903
401-680-5333
JDana@providenceri.gov

DENNIS J. HERRERA
*City Attorney for the City and County of San Francisco*

*/s Dennis J. Herrera*
Dennis J. Herrera,* City Attorney
Jesse C. Smith, Chief Assistant City Attorney
Ronald P. Flynn, Chief Deputy City Attorney
Yvonne R. Meré
   Chief of Complex and Affirmative Litigation
Erin Kuka,* Deputy City Attorney
Neha Gupta, Deputy City Attorney
San Francisco City Attorney's Office
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, CA 94102
Tel. (415) 554-4229
Fax (415) 554-4715
Erin.Kuka@sfcityatty.org

CITY OF SEATTLE
*City of Seattle City Attorney*

/s *Peter S. Holmes*
Peter S. Holmes,* City Attorney
Erica R. Franklin, Assistant City Attorney
Ghazal Sharifi, Assistant City Attorney
701 Fifth Avenue, Suite 2050
Seattle, WA 98104-7097
Tel. (206) 684-8200
Fax (206) 684-4648
Peter.Holmes@seattle.gov
Erica.Franklin@seattle.gov
Ghazal.Sharifi@seattle.gov

ROLANDO L. RIOS
*Special Counsel for Hidalgo and Cameron Counties*

*/s Rolando Rios*
Rolando Rios*
Special Counsel for Hidalgo and Cameron Counties
115 E. Travis, Suite 1645
San Antonio, TX 78205
(210) 222-2102
rrios@rolandorioslaw.com

JO ANNE BERNAL
*El Paso County Attorney*

*/s Jo Anne Bernal*
Jo Anne Bernal,* County Attorney
Ian Kaplan, Assistant County Attorney
El Paso County Attorney's Office
500 E. San Antonio, Room 503
El Paso, TX 79901
Tel. (915) 546-2050
Joanne.bernal@epcounty.com
Ian.kaplan@epcounty.com

GARY W. KUC
*County Solicitor of Howard County*

*/s Gary W. Kuc*
Louis P. Ruzzi, Senior Assistant County Solicitor
Tsega Girma,* Senior Assistant County Solicitor
Office of Law
3450 Court House Drive
Ellicott City, Maryland  21043
Tel. (410) 313-2104
Fax (410) 313-3292
lruzzi@howardcountymd.gov
tgirma@howardcountymd.gov

LESLIE J. GIRARD
*Monterey County Counsel*

*/s Leslie J. Girard*
Leslie J. Girard, County Counsel
Susan K. Blitch, Assistant County Counsel
William M. Litt, Deputy County Counsel
Office of the County Counsel
County of Monterey
168 West Alisal St., 3d Floor
Salinas, CA 93901
Tel. (831) 755-5045
Fax (831) 755-5283
GirardLJ@co.monterey.ca.us
LittWM@co.monterey.ca.us

UNITED STATES CONFERENCE OF MAYORS

*/s John Daniel Reaves*
John Daniel Reaves*
General Counsel
United Conference of Mayor
1750 K Street, N.W., 11th Floor
Washington, D.C. 20006
Tel. (202) 285-7482
jdreaves@usa.net

* Application for *pro hac vice* admission forthcoming