# Exhibit 41

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, et al., <br><br> Plaintiffs, <br><br> v. <br><br> TRUMP, et al., <br><br> Defendants. | 20 Civ. 5770 (JMF) <br><br> **DECLARATION OF JOSEPH J. SALVO** |

Pursuant to 28 U.S.C. § 1746(2), I, Joseph J. Salvo, hereby declare as follows:

1. I am over the age of eighteen and have personal knowledge of all the facts stated herein.

2. I am the Chief Demographer for New York City (the "City"), a post I have held since 1994. I was employed by the New York City Department of City Planning (DCP) from 1982 until February of 2020. I am now employed (part-time) by the New York City Economic Development Corporation and detailed to the Population Division of DCP as Chief Demographer. The Population Division serves as the City's in-house demographic consultant, providing expertise to agencies for a whole host of applications involving assessments of need, program planning and targeting, and policy formulation.

3. As Chief Demographer for the City, I head a team at the Department of City Planning that has been and continues to be the technical lead on the City of New York's census efforts. We were responsible for reviewing the address list used in the 2020 decennial census, through participation in the Local Update of Census Addresses (LUCA) program, a function we

have performed since 1998, when the LUCA program was instituted. We also provide demographic expertise in support of census outreach efforts through a regular series of analytical reports on patterns of self-response to the census by neighborhood. We produce and share these reports so that outreach efforts throughout the City, such as those coordinated by NYC Census 2020 (New York City's census outreach initiative), the Regional Office of the United States Census Bureau, and other community-based groups, can more efficiently target populations with low self-response rates. I am also actively engaged at a national level, promoting the use of methods that will provide a more accurate count for the nation's cities during the 2020 census.

4.     As I have testified in previous litigation related to the 2020 census, self-response is the most accurate and efficient way to collect data in the census.[1] As of July 23, more than four months into the 2020 census, self-response rates in New York City have been lagging, at just 53.7 percent, compared to 62.3 percent for the nation. While any comparison with 2010 is limited by the unique timetable the pandemic has imposed on the 2020 Census enumeration, it is safe to say that self-response rates for the City and the nation are below their 2010 levels for comparable periods.[2] Moreover, there are substantial differences in self-response rates by neighborhood within New York City. For example, there is a pattern of lower self-response in black and selected Hispanic neighborhoods.

5.     If households do not self-respond (which can be done at any point in the enumeration) the next best thing is for them to cooperate with census enumerators when they knock on the door during a process called Non-Response Follow-Up (NRFU). Like self-responses,

---

[1] *See, e.g., State of New York v. U.S. Department of Commerce*, 18-cv-2921 (JMF), Nov. 6, 2018 trial transcript, at 292, 302, 325-26. In addition to these excerpts, my entire testimony during the citizenship question trial supports this point as well as most of the other assertions in this declaration. *See id.* at 288-453.

[2] Based on a response rate comparison for 2010 and 2020, approximately thirty-seven days from the initial mailout (April 23), as cited in *Weekly Report on Self-Response (Rates Issued on April 23),* NYC Department of City Planning, Population Division, April 24, 2020.

2

responses provided in-person to census enumerators come directly from the household being enumerated and thus include self-reported data about both the number of household members and their demographic characteristics (such as age, gender, and race), similar to households that self-respond by mail or online. But when households neither self-respond nor answer the door for census enumerators, the quality of the data regarding such households significantly declines.

6. If no one responds to the knock on the door, the Census Bureau will leave a "notice of visit," and then check administrative records from the postal service to see if there is evidence that the unit is occupied. Field workers will talk with neighbors, landlords, or others who may serve as "proxy respondents," by providing information on the number of persons and other characteristics of the non-responding household. Another check of administrative records from social security, the IRS, and from other sources, may help complete the enumeration for the household. But such records may not exist, especially for historically marginalized groups

7. In cases where enumerators cannot obtain a response from a household after multiple visits, there are no proxy respondents, and administrative records are not available, the Census Bureau relies on its operation of last resort: statistical imputation. Households in the neighborhood that responded in the census (also known as "donors") are used in a statistical model as a substitute for the missing household. Since this form of imputation extrapolates data based on neighboring households, error is introduced because the demographic characteristics of households that do not respond are unknown and may differ substantially from the characteristics reported by households that do. In fact, it is a maxim in statistical science that those who fail to respond in surveys are inherently different from those who do respond. And since information on the actual number of persons in the household that failed to respond is frequently speculative or

unknown, the count itself (in addition to the data on the characteristics of household members) is likely to be increasingly compromised as imputation levels rise.

8. For these reasons, it is extremely important to maximize census self-response rates and, failing that, the rates at which households respond in-person to census enumerators during NRFU. Any action that lowers these rates, or that undermines efforts to increase them, impairs the quality of the data collected during the census. But President Trump's July 21, 2020 "Memorandum on Excluding Illegal Aliens from the Apportionment Base Following the 2020 Census" does just that.

9. Immigrant communities already confronted serious challenges for the accuracy and completeness of the 2020 census stemming from concerns about privacy, a hostile environment facing immigrants on the heels of efforts to add a citizenship question to the census, fear of government authorities, and unprecedented language diversity.  On top of that, in March 2020 COVID-19 halted all manner of on-the-ground census outreach, just as the census was about to begin. While "virtual" efforts continued, on-the-ground outreach has always been a vital part of promoting awareness of the census and increasing self-response rates.  The limitation on physical outreach posed by COVID-19 makes it all the more important—particularly with respect to traditionally hard-to-count groups such as immigrants—to avoid any further disincentive to self-respond or cooperate with enumerators and to maintain a clear message that everyone counts in the census.

10. But instead, President Trump's July 21, 2020 "Memorandum on Excluding Illegal Aliens from the Apportionment Base Following the 2020 Census" will further depress response rates in immigrant communities because it discredits the essential message that everyone's response matters and makes an already fearful group more apprehensive about the perceived risks

associated with responding. Time and time again, Census Bureau research and my own local experience have confirmed that messages about the importance of the census from "trusted voices" in the community are a major factor affecting response. It is a major impetus behind the emphasis on local area partnerships, which has been codified in census implementation plans, starting in earnest with the 2000 Census and continuing through today. Also, it is one big reason why some immigrant communities have higher response rates than others, with Washington Heights in Manhattan being the best example of a high response neighborhood, despite its large non-English-speaking immigrant population but with strong "trusted voices" and good community organization. Given that approximately one million individuals live in mixed-immigration-status households in New York City,[3] the President's memorandum—by discrediting the "everyone counts" messaging, including from "trusted voices" in the community, and by increasing fears about the perceived risks of responding—will have a chilling effect on census participation not only for the undocumented, but for a wider net of the city's more than 3.1 million immigrants.

11.   Moreover, the timing of the President's memorandum compounds its negative impact. This disincentive to participation is occurring just as the Census Bureau begins its NRFU operations, where thousands of census enumerators will begin knocking on doors of those who have not responded. Making matters worse, on July 30, 2020, it was reported that the Trump administration would be shortening the time during which the Census Bureau will be allowed to conduct NRFU operations. As a result, those operations are reportedly scheduled to end by September 30, 2020—one month earlier than the planned October 31 end date, which the Census Bureau had proposed earlier this year (at the urging of local officials), in order to properly complete the census enumeration during the pandemic. The compressed timeframe imposed on the

---

[3] *See* Mayor's Office of Immigrant Affairs, *State of Our Immigrant City* (March 2018), at 6, 12, available at https://on.nyc.gov/39QD8fT.

NRFU operation, in unprecedented circumstances that call for a much longer operation, further exacerbates the negative impact of the President's memorandum on census data quality and count accuracy. The President's memorandum disincentivizes self-response and cooperation with in-person enumerators, and the compressed timeframe will magnify the impact of that disincentive as there will be less opportunity for repeated enumerator visits.

12. For all these reasons, the July 21, 2020 Presidential memorandum is likely to make the Census Bureau resort to less-reliable methods, including statistical imputation, more frequently in immigrant communities than it otherwise would. As described above, this results in poorer quality (less accurate) data both in terms of demographic characteristics as well as the actual count of persons.

13. The decennial census is the statistical backbone of our country, and from the standpoint of a local city planning agency, if a decennial census fails to produce accurate data, informed decision-making cannot occur. This is because the census is more than just a count of people. It also contains other information that helps with school planning, guides policy decisions, assists in the direction of city resources generally, and informs responses to public health emergencies and disasters. And census data drive other surveys that are vital to these areas as well. When the census characteristics data are inaccurate—even if the total population count is correct—cities cannot accurately target resources to address needs, by creating, managing, and effectively implementing programs.

14. For example, the Population Division at DCP disseminates census data to the New York City Department of Health and Mental Hygiene (DOHMH). The characteristics data on population subgroups form a base for DOHMH's calculation of disease and other health-related event rates by population subgroups. In addition, DOHMH conducts surveys to track progress

toward the reduction of chronic diseases. Many of these surveys rely on sampling and weighting designs that are linked to the American Community Survey (ACS), which is based on the decennial census. A prime example is tracking the prevalence of uninsured New Yorkers as a means of targeting programs for health insurance enrollment. And, most recently, census data were used to create COVID-19 rates, for the purposes of identifying relative incidence of the disease in the City's neighborhoods.

15. In addition, we regularly provide data and consultation to the New York City Department of Education (DOE) and the School Construction Authority (SCA). DOE relies on our analysis of recent changes in the composition of the population in neighborhoods to inform decisions on how to change the zones around schools as conditions demand, particularly new entrants to the neighborhood and their characteristics, such as the number of children. To perform that analysis, we use data from the decennial census, the ACS, and vital statistics. For the SCA, we use decennial census data, along with counts of recently-constructed housing, to project the number of school children who are likely to be associated with new housing. SCA uses this information to plan for new schools and/or the expansion of existing facilities.

16. Another example of the City's use of demographic characteristics data from the census involves planning for the elderly. The population that is 65 years and over is projected to increase nationally and in New York City over the next 20 years. As part of the Age-friendly NYC initiative, a partnership between the City of New York and the New York Academy of Medicine, the Population Division uses age data from the decennial census as a basis for projections of older population groups by neighborhood. These data are used to target neighborhood services for the aged, and to help government agencies, elected officials, health care and social service providers, planners, funders, and researchers understand and analyze spatial and

socio-demographic patterns and trends involving the burgeoning older populations of the City. This neighborhood-level approach is based—first and foremost—on data from the decennial census. Inaccuracies in population counts and characteristics data from the census and from the ACS compromise the City's ability to target current services, to determine priorities, and to ensure a more accurate projection of older population for future years.

17. New York City also relies on demographic data from the census and from the ACS for emergency preparedness. Whether it is COVID-19, coastal flood events, or blackouts, City agencies need to be able to quantify the size of affected populations for everything from evacuations to pandemic response. Census and ACS data at the neighborhood level for persons with mobility limitations and other disabilities, especially older populations who require special assistance during pandemics or other natural disasters, are cases in point. Teams evaluate these numbers on a continuous basis as part of plans for mitigation in times of natural disasters and in other emergencies, such as the activation of cooling centers for vulnerable populations when an extreme heat wave strikes.

18. These examples of how New York City uses not just total population counts but also demographic characteristics data from the census put into clear perspective why we cannot afford any federal actions that will further depress self-response rates, make NRFU efforts less effective, and result in poorer quality census data. But the President's order excluding undocumented immigrants from the apportionment does just that. The President's order will confirm immigrant's fears about the census, undermine efforts to alleviate those fears, and provide immigrants with an additional disincentive to answer the door when the Census Bureau comes knocking.

19. This is the 4th decennial census I have worked on in a professional capacity and I am very familiar with the challenges we've faced in the past, some quite formidable; but, I can say without hesitation that the current climate is unprecedented in its potential to affect the enumeration. And, on top of a global pandemic, the last thing we needed was an order from the President of the United States stating that undocumented immigrants will not be counted. The July 21, 2020 Presidential memorandum will likely undermine outreach efforts and depress response rates in immigrant communities (both self-response and in-person response to enumerators), and thus lower the quality of data that the City relies upon to make crucial policy decision impacting education, health, and emergency planning, among other things.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 4 day of AUGUST, 2020

*Joseph J. Salvo*
Joseph J. Salvo, Ph.D.
Chief Demographer, Population Division
New York City Department of City Planning

9