## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, et al., | |
| Plaintiffs, | 20-CV-5770 (JMF) |
| v. | |
| DONALD J. TRUMP, *in his official capacity as President of the United States*, et al., | |
| Defendants. | |

| | |
|---|---|
| NEW YORK IMMIGRATION COALITION, et al., | |
| Plaintiffs, | 20-CV-5781 (JMF) |
| v. | |
| DONALD J. TRUMP, *in his official capacity as President of the United States*, et al., | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT OR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ............................................................................................................ i

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

I.      Constitutional and statutory framework ............................................................................ 2

II.     The Presidential Memorandum ......................................................................................... 4

III.    Events precipitating the Presidential Memorandum. ........................................................ 5

ARGUMENT ........................................................................................................................... 7

I.      Standard of review. ........................................................................................................... 7

II.     Plaintiffs include jurisdictions and residents of jurisdictions that would lose
representation if undocumented immigrants were excluded from the population base
used for congressional apportionment. .............................................................................. 8

III.   Defendants' decision to exclude undocumented immigrants from the apportionment
base violates Article I and the Fourteenth Amendment. .................................................. 10

        A.     The Constitution explicitly requires the population base for apportionment to
include the whole number of persons in each State. ............................................ 10

        B.     Apportioning Representatives based on numbers other than the actual
enumeration from the decennial census is also unconstitutional. ......................... 24

IV.   The Memorandum is *ultra vires* under the statutory scheme Congress enacted to
implement the required decennial census and reapportionment of House seats. .............. 27

        A.     The Memorandum violates the statutory requirements to count the total
population, and to report and use that total for apportionment purposes. ............. 27

        B.     The Memorandum violates the Census Act by producing apportionment
figures that are not based solely on the decennial census. ..................................... 33

        C.     The Memorandum violates 2 U.S.C. § 2a by producing apportionment
figures that are not based solely on a ministerial calculation. .............................. 36

        D.     This Court has equitable authority to correct the Presidential Memorandum's
*ultra vires* mandates. ............................................................................................ 38

i

V. Alternatively, a preliminary injunction is warranted to prevent irreparable harm. .......... 40

 A. The Presidential Memorandum will deter immigrants and their households from responding to the 2020 census. .................................................................. 42

 B. By depressing response rates, the Presidential Memorandum will irreparably degrade the quality of census data vital to public policymaking and cause Plaintiffs to lose federal funding. ........................................................................ 47

 C. Plaintiffs will be irreparably harmed by Defendants' efforts to reallocate political power away from their jurisdictions. ..................................................... 49

 D. The balance of equities and public interest favor a preliminary injunction. ......... 50

CONCLUSION .................................................................................................................... 52

# TABLE OF AUTHORITIES

**Page(s)**

**Constitutional Provisions**

U.S. Const. amend. XIV ...........................................................................................24

U.S. Const. amend. XIV, § 2 ............................................................................. *passim*

U.S. Const. art I, § 2 ........................................................................................ *passim*

U.S. Const. art. II, § 1 ...............................................................................................3

**Cases**

*ACLU v. Ashcroft,*
  322 F.3d 240 (3d Cir. 2003)..............................................................................51

*Am. Sch. of Magnetic Healing v. McAnnulty,*
  187 U.S. 94 (1902)............................................................................................38

*Armstrong v. Exceptional Child Center,*
  575 U.S. 320 (2015).....................................................................................38, 40

*Bowen v. Mich. Acad. of Family Physicians,*
  476 U.S. 667 (1986)..........................................................................................38

*Carey v. Klutznick,*
  637 F.2d 834 (2d Cir. 1980)..............................................................................49

*Carroll v. Safford,*
  44 U.S. 441 (1845)............................................................................................38

*Chamber of Commerce v. Reich,*
  74 F.3d 1322 (D.C. Cir. 1996) ..........................................................................39

*Dalton v. Specter,*
  511 U.S. 462 (1994)..........................................................................................40

*Dart v. United States,*
  848 F.2d 217 (D.C. Cir. 1988) ..........................................................................39

*Dep't of Commerce v. Montana,*
  503 U.S. 442, 1992 WL 672929 (1992).............................................29, 30, 36, 37

*Dep't of Commerce v. New York,*
  139 S. Ct. 2551 (2019)......................................................................5, 18, 34, 40

iii

*Dep't of Commerce v. U.S. House of Representatives*,
    525 U.S. 316 (1999) ............................................................................................. *passim*

*Evenwel v. Abbott*,
    136 S. Ct. 1120 (2016) ........................................................................................ *passim*

*Faiveley Transport. Malmo AB v. Wabtec Corp.*,
    559 F.3d 110 (2d Cir. 2009) ........................................................................................41

*Fed'n for Am. Immigration Reform (FAIR) v. Klutznick*,
    486 F. Supp. 564 (D.D.C. 1980) ..............................................................12, 13, 19, 20

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ............................................................................................. *passim*

*Garza v. County of Los Angeles*,
    918 F.2d 763 (9th Cir. 1990) ......................................................................................14

*Greene v. United States*,
    79 F.3d 1348 (2d Cir. 1996) ........................................................................................30

*Haim v. Islamic Republic of Iran*,
    784 F. Supp. 2d 1 (D.D.C. 2011) ...............................................................................41

*Hake v. Citibank, N.A.*,
    No. 19-MC-125 (JGK), 2020 WL 1467132 (S.D.N.Y. Mar. 26, 2020) .....................41

*Hawaii v. Trump*,
    878 F.3d 662 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 2392 (2018) .....................39

*Lamar, Archer & Cofrin, LLP v. Appling*,
    138 S. Ct. 1752 (2018) ................................................................................................30

*League of Women Voters of Fla. v. Browning*,
    863 F. Supp. 2d 1155 (N.D. Fla. 2012) ......................................................................46

*Leedom v. Kyne*,
    358 U.S. 184 (1958) ....................................................................................................38

*Lorillard v. Pons*,
    434 U.S. 575 (1978) ....................................................................................................31

*Make the Road N.Y. v. Cuccinelli*,
    419 F. Supp. 3d 647 (S.D.N.Y. 2019) ........................................................................50

*Mittleman v. Postal Regulatory Comm'n*,
    757 F.3d 300 (D.C. Cir. 2014) ...................................................................................39

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*,
  863 F.3d 96 (2d Cir. 2017) ............................................................................30

*Mountain States Legal Found. v. Bush*,
  306 F. 3d. 1122 (D.C. Cir. 2002) ...........................................................38, 39

*Mullins v. City of New York*,
  626 F.3d 47 (2d Cir. 2010) ............................................................................41

*New York Progress & Prot. PAC v. Walsh*,
  733 F.3d 483 (2d Cir. 2013) ...........................................................................51

*New York v. U.S. Dep't of Commerce*,
  351 F. Supp. 3d 502 (S.D.N.Y. 2019), *aff'd* 139 S. Ct. 2551 (2019) ........................... *passim*

*New York v. U.S. Dep't of Homeland Sec.*,
  - - - F.3d - - - - , 2020 WL 4457951 (2d Cir. Aug. 4, 2020) ................................30

*Plyler v. Doe*,
  457 U.S. 202 (1982) ........................................................................................12

*Ramos v. Nielsen*,
  336 F. Supp. 3d 1075 (N.D. Cal. 2018) ...........................................................7

*Saget v. Trump*,
  345 F. Supp. 3d 287 (E.D.N.Y. 2018) ..............................................................7

*Sale v. Haitian Ctrs. Council*,
  509 U.S. 155 (1993) ........................................................................................39

*U.S. House of Representatives v. U.S. Dep't of Commerce*,
  11 F. Supp. 2d 76 (D.D.C. 1998) ....................................................................50

*Utah v. Evans*,
  536 U.S. 452 (2002) ...........................................................................24, 25, 27

*Wesberry v. Sanders*,
  376 U.S. 1 (1964) ...............................................................................14, 15, 17

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ........................................................................................49

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ....................................................................................8, 50

*Wisconsin v. City of New York*,
  517 U.S. 1 (1996) .....................................................................................18, 24

*XL Specialty Ins. Co. v. Level Glob. Inv'rs, L.P.*,
    874 F. Supp. 2d 263 (S.D.N.Y. 2012)...................................................................41

**Statutes**

2 U.S.C. § 2(a) ...........................................................................................................5

2 U.S.C. § 2a .................................................................................................. *passim*

2 U.S.C. § 2a(a) ............................................................................................. *passim*

2 U.S.C. § 2a(b) .........................................................................................................3

2 U.S.C. § 141 .........................................................................................................30

3 U.S.C. § 3 ...............................................................................................................3

13 U.S.C. § 2 .............................................................................................................3

13 U.S.C. § 4 .............................................................................................................3

13 U.S.C. § 141 ...............................................................................................3, 28, 36

13 U.S.C. § 141(a) .........................................................................................2, 3, 27, 28

13 U.S.C. § 141(b) ........................................................................................... *passim*

Act of June 18, 1929, § 2 .........................................................................................28

Act of June 18, 1929, § 22 ...................................................................................28, 31

Indian Citizenship Act of 1924, Pub. L. No. 68 -175, 43 Stat. 253 ...............................13

Pub. L. No. 71-962, § 6(b) .......................................................................................30

Pub. L. No. 76-481....................................................................................................19

Pub. L. No. 77-291, § 1 ............................................................................................29

**Rules & Regulations**

83 Fed. Reg. at 5533 ...........................................................................................23, 25

Exec. Order 13,768, 82 Fed. Reg. 8799 (Jan. 25, 2017)................................................7

Exec. Order No. 13,880, 84 Fed. Reg. 33,821 (July 11, 2019).....................................51

Fed. R. Civ. P. 56(a) ..................................................................................................8

*Final 2020 Census Residence Criteria and Residence Situations*, 83 Fed. Reg. 5525 (Feb. 8, 2018) ...............................................................................21, 32

*Final 2020 Census Residence Criteria and Residence Situations*, 83 Fed. Reg. 5525, 5526 (Feb. 8, 2018) ..................................................................................32

Letter from Assistant Attorney Gen. Carol T. Crawford to Honorable Jeff Bingaman (Sept. 22, 1989), 135 Cong. Rec. S22,521 (daily ed. Sept. 29, 1989)...................20

*Memorandum on Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census*, 85 Fed. Reg. 44,679, 44,680 (July 23, 2020) ..................... *passim*

## Legislative Materials

67 Cong. Rec. 7078 (Apr. 7, 1926) ...............................................................................29

71 Cong. Rec. (Mar. 2 1929) .........................................................................................29

71 Cong. Rec. 1821 (May 23, 1929)..........................................................................19, 31

71 Cong. Rec. 1858 (1929) ............................................................................................37

71 Cong. Rec. 1910 (May 25, 1929) .............................................................................19

71 Cong. Rec. 1958 (May 27, 1929) .............................................................................19

71 Cong. Rec. 2065 (1929) ............................................................................................31

71 Cong. Rec. 2451 (June 6, 1929)................................................................................19

*1980 Census: Counting Illegal Aliens: Hearing Before the S. Subcomm. on Energy, Nuclear Proliferation, & Fed. Services of the Comm. on Gov'tal Affairs (1980 Census)*, 96th Cong. 10 (1980) ..........................................................20

Census Act of 1790, S. 101, 1st Cong. § 5, (1790).......................................................19

Cong. Globe, 39th Cong., 1st Sess. 10 (1865)..............................................................15

Cong. Globe, 39th Cong., 1st Sess. 2767 (1866)......................................................16, 17

Cong. Globe, 39th Cong., 1st Sess. 705 (1866).............................................................17

Cong. Rec. H4372 (Apr. 11, 1940).................................................................................20

H.R. Rep. No. 1787 (1940) ............................................................................................19

*Hearing Before the H. Comm. on Oversight & Reform*, 116th Cong. 31 (Mar. 14, 2019) ........................................................................................................................21

*Hearing Before the H. Comm. on Oversight & Reform*, 116th Cong. 12 (Feb. 12, 2020) ................................................................................................21

S. Rep. No. 2, 71st Cong., 1st Sess. ........................................................................36

*Statement from the President Regarding Apportionment* (July 21, 2020), https://www.whitehouse.gov/briefings-statements/statement-president-regarding-apportionment/ ...........................................................................6

**Other Authorities**

1 The Records of the Federal Convention of 1787 (Max Farrand ed., 1911) ...............14

Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/inhabitant ........................22

The Federalist No. 36 ...............................................................................................25

The Federalist No. 54 ...............................................................................................14

The Founders' Constitution 102-03 (P. Kurland & R. Lerner eds. 1987) .....................25

*Full Transcript: Trump's 2020 State of the Union Address*, N.Y. Times (Feb. 5, 2020) ...................................................................................................7

Joseph T. Sneed III, Footprints on the Rocks of the Mountain: An Account of the Enactment of the Fourteenth Amendment 28 (1997) .......................................15, 41

Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. Times (May 16, 2018) ..............................................................7

Nick Miroff, *Trump suspends Global Entry, traveler programs for New York residents over 'sanctuary' policies*, Wash. Post (last updated Feb 6, 2020) ...........................7

*Remarks by President Trump at Signing of H.R. 3401* (July 1, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-signing-h-r-3401/ ...........................................................................6

*Remarks by President Trump Before Marine One Departure* (July 5, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-marine-one-departure-51/ ...........................................................................6

*Remarks by President Trump on Citizenship and the Census* (July 11, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-citizenship-census/ ...........................................................................6, 51

*Statement from U.S. Census Bureau Director Steven Dillingham: Delivering a*
    *Complete and Accurate 2020 Census Count* (Aug. 3, 2020),
    https://www.census.gov/newsroom/press-releases/2020/delivering-complete-
    accurate-count.html.................................................................................................................46

U.S. Census Bureau, *2020 Census: Nonresponse Followup*, (June 19, 2020),
    https://www.census.gov/newsroom/press-kits/2020/nonresponse-followup.html.........................45

**INTRODUCTION**

This lawsuit challenges Defendants' flagrantly unconstitutional and unlawful decision to exclude undocumented immigrants from the total-population base that is used to apportion congressional seats among the States.  This decision violates the unambiguous mandate in Article I and the Fourteenth Amendment that *all* "persons in each State" be included "according to their respective [n]umbers" in the apportionment base.  U.S. Const. amend. XIV, § 2; *id.* art. I, § 2, cl. 3.  Both this Court and the Supreme Court have already determined that this language requires the federal government "to count every single person residing in the United States, whether citizen or noncitizen, whether living here with legal status or without."  *New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 514 (S.D.N.Y. 2019), *aff'd* 139 S. Ct. 2551 (2019); *accord Evenwel v. Abbott*, 136 S. Ct. 1120, 1129 (2016).  The inclusion of all immigrants was expressly discussed and endorsed in the debates over the Fourteenth Amendment.  And every decennial census since the Fourteenth Amendment's adoption has counted all residents without regard to their citizenship or immigration status.

The sheer clarity of this constitutional command entitles Plaintiffs to summary judgment on their constitutional claims against Defendants' exclusionary policy.  Defendants have no discretion or authority to disregard the Constitution's plain text and extensive history, to flout prior rulings from this Court and the Supreme Court, or to break with more than two hundred years of settled practice.

Plaintiffs are also entitled to summary judgment because Defendants' exclusion of undocumented immigrants from the apportionment base is an *ultra vires* violation of the statutory provisions that Congress enacted to implement the Constitution's clear requirements.  Congress has mandated that the decennial enumeration count all persons, regardless of immigration status, and that the President's apportionment report to Congress must be based

1

solely on this enumeration of all persons.  *See* 13 U.S.C. § 141(a), (b); 2 U.S.C. § 2a. Defendants' exclusionary policy will necessarily conflict with these statutory requirements.

Finally, in the alternative, Plaintiffs are entitled to a preliminary injunction on their constitutional and statutory claims.  Such relief is essential because Plaintiffs and their residents or constituents are suffering immediate and irreparable injury from Defendants' sudden announcement of their exclusionary policy.  Most immediately, Defendants' actions are deterring immigrant households from responding to the ongoing enumeration for the 2020 census by sowing confusion, mistrust, and fear among immigrant households about the consequences of responding to the census.  That deterrent effect is heightened by the plainly xenophobic and discriminatory purpose animating Defendants' exclusionary policy—the latest in a long string of open attacks by this administration on immigrant communities and the cities and States where they reside.  And Defendants have only exacerbated these immediate harms to the ongoing enumeration and underscored the need for immediate relief with their recent announcement that they are unilaterally curtailing census follow-up operations by a full month, from October 31 to September 30.

Under these unusual and pressing circumstances, Plaintiffs are entitled to expedited summary judgment on their constitutional and statutory claims, or a preliminary injunction to avert immediate harm.

## BACKGROUND

### I.    Constitutional and statutory framework.

The Constitution requires that seats in the House of Representatives "shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed."  U.S. Const. amend. XIV, § 2; *see id.* art. I, § 2, cl. 3.  The number of Representatives apportioned to each State, along with the two Senators

given to each State, determines the allocation among the States of electors in the Electoral College.  *Id.* art. II, § 1, cl. 2; *see also* 3 U.S.C. § 3.  To apportion Representatives among the States, and in turn to allocate electors among the States, the Constitution requires a decennial "actual Enumeration" of all persons living here—the resulting numbers from which must constitute the apportionment base.  U.S. Const. art. I, § 2, cl. 3.

The Constitution provides that the decennial enumeration shall be made "in such manner as [Congress] shall direct by law."  *Id.*  In the Census Act, Congress has assigned the responsibility of conducting the enumeration to the Secretary of Commerce, who may delegate authority for establishing census procedures to the Census Bureau.  13 U.S.C. §§ 2, 4, 141.

The Census Act sets specific deadlines for conducting the enumeration and corresponding apportionment of Representatives.  The Act requires that the decennial census be taken on April 1, 2020, the "decennial census date."  *Id.* § 141(a).  Within nine months of the decennial census date, *i.e.*, by January 1, 2021, the Secretary of Commerce must report to the President "[t]he tabulation of total population by States" that is "required for the apportionment of Representatives in Congress among the several States."  *Id.* § 141(b).  Between January 3 and January 10, 2021, the President must transmit to Congress "a statement showing the whole number of persons in each State, excluding Indians not taxed, as ascertained under the . . . decennial census of the population, and the number of Representatives to which each State would be entitled" using the method of equal proportions, with each State receiving at least one Member.  2 U.S.C. § 2a(a).  Within fifteen days of receiving the President's statement, the Clerk of the House of Representatives must transmit "to the executive of each State a certificate of the number of Representatives to which such State is entitled."  *Id.* § 2a(b).

II.     **The Presidential Memorandum.**

On July 21, 2020, President Trump issued a memorandum declaring that "[f]or the purpose of the reapportionment of Representatives following the 2020 census, it is the policy of the United States to exclude" undocumented immigrants from the congressional apportionment base "to the maximum extent feasible and consistent with the discretion delegated to the executive branch." *Memorandum on Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census*, 85 Fed. Reg. 44,679, 44,680 (July 23, 2020) (the "Memorandum") (ECF No. 1-1).[1]  The Memorandum asserts that "[i]ncreasing congressional representation based on the presence of aliens who are not in a lawful immigration status would also create perverse incentives encouraging violations of Federal law," and that "States adopting policies . . . that hobble Federal efforts to enforce the immigration laws passed by the Congress should not be rewarded with greater representation in the House of Representatives." *Id.*

The Memorandum makes clear that the President both understands and intends that excluding undocumented immigrants from the apportionment base will reallocate political power between the States, and specifically that it will weaken political influence for States with larger undocumented immigrant populations. *See id.*  Referring to one State whose residents include more than two million undocumented immigrants,[2] the Memorandum notes that "[i]ncluding these illegal aliens in the population of the State for the purpose of apportionment could result in the allocation of two or three more congressional seats than would otherwise be allocated." *Id.*

---

[1] All docket references are to 20-CV-5770 (JMF) unless otherwise specified.

[2] This State is California, but Texas is similarly situated. *See* Pls.' Rule 56.1 Stmt. ¶¶ 3-4.  The Governmental Plaintiffs include two local jurisdictions in California and three counties in Texas; and the NGO Plaintiffs have members residing in those States, *see id.* ¶¶ 23-51.

The Memorandum accordingly directs the Secretary of Commerce, "[i]n preparing his report to the President under section 141(b) of title 13," to "take all appropriate action, consistent with the Constitution and other applicable law, to provide information permitting the President, to the extent practicable," to exclude undocumented immigrants from the final determination regarding the "whole number of persons in each State" that the President transmits to Congress pursuant to 2 U.S.C. § 2(a). Memorandum, 85 Fed. Reg. at 44,679-80.

## III. Events precipitating the Presidential Memorandum.

The Presidential Memorandum was not issued in a vacuum, but against the backdrop of prior litigation about the census. In *New York v. Department of Commerce*, this Court held that Secretary of Commerce Wilbur Ross's decision to add a citizenship question to the 2020 census violated the Administrative Procedure Act and enjoined the addition of the question, 351 F. Supp. 3d—a decision affirmed in part by the Supreme Court on the ground that the reason the Secretary provided for adding the citizenship question was pretextual. *Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019). After trial, new evidence emerged about the reason for adding the question.

In August 2015, Republican redistricting strategist Thomas Hofeller authored a study advising that a citizenship question on the census was necessary to gather data to exclude noncitizens from the redistricting population base, a result "advantageous to Republicans and Non-Hispanic Whites."[3] He then helped ghostwrite a letter to the Commerce Department requesting a citizenship question that was funneled through several intermediaries before

---

[3] Pls.' Mot. for Order to Show Cause, 18-cv-2921 (JMF), ECF No. 595-1 at 63 (May 30, 2019) (citing exhibits).

becoming part of the Secretary's effort to add a citizenship question.[4]  Less than a week after the

Supreme Court's decision, Defendant Trump confirmed that efforts to add the citizenship

question was intended to curtail the growing political power of immigrant communities of color.

He first stated that the citizenship question was "very important [] to find out if someone is a

citizen as opposed to an illegal."[5]  A few days later, Defendant Trump said: "Number one . . .

you need it for Congress, for districting.  You need it for appropriations.  Where are the funds

going?  How many people are there?"[6]  The following week, he noted that "[s]ome states may

want to draw state and local legislative districts based upon the voter-eligible population."[7]

In announcing the Presidential Memorandum, Defendant Trump expressly linked the

Presidential Memorandum to the citizenship question effort, proclaiming he was fulfilling his

promise that he would "not back down in [his] effort to determine the citizenship status of the

United States population."[8]  Defendant Trump has also linked the Memorandum to a broader

campaign against so-called sanctuary cities and States—jurisdictions that elect in some

circumstances to limit their cooperation with federal immigration enforcement.[9]  The Presidential

---

[4] *N.Y. Immig. Coal.* Pls.' Mot for Sanctions, 18-CV-2921 (JMF), ECF No. 635-1 at 124–31 (July 16, 2019); Defs.' Opp. to Ltr. Mot. to Compel, 18-CV-2921 (JMF), ECF No. 451 at 3 (Oct. 30, 2018); Pls.' Jt. Proposed Post-Trial Findings of Fact, 18-CV-2921 (JMF), ECF No. 545 at 52–53 (Nov. 21, 2018) (citing exhibits).

[5] *Remarks by President Trump at Signing of H.R. 3401* (July 1, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-signing-h-r-3401/.

[6] *Remarks by President Trump Before Marine One Departure* (July 5, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-marine-one-departure-51/.

[7] *Remarks by President Trump on Citizenship and the Census* (July 11, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-citizenship-census/.

[8] *Statement from the President Regarding Apportionment* (July 21, 2020), https://www.whitehouse.gov/briefings-statements/statement-president-regarding-apportionment/

[9] Defendant Trump has sought by executive order to bar "sanctuary jurisdictions" from receiving

Memorandum states that one of its objectives is to punish States for enacting policies that the federal government disfavors.  Memorandum, 85 Fed. Reg. at 44,680.

The Presidential Memorandum is part of a broader pattern of Defendant Trump's "expressed animus against non-white, non-European immigrants." *Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1098 (N.D. Cal. 2018); *see also id.* at 1100 (citing such statements).  To take just one example, he asked during a meeting concerning "immigrants from Haiti, El Salvador, and African countries," why the United States was "'having all these people from shithole countries come here?'" and "suggested that the United States should instead bring more people from countries such as [mostly white] Norway.'" *Id.*  He also asked: "'Why do we need more Haitians?' and insisted they be removed from an immigration deal." *Saget v. Trump*, 345 F. Supp. 3d 287, 303 (E.D.N.Y. 2018).  In 2018, he referred to certain immigrants as "animals."[10]

## ARGUMENT

## I.    Standard of review.

Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

---

federal grants.  *See* Exec. Order 13,768, 82 Fed. Reg. 8799 (Jan. 25, 2017).  In his 2020 State of the Union address, Defendant Trump denounced "the sanctuary city of New York," and the next day, the Acting Secretary of Homeland Security announced that New York State residents would be prohibited from enrolling or re-enrolling in Trusted Traveler programs in retaliation for New York's sanctuary laws.  Transcript*, Trump's 2020 State of the Union Address*, N.Y. Times (Feb. 5, 2020), https://www.nytimes.com/2020/02/05/us/politics/state-of-union-transcript.html; Nick Miroff, *Trump suspends Global Entry, traveler programs for New York residents over 'sanctuary' policies*, Wash. Post (Feb. 5, 2020), https://www.washingtonpost.com/immigration/trump-suspends-global-entry-traveler-programs-for-new-york-residents-over-sanctuary-policies/2020/02/05/e2755790-4890-11ea-9475-535736e48788_story.html.

[10] Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. Times (May 16, 2018), https://www.nytimes.com/2018/05/16/us/politics/trump-undocumented-immigrants-animals.html.

To obtain a preliminary injunction, Plaintiffs must establish that they are likely to suffer irreparable harm absent preliminary relief; they are likely to succeed on the merits; the balance of the equities tips in their favor; and an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## II.     Plaintiffs include jurisdictions and residents of jurisdictions that would lose representation if undocumented immigrants were excluded from the population base used for congressional apportionment.

Plaintiffs have standing to bring this challenge because—among other injuries—the exclusion of undocumented immigrants from the apportionment base will cause Plaintiffs or the jurisdictions in which Plaintiffs operate to lose seats in the House of Representatives. Such a loss "undoubtedly satisfies the injury-in-fact requirement of Article III standing." *New York*, 351 F. Supp. 3d at 607 (quotation marks omitted); *see also Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 330 (1999) (holding that the plaintiffs demonstrated standing for purposes of summary judgment by submitting an expert affidavit showing that "it is a virtual certainty that Indiana will lose a seat . . . under the Department's Plan").

The Memorandum expressly states that the policy of excluding undocumented immigrants from the apportionment base is intended to, and is certain to cause, California to lose at least one seat in the House of Representatives. And it is certain to have the same effect on Texas. The Memorandum states that "Current estimates suggest that one State is home to more than 2.2 million illegal aliens, constituting more than 6 percent of the State's entire population. Including these illegal aliens in the population of the State for the purpose of apportionment could result in the allocation of two or three more congressional seats than would otherwise be allocated." Memorandum, 85 Fed. Reg. at 44,680. According to the Department of Homeland Security, as of 2015, California had 2.9 million undocumented residents and Texas had 1.9 million undocumented residents in 2015. Pls.' 56.1 Stmt. ¶ 4. According to the Census Bureau's

most recent estimates, as of July 1, 2019, the total population of California was 39,512,223 and

the total population of Texas was 28,995,881.  Pls.' 56.1 Stmt. ¶¶ 12, 14.  These estimates from

the Census Bureau and DHS indicate that undocumented immigrants constitute approximately

7.3% of the population of California and approximately 6.6% of the population of Texas.  As of

the most recent congressional reapportionment following the 2010 Decennial Census, the

average population of each U.S. House district is 710,767 people.  Pls.' 56.1 Stmt. ¶ 5.  Based on

these facts alone, there can be no dispute that the exclusion of undocumented immigrants will

cause California and Texas to lose at least one seat in the House.

Additionally, Plaintiffs' expert, Dr. Christopher Warshaw, confirms that the

Memorandum will "almost certainly" cause certain States to lose seats in Congress.  Warshaw

Decl. ¶ 11 (Ex. 58).[11]  Dr. Warshaw modeled the effects of excluding undocumented immigrants

from the population count used to calculate congressional reapportionment after the 2020 census.

Pls.' 56.1 Stmt. ¶ 20; Warshaw Decl. ¶ 11 (Ex. 56).  According to Dr. Warshaw, if

undocumented immigrants are excluded from the apportionment base, there is a 98.3%

probability that Texas will lose a seat in the House of Representatives, and a 72.1% probability

for California.  Pls.' 56.1 Stmt. ¶¶ 21–22; Warshaw Decl. ¶ 47 tbl. 8 (Ex. 58).

The Governmental Plaintiffs include jurisdictions in California (the City and County of

San Francisco, and Monterey County) and Texas (Cameron, El Paso, and Hidalgo Counties).

*See* Governmental Plaintiffs' Am. Compl. ¶¶ 42, 44–46, 48 (ECF No. 34).  The NGO Plaintiffs

include organizations with members residing in both States.  Pls.' 56.1 Stmt. ¶¶ 33–34 (ADC);

*id.* ¶¶ 40–41 (FIEL Houston, Inc.); *id.* ¶¶ , 46–47 (Ahri).  Residents of these Plaintiff counties

---

[11] Citations in this Memorandum to "Ex. __" are to the exhibits to the accompanying Declaration
of Matthew Colangelo dated August 7, 2020.

and the Texas- and California-based members of Plaintiff organizations will suffer a loss of political power if Texas or California lose a congressional seat.  Indeed, ADC has members in all 50 states—*any* change to apportionment is certain harm a member of ADC.  Pls.' 56.1 Stmt. ¶ 34.[12]

These injuries are traceable to Defendants' recent actions and redressable by a favorable ruling from this Court.  There is no question that the exclusion of undocumented immigrants from the apportionment base will *directly* affect the apportionment.  Indeed, the Presidential Memorandum itself both acknowledges and intends this effect on apportionment, *see* Memorandum, 85 Fed. Reg. at 44,680.  Moreover, this Court previously found—and the Supreme Court agreed—that the predictable effects of defendants' actions on the accuracy of the ongoing enumeration are sufficient to establish traceability.  *New York*, 351 F. Supp. 3d at 619–25.  And all of these injuries will plainly be redressed by a favorable ruling that requires Defendants to do what the Constitution mandates: "counting the whole number of persons in each State."  U.S. Const. amend. XIV, § 2.

## III.   Defendants' decision to exclude undocumented immigrants from the apportionment base violates Article I and the Fourteenth Amendment.

### A.   The Constitution explicitly requires the population base for apportionment to include the whole number of persons in each State.

Defendants' blanket exclusion of undocumented immigrants from the apportionment base, without regard to their physical residence here, flagrantly violates the Constitution.  The Constitution's plain language requires that all "persons" physically living "in each State" be

---

[12] Plaintiffs' representational harms alone suffice to establish injury-in-fact for standing purposes.  To the extent Defendants oppose summary judgment on standing grounds, Plaintiffs intend to present additional evidence establishing the other injuries alleged in their complaints. *See* Governmental Plaintiffs' Am. Compl. ¶¶ 117–36 (ECF No. 34); NGO Plaintiffs' First Am. Compl. ¶¶ 19–83 (ECF No. 62).

included in the apportionment count—regardless of their citizenship or immigration status.  U.S. Const. amend. XIV, § 2; *id.* art. I, § 2, cl. 3 (requiring apportionment "according to [the States'] respective Numbers").  The Framers of the Fourteenth Amendment specifically chose to refer to "persons" rather than "citizens" in the Fourteenth Amendment's text to ensure that noncitizens residing in this country are included in apportioning House seats.  The Supreme Court confirmed four years ago that the Constitution requires congressional apportionment based on each State's total population, including undocumented immigrants.  *See Evenwel.* 136 S. Ct. at 1123.  And settled practice for more than two hundred years has adhered to this rule.

Defendants have turned this constitutional and historical consensus on its head.  They have treated as dispositive a factor that has always been considered immaterial for apportionment (immigration status).  And they have treated as immaterial a factor that has consistently determined the apportionment base since the first census in 1790 (physical residence). Defendants cannot fundamentally alter the constitutional order by decreeing that millions of undocumented immigrants who indisputably live in this country are not "persons."

> **1.     The Constitution's text unambiguously mandates counting all persons, including undocumented immigrants, in the apportionment base.**

The constitutional mandate to base apportionment on all persons living in the United States, without regard to their immigration status, is clear.  Section 2 of the Fourteenth Amendment requires that U.S. House seats "shall be apportioned among the several States according to their respective numbers, counting the *whole number of persons in each State*, excluding Indians not taxed."  U.S. Const. amend. XIV, § 2 (emphasis added).  And Article I requires that the "respective Numbers" of each State be determined by an "actual Enumeration" of the total population.  *Id.* art. I, § 2, cl. 3.

The Supreme Court has held that the term "person" in the Fourteenth Amendment includes undocumented immigrants. *Plyler v. Doe*, 457 U.S. 202, 210 (1982). The Court explained that, "[w]hatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sentence of that term." *Id.* Because undocumented immigrants "are clearly 'persons,'" the plain text of the Fourteenth Amendment is "not ambiguous" in mandating that undocumented immigrants living in this country must be included for apportionment. *Fed'n for Am. Immigration Reform (FAIR) v. Klutznick*, 486 F. Supp. 564, 576 (D.D.C. 1980) (three-judge court). This Court has recognized as much: "[b]y its terms, . . . the Constitution mandates that every ten years the federal government endeavor to count *every single person* residing in the United States, whether citizen or noncitizen, *whether living here with legal status or without*," and "[t]he population count derived from that effort is used . . . to apportion Representatives among the states." *New York*, 351 F. Supp. 3d at 514 (emphases added).

By contrast, the Constitution uses distinct language when referring to a subset of persons. For example, the Constitution repeatedly uses the term "citizens" rather than "persons" to describe the subset of persons living here who hold citizenship. *See, e.g.*, U.S. Const. art. 1, § 2, cl. 2 ("No Person shall be a Representative who shall not have . . . been seven Years a Citizen of the United States"). The same distinction appears in Section 2 of the Fourteenth Amendment, which requires the apportionment base to include "the *whole number of persons* in each State," but then provides that a State that denies the right to vote to "*citizens* of the United States" will have its basis of representation reduced. U.S. Const. amend. XIV, § 2 (emphasis added).

Similarly, the Constitution originally contained two express exclusions from the apportionment base, neither of which turned on immigration status. First, the original Apportionment Clause excluded all "Indians not taxed," U.S. Const. art. I, § 2, cl. 3, an

exception that became irrelevant after the Indian Citizenship Act of 1924, Pub. L. No. 68 -175, 43 Stat. 253.  Second, it infamously counted slaves as only three-fifths of a person for apportionment, U.S. Const. art. I, § 2, cl. 3, an exception overturned by the Fourteenth Amendment.  "By making express provision for Indians and slaves, the Framers demonstrated their awareness that" the otherwise "all-inclusive" language delineating the population base for apportionment does not permit the exclusion of any other residents.  *FAIR*, 486 F. Supp. at 576.

> ### 2.  The Constitution's broad terms reflected a conscious intent to include all persons, including all immigrants, in the apportionment base.

The choice to base apportionment on total population, regardless of citizenship or immigration status, was no accident.  Both the original Framers and the Framers of the Fourteenth Amendment chose to "allocat[e] House seats to States" with "total population as the congressional apportionment base," a mandate based on their fundamental "theory of the Constitution."  *Evenwel*, 136 S. Ct. at 1128–29.

"At the time of the founding, the Framers confronted the question" of how to allocate seats in the new government to the States.  *Id.* at 1127.  "The Framers' solution, now known as the Great Compromise, was to provide each State the same number of seats in the Senate, and to allocate House seats based on States' total population," that is, "'*according to their respective Numbers*.'"  *Id.* (quoting U.S. Const. art. I, § 2, cl. 3) (emphasis in original).  In selecting all residents as the basis for apportionment, the Framers specifically considered and rejected other proposals, such as allocating House "representation based on wealth or property."  1 The Records of the Federal Convention of 1787 ("Farrand's Records"), at 542 (Max Farrand ed., 1911) (Pierce Butler).  As James Madison explained, "[i]t is a fundamental principle of the proposed Constitution that as the aggregate number of representatives allotted to the several

States, is to be … founded on the aggregate *number of inhabitants*."  The Federalist No. 54 (James Madison) (emphasis added).

The Framers made clear that basing apportionment on total population guaranteed every person representation in the House, regardless of their legal status, thus ensuring that the House will "be the most exact transcript of the whole Society," 1 Farrand's Records, *supra*, at 142 (James Wilson), and provide representation to "every individual of the community at large," *id.* at 473 (Alexander Hamilton).  Thus, as the Supreme Court has explained, "the basis of *representation* in the House was to include all inhabitants," *Evenwel*, 136 S. Ct. at 1127, including women, children, indentured servants, and many other individuals who did not have the right to vote or full legal status.  *See Garza v. County of Los Angeles*, 918 F.2d 763, 774 (9th Cir. 1990); *see also Wesberry v. Sanders*, 376 U.S. 1, 13 ("[W]hen the delegates agreed that the House should represent 'people' they intended that in allocating Congressmen the number assigned to each State should be determined solely by the number of the State's inhabitants.").

When drafting the Fourteenth Amendment, Congress reconsidered the proper basis for apportioning House seats and reaffirmed that apportionment must be based on *all persons living* in each State—including noncitizens.  "Concerned that Southern states would not willingly enfranchise freed slaves, and aware that 'a slave's freedom could swell his state's population for purposes of representation in the House,'" the Fourteenth Amendment's Framers "considered at length the possibility of allocating House seats to states on the basis of voter population" or citizen population.  *Id.* (quoting Joseph T. Sneed III, Footprints on the Rocks of the Mountain: An Account of the Enactment of the Fourteenth Amendment 28 (1997)).  For example, on December 5, 1865, Thaddeus Stevens proposed apportioning Representatives among the States "according to their respective legal voters," specifying that "for this purpose none may be named

as legal voters who are not either natural-born citizens or naturalized foreigners." Cong. Globe, 39th Cong., 1st Sess. 10 (1865).

Later, on January 16, 1866, the Joint Committee of Fifteen on Reconstruction that drafted the Fourteenth Amendment initially voted to adopt a proposal that would have required apportioning House seats based on "the whole number of citizens of the United States in each state." Benjamin B. Kendrick, The Journal of the Joint Committee of Fifteen on Reconstruction, 39th Congress, 1865-1867, 49–52 (Ex. 52).[13] After further deliberations, however, Representative Conkling "moved to amend the proposed article by striking out the words 'citizens of the United States in each state,' and inserting in lieu thereof the words, 'persons in each State, including Indians not taxed." *Id.* at 52. The Joint Committee adopted Conkling's amendment by a vote of 11-3. *Id.*

Representative Conkling explained that basing apportionment on "persons" rather than "citizens" was essential to passage of the Fourteenth Amendment:

> It has been insisted that "citizens of the United States" and not "persons" should be the basis of representation and apportionment. These words were in the amendment as I originally drew it and introduced it, but my own judgment was that it should be "persons," and to this the committee assented.
>
> There are several answers to the argument in favor of "citizens" rather than "persons." The present Constitution is, and always was opposed to this suggestion. 'Persons,' and not 'citizens,' have always constituted the basis.
>
> Again, it would narrow the basis for taxation and cause considerable inequalities in this response, because the number of aliens in some States is very large, and growing larger now, when emigrants reach our shores at the rate of more than a State a year.

---

[13] Where indicated, Plaintiffs have filed certain of the original sources cited in this discussion as Exhibits to these papers. Plaintiffs can provide the Court with copies of other legislative or historical materials if it would assist the Court's review.

Again, many of the large States now hold their representation in part by reason of their aliens, and the Legislatures and people of these States are to pass upon the amendment.  It must be acceptable to them.

Cong. Globe, 39th Cong., 1st Sess. 2767, at 359 (1866).

The Framers of the Fourteenth Amendment further made clear that the Amendment requires including *all* immigrants in the apportionment base.  As Representative John Bingham explained, the "*whole immigrant population* should be numbered with the people and counted as part of them" because "[u]nder the Constitution as it now is and as it always has been, the *entire immigrant population of this country* is included in the basis of representation."  *Id.* at 432 (emphases added); *see also id.* at 2944 (Sen. Williams) ("Representation is now based upon population," including "foreigners not naturalized.").  Proponents of maintaining the total-population apportionment base repeatedly declared their refusal to "throw[] out of the basis at least two and a half millions of unnaturalized foreignborn men and women."  *Id.* at 1256 (Sen. Henry Wilson); *see also, e.g.*, *id.* at 2987 (proposal to apportion based on voting population was "blow which strikes the two million one hundred thousand unnaturalized foreigners who are now counted in the basis of representation from that basis"); *id.* at 411 (Rep. Burton Cook) (representation based on voters improperly "takes from the basis of representation all unnaturalized foreigners").

The Framers believed that excluding residents from the apportionment base, including immigrants, would fatally undermine a cornerstone of the Constitution—"equal representation for equal numbers of people."  *Wesberry*, 376 U.S. at 18.  A basic "idea of the Constitution" has always been, and continues to be, that "the whole population is represented; that although all do not vote, yet all are heard."  Cong. Globe, 39th Cong., 1st Sess. 705 (1866) (Sen. William Fessenden).  No matter a person's legal status, the Framers emphasized, "[a]ll the people, or all the members of a State or community, are equally entitled to protection; they are all subject to its

16

laws; they must all share its burdens, and they are all interested in its legislation and government." *Id.* at 2962 (1866) (Sen. Luke Poland).  As Senator Jacob Howard explained when introducing the amendment's final language on the Senate Floor:

> Its basis of representation is numbers . . . that is, the whole population.  The committee adopted numbers as the most just and satisfactory basis, and this is the principle upon which the Constitution itself was originally framed, that the basis of representation should depend upon numbers; and such . . . is the safest and most secure principle upon which the Government can rest. Numbers, not voters; numbers, not property; this is the theory of the Constitution.

Cong. Globe, 39th Cong., 1st Sess. 2766–67 (1866).

Defendants' actions to exclude an entire category of persons living in this country from apportionment break this foundational promise and flout the explicit intent of the Framers of the Fourteenth Amendment.

### 3. The Supreme Court has determined that the Constitution requires counting all persons, including undocumented immigrants, for apportionment.

Just four years ago, the Supreme Court confirmed that the Fourteenth Amendment requires including all immigrants in apportioning House seats. In *Evenwel*, the plaintiffs argued that Texas was required to exclude noncitizens—many of whom are undocumented—in equalizing population for legislative districts within the State. The Supreme Court rejected this claim on the ground that, with respect to *inter*-state apportionment, Section 2 of the Fourteenth Amendment "retained total population as the congressional apportionment base." *Evenwel*, 136 S. Ct. at 1128.  The Court emphasized: "[i]t cannot be that the Fourteenth Amendment calls for the apportionment of congressional districts based on total population, but simultaneously prohibits States from apportioning their own legislative districts on the same basis." *Id.* at 1128–29.  The concurring Justices agreed that "House seats are apportioned based on total population."

17

*Id.* at 1148 (Alito, J., concurring in the judgment); *see also id.* at 1138 (Thomas, J., concurring in the judgment) (similar).

Thus, all nine Justices in *Evenwel* agreed that apportionment of House seats among the States must be based on total population, including noncitizens. And that constitutional determination was central to the Court's rejection of the plaintiffs' claim there.  The Presidential Memorandum thus defies the Supreme Court's decision of just four years ago.

### 4. Centuries of established practice further confirm that the apportionment base must include undocumented immigrants.

*Evenwel* is consistent with not only the Constitution's clear text and extensive history, but also more than two hundred years of unbroken practice that has always included all persons residing in each State, regardless of their citizenship or immigration status, in the apportionment base.  *See Evenwel*, 136 S. Ct. at 1133 (relying on "settled practice").  Judicial "interpretation of the Constitution" may be "guided by a Government practice that has been open, widespread, and unchallenged since the early days of the Republic."  *Dep't of Commerce*, 139 S. Ct. at 2567 (internal quotation marks and citations omitted).  And the Supreme Court has emphasized "the importance of historical practice in" understanding the Enumeration Clause specifically. *Wisconsin v. City of New York*, 517 U.S. 1, 21 (1996).

Since the first census in 1790, "[t]he Census Bureau has always attempted to count every person residing in a state on Census day, and the population base for purposes of apportionment has always included all persons, including aliens both lawfully and unlawfully within our borders."  *FAIR*, 486 F. Supp. at 576; *see, e.g.*, Census Act of 1790, S. 101, 1st Cong. § 5, (1790). Both Congress and the Executive Branch have long made clear that this unbroken historical practice is constitutionally required.

Congress has repeatedly rejected statutory proposals to exclude all noncitizens or undocumented immigrants from the apportionment base on the ground that the Constitution forbids any such exclusion.  For example, in 1929, Congress rejected proposals to amend the Census Act to exclude noncitizens from apportionment after members of the House and Senate repeatedly declared that "the plain mandate of the Constitution" requires counting all persons, including all noncitizens, for apportionment.  71 Cong. Rec. 1910 (May 25, 1929) (Sen. Bratton); *see, e.g.*, *id.* at 1958 (May 27, 1929) (Sen. Reed), 2451-52 (June 6, 1929) (Rep. Griffith).  The Senate's legislative counsel provided a legal opinion confirming that all immigrants living here must be included given the Constitution's "'natural and obvious' meaning," "the history of the fourteenth amendment, the evidence of the records of the Constitutional Convention, and the uniform past congressional construction of the term by Congress in its apportionment legislation."  *Id.* at 1822 (May 23, 1929).

In 1940, in enacting a bill to amend the 1929 Act, *see* Pub. L. No. 76-481, Congress again rejected a proposal to exclude noncitizens from apportionment.  *See* H.R. Rep. No. 1787, at 1 (1940) (Ex. 55) (committee report showing proposed exclusion of noncitizens).  As Representative Emanuel Celler explained in opposing the proposal:

> For 150 years we have included aliens in the count.  We cannot, by mere resolution of this body or the adjoining body, change that constitutional requirement.  If you strike out aliens you have parted with a principle of government upon which the fathers agreed some 150 years ago…When we use the word "persons" we include all peoples.

Cong. Rec. H4372 (Apr. 11, 1940); 86 Cong. Rec. at 4384-86 (voting 209-23 to strike exclusion).

And in 1980, a bill to exclude undocumented immigrants from the apportionment base failed after New York Senator Jacob Javits explained that there is no plausible way to construe the Constitution's words as meaning "anything other than as described in Federalist papers, the

aggregate number of inhabitants, which includes aliens, legal and illegal." *1980 Census: Counting Illegal Aliens: Hearing Before the S. Subcomm. on Energy, Nuclear Proliferation, & Fed. Services of the Comm. on Gov'tal Affairs* (*1980 Census*), 96th Cong. 10 (1980).

The Executive Branch has likewise consistently maintained that the Constitution requires counting all persons, regardless of immigration status, in the apportionment base.  For example, in *FAIR v. Klutznick*, the Department of Justice, on behalf of the President, Secretary of Commerce, and Director of the Census Bureau, urged a district court to reject claims demanding exclusion of undocumented immigrants from the apportionment base.  Defs.' Mem. of Points & Authorities in Support of Mot. to Dismiss or for Summary Judgment, No. 79-3269 (D.D.C.), *reprinted in 1980 Census*, *supra*, at 125-156.  The government explained that "the plain language of the Constitution, as well as the intent of its framers, establishes that all inhabitants, including illegal aliens, must be enumerated for the purpose of apportioning Representatives." *Id.* at 131. Similarly, the Department of Justice's Office of Legislative Affairs has opined that the Constitution "require[s] that inhabitants of States who are illegal aliens be included in the census count."  Letter from Assistant Attorney Gen. Carol T. Crawford to Honorable Jeff Bingaman (Sept. 22, 1989), in 135 Cong. Rec. S22,521 (daily ed. Sept. 29, 1989).

Defendants have acknowledged that the decennial enumeration that necessarily determines the apportionment base must count *all persons living* in the United States, without any exclusions.  For example, on March 14, 2019, Secretary Ross testified under oath during a congressional committee hearing that "[t]he constitutional mandate, sir, for the census is to try to count *every person residing* in the U.S. at their place of residence on the dates when the census is conducted."  *Hearing Before the H. Comm. on Oversight & Reform*, 116th Cong. 31 (Mar. 14, 2019) (emphasis added); *see id.* ("We intend to try to *count every person* taking all necessary

actions to do so." (emphasis added)).  During a congressional committee hearing in February 2020, Census Bureau Director Dillingham testified that the Bureau will "*count everyone*, wherever they are living*,*" including undocumented immigrants.  *Hearing Before the H. Comm. on Oversight & Reform*, 116th Cong. 12 (Feb. 12, 2020) (emphasis added).

In multiple filings in this Court, many of the Defendants here repeatedly admitted that the Constitution requires enumerating every person residing in the United States, no matter their immigration status, for inclusion in the apportionment base.  *See, e.g.*, *New York v. Dep't of Commerce*, Defs.' Post-Trial Proposed Findings of Fact and Conclusions of Law 1, 18-CV-2921 (JMF) (S.D.N.Y. Nov. 21, 2018), ECF No. 546 ("Constitution requires the federal government to conduct a Decennial Census counting the total number of 'persons'—with no reference to citizenship status—residing in each state." (internal citations omitted)).[14]

And, under a final rule adopted for the 2020 census, the Census Bureau has already decided to count undocumented immigrants for apportionment purposes.  *See Final 2020 Census Residence Criteria and Residence Situations*, 83 Fed. Reg. 5525, 5533 (Feb. 8, 2018).

Defendants' attempt to reverse course at the last minute after the actual enumeration is already underway, and to exclude undocumented immigrants from the apportionment base for the first time in our country's history, reflects a radical break from the consistent understanding and practice of the federal government for more than two centuries.  There is simply no textual or historical support for this abrupt break in one of our country's foundational principles.

---

[14] *See also, e.g.*, *New York v. Dep't of Commerce*, Memo. of Law in Support of Defs.' Mot. to Dismiss 25, 18-CV-2921 (JMF) (S.D.N.Y. May 25, 2018), ECF No. 155 ("Constitution supplies a simple judicial standard for determining the constitutionality of [Census Bureau] practices— the Secretary must perform *a person-by-person headcount*" (emphasis added)).

**5.    Defendants do not have any "discretion" to exclude undocumented immigrants from the apportionment base.**

Contrary to the President's Memorandum, the Executive Branch does not have "discretion" to categorically exclude undocumented immigrants from the "whole number of persons in each State" based solely on their immigration status, without any regard to their physical residence here.  85 Fed. Reg. at 44,679.

The Memorandum reasons that apportionment should be based only on the number of "inhabitants" of each State, and that the President purportedly has discretion to deem undocumented immigrants who reside here as not "inhabitants."  *Id.*  But even if being an "inhabitant" were the relevant criterion, millions of undocumented immigrants who live in this country are indisputably inhabitants because they live here, many for years or even decades.  An "inhabitant" is "a person . . . that lives in a particular place."  Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/inhabitant.  The President has no discretion to declare that undocumented residents of this country are not "inhabitants."

The text of the Constitution and an unbroken line of history also foreclose any discretion here.  The Supreme Court has held that "[u]sual residence" is "the gloss given the constitutional phrase 'in each State'" in Section 2 of the Fourteenth Amendment—meaning all persons whose "usual residence" is in the United States "must be included in the enumeration of the population and the apportionment of House seats."  *Franklin v. Massachusetts*, 505 U.S. 788, 805 (1992).  And "usual residence" has always been the criterion for enumeration and apportionment since "the first enumeration Act."  *Id.*  Conversely, the Framers specifically considered and rejected the notion that a person's legal status—including voter, citizenship, or immigration status— could ever override their physical residence in the United States and result in their exclusion from the apportionment base.  *See* 85 Fed. Reg, at 44,680.  Defendants lack any authority to

exclude undocumented immigrants who maintain their usual residence in the United States from the apportionment.

The Memorandum's conclusory attempts to support its invocation of "discretion" rely on inapposite examples. For example, the Memorandum asserts that noncitizens who are only temporarily in the United States for a vacation or a business trip are not included in the decennial enumeration used for apportionment even though they may be "physically present." 85 Fed. Reg. at 44,679. But temporary visitors are not included in the apportionment base precisely because the United States is not their "usual residence." *See* 83 Fed. Reg. at 5533. By contrast, the millions of undocumented immigrants whom Defendants seek to exclude from apportionment are not merely "physically present" as a fleeting matter but rather are residents here—many for years or even decades. The policy of excluding temporary visitors provides no support for Defendants' attempt to exclude actual residents of this country who happen to be undocumented immigrants.

Defendants also point to the Secretary of Commerce's decision, "at various times, to include" in the apportionment federal military and civil personnel who are not physically present in this country but are temporarily serving overseas. 85 Fed. Reg. at 44,679. But the policy of including overseas federal personnel takes as a given the principle that all persons living in the United States must be counted for apportionment purposes, and simply extends that principle to persons who can be deemed to maintain a "usual residence" in the country—because they have "retained their ties to the States"—even though they have been "*temporarily* stationed abroad" by the government. *Franklin*, 505 U.S. at 806 (emphasis added). In no sense does this inclusionary policy to *include* persons who are not currently physically present in their home

States authorize Defendants to *exclude* persons who indisputably reside here and thus are part of the "whole number of persons in each State."  U.S. Const. amend. XIV.

> **B.     Apportioning Representatives based on numbers other than the actual enumeration from the decennial census is also unconstitutional.**

The Presidential Memorandum violates the Constitution for a second, independent reason: it requires the use of data other than the "actual Enumeration" of the population ascertained by the decennial census to apportion Representatives.  The actual enumeration in the 2020 census indisputably will include undocumented immigrants, and the Constitution requires Defendants to rely solely on this "actual Enumeration" for congressional apportionment.  The subtraction of undocumented immigrants to create an apportionment base that is different from the population included in the actual enumeration violates this constitutional requirement.

Article 1, Section 2 mandates that House seats be allocated based on the "numbers" determined by the "actual Enumeration" of the decennial census.  U.S. Const. art 1, § 2.  While the Executive Branch may maintain some discretion over the manner of conducting the census, *see Franklin*, 505 U.S. at 799; *Utah v. Evans*, 536 U.S. 452 (2002), once the decennial census determines the "actual Enumeration," Defendants must use those numbers—and only those numbers—to apportion House seats.  As the Supreme Court has explained, "the Constitution provides that the results of the census *shall be used* to apportion the Members of the House of Representatives among the States."  *Wisconsin*, 517 U.S. at 5 (emphasis added).  And "[t]he decennial census is *the only census* that is used for apportionment purposes."  *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 341 (1999) (quotation marks omitted) (emphasis added).

The Framers required that apportionment be based solely on the numbers from the actual enumeration to provide a fixed rule "that would limit political chicanery."  *Utah*, 536 U.S. at 500

24

(Thomas, J., concurring in part and dissenting in part).  The Framers' "principal concern was that the Constitution establish a standard resistant to manipulation." *Id.* at 503.  George Mason described having a "permanent and precise standard as essential to fair representation," because absent such a standard, "those who have power in their hands will not give it up while they can retain it."  *Id.* at 502 (quoting The Founders' Constitution 102-03 (P. Kurland & R. Lerner eds. 1987)).  Roger Sherman agreed that "the rule of revising the Representation ought to be fixt by the Constitution."  *Id.* (quoting The Founders' Constitution 104).  And Alexander Hamilton, writing about the Enumeration Clause's apportionment of direct taxes among the States, explained that "*an actual Census or enumeration of the people must furnish the rule*," so as to "shut[] the door to partiality or oppression."  The Federalist No. 36 at 220 (emphasis added).

For the 2020 census, the actual Enumeration will continue to include undocumented immigrants.  Defendant Dillingham recently confirmed in congressional testimony that the Memorandum "does not change the Census Bureau's plans for field data collection across the nation," and that the Bureau will "continue full steam ahead with . . . counting every person," including undocumented immigrants  Prepared Statement of Dr. Steven Dillingham Before the House Oversight and Reform Committee (July 29, 2020). [15]  Dillingham reaffirmed that the Census Bureau will continue to adhere to its Residence Rule for the 2020 census, *see id.*, which requires enumerating undocumented immigrants "at the U.S. residence where they live and sleep most of the time."  83 Fed. Reg. at 5533.  And Defendants confirmed to this Court in this case that "[t]he Census Bureau is conducting a complete enumeration of the total population and

---

[15] https://docs.house.gov/meetings/GO/GO00/20200729/110948/HHRG-116-GO00-Wstate-DillinghamS-20200729.pdf.

nothing in the [Presidential Memorandum] alters that counting process."  Joint Letter 9, *New York v. Trump*, 20-CV-5770 (JMF), ECF No. 37 (S.D.N.Y. filed Aug. 3, 2020).[16]

The Presidential Memorandum, however, directs the use of population totals excluding undocumented immigrants for apportionment—which are different from the actual Enumeration. To implement the Memorandum, Defendants would need to take the actual Enumeration numbers and subtract some estimate of the undocumented immigrants who live in each State, using administrative data or statistical models from sources other than the decennial actual Enumeration.  *See* 85 Fed. Reg. at 44,679-80.  Defendants would then use the resulting figures— rather than the actual Enumeration numbers—as the apportionment base.  *See id.*  Defendants' recent submission to this Court confirmed that, under the Memorandum, "an apportionment number . . . will be chosen by the President after the census is complete."  Joint Letter 5, *New York v. Trump*, 20-CV-5770 (JMF), ECF No. 37 (S.D.N.Y. filed Aug. 3, 2020).  In other words, the President will "choose" a "number" for the apportionment base that differs from the "complete enumeration of the total population."  *Id.* at 9.

The Constitution prohibits Defendants from apportioning seats in this manner.  The President does not have "discretion" to add to, subtract from, or otherwise alter the numbers of persons actually enumerated through the decennial census to "choose" a separate apportionment base of his own liking.  As the Census Bureau has recognized for decades, there is unbroken

---

[16] If Defendants assert, contrary to Dillingham's congressional testimony, the Residence Rule, and Defendants' recent submission, that the "actual Enumeration" is the numbers derived after subtracting undocumented immigrants from the 2020 census count, that also would violate the Enumeration Clause.  The Enumeration Clause prohibits Defendants from subtracting enumerated people out of the actual Enumeration numbers, and it certainly prohibits Defendants from doing so based on statistical estimates that rely on sampling and administrative data from outside agencies.  *See, e.g.*, *U.S. House of Representatives*, 525 U.S. at 346-47 (Scalia, J., concurring in part) ("an 'enumeration' requires an actual counting").

"historical precedent of using the actual Enumeration for purposes of apportionment" rather than any other population count.  *U.S. House of Representatives*, 525 U.S. at 340.  The Constitution's fixed "rule" bars the President from using an apportionment base that differs from the actual Enumeration numbers.  The Federalist No. 36 at 220.

Indeed, Defendants' scheme to deviate from the actual Enumeration numbers in shaping political power for the next decade represents precisely the type of "political chicanery" and "manipulation" that the Framers prevented by adopting the Enumeration Clause.  *Utah*, 536 U.S. at 500, 503 (Thomas, J., concurring in part and dissenting in part).  The Memorandum makes no secret that Defendants seek to exclude undocumented immigrants from the apportionment base for political reasons.  The Memorandum explicitly seeks to prevent certain States from being "rewarded with greater representation in the House of Representatives," and even singles out a particular state—California—whose political power Defendants wish to reduce.  85 Fed. Reg. at 44,680.  The Framers foresaw that leaders could seek to manipulate congressional apportionment for their own political benefit, and they guarded against such abuse by mandating that apportionment be determined by the actual Enumeration of the population ascertained through a decennial census, and nothing else.

**IV.    The Memorandum is *ultra vires* under the statutory scheme Congress enacted to implement the required decennial census and reapportionment of House seats.**

The President's Memorandum also violates statutory provisions Congress enacted to implement those constitutional requirements.  *See* 13 U.S.C. § 141(a), (b); 2 U.S.C. § 2a.  The Memorandum is *ultra vires* under these statutes in at least three ways.

**A.    The Memorandum violates the statutory requirements to count the total population, and to report and use that total for apportionment purposes.**

Congress enacted a statutory scheme directing that the whole population of the States— including undocumented immigrants who reside here—must be counted in the decennial census

and then used to apportion representatives.  13 U.S.C. § 141; 2 U.S.C. § 2a.  As Congress explained in enacting predecessors to these two provisions in a single statute,[17] "the functions served by them interlock," because "there is but one basic constitutional function served by the census.  It is to provide an enumeration of the people for the purpose of redistributing congressional representatives proportioned thereto."  S. Rep. No. 71-2, at 2 (1929) (Ex. 53).

As codified at 13 U.S.C. § 141(a), the Census Act instructs that the Secretary of Commerce "shall . . . take a decennial census of population . . . ."  Subsection (b) then specifies that "[t]he tabulation of total population by States under subsection (a) . . . as required for the apportionment of Representatives in Congress among the several States shall be completed within 9 months after the census date and reported by the Secretary to the President of the United States."  *Id*. § 141(b); *see also* Act of June 18, 1929, § 2, 46 Stat. 21, 21 (requiring same tabulation).  These provisions together require that there be a "census of population" under subsection (a), that this census include a "tabulation of total population by States as required for" apportionment, and that this tabulation then be provided in a report to the President.

In turn, 2 U.S.C. § 2a(a) directs the President to provide Congress an apportionment report that is based solely on the census's tabulation of population and application of a mathematical apportionment method to that result.  As the statute provides, "the President shall transmit to the Congress a statement showing the *whole number of persons in each State*, excluding Indians not taxed, as ascertained under the seventeenth and each subsequent *decennial census of the population*, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives *by the method known as the method of equal proportions* . . . ."  2 U.S.C. § 2a (emphases added); *see also* Act

---

[17] *See* Act of June 18, 1929, §§ 2, 22.

of June 18, 1929, § 2, 46 Stat. 21, 21; Pub. L. No. 77-291, § 1 (amending provision of 1929 Act

to require use of "equal proportions" method).  The "method of equal proportions" is a method

of apportionment based on each State's population designed to minimize disparities in

"population per Representative" among States.  71 Cong. Rec. at 4965 (Mar. 2 1929)

("Memorandum on the Method of Equal Proportions" by Professor Edward Huntington noting

unanimous adoption of method by Advisory Committee of the Census); 67 Cong. Rec. at 7078

(Apr. 7, 1926) (Advisory Committee report describing method as providing "an apportionment in

which the ratios between the representation and the population of the Several States are as nearly

alike as possible"). The Department of Justice has recognized that the method of equal

proportions relies on each State's population. Br. for Appellants, *Dep't of Commerce v.

Montana*, 503 U.S. 442 (1992), 1992 WL 672939, at *9-*11 ("Under all of the methods, the

formula for establishing each State's priorities has as its numerator the population of the State.").

By requiring the exclusion of undocumented immigrants from the statutory phrases "total

population" and "whole number of persons in each State," the Memorandum directs the

President and the Secretary of Commerce to perform unlawful, *ultra vires* actions.

The Commerce Secretary is not empowered to provide the President with information "as

required for the apportionment" other than a "tabulation of *total population*."  13 U.S.C. § 141(b)

(emphasis added).  And the President is not empowered to exclude undocumented immigrants

from "the whole number of persons in each State" or from the apportionment numbers in his

apportionment report to Congress.  2 U.S.C. § 2a(a).  The reason is simple: undocumented

immigrants are persons.  As a matter of plain language, the word "person" in § 2a makes no

distinction based on citizenship or immigration status.  *See also supra* Part III.A. (same

discussion in context of Fourteenth Amendment).  At no point has Congress had trouble

distinguishing among persons, citizens, and noncitizens when it wishes to do so—and it certainly

had no such trouble in 1929 when §§ 141 and 2a were initially enacted. *See, e.g.*, Pub. L. No.

71-962, § 6(b) (prohibiting "alien" from "being admitted to citizenship" without being "a person

of good moral character" as shown by, *inter alia*, testimony of two "citizens of the United

States"). Similarly, the single exception reflected in § 2a's text—"Indians not taxed"—suggests

no other exclusions were intended. *See Greene v. United States*, 79 F.3d 1348, 1355 (2d Cir.

1996) ("mention of one impliedly excludes others").

Congress is also "presumed to legislate with familiarity of the legal backdrop for its

legislation." *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 114 (2d

Cir. 2017). That backdrop speaks volumes. Congress adopted the "whole number of persons"

statutory language in 1929 (and again in 1941) against (1) its own unbroken legislative practice

to count noncitizens, including undocumented immigrants, for apportionment purposes[18]; and (2)

Supreme Court precedent holding that "person" in the Fourteenth Amendment includes

undocumented immigrants. *See supra* Part III.A. This further shows that the statute requires

including such individuals in apportionment. When "Congress used the materially same

language [in a statute] it presumptively was aware of the longstanding judicial interpretation of

the phrase and intended for it to retain its established meaning." *See Lamar, Archer & Cofrin,*

*LLP v. Appling*, 138 S. Ct. 1752, 1762 (2018) (unanimous court on this point); *see also New York*

*v. U.S. Dep't of Homeland Sec.*, __ F.3d __, 2020 WL 4457951, at *21 (2d Cir. Aug. 4, 2020)

(Congress "ratified the settled meaning" of a term in immigration law "[i]n light of the judicial,

administrative, and legislative treatments" of that term from 1882 to 1996).

---

[18] For the vast majority of the nation's history, Congress apportioned seats in the House by
statute enacted shortly after the decennial census. *See* Br. for Appellants, *Dep't of Commerce v.*
*Montana*, 503 U.S. 442 (1992), 1992 WL 672929, at *4-*15.

The Memorandum also contradicts Congress's unambiguous rejection of proposals to exclude noncitizens from the apportionment base.  As discussed above, in enacting the 1929 Act in which 2 U.S.C. § 2a originated, both the Senate and House considered and rejected amendments to exclude noncitizens from the "whole number of persons in each State" for apportionment purposes.[19]  Congress again rejected such a bill in 1940, and again in 1980.  *See supra* Part III.A.4.  These votes show that Congress understood that the ordinary meaning of the phrase "persons in each state" included noncitizens: "at the time of the [Fourteenth Amendment's adoption] and since, an alien was and has been a 'person.'"  71 Cong. Rec. at 1821 (May 23, 1929). They also show that Congress understood that its own historical legislative practice had "been uniformly in favor of inclusion of aliens," *id.* at 1822, such that enactment of the "whole number of persons" language would continue that unbroken practice.

The Census Bureau's longstanding interpretation of its statutory obligations further confirms that undocumented immigrants residing in the United States are part of the enumerated population used to apportion House seats. "Congress is presumed to be aware of an administrative . . . interpretation of a statute."  *Lorillard v. Pons*, 434 U.S. 575, 580 (1978); *see also New York*, __ F.3d __, 2020 WL 4457951, at *21.  On February 8, 2018, after notice-and-comment rulemaking, the Census Bureau promulgated its "Residence Rule" for the 2020 census, which is used to "determine where people are counted during each decennial census" in order "to apportion the seats in the U.S. House of Representatives among the States."  *Final 2020 Census Residence Criteria and Residence Situations*, 83 Fed. Reg. 5525, 5526 (Feb. 8, 2018).  Its

---

[19] *See* 71 Cong. Rec. 2065 (vote on amendment by Sen. Sackett fails, 29-48) (1929); *id.* at 2360-63 (House adopts alienage exclusion as amendment to section 22 on June 4, 1929); *id.* at 2448-2445 (Rep. Tilson of Connecticut offers substitute for section 22 of the bill without alienage exclusion, House by vote of 202-129 sustains ruling of the chair against point of order against Tilson amendment, House adopts Tilson amendment 212-102, and House passes bill).

purpose is "to ensure that the concept of usual residence is interpreted and applied, consistent with the intent of the Census Act of 1790, which was authored by a Congress that included many of the framers of the U.S. Constitution and directed that people were to be counted at their usual residence." *Id.* at 5526.

Under the Residence Rule, "[c]itizens of foreign countries living in the United States" must be "[c]ounted at the U.S. residence where they live and sleep most of the time." *Id.* at 5533. The Census Bureau elaborated that the "Census Bureau is committed to counting every person in the 2020 Census," including citizens of foreign countries living in the United States. *Id.* at 5526. And it considered comments "express[ing] concern about the impact of including undocumented people in the population counts for redistricting because these people cannot vote," *id.* at 5530, but declined to make any changes to its residence criteria and indicated that it "will retain the proposed residence situation guidance for foreign citizens in the United States." *Id.*

The Memorandum attempts to manufacture ambiguity on whether undocumented immigrants "inhabit" a State such that they constitute a "person[] in each State" for constitutional purposes. 85 Fed. Reg. at 44,679. But there is no such ambiguity: the phrase "whole number of persons in each State," as used in 2 U.S.C. § 2a, has always been understood to include people who reside in a particular State regardless of alienage or immigration status. *See supra* Part III.A. Congress has repeatedly rejected measures to exclude aliens from § 2a—measures that would have made little sense if § 2a already excluded categories of aliens. Moreover, it would be inconsistent with § 2a—under which the President has a ministerial role to report the census's count of total population and mandated to use a method designed to minimize per-district population disparities—to grant him discretion to exclude whole classes of persons.

**B.     The Memorandum violates the Census Act by producing apportionment figures that are not based solely on the decennial census.**

The Memorandum's reliance on non-census data to determine the number of undocumented immigrants to be removed from the apportionment base violates the requirement under 2 U.S.C. § 2a to use census data only.

Section 2a is clear that both the "whole number of persons" and the apportionment data must be ascertained from the decennial census.[20]  The provision specifies that this number must be "ascertained under the . . . decennial census of the population."  In *Franklin v. Massachusetts,* 505 U.S. 788 (1992), the Supreme Court affirmed that "Section 2a . . . expressly require[s] the President to use . . . the data from the 'decennial census.'"  *Id.* at 797.[21]

The broader statutory scheme makes clear that the apportionment data reported by the President must come from the census alone.  The Census Act specifies that "[t]he tabulation of total population by States" is "required for the apportionment of Representatives in Congress among the several States."  13 U.S.C. § 141(b).  As the Senate Report for the 1929 bill explained, "[t]he census would be taken in November, 1929.  One year later, *with these figures in*

---

[20] The President's statement must "show[] the whole number of persons in each State . . . as ascertained under the seventeenth and each subsequent decennial census of the population."  2 U.S.C. § 2a.  Apportionment must be based on "the method of equal proportions," relying on that data.  *Id*.

[21] *Franklin* held that certain elements of 2 U.S.C. § 2a(a) are non-ministerial, but the Court appeared to limit those to circumstances in which the Secretary of Commerce has exercised policy judgment.  *See* 505 U.S. at 799 ("§ 2a does not curtail the President's authority to direct the Secretary in making policy judgments that result in 'the decennial census'; he is not expressly required to adhere to the policy decisions reflected in the Secretary's report.").  Whatever those non-ministerial duties may be, *Franklin* is equally clear that use of the census data and the calculation of apportionment figures are ministerial.  *Id.* at 797 ("Section 2a does not expressly require the President to use the data in the Secretary's report, but, rather, the data from the "decennial census."); *id*. at 799 (the President's apportionment calculation is of a "ministerial nature").

*hand*, the President would report the census figures, together with a table showing how, *under these figures*, the House would be apportioned."  S. Rep. 71-2 at 4 (emphases added) (Ex. 53).

The President's use of the census's count of the whole number of persons in each State, and application of the chosen mathematical method (equal proportions), are not discretionary matters.  "The Department of Commerce counts the people (as it always has done)," and "the President reports upon a problem in mathematics which is standard, and for which rigid specifications are provided by Congress itself, and to which there can be but one mathematical answer."  S. Rep. 71-2, at 4-5 (Ex. 53); *see also* H.R. Rep. 70-2010, at 7 (official providing report "is left with no discretionary power" and must use "without deviation, the population of each State" as reported in census) (Ex. 54).  The Supreme Court has made equally clear that, under 2 U.S.C. § 2a, the President must use census data and that an apportionment based on that data is "admittedly ministerial."  *Franklin*, 505 U.S. at 797, 799.

The Supreme Court has further confirmed that the President's apportionment report must be based on the population figures from the census, noting that the Apportionment and Census Acts "mandat[e] a population count that will be used to apportion representatives."  *Dep't of Commerce*, 139 S. Ct. at 2568-69; *see also U.S. House of Representatives*, 525 U.S. at 321-22 ("Using this information [from the Census], the President must then "transmit to the Congress a statement showing the whole number of persons in each State . . . and the number of Representatives to which each State would be entitled.").

The Department of Justice has also historically recognized that the apportionment must be based on the total population figures produced by the census.  Reply Br. for the Federal Appellants at 15, *Franklin v. Massachusetts* ("[I]t is true that the method of equal proportions calls for application of a set mathematical formula to the state population totals produced by the

census"); Tr. of Oral Argument at 12, *Franklin,* 505 U.S. 788 (Deputy Solicitor General Roberts)

("The law directs [the President] to apply, of course, a particular mathematical formula to the

population figures he receives . . . ."); *id.* at 12("It would be unlawful [for the President] . . . just

to say, these are the figures, they are right, but I am going to submit a different statement."); *id.*

at 13 ("I think under the law he is supposed to base his calculation on the figures submitted by

the Secretary.").

The President's Memorandum violates these requirements.  To exclude undocumented

immigrants from the apportionment base, *see* 85 Fed. Reg. at 44,680, the President will

necessarily have to rely on information that is not contained within the census, because the 2020

census questionnaire is not gathering information concerning citizenship or immigration status.

*See, e.g.*, Order, *New York v. U.S. Dep't of Commerce*, 18-CV-2921 (JMF) (S.D.N.Y. Aug. 7,

2019), ECF No. 653 (permanently enjoining the inclusion of a citizenship question on the 2020

decennial census questionnaire).

Further, the Memorandum itself concedes that it will rely on information other than that

obtained by the census.  The Memorandum distinguishes between the enumeration information

gathered by the census under the governing Residence Rule, and the information the President

will use to exclude undocumented immigrants from the census count of whole persons:

> [T]he Secretary shall take all appropriate action, consistent with the Constitution
> and other applicable law, to provide information permitting the President, to the
> extent practicable, to exercise the President's discretion to carry out the policy set
> forth in section 2 of this memorandum.  The Secretary *shall also* include in that
> report information tabulated according to the methodology set forth in [the
> Residence Rule].

85 Fed. Reg. at 44,680 (emphasis added).  The Memorandum additionally indicates that other

"data on illegal aliens . . . relevant for the purpose of conducting the apportionment" may be

available as a result of Executive Order 13,880, in which the President "instructed executive

departments and agencies to share information with the Department of Commerce, to the extent permissible and consistent with law, to allow the Secretary to obtain accurate data on the number of citizens, non-citizens, and illegal aliens in the country."  85 Fed. Reg. at 44,680.

Simply put, the Memorandum violates statutory requirements by requiring the reporting to the President and the subsequent Presidential use of non-census data to calculate a whole number of persons in each State that is different from census results, and to apportion seats in Congress according to that latter figure.

### C.  The Memorandum violates 2 U.S.C. § 2a by producing apportionment figures that are not based solely on a ministerial calculation.

The President is required to report an apportionment calculation "by the method known as the method of equal proportions."  2 U.S.C. § 2a.  In *Franklin*, the Supreme Court made clear that the President's apportionment calculation is of a "ministerial nature."  *See Franklin*, 505 U.S. at 799.  *Franklin* noted that the Senate Report for the bill that presaged 2 U.S.C. § 2a, states that the President is to report "upon a problem in mathematics which is standard, and for which rigid specifications are provided by Congress itself, and to which there can be but *one mathematical answer*."  *Id.* (quoting S. Rep. No. 2, 71st Cong., 1st Sess., at 4–5) (emphasis added).

The legislative history confirms the point.  In 1920, for the first time, Congress failed to pass a reapportionment act.  *Montana*, 503 U.S. at 451–52.  Accordingly, in 1929, in passing the modern precursor to 13 U.S.C. § 141 and 2 U.S.C. § 2a, Congress ensured "an automatic reapportionment through the application of a mathematical formula to the census."  *Franklin*, 505 U.S. at 809 (Stevens, J., concurring in part and concurring in the judgment).  "The automatic connection between the census and the reapportionment was the key innovation of the Act."  *Id.*

In 1941, the Act was modified to change the allocation formula to the current method of equal proportions.  *See id.* at 809 n.5 (citing *Montana*, 503 U.S. at 451–52 & n.25).

Indeed, congressional debate makes clear that Congress intended to give the President no discretion in how reapportionment figures would be calculated.  The sponsor of the bill, Senator Vandenburg, explained that the President had no discretion in such a calculation and that "as a matter of indisputable fact, th[e] function served by the President is as purely and completely a ministerial function as any function on earth could be."  71 Cong. Rec. 1858 (1929); *see also supra* IV.B. (noting similar statements in committee reports).

As discussed *supra*, the Memorandum establishes a policy under which the President will perform additional calculations beyond those set forth by the method of equal proportions in order to derive an apportionment figure that excludes undocumented immigrants.  85 Fed. Reg. at 44,680 ("[I]t is the policy of the United States to exclude from the apportionment base aliens who are not in a lawful immigration status under the Immigration and Nationality Act.").  But Congress designed a system with only "one mathematical answer" to the question of apportionment, S. Rep. 71-2, at 4-5 (Ex. 53).  By altering Congress's required apportionment computation to add calculations not specified by 2 U.S.C. § 2a, the Memorandum causes the President to violate his ministerial duty to report apportionment figures under the "rigid specifications" provided by the method of equal proportions.  S. Rep. No. 71-2, at 4–5 (Ex. 53).  Such calculations therefore violate the "automatic connection between the census and the reapportionment" that Congress established.  *Franklin*, 505 U.S. at 809 (Stevens, J., concurring in part and concurring in the judgment).

**D.      This Court has equitable authority to correct the Presidential Memorandum's *ultra vires* mandates.**

Because the Memorandum requires Defendants Trump and Ross to act beyond the plain scope of their statutory authority, the equitable jurisdiction of this Court is available to correct this *ultra vires* action and provide redress to Plaintiffs.

The Supreme Court has long recognized that federal courts have inherent equitable authority to grant relief to enjoin *ultra vires* action, such as that ordered by the Memorandum, even in the absence of an express statutory provision.  The Court most recently reaffirmed this authority in *Armstrong v. Exceptional Child Center*, which explained that federal courts may grant injunctive relief absent a statutory cause of action "with respect to violations of federal law by federal officials."  575 U.S. 320, 326-27 (2015).  This inherent equitable authority, the Court noted in *Armstrong*, has been recognized for centuries "and reflects a long history of judicial review of illegal executive action, tracing back to England."  *Id.* at 327; *see also generally Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108, 110 (1902); *Carroll v. Safford*, 44 U.S. 441, 463 (1845).

The core purpose of inherent equitable authority is not just to provide redress for individuals whose statutory or constitutional rights are violated, but also to ensure the proper separation of powers and require "the executive to obey [Congress's] statutory commands." *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 681 (1986); *see also Leedom v. Kyne*, 358 U.S. 184, 191 (1958) ("This Court cannot lightly infer that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers.").

The modern doctrine of *ultra vires* review provides inherent, nonstatutory review for executive action in excess of statutory authority.  *See, e.g.*, *Mountain States Legal Found. v. Bush*, 306 F. 3d. 1122, 1136 (D.C. Cir. 2002) ("the Supreme Court has indicated generally that

38

review is available to ensure that the Proclamations are consistent with constitutional principles and that the President has not exceeded his statutory authority"); *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996) ("When an executive acts *ultra vires,* courts are normally available to reestablish the limits on his authority").  Such review exists independently from the Administrative Procedure Act ("APA"), and the APA does not restrict or "repeal the review of *ultra vires* actions."  *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988); *see also Hawaii v. Trump*, 878 F.3d 662, 682 (9th Cir. 2017) (finding equitable cause of action "which exists outside of the APA"), *rev'd on other grounds*, 138 S. Ct. 2392 (2018); *Mittleman v. Postal Regulatory Comm'n*, 757 F.3d 300, 307 (D.C. Cir. 2014) ("the absence of a cause of action for judicial review under the APA does not necessarily foreclose all judicial review"); *Reich*, 74 F.3d at 1326-27 (engaging in *ultra vires* review where APA claim not pled).

Further, courts have consistently acknowledged that *ultra vires* review extends to review of actions taken by the *President*, not just subsidiary executive branch actors.  *See, e.g.*, *Hawaii*, 878 F.3d at 682-83 (finding equitable cause of action "allows courts to review *ultra vires* actions by the President that go beyond the scope of the President's statutory authority"); *Mountain States Legal Found.*, 306 F.3d at 1136 (finding equitable review generally available to determine whether presidential executive memoranda exceed statutory authority); *Reich*, 74 F.3d at 1327-28 (finding, under equitable review, that presidential executive order violated National Labor Relations Act).  Indeed, the Supreme Court has often reviewed whether presidential actions comply with congressional statutes without specifying or identifying a cause of action.  *See, e.g.*, *Sale v. Haitian Ctrs. Council*, 509 U.S. 155 (1993) (reviewing presidential actions relating to Haitian migrants for compliance with the INA without discussing cause of action); *Dames &*

39

*Moore v. Regan* (453 U.S. 654 (1981) (upholding executive orders, including their conformity with various statutes, without discussing causes of action).

*Ultra vires* review may be inappropriate in two circumstances, but neither exception applies here. First, inherent equitable authority is unwarranted where Congress has demonstrated an "intent to foreclose" equitable relief by providing alternate enforcement mechanisms and because the statute is judicially unadministrable. *See Armstrong*, 575 U.S. at 327-29. Here, there is no alternate mechanism for enforcing the statutory provisions at issue, and the statutory mandate and remedy—to include undocumented immigrants with all other people in the apportionment base—is eminently administrable.

Second, equitable review may be inappropriate "[w]here a statute . . . commits decisionmaking to the discretion of the President." *Dalton v. Specter*, 511 U.S. 462, 477 (1994). But that is plainly not the case here, where Congress has mandated that the Secretary and the President perform specifically prescribed actions without any meaningful discretion. Indeed, the Supreme Court has held that by "mandating a population count that will be used to apportion representatives" under 13 U.S.C. § 141(b) and 2 U.S.C. § 2a, Congress did *not* commit unreviewable discretion the executive. *Dep't of Commerce*, 139 S. Ct. at 2568-69.

It is beyond any question that the Memorandum requires action in excess of the authority granted by statute to the President and the Commerce Secretary. As such, this Court has ample power to grant the requested relief to ensure compliance with the law.

## V.     **Alternatively, a preliminary injunction is warranted to prevent irreparable harm.**

In the alternative, Plaintiffs are entitled to a preliminary injunction on their claims that the Memorandum violates the Constitution and federal law. Plaintiffs are likely to succeed on the merits of their claims that the decision to exclude undocumented immigrants from the apportionment base violates the Constitution and federal law, and that the Presidential

Memorandum violates Article I and Section 2 of the Fourteenth Amendment and violates the Census Act, for the reasons set out in Part III and Part IV above.

As this Court has recognized, "[a] showing of irreparable harm 'is the single most important prerequisite for the issuance of a preliminary injunction.'" *XL Specialty Ins. Co. v. Level Glob. Inv'rs, L.P.*, 874 F. Supp. 2d 263, 270 (S.D.N.Y. 2012) (quoting *Faiveley Transport. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)).  Plaintiffs need only show a "*threat* of irreparable harm, not that irreparable harm already [has] occurred." *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010).

Plaintiffs will suffer irreparable and imminent harm because the Memorandum discourages immigrant households from responding to the 2020 census.  The well-publicized Memorandum will produce a chilling effect on response rates by sowing confusion, mistrust, and fear among immigrant households about the consequences of responding to the census.  The resulting decline in response rates will both degrade the quality of census data—thereby compromising the Governmental Plaintiffs' policy and planning decisions that rely on that data—and result in an ultimate undercount of immigrant communities that will reduce the federal funds flowing to those communities.[22]  Plaintiffs will also suffer imminent, irreparable harm because the Memorandum will dilute the political power of Plaintiffs' constituents.

---

[22] This Court may take judicial notice of the evidentiary record from the related case of *State of New York v. Department of Commerce*, 18-CV-2921 (JMF), under the "established . . . approach that permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation . . . to reach their own, independent findings of fact in the cases before them."  *Haim v. Islamic Republic of Iran*, 784 F. Supp. 2d 1, 6 (D.D.C. 2011); *see Hake v. Citibank, N.A.*, No. 19-MC-125 (JGK), 2020 WL 1467132, at *5 (S.D.N.Y. Mar. 26, 2020) ("[T]he court could 'take judicial notice of the evidentiary record in another similar case and, from that, make certain factual findings that obviate the need for Plaintiffs to re-present the same evidence.") (citation, brackets, and internal quotation marks omitted).

**A.      The Presidential Memorandum will deter immigrants and their households from responding to the 2020 census.**

The Memorandum, and Defendants' corresponding public statements, are already predictably deterring participation in the ongoing decennial census and undermining the Census Bureau's efforts to count immigrants and their families.  Just as adding a citizenship question to the decennial census would have made non-citizen and Hispanic households "unlikely to respond (or to give a complete response) to in-person NRFU enumerators," *New York*, 351 F. Supp. 3d at 585, so too will the exclusion of undocumented immigrants from the apportionment base make immigrant households less willing to respond to the census or to NRFU enumerators.  Barreto Decl. ¶ 85 (Ex. 56).

Defendants' decision to exclude undocumented immigrants from the apportionment base sends a clear message that this community does not count and should be left out of the democratic process.  Bird Decl. ¶ 9 (Ex. 9); Choi Decl. ¶¶ 16-18 (Ex. 14); Colon Decl. ¶ 11 (Ex. 16); Cullinane Decl. ¶ 7 (Ex. 17); Espinosa Decl. ¶ 11 (Ex. 18); Khalaf Decl. ¶¶ 12 (Ex. 26); Matos Decl. ¶ 11 (Ex. 30); Mostofi Decl. ¶ 8 (Ex. 34); Oshiro Decl. ¶¶ 12-13 (Ex. 36); Sarmiento Decl. ¶ 5 (Ex. 42); Seon Decl. ¶¶ 13-14 (Ex. 43); Soto Decl. ¶ 12 (Ex. 45); Torres Decl. ¶ 19 (Ex. 47).  This message, and its import, is widely known across immigrant communities, particularly those that consume Spanish-language media.  Barreto Decl. ¶ 14 (Ex. 56); Oshiro Decl. ¶ 12 (Ex. 36); Torres Decl. ¶ 18 (Ex. 47).  The Memorandum undercuts Plaintiffs' messaging that "everyone counts" and effectively discourages immigrant households from responding to the census at all.  Alvarez Decl. ¶ 11 (Ex. 1); Baldwin Decl. ¶ 8 (Ex. 4); Bird Decl. ¶ 12 (Ex. 9); Broughton Decl. ¶ 6 (Ex. 10); Brower Decl. ¶ 11 (Ex. 11); Bysiewicz Decl. ¶ 8 (Ex. 12); Choi Decl. ¶¶ 16-18 (Ex. 14); Colon Decl. ¶ 7 (Ex. 16); Espinosa Decl. ¶¶ 7, 12-13 (Ex. 18); Matos Decl. ¶ 9, 12 (Ex. 30); Murray Decl. ¶ 5 (Ex. 35); Oshiro Decl. ¶¶ 12-13 (Ex. 36);

Sarmiento Decl. ¶ 5 (Ex. 42); Seon Decl. ¶¶ 9, 14 (Ex. 43); Sivongxay Decl. ¶ 12 (Ex. 44); Soto Decl. ¶ 6 (Ex. 45); Torres Decl. ¶¶ 12, 13, 19 (Ex. 47); Barreto Decl. ¶¶ 33, 54 (Ex. 56).  As the Chief Demographer for New York City has explained, the Memorandum "discredits the essential message that everyone's response matters and makes an already fearful group more apprehensive about the perceived risks associated with responding [to the census]."  Salvo Decl. ¶ 10 (Ex. 41). As Dr. Matthew A. Barreto, a Chicano/a Studies professor with decades of experience in public opinion research in the Latino community, writes, the Memorandum both reduces the benefits and raises the risks of Census participation for undocumented immigrants because "the July 21 PM states they won't count, and there is now a risk of their information being linked to immigration records and facing immigration enforcement."  Barreto Decl. ¶ 62 (Ex. 56); *see also* Torres Decl. ¶ 20 (Ex. 47).  Following the issuance of the Memorandum, immigrant community members living in Monterey County, for example, expressed that "[w]e don't matter, why be counted if at the end of the day being counted doesn't matter in terms of political power, which is where we need it most."  Soto Decl. ¶ 12 (Ex. 45).  And immigrant community members in Virginia explained that "they don't see a benefit in filling out the [census] form if they will not be counted."  Sarmiento Decl. ¶ 6 (Ex. 42).

Furthermore, the Memorandum sows fear that the Trump Administration is again seeking to identify the location and numbers of undocumented immigrants, ostensibly for exclusion from apportionment (a grave harm in its own right), but also potentially for immigration enforcement purposes.  Alvarez Decl. ¶ 10 (Ex. 1); Bird Decl. ¶ 6 (Ex. 9); Cullinane Decl. ¶ 8 (Ex. 17); Espinosa Decl. ¶¶ 12-13 (Ex. 18); Matos Decl. ¶ 12 (Ex. 30); Mostofi Decl. ¶ 9 (Ex. 34); Oshiro Decl. ¶¶ 10, 14 (Ex. 36); Roche Decl. ¶ 6 (Ex. 38); Sarmiento Decl. ¶ 12 (Ex. 42); Sivongxay Decl. ¶ 13 (Ex. 44).  As Dr. Barreto explains, the Memorandum is likely to "generate a chilling

effect and incentivize households with undocumented immigrants to provide no additional information to the Federal Government that they feel would implicate their immigration status," particularly with respect to census questionnaire items "asking about nativity or ethnic/racial group." Barreto Decl. ¶ 31 (Ex. 56). Since the Memorandum was issued, mixed-status families have questioned "whether they should participate in the Census as a result of their fears that the Government could probe into the undocumented individuals in [their] extended famil[ies]." Espinosa Decl. ¶ 13 (Ex. 18); *see also* Choi Decl. ¶ 19 (Ex. 14); Oshiro Decl. ¶ 10 (Ex. 36); Torres Decl. ¶ 20 (Ex. 47). As with the citizenship question, these fears will predictably reduce census response rates in these communities, particularly with respect to government-related NRFU efforts.

Plaintiffs have already begun to see signs that the Memorandum is deterring census response in their own communities. *See* Baldwin Decl. ¶¶ 8-9 (Ex. 4); Bird Decl. ¶ 12 (Ex. 9); Choi Decl. ¶ 27 (Ex. 14); Espinosa Decl. ¶¶ 10-13 (Ex. 18); Khalaf Decl. ¶¶ 11-12 (Ex. 26); Mostofi Decl. ¶ 9 (Ex. 34); Oshiro Decl. ¶¶ 11-14 (Ex. 36); Sarmiento Decl. ¶ 7 (Ex. 42); Seon Decl. ¶¶ 13-17 (Ex. 43); Sivongxay Decl. ¶ 13 (Ex. 44); Soto Decl. ¶ 12 (Ex. 45); Torres Decl. ¶¶ 2, 16 (Ex. 47); Aranda-Yanoc Decl. ¶ 7 (Ex. 51). Plaintiffs have also observed an appreciable increase in the number of questions from immigrant and Latinx constituents and media (particularly Spanish-language media) about the privacy and confidentiality of their census responses, Barreto Decl. ¶ 16 (Ex. 56); Baldwin Decl. ¶ 8 (Ex. 4); Banerji Decl. ¶5 (Ex.5); Choi Decl. ¶ 19 (Ex. 14); Mostofi Decl. ¶ 9 (Ex. 34); Oshiro Decl. ¶¶ 10, 12, 14 (Ex. 36); Seon Decl. ¶ 16 (Ex. 43); Sivongxay Decl. ¶ 22 (Ex. 44); Torres Decl. ¶ 18 (Ex. 47); Aranda-Yanoc Decl. ¶ 7 (Ex. 51); as well as how the Administration would identify undocumented immigrant populations for exclusion from the apportionment count. Alvarez Decl. ¶ 10 (Ex. 1); Choi Decl.

¶¶ 18, 27 (Ex. 14); Cullinane Decl. ¶ 8 (Ex. 17); Espinosa Decl. ¶¶ 12-13 (Ex. 18); Oshiro Decl. ¶ 10 (Ex. 36); Seon Decl. ¶ 16 (Ex. 43).  These concerns about privacy, confidentiality, and potential immigration consequences reflect further reluctance to respond to the census among an already hard-to-count population at a critical point in the enumeration—right before the start of NRFU operations.[23]

Because of the Memorandum's chilling effect on immigrant communities, the NGO Plaintiffs will have to divert resources from mission critical programs—including education, housing, and pandemic-related assistance—to additional census outreach.  *See New York*, 351 F. Supp. 3d at 616-17; Choi Decl. ¶¶ 20-26 (Ex. 14); Espinosa Decl. ¶¶ 14-17 (Ex. 18); Khalaf Decl. ¶¶ 14-15 (Ex. 26); Oshiro Decl. ¶¶ 15-16 (Ex. 36); Seon Decl. ¶¶ 17-18 (Ex. 43); Torres Decl. ¶ 23 (Ex. 47).  Plaintiffs' census outreach efforts have centered on publicizing the importance of counting every person, regardless of citizenship or immigration status, including for apportionment purposes.  *See* Choi Decl. ¶ 12; Espinosa Decl. ¶ 7 (Ex. 18); Oshiro Decl. ¶ 7 (Ex. 36); Seon Decl. ¶ 9 (Ex, 43); Torres Decl. ¶ 12 (Ex. 47).  The Memorandum directly contradicts these messages, which has resulted in members of the communities that the NGO Plaintiffs serve expressing reluctance to respond to the census.  Choi Decl. ¶¶ 17, 27 (Ex. 14); Espinosa Decl. ¶¶ 13-14 (Ex. 18); Khalaf Decl. ¶¶ 12-15 (Ex. 26); Oshiro Decl. ¶¶ 10-14 (Ex. 36); Seon Decl. ¶¶ 12-15 (Ex. 43).  The NGO Plaintiffs are diverting resources to increase or revise their outreach efforts to overcome the Memorandum's damage because once the enumeration period closes the opportunity for Plaintiffs to ensure their communities are counted—and receive the political power and government funding to which they are entitled—is

---

[23] U.S. Census Bureau, *2020 Census: Nonresponse Followup*, https://www.census.gov/newsroom/press-kits/2020/nonresponse-followup.html (June 19, 2020).

irretrievably lost.  *Cf. League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012) ("[W]hen a plaintiff loses an opportunity to register a voter, the opportunity is gone forever").

Defendants' recent decision to accelerate the conclusion of nonresponse followup operations heightens the urgency—and exacerbates these injuries—because it limits the timeframe in which this Court can grant meaningful relief to redress these harms.  The Bureau announced earlier this year that it would collect census responses through October 30. Thompson Decl. ¶ 14 (Ex. 57).  On August 3, Defendants abruptly reversed course, opting to end field operations even earlier—on September 30, just 54 days from the date of this filing.  *See Statement from U.S. Census Bureau Director Steven Dillingham: Delivering a Complete and Accurate 2020 Census Count* (Aug. 3, 2020), https://www.census.gov/newsroom/press-releases/2020/delivering-complete-accurate-count.html.  This change dramatically reduces the remaining time during which individuals can respond to the census and the time for Plaintiffs to conduct outreach efforts to ensure a complete count.  Bird Decl. ¶¶ 10-11 (Ex. 9); Choi Decl. ¶ 24 (Ex. 14); Espinosa Decl. ¶¶ 15, 21 (Ex. 18); Oshiro Decl. ¶ 18 (Ex. 36); Seon Decl. ¶ 22 (Ex. 43); Torres Decl. ¶ 24 (Ex. 47); Thompson Decl. ¶ 16 (Ex. 57).  Furthermore, many of the Governmental Plaintiffs' jurisdictions have already observed low response rates in immigrant communities.  Alvarez Decl. ¶ 9 (Ex. 1); Baldwin Decl. ¶ 7 (Ex. 4); Brower Decl. ¶ 10 (Ex. 11); Bysiewicz Decl. ¶ 10 (Ex. 12); Hardcastle Decl. ¶ 5 (Ex. 21); Mohamed Decl. ¶ 8 (Ex. 33); Murray Decl. ¶ 7 (Ex. 35); Salvo Decl. ¶ 4 (Ex. 41); Sivongxay Decl. ¶ 10 (Ex. 44).  The compounding deterrent effect of the Memorandum on response rates and the short window of time remaining to encourage response requires emergency relief.

**B.      By depressing response rates, the Presidential Memorandum will irreparably degrade the quality of census data vital to public policymaking and cause Plaintiffs to lose federal funding.**

The Memorandum's harm to response rates will inflict irreparable injury on Plaintiffs by degrading the quality of the resulting Census Bureau data and reducing the funding streams guided by that data.  First, the decline in self-response and the decreased NRFU effectiveness resulting from the Memorandum's chilling effect on immigrant communities will degrade the quality of the data that the Governmental Plaintiffs rely upon to "allocate educational and public health resources efficiently and effectively," *New York*, 351 F. Supp. 3d at 610-11, as well as other critical public resources.  Salvo Decl. ¶ 8 (Ex. 41); Aragon Decl. ¶ 5 (Ex. 2); Arwady Decl. ¶ 4 (Ex. 3); Baldwin Decl. ¶ 28 (Ex. 4); Bayer Decl. ¶ 6 (Ex. 6); Bell Decl. ¶ 5 (Ex. 7); Bird Decl. ¶ 13 (Ex. 9); Brower Decl. ¶ 13 (Ex. 11); Bysiewicz Decl. ¶ 9 (Ex. 12); Cassidy Decl. ¶ 5 (Ex. 13); Cline Decl. ¶ 5 (Ex. 15); Freedman Decl. ¶ 5; ¶ 5 (Ex. 20); Hardcastle Decl. ¶ 6 (Ex. 21); Jimenez Decl. ¶¶ 3-4 (Ex.24); Kaneff Decl. ¶¶ 5-6 (Ex. 25); Lundine Decl. ¶ 4 (Ex. 29); Medina Decl. ¶ 4 (Ex. 32); McCaw Decl. ¶ 7 (Ex. 31); Rapoza Decl. ¶ 7 (Ex. 37); Rodriguez Decl. ¶ 5 (Ex. 39); Rynerson Decl. ¶ 13; Sternesky Decl. ¶ 9 (Ex. 46); Wheeler Decl. ¶ 9 (Ex. 48); Wyatt Decl. ¶ 13 (Ex. 49); Wortman Decl. ¶ 5 (Ex. 50).  Indeed, the decennial census is the "statistical backbone of our country"; census data allows the Government Plaintiffs to "guide[] policy decisions, assists in the direction of city resources generally, and informs responses to public health emergencies and disasters."  Salvo Decl. ¶ 13 (Ex. 41).  The Governmental Plaintiffs rely upon the census to produce accurate characteristics data to make decisions about housing (Wyatt Decl. ¶¶ 3, 6-7, 11-12 (Ex. 49); Lopez Decl. ¶ 12 (Ex. 20); Sternesky Decl. ¶ 3 (Ex. 46)); school resources (Bird Decl. ¶¶ 14-15 (Ex. 9); Cassidy Decl. ¶ 3 (Ex. 13); Howell Decl. ¶ 2 (Ex. 23); Lane Decl. ¶ 5 (Ex. 27); Lopez Decl. ¶¶ 14-15 (Ex. 28); McCaw Decl. ¶ 6 (Ex. 31); Mohamed Decl. ¶ 6 (Ex. 33); Salvo Decl. ¶ 15 (Ex. 41)); public

47

health (Arwady Decl. ¶ 6 (Ex. 3); Hammond Decl. ¶ 3 (Ex. 20);  (Ex. 29); McCaw Decl. ¶ 6 (Ex. 31) , Salvo Decl. ¶ 14 (Ex. 41)) and infrastructure and transportation (Aragon Decl. ¶ 5 (Ex. 2); Baldwin Decl. ¶ 16 (Ex. 4); Biagi Decl. ¶¶ 4-5 (Ex. 8); Brower Decl. ¶ 15 (Ex. 11); Lopez Decl. ¶ 13 (Ex. 28); Kaneff Decl. ¶ 3 (Ex. 25); McCaw Decl. ¶ 6 (Ex. 31); Mohamed Decl. ¶ 6 (Ex. 33); Salvo Decl. ¶ 17 (Ex. 41); Wheeler Decl. ¶ 4 (Ex. 48)), among other key decisions.  A decline in the quality of that data will impair the Governmental Plaintiffs' "ability to make and implement such policies."  *New York*, 351 F. Supp. 3d at 600.

Moreover, as with the citizenship question, reduced response rates among immigrant households due to the Memorandum will result in a net differential undercount of these households, as "each of NRFU's steps will replicate or exacerbate the effects of the net differential decline in self-response rates among noncitizen households."  *New York*, 351 F. Supp. 3d at 583; Barreto Decl. ¶ 70 (Ex. 56) ("[T]he PM increases the likelihood that Latinos, immigrants, and noncitizens are less likely to self-respond to the 2020 census" and that "non-responding individuals are also unlikely to respond after household visits by census enumerators because of fear of government interaction."); Thompson Decl. ¶ 13 (Ex. 57) (explaining that the Memorandum will impact the macro environment and undermine NRFU, "significantly increas[ing] the risk of larger total and differential undercounts").  This undercount will disproportionately deprive Plaintiffs and their constituents of federal funding for education and social services.  *New York*, 351 F. Supp. 3d at 597-98; *see also* Aragon Decl. ¶ 6 (Ex. 2); Baldwin Decl. ¶ 15 (Ex. 4); Brower Decl. ¶ 25 (Ex. 11); Kaneff Decl. ¶ 4 (Ex. 22); Lopez Decl. ¶ 11 (Ex. 28).

48

**C.      Plaintiffs will be irreparably harmed by Defendants' efforts to reallocate political power away from their jurisdictions.**

The Memorandum's stated goal—to shift political power away from jurisdictions that are home to substantial numbers of undocumented immigrants, 85 Fed. Reg. at 44,680—effectively concedes that Plaintiffs will be irreparably harmed by Defendants' actions.  "The Supreme Court has squarely held that the loss of a seat or seats in the House of Representatives" imposes direct harms "because of the dilution of political power that results from such an apportionment loss." *New York*, 351 F. Supp. 3d at 595, 607; *see also Carey v. Klutznick*, 637 F.2d 834, 836-38 (2d Cir. 1980) (finding irreparable harm based on the "deprivation of [the plaintiffs'] right to a fair apportionment" based on the likelihood that New York would lose a congressional seat).  The likely loss of political power as a result of the exclusion of undocumented immigrants in the apportionment count constitutes a "concrete," "actual or imminent" injury that is "not 'conjectural' or 'hypothetical.'"  *U.S. House of Representatives*, 525 U.S. at 332 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).

There is no dispute that an apportionment excluding undocumented immigrants will result in the loss of congressional seats in states in which at least some of the Plaintiffs are located—this is the express purpose of the Memorandum.  Dr. Christopher Warshaw confirms that the Memorandum will "almost certainly" cause states with large undocumented immigrant populations to lose congressional seats—its intended impact.  Warshaw Decl. § 11 (Ex. 58); *see U.S. House of Representatives*, 525 U.S. at 330 (affirming summary judgment based on expert testimony concerning the loss of congressional seats in apportionment).  Dr. Warshaw found that if undocumented immigrants are excluded from the apportionment count, Texas—home to three of the Governmental Plaintiffs' jurisdictions and numerous members of the NGO Plaintiffs—has a 98.3% chance of losing a congressional seat.  Warshaw Decl. § 43, Tbl. 7 (Ex. 58).  Dr.

Warshaw further found that New Jersey and California are highly likely to lose seats under the Memorandum, and Florida, Illinois, New York and Arizona are also at risk of losing seats. *Id.*

These harms require immediate relief, as "time is of the essence," and "[d]elayed review would cause hardship to Plaintiffs." *New York*, 351 F. Supp. 3d at 502.  The President must report to the Clerk of the House the apportionment population counts for each state within one week of the opening of the next session of Congress, and the Clerk of the House must inform each state governor within fifteen days of receiving the apportionment population counts.  2 U.S.C § 2a(a).  Where an invalid apportionment base count threatens to yield a misallocation of congressional seats, "the possibility of irreparable harm . . . is likely, if not certain." *U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76, 88 (D.D.C. 1998).  Waiting until Defendants actually alter the apportionment in January 2021 by excluding undocumented immigrants will only create confusion and disruption.

   **D.     The balance of equities and public interest favor a preliminary injunction.**

In deciding a motion for a preliminary injunction against the federal government, the inquiries into the "balance of equities" and whether "an injunction is in the public interest" merge.  *See Make the Road N.Y. v. Cuccinelli*, 419 F. Supp. 3d 647, 665 (S.D.N.Y. 2019) (citations omitted).  In this merged inquiry, the court must "'balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief,'" as well as "'the public consequences in employing the extraordinary remedy of injunction.'"  *Id.* (quoting *Winter*, 555 U.S. at 24).  Here, the balance of the equities and public interest tip sharply in Plaintiffs' favor.

The public interest in a complete and accurate census is paramount.  "The integrity of the census is a matter of national importance. As noted, the population count has massive and lasting consequences. And it occurs only once a decade, with no possibility of a do-over if it turns out to

be flawed." *New York*, 351 F. Supp. 3d at 517.  Defendants' actions drive immigrants away from

responding to the census and, in so doing, degrade the accuracy and integrity of the resulting

headcount.  This harm is cumulative and irreparable; each day the Memorandum remains in

effect, it will continue to drive down response rates and undermine the "statistical backbone" of

the country.  Salvo Decl. ¶ 13 (Ex. 41).  Likewise, Plaintiffs and the public have an interest in

ensuring that the apportionment count and resulting distribution of political power accurately

reflects the population at large.

By contrast, Defendants will suffer no injury at all if the Memorandum is enjoined

pending a final decision on the merits.  As discussed *supra*, the Memorandum's exclusion of

undocumented immigrants from the apportionment count violates the Constitution and the

Census Act, and "the Government does not have an interest in the enforcement of

an unconstitutional law."  *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir.

2013) (quoting *ACLU v. Ashcroft,* 322 F.3d 240, 247 (3d Cir. 2003)).  Moreover, the current

crisis is one of Defendants' own making, if not their own design.  Despite issuing an Executive

Order calling for the collection of citizenship data for redistricting purposes more than a year

ago,[24] President Trump waited to announce the Memorandum until the middle of the counting

period, just as the census was poised to begin critical NRFU operations.  Nearly simultaneously,

Defendants chose to end the response period a month earlier than scheduled, further limiting the

Bureau's ability ensure an accurate headcount.  The Memorandum is part of a pattern of conduct

by Defendants that is directed at undermining the enumeration, particularly with respect to the

counting of immigrants and communities of color.  Among other remedial value, a preliminary

---

[24] *See* Exec. Order No. 13,880, 84 Fed. Reg. 33,821 (July 11, 2019); *see also Remarks by*
*President Trump on Citizenship and the Census* (July 11, 2019)
https://www.whitehouse.gov/briefings-statements/remarks-president-trump-citizenship-census/.

injunction will serve the "strong interest in ensuring that the census proceeds in an orderly, transparent, and fair manner—and, relatedly, that it is conducted in a manner that bolsters public confidence in the integrity of the process and helps strengthen this mainstay of our democracy." *New York*, 339 F. Supp. 3d at 150-51 (quotation marks omitted).  In particular, a preliminary injunction will help restore some measure of trust in the census that Defendants have repeatedly attempted to erode among immigrants and give Plaintiffs an opportunity to conduct outreach in an atmosphere less polluted by Defendants' misinformation and attempts to intimidate and marginalize immigrants.  Barreto Decl. ¶¶ 66-69 (Ex. 56); Espinosa Decl. ¶ 15 (Ex. 18); Choi Decl. ¶ 24-25 (Ex. 14); Seon Decl. ¶ 22 (Ex. 43); Torres Decl. ¶ 24 (Ex. 47).

## CONCLUSION

For the foregoing reasons, the Court should grant partial summary judgment in favor of Plaintiffs, or alternatively a preliminary injunction.


DATED:  August 7, 2020

Respectfully submitted,

LETITIA JAMES
*Attorney General of the State of New York*

By: */s/ Matthew Colangelo*

Steven C. Wu
  *Deputy Solicitor General*
Judith N. Vale
  *Senior Assistant Solicitor General*
Eric R. Haren*, Special Counsel*

*Of Counsel*

Matthew Colangelo
  *Chief Counsel for Federal Initiatives*
Morenike Fajana, *Special Counsel*
Elena Goldstein
  *Deputy Chief, Civil Rights Bureau*
Fiona J. Kaye, *Assistant Attorney General*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6057
Matthew.Colangelo@ag.ny.gov

*Attorneys for the Plaintiffs in* 20-CV-5770

/s/ Dale Ho
Dale E. Ho
Davin Rosborough
Adriel I. Cepeda Derieux
Jonathan Topaz
Sophia Lin Lakin*
American Civil Liberties Union
Foundation
125 Broad St.
New York, NY 10004
(212) 549-2693
dho@aclu.org
drosborough@aclu.org
acepedaderieux@aclu.org
jtopaz@aclu.org
slakin@aclu.org

/s/ Sarah Brannon* ***
Ceridwen Cherry*
American Civil Liberties Union
Foundation
915 15th Street, NW
Washington, DC 20005-2313
(202) 675-2337
sbrannon@aclu.org
ccherry@aclu.org

Julia A. Gomez
Peter Eliasberg**
ACLU Foundation of Southern California
1313 West 8th Street
Los Angeles, CA 90017
(213) 977-9500
jgomez@aclusocal.org
peliasberg@aclusocal.org

/s/ John A. Freedman
John A. Freedman
R. Stanton Jones**
Daniel F. Jacobson**
Chase Raines**
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
(202) 942-5000
John.Freedman@arnoldporter.com
Stanton.Jones@arnoldporter.com
Daniel.Jacobson@arnoldporter.com
Chase.Raines@arnoldporter.com

/s/ Perry Grossman
Perry Grossman
pgrossman@nyclu.org
New York Civil Liberties Union
Foundation
125 Broad Street
New York, NY 10004
Phone: (212) 607-3329
Andre Segura**
Edgar Saldivar**
Thomas Buser-Clancy**
ACLU Foundation of Texas, Inc.
P.O. Box 8306
Houston, TX 77288
Telephone: (713) 942-9146
Fax: (713) 942-8966
asegura@aclutx.org
esaldivar@aclutx.org
tbuser-clancy@aclutx.org

*Attorneys for the Plaintiffs in* 20-CV-5781

\* Admitted *pro hac vice*

\*\* Designates *pro hac vice* application forthcoming.

\*\*\* Not admitted in the District of Columbia; practice limited pursuant to D.C. App. R. 49(c)(3).

53