**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

STATE OF NEW YORK, *et al.*,

     *Plaintiffs*,


          v.

DONALD J. TRUMP, in his official capacity
as President of the United States of America, *et
al.*,

     *Defendants*.

Case No. 20-CV-5770 (RCW) (PWH) (JMF)


**BRIEF OF THE U.S. HOUSE OF REPRESENTATIVES
AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS**

# TABLE OF CONTENTS

Page

INTEREST OF *AMICUS CURIAE* ....................................................................... 1

INTRODUCTION AND SUMMARY ....................................................................... 2

ARGUMENT ................................................................................................................ 3

I.    The Memorandum Violates the Constitutional and Statutory Requirement of
      Apportionment Based on the Total Population................................................... 3

      A.    The Constitution's Text, History, and Purpose Require Apportionment
            Based on the Total Population ................................................................... 4

      B.    Congress Has Long Understood the Constitution to Require
            Apportionment Based on Total Population and Has Implemented that
            Requirement by Statute ............................................................................. 7

      C.    The Executive Branch Has Consistently Recognized the Constitutional
            Requirement of Apportionment Based on Total Population................... 10

      D.    The Memorandum Is Invalid Under the Constitution and Applicable
            Statutes ...................................................................................................... 13

II.   The Memorandum Harms the Integrity of the House and Public Perceptions of its
      Legitimacy .......................................................................................................... 15

      A.    The Memorandum Continues Efforts to Manipulate the Census,
            Undermining the Reality and Perception of Impartiality...................... 16

      B.    The Memorandum Will Result in a Flawed and Inaccurate Apportionment........ 19

      C.    The Memorandum Will Distort the Composition of the House .......................... 22

CONCLUSION ........................................................................................................... 24

## TABLE OF AUTHORITIES

**Cases**

*Alabama v. Dep't of Commerce*, No. 2:18-cv- 00772-RDP (N.D. Ala. Mar. 13, 2020) ............. 15

*Assembly of State of Cal. v. U.S. Dep't of Commerce*, 968 F.2d 916 (9th Cir. 1992) ................. 21

*Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019) ................................................. 18, 20, 21

*Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999) ........................ 15, 16

*Evenwel v. Abbott*, 136 S. Ct. 1120 (2016) ..................................................... 4, 5, 6, 24

*Fed. for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564 (D.D.C. 1980) ............... *passim*

*Franklin v. Massachusetts*, 505 U.S. 788 (1992) ......................................................... 10

*New York v. DHS*, __ F.3d __, 2020 WL 4457951 (2d Cir. Aug. 4, 2020) ................................. 13

*New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502 (S.D.N.Y. 2019) ................. 17, 18, 22

*NLRB v. Noel Canning*, 573 U.S. 513 (2014) ................................................................. 13

*Plyler v. Doe*, 457 U.S. 202 (1982) ................................................................. 6, 23

*Powell v. McCormack*, 395 U.S. 486 (1969) ................................................................. 1, 23

*Ridge v. Verity*, 715 F. Supp. 1308 (W.D. Pa. 1989) ................................................. 12

*Wesberry v. Sanders*, 376 U.S. 1 (1964) ................................................................. 5

*Yick Wo v. Hopkins*, 118 U.S. 356 (1896) ................................................................. 6

*Young v. Klutznick*, 652 F.2d 617 (6th Cir. 1981) ................................................. 21

**Constitutional and Statutory Provisions**

U.S. Const. Art. I, § 2, cl. 3 ................................................................................. *passim*

U.S. Const. Art. I, § 3 ................................................................................. 23

U.S. Const. Art. II, § 1, cl. 2 ................................................................................. 4

U.S. Const. Amend. XVII ...................................................................................... 23

U.S. Const. Amend. XIV ............................................................................... *passim*

13 U.S.C. § 141 ................................................................................... 2, 9, 15, 20

2 U.S.C. § 2a ........................................................................................ 1, 2, 3, 9

20 Stat. 475 § 8 (1879) ............................................................................................ 4

## Other Authorities

1 Records of the Federal Convention of 1787 (M. Farrand ed. 1911) ..................................... 5, 24

*1980 Census: Counting Illegal Aliens: Hearing Before the S. Subcomm. on Energy, Nuclear Proliferation, & Fed. Services of the Comm. on Gov'tl Affairs (1980 Census),* 96th Cong. 10 (1980) ............................................................................................ 8

83 Fed. Reg. 5,525 (2018) .......................................................................... 11

85 Fed. Reg. 44,679 (2020) ................................................................... *passim*

39 Op. Att'y Gen. 518 (1940) ...................................................................... 4

71 Cong. Rec. 1821 (1929) ........................................................................... 8

86 Cong. Rec. 4372 (1940) ........................................................................... 8

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ............................. 6

America Counts Staff, *Responding to the Census Will Help Plan Health Care Programs for the Next Decade*, U.S. Census Bureau (July 13, 2020), https://perma.cc/8TL2-6A2P ................. 22

Black's Law Dictionary (11th ed. 2019) ............................................................. 4

Brief for the United States as *Amicus Curiae* Supporting Appellees, *Evenwel v. Abbott*, No. 14-940, 2015 WL 5675829 (2015) .................................................................. 24

Carroll D. Wright, *History and Grown of the U.S. Census, Prepared for the Senate Committee on the Census*, Department of Labor (1900) ................................................................. 10

Cong. Globe, 39th Cong., 1st Sess. 2767 (1866) .................................................. 5, 6, 7

Decl. of Census Bureau Senior Advisor Enrique Lamas, Defs.' Supp. Rule 26(a)(1) Disclosures and Rule 26(a)(2)(C) Disclosures, *Alabama v. Dep't of Commerce*, No. 2:18-cv- 00772-RDP

(N.D. Ala. Mar. 13, 2020) ............................................................................................ 15

Department of Homeland Security, *Population Estimates: Illegal Alien Population Residing in the United States: January 2015* (Dec. 2018),  https://perma.cc/MM2Q-WBH3 ................... 15

Email from Brooke Alexander, Executive Assistant to the Secretary, Dep't of Com., to Hilary Geary (Apr. 5, 2017, 4:24 PM), https://perma.cc/8NJF-T73G?type=image ........................... 17

Email from Kris Kobach, Kansas Secretary of State, to Secretary Wilbur L. Ross, Jr., Dep't of Com. (July 14, 2017, 9:12 AM), https://perma.cc/P2NU-7S5P?type=image ......................... 17

Email from Kris Kobach, Secretary of State of Kansas, to Wendy Teramoto, Chief of Staff, Dep't of Com. (July 21, 2017, 4:34 PM), https://perma.cc/8WQG-QYEH?type=image ......... 17

Email from Ron Jarmin, Acting Director, Census Bureau, to Arthur Gary, Gen. Counsel, Justice Management Division, Dep't of Justice, (Dec. 22, 2017, 3:32 PM) ....................................... 17

Federal Defs.' Post-Trial Proposed Findings, 15 Arg. Mem., *Fed. for Am. Immigration Reform v. Klutznick*, No. 79-3269 (D.D.C. filed Feb. 15, 1980) ....................................................... 12

H.J. Res. 20, 71st Cong. (1931) ........................................................................................... 8

H.J. Res.101, 71st Cong. (1931) .......................................................................................... 8

H.J. Res.263, 71st Cong. (1931) .......................................................................................... 8

H.J. Res.356, 71st Cong. (1931) .......................................................................................... 8

H. Res. 484, 71st Cong. (1931) ............................................................................................ 8

H.R. 3639, 100th Cong. (1987) ............................................................................................ 8

H.R. 3797, 111th Cong. (2011) ............................................................................................ 8

Hansi Lo Wang, *Republicans Signal They're Willing to Cut Census Counting Short*, NPR (July 28, 2020), https://perma.cc/VXX4-MF7P ............................................................................. 20

Hearing Before the H. Comm. on Oversight & Reform, 116th Cong. 12 (Feb. 12, 2020) ........... 11

Jeffrey S. Passel, *Measuring Illegal Immigration: How Pew Research Center Counts Unauthorized Immigrants in the U.S.*, Pew Research Center (July 12, 2019), https://perma.cc/5ZP8-77KL ............................................................................................. 15

Jennifer D. Williams, Cong. Research Serv., Answers to Selected Questions About the Decennial Census (Apr. 27, 2017) ...................................................................................................... 9

Jens Manuel Krogstad, *et al.*, *5 Facts About Illegal Immigration in the U.S.*, Pew Research Ctr. (June 12, 2019), https://perma.cc/YQU8-J9E3 ........................................................................ 14

Jynnah Radford, *Key Findings About U.S. Immigrants*, Pew Research Ctr. (June 17, 2019), https://perma.cc/USU7-L9BM ................................................................................................. 14

Letter from Carol T. Crawford, Assistant Attorney General, to Senator Jeff Bingham (Sept. 22, 1989) ........................................................................................................................................ 12

Letter from Thomas M. Boyd, Acting Assistant Attorney, to Hon. James C. Miller III, Director of Office of Management & Budget (June 29, 1988) ............................................................... 12

Margaret Mikyung Lee & Erika Lunder, *Constitutionality of Excluding Aliens from the Census for Apportionment and Redistricting Purposes*, Cong. Research Serv. (Apr. 13, 2012)........ 8, 9

Memorandum from Acting Chairwoman Carolyn B. Maloney to Members of the Committee on Oversight and Reform, *Update on Investigation of Census Citizenship Question Since House Held Attorney General Barr and Commerce Secretary Ross in Contempt of Congress* (Nov. 12, 2019), https://perma.cc/A4WB-HVAP ........................................................................... 18

Memorandum from Wilbur L. Ross, Jr., Secretary of Commerce, to Karen Dunn Kelley, Under Secretary of Commerce for Economic Affairs, *Reinstatement of a Citizenship Question on the 2020 Decennial Census Questionnaire* (Mar. 26, 2018), https://perma.cc/2XDF-Q7E8 ......... 16

Press Release, H. Comm. on Oversight and Reform, *Four Former Census Bureau Directors Testify the Trump Administration's Attempt to Ban Undocumented Immigrants from 2020 Census is Unconstitutional* (July 29, 2020) ........................................................................... 11

Press Release, H. Comm. on Oversight and Reform, *Oversight Committee Held Emergency Hearing on Trump Administration's Unconstitutional Politicization of 2020 Census* (July 29, 2020) ....................................................................................................................................... 22

Randy Capps et al., Migration Policy Inst., *A Profile of U.S. Children with Unauthorized Immigrant Parents* 1 (2016), https://perma.cc/9TDT-BYKL.................................................. 23

*Remarks by President Trump Before Marine One Departure*, White House, (July 5, 2019), https://perma.cc/QK6V-833H ................................................................................................ 18

*Response Rates*, United States Census 2020, https://2020census.gov/en/response-rates.html..... 21

Rules of the U.S. House of Representatives (116th Cong.), Rule II.8(b), https://perma.cc/M25F-496H........................................................................................................................................... 1

S. 1688, 111th Cong. (2011) ...................................................................................................... 8

S. 2366, 96th Cong. (1980) ................................................................................ 8

S. Rep. 71-2 (1929) ........................................................................................... 9

*Statement from the President Regarding Apportionment*, White House, (July 21, 2020)
    https://perma.cc/PZ5Y-23GS ..................................................................... 18

Stephanie Ebbs, *2020 Census to end data collection Sept. 30, raising concerns about
    undercounting*, ABC News (Aug. 4, 2020), https://perma.cc/54KX-NUUB ......... 21

The Federalist No. 54 (G. Carey & J. McClellan eds. 2001) ............................... 4

Thomas Hofeller, *The Use of Citizen Voting Age Population in Redistricting* (2015),
    https://perma.cc/22RT-5EWN. ............................................................. 16, 17

Thomas M. Durbin, *The 1990 Decennial Census and the Counting of Illegal Aliens*, Cong. Rsch.
    Serv., 88-62 A (1988) ................................................................................ 9

U.S. Census Bureau, *Population of The United States in 1860*, https://perma.cc/MBR8-AKDU.
    ........................................................................................................ 10

U.S. Census Bureau, *Historical Perspective*, https://perma.cc/Y6LW-XKF8. .......... 14

U.S. Census Bureau, *Frequently Asked Questions on Congressional Apportionment*,
    https://perma.cc/2HCH-NYVZ ................................................................... 11

U.S. Census Bureau, *Computing Apportionment*, https://perma.cc/29ZD-9V76. ....... 11

## INTEREST OF *AMICUS CURIAE*

*Amicus curiae*, the United States House of Representatives (House),[1] respectfully submits this brief in furtherance of its compelling institutional interests in this case.

First, the House has a paramount interest in the integrity of its own composition, *see Powell v. McCormack*, 395 U.S. 486, 548 (1969), which depends upon the lawful and accurate apportionment of Representatives among the States based on the decennial census.

Second, the Apportionment and Enumeration Clauses of Article I of the Constitution place responsibility for the census and apportionment with Congress. *See* U.S. Const. Art. I, § 2, cl. 3 (the enumeration shall be conducted "in such Manner as [Congress] shall by Law direct"). The House therefore has a compelling interest in ensuring that the President and the Secretary of Commerce do not transgress constitutional and statutory constraints in the administration of the census and the certification of the apportionment to Congress.

Third, federal law requires the Clerk of the House, on the basis of the apportionment, to notify each State's governor of the number of Representatives to which the State is entitled. 2 U.S.C. § 2a(b). The House has an interest in the integrity and legality of the process its officers and personnel are directed to carry out.

Finally, the House has a powerful interest in ensuring that all of our Nation's communities—who contribute to the public fisc and are equally subject to its laws—receive the representation in the House to which they are entitled.

---

[1] The Bipartisan Legal Advisory Group (BLAG) of the United States House of Representatives has authorized the filing of an *amicus* brief in this matter. The BLAG comprises the Honorable Nancy Pelosi, Speaker of the House, the Honorable Steny H. Hoyer, Majority Leader, the Honorable James E. Clyburn, Majority Whip, the Honorable Kevin McCarthy, Republican Leader, and the Honorable Steve Scalise, Republican Whip, and "speaks for, and articulates the institutional position of, the House in all litigation matters." Rules of the U.S. House of Representatives, 116th Cong., Rule II.8(b) (2019), https://perma.cc/M25F-496H. The Republican Leader and Republican Whip dissented.

## INTRODUCTION AND SUMMARY

By memorandum issued on July 21, 2020, President Trump ordered the exclusion of noncitizens "who are not in a lawful immigration status" from "the reapportionment of Representatives following the 2020 census." Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census, 85 Fed. Reg. 44,679, 44,680 (July 23, 2020) (the Memorandum). The Memorandum justifies that exclusion on the basis of the President's purported discretion to redefine which U.S. residents qualify as "inhabitants" in determining the total population of each State for purposes of apportionment. *Id.* at 44,679.

The Constitution, as well as the Census and Reapportionment Acts, prohibit the President's action. Section 2 of the Fourteenth Amendment requires the "counting [of] the whole number of *persons* in each State," U.S. Const. Amend. XIV, § 2 (emphasis added), and its Apportionment Clause commands that "Representatives shall be apportioned among the several States according to their respective numbers," as determined in the enumeration. *Id.*; *see also* U.S. Const. Art. I, § 2, cl. 3. Based on this language and the enactment history of the original Constitution and the Fourteenth Amendment, all three branches of the Federal Government have long understood that the Constitution requires the Congressional apportionment base to encompass all "persons" residing in each State—irrespective of citizenship or immigration status. The implementing statutes reflect the Constitution's clear mandate, requiring "the tabulation of total population by States," 13 U.S.C. § 141(b), and counting the "whole number of persons in each State," 2 U.S.C. § 2a(a). The President therefore cannot lawfully transmit an apportionment calculation based on anything other than "the whole number of persons in each State." *Id.*

The actions directed by the Memorandum not only violate the law but also threaten serious harm to the integrity of the House and its composition.   This Administration's implementation of the census has been marked by efforts to manipulate the count for apparently political purposes, and the Memorandum is a new and troubling chapter in that history.   The Memorandum compounds the perception that the Administration is using the census as a partisan tool designed to enhance the voting power of certain favored groups while suppressing the voting power of others.   Even setting these problems aside, the Memorandum's goal of ascertaining the number of immigrants without lawful status is impossible as a practical matter to do accurately, because any attempt to do so would either use statistical sampling that federal law prohibits or would yield wildly inaccurate figures that would distort the composition of the House.   An inaccurate census tainted by partisan political influence will harm the public's faith in the apportionment, impair effective governance, and undermine the foundational principle, central to the House's legitimacy, that in our democracy all the people count.

## ARGUMENT

### I.     The Memorandum Violates the Constitutional and Statutory Requirement of Apportionment Based on the Total Population

Every tool of constitutional and statutory interpretation demonstrates that the Memorandum is unlawful.   The text of the Apportionment and Enumeration Clauses and the Fourteenth Amendment, viewed in light of the history and purpose of those provisions, confirms that apportionment must be based on a count of the total population of all persons.   Congress, the courts, and the Executive Branch have consistently interpreted the Constitution to require an all-persons enumeration.   Congress has not only enacted statutes that implement the Constitution's command to count all persons, but has also refused to enact legislation that would accomplish what the Memorandum attempts to achieve by executive fiat.

3

A.    The Constitution's Text, History, and Purpose Require Apportionment
      Based on the Total Population

As originally drafted, the Constitution required that all persons be counted for purposes of apportioning seats in the House and allocating electors in the Electoral College, *see* U.S. Const. Art. I, § 2, cl. 3; *id.* Art. II, § 1, cl. 2, subject to two notorious and explicitly identified exceptions: Enslaved people were counted as only three-fifths of a person, and "Indians not taxed" were excluded from the total population. *Id.* Art. I, § 2, cl. 3. The Fourteenth Amendment, ratified in the wake of the Civil War to establish full political representation for all, amended the Enumeration Clause of Article I to remove the Three-Fifths Clause and declare that apportionment of Representatives be based on the "whole number of persons in each State." U.S. Const. Amend. XIV, § 2.[2]

The meaning of these provisions is clear. The term "person" includes any "human being," Black's Law Dictionary (11th ed. 2019), and necessitates that *every* individual living in the United States be included in the decennial count. This was the understanding of the Constitution's framers. James Madison explained in the Federalist Papers that "the aggregate number of representatives allotted to the several states" was to be "founded on the aggregate number of inhabitants," even though a State could deny many of its residents the franchise. The Federalist No. 54, at 284 (G. Carey & J. McClellan eds., 2001) (quoted in *Evenwel v. Abbott*, 136 S. Ct. 1120, 1127 (2016)). Alexander Hamilton, speaking in support of apportionment based on total population, stated: "There can be no truer principle than this—that every individual of the

---

[2] The exception for "Indians not taxed" was retained in the Fourteenth Amendment but is no longer applicable. *See, e.g.*, An Act to Provide for Taking the Tenth and Subsequent Censuses, ch. 195 § 8, 20 Stat. 475 (1879) (authorizing the Census Bureau to enumerate all Native Americans); *Exclusion of "Indians Not Taxed" When Apportioning Representatives*, 39 Op. Att'y Gen. 518, 519–20 (1940) (recommending that the Secretary of Commerce continue enumerating all Native Americans in light of both the Supreme Court's determination that all Native Americans are subject to federal income tax laws and the uncertainty about the meaning of the constitutional phrase "Indians not taxed").

community at large has an equal right to the protection of government."  1 Records of the Federal Convention of 1787, at 473 (M. Farrand ed., 1911) (quoted in *Evenwel*, 136 S. Ct. at 1127).  The debates at the Constitutional Convention make "abundantly clear" that "when the delegates agreed that the House should represent 'people' they intended that in allocating Congressmen the number assigned to each State should be determined solely by the number of the State's inhabitants."  *Wesberry v. Sanders*, 376 U.S. 1, 13 (1964).

The Fourteenth Amendment abandoned the Three-Fifths Clause but otherwise retained total population as the apportionment base, specifying that Representatives must be apportioned "according to their respective numbers, *counting the whole number of persons in each State*."  U.S. Const. Amend. XIV, § 2 (emphasis added).  That the Fourteenth Amendment uses distinct language in other provisions to refer specifically to citizens underscores that the broader reference to "persons" includes all inhabitants, regardless of citizenship status.  *Compare id.*, § 1, cl. 2 ("No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States . . ." *with id.*, § 1, cl. 3 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . .").

The ratification history of the Fourteenth Amendment further confirms that the provision encompasses all persons, regardless of immigration status.  The framers of the Fourteenth Amendment deliberately chose a total-population basis for the apportionment of Representatives in the House.  *See Evenwel*, 136 S. Ct. at 1127–29; *Wesberry*, 376 U.S. at 13 (finding it "abundantly clear . . . that in allocating Congress[ional seats] . . . the number assigned to each state should be determined solely by the number of the State's inhabitants"); *see also* Cong. Globe, 39th Cong., 1st Sess. 2767 (1866) (remarks of Sen. Jacob Howard) ("Numbers, not voters … [or] property; this is the theory of the Constitution.").

5

The selection of the word "persons" for the apportionment base reflected an understanding that all individuals "have as vital an interest in the legislation of the country as those who actually deposit the ballot." *Evenwel*, 136 S. Ct. at 1128 (quoting Cong. Globe, 39th Cong., 1st Sess., 141 (1866) (remarks of Rep. James Blaine)); *see also* Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 169–72, 217–18 (1998) (emphasizing the framers' "paradigmatic[]" concern to use the term "persons" to encompass "nonvoting aliens" in the wake of the Supreme Court's *Dred Scott* decision). In making this choice, the Amendment's framers recognized that elected federal officials represent and act in the name of *all* their constituents, including nonvoting classes, like women (at the time), children, incarcerated persons, and noncitizens.[3]

In light of the text and history of the Fourteenth Amendment, the Supreme Court has explained that "[a]liens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons'" under the Fourteenth Amendment. *Plyler v. Doe*, 457 U.S. 202, 210 (1982). "Whatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sentence of that term." *Id.* The references to "persons" in the Fourteenth Amendment therefore "are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality." *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886).

Contrary to the Memorandum's assertion, the Fourteenth Amendment did not leave open the possibility that some classes of state residents would be excluded from the enumeration and

---

[3] *See* Cong. Globe, 39th Cong., 1st Sess. 141 (1866) (remarks of Rep. James Blaine) (describing rejected amendment's proposed use of "suffrage instead of population [as] the basis of apportioning Representatives"); *id.* at 353 (remarks of Rep. Andrew Rogers) (asserting "the States are entitled to representation" for women and children, who "constitute[ed] nearly one half of the population of this country, [but] cannot vote").

apportionment.   The primary drafter of the Fourteenth Amendment, Representative John Bingham, made clear that the Fourteenth Amendment's use of the term "whole number of persons" encompasses all persons living in each State, including the "entire immigrant population not naturalized."   Cong. Globe, 39th Cong., 1st Sess. 432 (1866) (remarks of Rep. John Bingham); *see also id.* at 1256 (remarks of Rep. Henry Wilson) (recognizing that "unnaturalized foreign-born" individuals and others ineligible to vote are included in the census count).   Bingham argued vehemently against alternative proposals that would have limited the apportionment base, asserting that "[u]nder the Constitution as it now is and as it always has been, *the entire immigrant population* of this country is included in the basis of representation." *Id.* at 432 (emphasis added); *see also id.* at 411 (remarks of Rep. Burton Cook) (expressing concern that representation based on number of voters would inappropriately "take[] from the basis of representation all unnaturalized foreigners").

The unambiguous text and drafting history of Article I and the Fourteenth Amendment thus make clear that the Constitution requires "the population base for purposes of apportionment" to "include[] all persons, including aliens both lawfully and unlawfully within our borders."  *Fed'n for Am. Immigr. Reform (FAIR) v. Klutznick*, 486 F. Supp. 564, 576 (D.D.C. 1980) (three-judge court).

### B.   Congress Has Long Understood the Constitution to Require Apportionment Based on Total Population and Has Implemented that Requirement by Statute

Congress has consistently understood that the Constitution mandates apportionment based on all who reside in the United States.   Every statute that Congress has ever passed regarding the census has reflected this understanding, and every census has included undocumented immigrants in the apportionment count.   *FAIR*, 486 F. Supp. at 576.

7

In light of Congress's understanding of the constitutional requirement to count all inhabitants, legislative efforts to alter the apportionment to exclude certain noncitizens from the apportionment count have always failed.  Immediately after adoption of the Fourteenth Amendment, a proposal to exclude "aliens" from apportionment was defeated in the House.  *See* Cong. Globe, 39th Cong., 1st Sess. 535, 538 (1866) (proposal to exclude); *see also id.* at 2767 (remarks of Sen. Jacob Howard) (explaining that the "basis of representation" is the "whole population" as "the principle upon which the Constitution itself was originally framed . . . [which] is the safest and most secure principle upon which the Government can rest").

Subsequent attempts to exclude either all aliens or undocumented immigrants from the apportionment base failed in the Seventy-first, Seventy-sixth, Ninety-sixth, One Hundredth, and One Hundred Eleventh Congresses.[4]  These efforts were rejected due to a broad recognition that the "statutory exclusion of aliens from the apportionment base would be unconstitutional" absent constitutional amendment.  71 Cong. Rec. 1821 (1929); *see also* 86 Cong. Rec. 4372 (1940) (remarks of Rep. Emanuel Celler) ("The Constitution says that all persons shall be counted," including "those aliens here illegally."); *1980 Census: Counting Illegal Aliens: Hearing Before the S. Subcomm. on Energy, Nuclear Proliferation, & Fed. Services of the Comm. on Gov'tl Affairs (1980 Census)*, 96th Cong. 10 (1980) (remarks of Sen. Jacob Javits ) (maintaining that the Constitution cannot mean "anything other than as described in Federalist papers, the aggregate

---

[4] *See* Margaret Mikyung Lee & Erika K. Lunder, *Constitutionality of Excluding Aliens from the Census for Apportionment and Redistricting Purposes*, Cong. Research Serv. at 6, n.37 (Apr. 13, 2012) (citing H.J. Res. 20, 101, 263, 356, and 484, 71st Cong. (1931); 86 Cong. Rec. 4372 (1940) (Senate); S. 2366, 96th Cong. (1980)); *see also* H.R. 3639, 100th Cong. (1987) (House)); H.R. 3797, 111th Cong. (2011) and S. 1688, 111th Cong. (2011).

number of inhabitants, which includes aliens, legal and illegal.").[5]   Congress has routinely

received counsel on this question reaching the same conclusion.[6]

      The statutes that currently implement the Constitution's Apportionment and Enumeration

Clauses reflect this consistent understanding of the Constitution's meaning.   The Census Act

requires the "tabulation of *total population* by States . . . as required for the apportionment of

Representatives in Congress among the several States."   13 U.S.C. § 141(b) (emphasis added).

The Reapportionment Act then requires the President to "transmit to the Congress a statement

showing *the whole number of persons* in each State . . . as ascertained . . .  [by the] decennial

census of the population" and, in turn, to transmit an apportionment of Representatives

calculated based on that full count.  2 U.S.C. § 2a(a) (emphasis added); *see also* S. Rep. No. 71-

2, at 4–5 (1929) (requiring the President "to report upon a problem in mathematics . . . for which

rigid specifications are provided by Congress itself, and to which there can be but one

mathematical answer").

---

[5] Although the Senate passed two bills with a provision "prohibit[ing] the use of funds to include illegal aliens in the census for apportionment," neither of these measures was enacted. Margaret Mikyung Lee & Erika K. Lunder, *Constitutionality of Excluding Aliens from the Census for Apportionment and Redistricting Purposes*, Cong. Research Serv. at 13 (2012) (referencing S. 358, § 601, 101st Cong. (1989) and Senate-passed version of H.R. 2991, 101st Cong. (1989)).

[6] *See* Thomas M. Durbin, *The 1990 Decennial Census and the Counting of Illegal Aliens*, Cong. Rsch. Serv., 88-62 A (1988) (concluding that "aliens, legal and illegal," are included within "persons" in the Enumeration Clause and "that a constitutional amendment would seem to be necessary to exclude illegal aliens from the decennial census"); Margaret Mikyung Lee & Erika K. Lunder, Cong. Rsch. Serv., Analysis of Whether Unauthorized Aliens Must be Included in the Census 1 (2009) (concluding that the Framers intended that "persons" would be "all-inclusive," so the "apportionment calculation" must be "based on the states' total resident population," including "both citizens and noncitizens"); Cong. Rsch. Serv., R41048, Constitutionality of Excluding Aliens from the Census for Apportionment and Redistricting Purposes 2 (2012) (finding "the total resident population of the states . . . includes both citizens and aliens"); Jennifer D. Williams, Cong. Rsch. Serv., Answers to Selected Questions About the Decennial Census 3 (2017) (citing Census Bureau's analysis concluding "the Constitution specified persons as the basis for apportionment, without regard to citizenship or legal resident status").

While the President has certain policy discretion in the administration of the census, his role in the reapportionment process is limited to reporting the "whole number of persons in each State" to Congress.  *Franklin v. Massachusetts*, 505 U.S. 788, 791, 799 (1992).  Like the Constitution itself, the statutory framework provides the President with no discretion to deviate from apportioning Congressional districts based on the "total," "whole," or "full" population.

### C.    The Executive Branch Has Consistently Recognized the Constitutional Requirement of Apportionment Based on Total Population

The Executive Branch, throughout both Republican and Democratic administrations, has joined Congress and the Judicial Branch in reading the Constitution to require the enumeration of all persons and the inclusion of all those enumerated in apportionment.  In particular, the Census Bureau and the Department of Justice (DOJ) have both acknowledged the constitutional requirement that apportionment account for all persons, including undocumented immigrants.

Since the first census, "[t]he Census Bureau has always attempted to count every person residing in a state on Census day, and the population base for purposes of apportionment has always included all persons, including aliens both lawfully and unlawfully within our borders." *FAIR*, 486 F. Supp. at 576.  Thus, the census has historically counted individuals who have been present without regard to legal status.[7]  For instance, enslaved persons who escaped to a free State were counted as inhabitants of that State, despite the fact these individuals were considered under law to be fugitives illegally residing there.[8]  The Bureau has similarly always relied on total population in making apportionment determinations, because "[t]he apportionment

---

[7] *See* Margaret Mikyung Lee & Erika K. Lunder, *Analysis of Whether Unauthorized Aliens Must be Included in the Census*, Cong. Rsch. Serv., 4 (2009) (referencing "reprint[ed] instructions [disseminated] to the Marshals for the 1820 and 1830 censuses" in Carroll D. Wright, *History and Grown of the U.S. Census, Prepared for the Senate Committee on the Census*, Department of Labor (1900), at 135, 140–41).

[8] U.S. Census Bureau, Population of The United States in 1860, at ix–xii, https://perma.cc/MBR8-AKDU (assessing fluctuations in the fugitive slave population).

population count for each of the 50 states includes the state's total resident population (citizens and non-citizens)."[9]  No census has ever systematically excluded undocumented immigrants.[10]

Recent history is in accord.  As recently as 2018, the Census Bureau issued a rule recognizing that the Constitution and federal statutes compel the conclusion that "[f]oreign citizens are considered to be 'living' in the United States if, at the time of the census, they are living and sleeping most of the time at a residence in the United States."  Final 2020 Census Residence Criteria and Residence Situations, 83 Fed. Reg. 5,525, 5,530 (2018).  Earlier this year, the Director of the Census Bureau told Congress that the Bureau's directive and mission is to "count everyone, wherever they are living."  *Hearing Before the H. Comm. on Oversight & Reform*, 116th Cong. 12 (Feb. 12, 2020).  And four former Directors of the Census Bureau recently testified before a House committee that President Trump's effort to exclude undocumented immigrants from the apportionment count was unconstitutional.[11]

Like the Census Bureau, the DOJ has made clear that enumeration and apportionment must include the entire population, including unauthorized immigrants.  In 1980, DOJ correctly observed that removing undocumented immigrants from the census and apportionment counts would constitute "a radical revision of the constitutionally mandated system for allocation of Representatives to the States of the Union and an equally radical revision of the historic mission of the decennial census."  Federal Defs.' Post-Trial Proposed Findings, 15 Arg. Mem. at 1,

---

[9] U.S. Census Bureau, Frequently Asked Questions on Congressional Apportionment, https://perma.cc/2HCH-NYVZ; *see also* U.S. Census Bureau, Computing Apportionment, https://perma.cc/29ZD-9V76 (explaining "Equal Proportions Method" of calculating apportionment, used since 1941, relies on "a state's total population").

[10] *See* Hearing, *Counting Every Person: Safeguarding the 2020 Census*, H. Comm. on Oversight & Government Reform (testimony of Kenneth Prewitt and Robert M. Groves).

[11] *See* Press Release, H. Comm. on Oversight & Reform, *Four Former Census Bureau Directors Testify the Trump Administration's Attempt to Ban Undocumented Immigrants from 2020 Census is Unconstitutional* (July 29, 2020).

*Klutznick*, No. 79-3269 (D.D.C. Feb. 15, 1980) (acknowledging that "for 200 years the decennial census has counted all residents of the states irrespective of their citizenship or immigration status"); *see also Ridge v. Verity*, 715 F. Supp. 1308, 1311 (W.D. Pa. 1989) (describing DOJ's argument on behalf of defendants as contending "that they are constitutionally mandated . . . to count all persons in the 1990 census, including illegal aliens, for purpose of apportionment" and that they have done so for 200 years).

DOJ has espoused the same position outside of litigation.  In 1988, DOJ's Office of Legislative Affairs asserted there was a "clear" constitutional mandate to count "all persons, including aliens residing in this country" in the census and "insisted upon their inclusion [in the apportionment base] . . . notwithstanding their acknowledgement that aliens were not bona fide members of the body politic."  Letter from Thomas M. Boyd, Acting Assistant Attorney, to Rep. William D. Ford, House of Representatives (June 29, 1988) (reprinted in *1990 Census Procedures and Demographic Impact on the State of Michigan*, U.S. Gov't Printing Off., 240–44 (1988)).  In writing to Members of Congress, the DOJ has recognized that "the original Apportionment and Census Clauses of Article I section two of the Constitution require that inhabitants of States who are illegal aliens be included in the census count."  Letter from Carol T. Crawford, Assistant Attorney General, to Senator Jeff Bingham (Sept. 22, 1989) (reprinted in 135 Cong. Rec. S22,521 (daily ed. Sept. 29, 1989) (noting that DOJ "found no basis for reversing this position")).  These longstanding DOJ analyses correctly reflect the unambiguous historical and legislative record of the Enumeration and Apportionment Clauses.

The consistent historical understanding of the Enumeration and Apportionment Clauses by all three branches establishes an unbroken precedent that the President may not transgress: *all persons*, regardless of immigration status, are to be counted in the census, and Representatives

must be apportioned based on that count.  Congress is entitled to rely on such uniform judicial, administrative, and legislative treatments of the Constitution's text.  *See N.L.R.B. v. Noel Canning*, 573 U.S. 513, 525 (2014) (noting that "the longstanding practice of government can inform our determination of what the law is" (internal citation and quotations marks omitted)); *cf. New York v. DHS*, __ F.3d __, 2020 WL 4457951, at *21 (2d Cir. Aug. 4, 2020).

### D.     The Memorandum Is Invalid Under the Constitution and Applicable Statutes

The Memorandum conflicts with the clear constitutional and statutory command that all persons must be included in the apportionment base, and the rationales offered in support of excluding immigrants without lawful status do not withstand scrutiny.  The President asserts that "the term 'persons in each State'" in the Enumeration Clause "has been interpreted to mean that only the 'inhabitants' of each State should be included" within the apportionment base. Excluding Illegal Aliens, 85 Fed. Reg. at 44,679.  The Memorandum then reasons that Congress has delegated to the President the discretion "to determine who qualifies as an 'inhabitant,'" and that this discretion "includes authority to exclude from the apportionment base aliens who are not in a lawful immigration status."  *Id.*   This logical leap fails under the plain language of the Constitution and the applicable statutes.

Any discretion the President might have to determine who qualifies as an "inhabitant" does not include the discretion to exclude residents based solely on their immigration status.  The inclusion of all "persons" in the Constitution's mandate for enumeration and apportionment, in addition to the historical reliance on total population for both, establishes that legal status is not a prerequisite for habitancy.  The Act of March 1, 1790, passed just three years after ratification of the Constitution, specified that persons be enumerated at their "usual residence."  Final 2020 Census Residence Criteria and Residence Situations, 83 Fed. Reg. 5525-01.  An individual's residence is his or her "usual place of abode," which is assessed without regard to the

individual's immigration status.  *Id.*  Thus, "[t]he apportionment population base always has included those persons who have established a residence in the United States," regardless of their legal status.[12]

Nor could the President plausibly interpret "inhabitants" categorically to exclude immigrants without lawful status.  In reality, many immigrants, whatever their legal status, are longstanding members of their communities.  While there is no accurate data regarding the actual number of unauthorized immigrants living in the United States, the Pew Research Center estimates that, in addition to 12.3 million lawful permanent residents and 2.2 million temporary lawful residents, an estimated 10.5 million unauthorized immigrants live in the United States.[13] Per Pew's estimates, "[a]bout two-thirds (66%) of unauthorized immigrant adults in 2017 had been in the U.S. more than 10 years," with at least half of undocumented adults having "lived in the U.S. for a median of 15.1 years."[14]  If the President had discretion to read the word "inhabitant" to exclude someone living in the United States for over a decade, then there would be few limits on his ability to expand and contract who is represented in our democracy.

The Memorandum's attempt to exclude immigrants without lawful status from the apportionment base violates the applicable statutes for an additional reason.  The Memorandum implicitly assumes that the census process will provide data on which the President can reliably and accurately determine which persons are immigrants without lawful status, and thus excludable.  That assumption is incorrect.  The 2020 census does not include any question about citizenship status, let alone address the more complex question whether each person counted is

---

[12] U.S. Census Bureau, Historical Perspective (2020), https://perma.cc/Y6LW-XKF8.

[13] Jynnah Radford, *Key Findings About U.S. Immigrants*, Pew Rsch. Ctr. (June 17, 2019), https://perma.cc/USU7-L9BM.

[14] Jens Manuel Krogstad, et al., *5 Facts About Illegal Immigration in the U.S.*, Pew Rsch. Ctr. (June 12, 2019), https://perma.cc/YQU8-J9E3.

lawfully present in the United States.  *Id.*; *see infra* Section II(A).  And the Census Bureau itself has announced that it lacks "accurate estimates of the resident undocumented population" in each State.[15]

Presumably, therefore, to discern the number of people who should be excluded from the enumeration, the Executive Branch would need to resort to the type of statistical sampling methods that the Census Act explicitly prohibits.  *See* 13 U.S.C. §§ 141(a), 195 (prohibiting the use of statistical sampling "for the determination of population for purposes of apportionment of Representatives in Congress among the several States"); *U.S. Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 343 (1999) (holding that the use of sampling in the decennial census to complete the enumeration "for apportionment purposes" violates the Census Act).[16] Thus, the President not only lacks the discretion he claims, but also could not exercise any such discretion in compliance with the Census Act even if he had it.

## II.   The Memorandum Harms the Integrity of the House and Public Perceptions of its Legitimacy

The census count has direct and substantial stakes for the distribution of political power across the country.  For that reason, an objective and impartial process, resulting in accurate and reliable data, is critical to implementing a constitutionally sound census.  *See, e.g.*, *Dep't of Com. v. House*, 525 U.S. at 348–49 (Scalia, J., concurring in part) (discussing the need for the census process to pursue "the most accurate way of determining population with minimal possibility of

---

[15]   Decl. of Census Bureau Senior Advisor Enrique Lamas, Defs.' Supp. Rule 26(a)(1) Disclosures and Rule 26(a)(2)(C) Disclosures, *Alabama v. Dep't of Com.*, No. 2:18-cv-00772-RDP (N.D. Ala. Mar. 13, 2020); *see infra* Section II(B).

[16]   Both Pew and the Department of Homeland Security use sampling to estimate the number of unauthorized immigrants.  *See* Jeffrey S. Passel, *Measuring Illegal Immigration: How Pew Research Center Counts Unauthorized Immigrants in the U.S.*, Pew Rsch. Ctr. (July 12, 2019), https://perma.cc/5ZP8-77KL; Dep't of Homeland Sec., Off. of Immigr. Stat., *Population Estimates: Illegal Alien Population Residing in the United States: January 2015* (Dec. 2018), https://perma.cc/U8LN-V6Y7.

partisan manipulation").  The Trump Administration, however, has attempted to manipulate the census in novel and troubling ways, and the Memorandum deepens serious concerns that the Administration's goal throughout has been to use the enumeration as a means of achieving partisan political ends.  The Memorandum will also result in a grossly inaccurate count of the population for apportionment purposes.  It therefore poses a direct institutional threat to the House, which draws its legitimacy from the accuracy and integrity of the census upon which its composition is determined.

### A.  The Memorandum Continues Efforts to Manipulate the Census, Undermining the Reality and Perception of Impartiality

The Memorandum does not arise in isolation.  Instead, it is the latest step in the Trump Administration's broader manipulation of the census process.  That pattern began with the attempt to add a citizenship question to the 2020 Census questionnaire—an apparent effort to enhance the political representation of "Republicans and non-Hispanic whites."[17]

In March 2018, the Secretary of Commerce directed the Census Bureau to include a citizenship question on the 2020 Census.  In a public memorandum, Secretary Ross claimed that the question was added to help the Department of Justice enforce the Voting Rights Act[18]—a law intended to protect the political power of racial minorities.  During litigation, however, it became clear that the White House had in fact encouraged Secretary Ross to consider adding the question and to speak to Kansas Secretary of State Kris Kobach, who urged Ross to address "the problem" of undocumented residents being counted for apportionment.[19]  As explained by a

---

[17] Thomas Hofeller, *The Use of Citizen Voting Age Population in Redistricting* at 8 (2015), https://perma.cc/22RT-5EWN.

[18] Memorandum from Wilbur L. Ross, Jr., Sec'y of Com., to Karen Dunn Kelley, Under Sec'y of Commerce for Econ. Affairs, *Reinstatement of a Citizenship Question on the 2020 Decennial Census Questionnaire*, 1 (Mar. 26, 2018), https://perma.cc/2XDF-Q7E8.

[19] *See* Email from Brooke Alexander, Executive Assistant to the Sec'y, Dep't of Com., to Hilary Geary (Apr. 5, 2017, 4:24 PM), https://perma.cc/8NJF-T73G?type=image; Email from

Republican gerrymandering expert who consulted with both White House staff and DOJ, including only voting-age citizens for purposes of legislative districts "would be advantageous to Republicans and Non-Hispanic Whites," but would be "functionally unworkable" without a citizenship question in 2020.[20]   Secretary Ross endorsed the citizenship question over the objections of career Census Bureau officials, who warned that its inclusion would "harm[] the quality of the census count."  Email from Dr. Ron Jarmin, Acting Director, Census Bureau, to Arthur Gary, Gen. Counsel, Justice Management Division, Dep't of Justice, 1, (Dec. 22, 2017, 3:32 PM).[21]

The District Court for the Southern District of New York concluded that Secretary Ross's explanation had been "materially inaccurate" and that Secretary Ross had made similar misrepresentations to the court itself and to two committees of the House.  *New York v. Dept. of Com.*, 351 F. Supp. 3d at 547.   The Supreme Court subsequently rejected the Commerce Department's attempt to add the question, holding that the Court could "[]not ignore the disconnect between the decision made and the explanation given" for adding the question, and further noting that the sole rationale provided for adding the question "seems to have been contrived."  *U.S. Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019).   This holding represented the first time in history that the Supreme Court had invalidated an agency's

---

Kris Kobach, Kansas Sec'y of State, to Wilbur L. Ross, Jr., Sec'y of Com. (July 14, 2017, 9:12 AM), https://perma.cc/P2NU-7S5P?type=image; Email from Kris Kobach, Sec'y of State of Kansas, to Wendy Teramoto, Chief of Staff, Dep't of Com. (July 21, 2017, 4:34 PM), https://perma.cc/8WQG-QYEH?type=image.

[20] Thomas Hofeller, *The Use of Citizen Voting Age Population in Redistricting* at 8 (2015), https://perma.cc/22RT-5EWN.

[21] White House staff members had discussed the citizenship question since the 2016 transition, including with Hofeller.  Dep. of A. Mark Neuman at 33, 40–41, *Kravitz v. Dep't of Com.*, No. 18-cv-1041 (D. Md. Oct. 28, 2018).  In 2017, Hofeller was also involved in reviewing DOJ's draft correspondence with the Census Bureau, in what the District Court for the Southern District of New York later described as an effort to "launder" Secretary Ross's decision through DOJ.  *New York v. U.S. Dep't of Com.*, 351 F. Supp. 3d 502, 570 (S.D.N.Y. 2019).

explanation for its action as pretextual.  *Id.* at 2574–76; *see also id.* at 2583 (Thomas, J., dissenting).

After the Supreme Court decided the case, the President hinted at the real purpose of the citizenship question: "You need it for Congress, for districting.  You need it for appropriations."[22]  The Executive Branch, however, has refused to provide Congress with the documents that would reveal the true motivation of the Administration's effort to add the citizenship question, even after the House held the Attorney General and Secretary of Commerce in contempt and sued to enforce its subpoenas in federal court.[23]

With this Memorandum, the President has abandoned any pretense.  He released the Memorandum with the statement: "I told the American people that I would not back down in my effort to determine the citizenship status of the United States population.  Today, I am following through on that commitment by directing the Secretary of Commerce to exclude illegal aliens from the apportionment base following the 2020 census."[24]  The Memorandum, following closely on the heels of the failed effort to insert a citizenship question onto the census, appears to confirm that the Administration has all along intended to use the census to enhance the voting power of certain favored constituencies at the expense of others.  These efforts to manipulate the census can only undermine the public's faith in the impartiality, objectivity, and integrity of the enumeration so essential to a successful census.

---

[22] *Remarks by President Trump Before Marine One Departure*, White House (July 5, 2019), https://perma.cc/QK6V-833H.

[23] *See* Memorandum from Rep. Carolyn B. Maloney, Acting Chairwoman of the Comm. on Oversight & Reform, to Members of the Committee on Oversight & Reform, Update on Investigation of Census Citizenship Question Since House Held Attorney General Barr and Commerce Secretary Ross in Contempt of Congress 1–3 (Nov. 12, 2019), https://perma.cc/A4WB-HVAP; *see also* Complaint, *Comm. on Oversight & Reform v. Barr*, No. 19-cv-3557 (D.D.C. Nov. 26, 2019).

[24] *Statement from the President Regarding Apportionment*, White House (July 21, 2020), https://perma.cc/PZ5Y-23GS.

**B.      The Memorandum Will Result in a Flawed and Inaccurate Apportionment**

The Memorandum not only supports the perception of improper partisan influence, but also will seriously diminish the accuracy of the count and thereby skew the apportionment.  For reasons explained above, the Executive Branch cannot attempt to determine the number of "aliens without lawful immigration status" except by using sampling techniques in direct violation of the law.  *See supra*, Section I(D).  Aside from those legal obstacles, there are insurmountable practical problems to arriving at any kind of accurate figure of undocumented immigrants.  Using those figures for apportionment would inflict lasting harm to public faith in the census and the resulting redistricting.

The Executive Branch has long acknowledged the difficulty of accurately capturing the kinds of data contemplated by the Memorandum.  The Census Bureau has historically lacked the ability to obtain data regarding undocumented immigrants.  *See FAIR*, 486 F. Supp. at 568 (D.D.C. 1980) ("The [Census] Bureau responds that it is constitutionally required to include all persons, including illegal aliens, in the apportionment base … [and] as a practical matter, it contends accurate methods to count illegal aliens . . . would take months to develop, *if it could be done at all*." (emphasis added)).  The current Administration has admitted that the Census Bureau's citizenship data, obtained through the American Communities Survey, is "not reported at the level of the census block, the  basic component of legislative districting plans; … ha[s] substantial margins of error; and … [does] not align in time with the census-based population counts used to draw legislative districts."  *Dep't of Com. v. New York*, 139 S. Ct. at 2562 (also citing Secretary Ross's decision not to pursue an ACS-based model to estimate citizenship because the Census Bureau "'could not confirm' that such ACS-based data modeling was possible 'with a sufficient degree of accuracy.'").  In other words, the Census Bureau's data is

inadequate to calculate either the number of undocumented immigrants or the total number of immigrants in the country.

Similar issues would arise with the use of records from other federal agencies. *See* Excluding Illegal Aliens, 85 Fed. Reg. at 44,680 (referencing E.O. 13880).  In 2018, Secretary Ross argued that other agencies' records were "inadequate" for identifying immigrants because "they were missing for more than 10% of the population." *Dep't of Com. v. New York*, 139 S. Ct. at 2563.  Even if these records could create a reliable data set to estimate the citizen and immigrant populations, neither the White House nor the Commerce Department has articulated a reliable methodology to determine which percentage of immigrants are "not in a lawful immigration status under the Immigration and Nationality Act." *See* Excluding Illegal Aliens, 85 Fed. Reg. at 44,680; 13 U.S.C. § 141.  The Census Bureau has neither the resources nor the legal expertise to answer this statutory question.  As one court recognized:

> the determination of [this] legal fact can be a complicated process, as our numerous cases involving attempts by the [Immigration and Naturalization Service] to deport residents of this country demonstrate.  The Immigration and Nationality Act is long and complex, full of provisos and exceptions.  It would be absurd to expect the Census Bureau to develop figures . . . of the number of deportable aliens present in this country. . .

*FAIR*, 486 F. Supp. at 573 n.12.

The status of the 2020 census exacerbates these data problems.  Only several weeks ago, senior Census Bureau officials acknowledged they would be unable to complete a full census by the statutory deadline, with fewer than two-thirds of households having responded to the Census as of August 13, 2020.[25]  The challenge of enumerating the remaining population of the United

---

[25] *See* Hansi Lo Wang, *Republicans Signal They're Willing to Cut Census Counting Short*, NPR (July 28, 2020), https://perma.cc/VXX4-MF7P (citing the Bureau's associate director for the 2020 census and associate director for field operations); *Response Rates*, United States Census 2020, https://2020census.gov/en/response-rates.html.

States—an estimated 120 million people—on a tight deadline has been made more difficult by the Bureau's abrupt decision to end its follow-up efforts by September 30, a month earlier than originally planned.[26]  These factors all but guarantee a substantial undercount that will be "most severe among urban minority populations."  *See Assembly of State of Cal. v. U.S. Dep't of Com.*, 968 F.2d 916, 917 (9th Cir. 1992).

Even if the Memorandum is never implemented, it still threatens to worsen the undercount.  The accuracy of the census depends on the willingness of members of the public to provide their information to the government and to trust that this information will be used for legitimate ends.  But noncitizens and members of their households have "historically responded to the census at lower rates than other groups."  *Dep't of Com. v. New York*, 139 S. Ct. at 2566. Undocumented immigrants are particularly "fearful" of responding to the census given a concern about the "possibility of [census] information being used against them."  *FAIR*, 486 F. Supp. at 568; *see also Young v. Klutznick*, 652 F.2d 617, 619 n.4 (6th Cir. 1981) (citing "attitudes toward government" and "immigration status" as reasons for not responding to the census).

The very existence of the Memorandum, and the hostility it demonstrates toward undocumented residents, risks further suppressing response rates of those residents and members of their households.  And many undocumented residents, already fearful of the Administration, may decline to respond to the census if they believe that they will not be counted anyway.  Thus, a former Director of the Census Bureau recently testified that there is cause to be "very concerned that the release of this directive will increase the fear of many" that "their information

---

[26] Stephanie Ebbs, *2020 Census to end data collection Sept. 30, raising concerns about undercounting*, ABC News (Aug. 4, 2020, 4:24 PM), https://perma.cc/54KX-NUUB.

will be given to immigration enforcement," which would likely result in "increased undercounts of these populations."[27]

An undercount impairs Congress's functioning and has a host of negative downstream consequences.  Congress depends on accurate census data to legislate effectively.  Census data guides many of the most significant federal programs, including Medicaid assistance, Medicare, the Supplemental Nutrition Assistance Program, the National School Lunch Program, and the Children's Health Insurance Program.[28]  In addition, "policy makers at all levels of government, as well as private businesses, households, researchers, and nonprofit organizations, rely on an accurate census in myriad ways that range far beyond the single fact of how many people live in each state."  *New York v. Dep't of Com.*, 351 F. Supp. 3d at 519.  An undercount thus distorts the data on which many of the government's most important decisions are based.  Even if the Memorandum is never implemented, it risks worsening an undercount of populations that are already among the least represented in government decision-making.

### C.     The Memorandum Will Distort the Composition of the House

For the reasons discussed above, the Memorandum, if implemented, will violate the law and yield an inaccurate apportionment of Representatives among the States, corrupting the composition of the House for at least the next decade.  Because the success of the census depends on the public's trust and cooperation, the Memorandum is also likely to harm the quality of future enumerations.

---

[27] Press Release, H. Comm. on Oversight & Reform, *Oversight Committee Held Emergency Hearing on Trump Administration's Unconstitutional Politicization of 2020 Census* (July 29, 2020).

[28] *See* America Counts Staff, *Responding to the Census Will Help Plan Health Care Programs for the Next Decade*, U.S. Census Bureau (July 13, 2020),  https://perma.cc/8TL2-6A2P.

Such an outcome obviously compromises the House's "[u]nquestionabl[e] … interest in preserving its institutional integrity." *Powell*, 395 U.S. at 548.  But the Memorandum's harms to the House also accrue on a broader level.  Since its inception, the House has been uniquely connected to its constituents.  The House of Representatives—or the "People's House," as it often has been called—is the only federal body that has been directly elected since the Constitution's ratification in 1788.[29]   Members of the House are the closest federal representatives to their constituents: whereas Senators represent the residents of their whole State, Representatives generally represent smaller communities within each State.  Members of the House represent the interests of *all* residents in their districts—including the interests of non-voters, like children—and provide important services to their constituents, regardless of citizenship status.[30]

Basing apportionment on anything other than the actual total population of each State would not affect just the House's composition, but also undermine its members' ability to represent fairly and fully all of their constituents.  As the DOJ has told the Supreme Court, "the federal government act[s] in the name of (and thereby represent[s]) all people, whether they [are] voters or not, and whether they [are] citizens or not."  Brief for the United States as *Amicus*

---

[29] Prior to the ratification of the Seventeenth Amendment in 1913, U.S. Senators were elected by state legislatures, rather than directly by the public.  *See* U.S. Const. Art. I, § 3; *id.* Amend. XVII.

[30] Nor is it simple to extricate the interests of citizens from the interests of noncitizens within a community.  For example, according to one recent analysis, over 4 million U.S.-citizen children under 18 were living with at least one unauthorized immigrant parent between 2009 and 2013.  Randy Capps et al., *A Profile of U.S. Children with Unauthorized Immigrant Parents*, Migration Policy Inst. 1 (2016), https://perma.cc/9TDT-BYKL.  Any benefits or assistance provided to the child thus aids the parent as well as the broader community in which that family lives.  *Cf. Plyler*, 457 U.S. at 230 (requiring states to permit undocumented immigrant children to attend public schools).

*Curiae* Supporting Appellees at 19, *Evenwel v. Abbott*, No. 14-940, 2015 WL 5675829 (W.D. Tex. Sept. 25, 2015).

Therefore, when Congress enacts new laws; provides funding for federal, state, and local programs; or performs oversight, its actions affect *all* segments of American communities—regardless of immigration status. The foundational logic of democratic representation therefore demands what federal law requires: Congressional representation must reflect the country's full population, not merely voters or those lawfully present. Alexander Hamilton's words bear repeating: "There can be no truer principle than this—that every individual of the community at large has an equal right to the protection of government." 1 Records of the Federal Convention of 1787, at 473 (M. Farrand ed., 1911) (quoted in *Evenwel*, 136 S. Ct. at 1127).

## CONCLUSION

The Constitution requires that "Representatives shall be apportioned among the several States according to their respective numbers, counting the *whole number of persons* in each State." U.S. Const. Amend. XIV, § 2; Art. I, § 2 (emphasis added). This unambiguous mandate, also reflected in federal statutes, leaves no room for interpretation or deviation by the President. Accordingly, the House joins Plaintiffs in requesting that this Court hold the Memorandum unlawful.

Respectfully submitted,

*Of Counsel*

JENNIFER SAFSTROM
JONATHAN L. BACKER
JOSHUA A. GELTZER
AMY M. MARSHAK
MARY B. McCORD
ANNIE OWENS
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY AND PROTECTION
Georgetown University Law Center
600 New Jersey Ave., NW
Washington, DC 20001
(202) 661-6728
jg1861@georgetown.edu

DAVID A. O'NEIL
LAURA E. O'NEILL
TARA GANAPATHY
KATHERINE NELSON
DEBEVOISE & PLIMPTON, LLP
801 Pennsylvania Ave. NW
Washington, DC  20004
Telephone:  (202) 383-8000
daoneil@debevoise.com

JAMES B. AMLER
DEBEVOISE & PLIMPTON, LLP
919 3rd Avenue
New York, NY 10022
Telephone:  (212) 909-6000
jbamler@debevoise.com

NEAL KUMAR KATYAL
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
(202) 637-5600
neal.katyal@hoganlovells.com

/s/ Douglas N. Letter
DOUGLAS N. LETTER
   *Counsel of Record*
   General Counsel
TODD B. TATELMAN
   Principal Deputy General Counsel
MEGAN BARBERO
JOSEPHINE MORSE
ADAM A. GROSS
WILLIAM E. HAVEMANN
JONATHAN B. SCHWARTZ
OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
219 Cannon House Office Building
Washington, D.C. 20515
(202) 225-9700
Douglas.Letter@mail.house.gov

*Counsel for Amicus Curiae*

August 14, 2020