**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, et al. | Case No. 20-CV-5770 (JMF) |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, *in his official capacity as President of the United States, et al*. | |
| Defendants. | |
| NEW YORK IMMIGRATION COALITION, et al. | Case No. 20-CV-5781 (JMF) |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, *in his official capacity as President of the United States, et al*. | |
| Defendants. | |

**[PROPOSED] AMICUS BRIEF OF THE LEAGUE OF WOMEN VOTERS**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY**
**JUDGMENT OR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Page

I.    SUMMARY OF ARGUMENT. .............................................................................3

II.   THE LEAGUE'S MISSION IS TO PROTECT DEMOCRACY THROUGH THE RIGHT TO VOTE AND EMPOWER ALL AMERICAN VOTERS. ...............................5

III.  IMPLEMENTATION OF THE MEMORANDUM WILL HARM INDIVIDUAL STATES AND THEIR CITIZENS, REGARDLESS OF POLITICAL AFFILIATION OR LEGAL STATUS. ......................................................................................6

     A.    Loss of Congressional Representation in Individual States. ....................................6

     B.    The Implementation of the President's Directive Will Decrease Federal Funding to ALA States for Public Services. ............................................................10

IV.  THE MEMORANDUM UNDERMINES DEMOCRACY, AND ERODES TRUST IN OUR CONSTITUTIONAL SYSTEM. ...............................................................................14

     A.    Representation Based on Accurate Apportionment Base Is the Bedrock of Our Democracy. .........................................................................................15

     B.    The Exclusion of Undocumented Immigrants from the Apportionment Base Would Create a Loss of Faith in the Democratic Process and Constitution. ..........16

V.   THE MEMORANDUM WILL CAUSE SOCIETAL WITHDRAWAL OF FAMILIES WITH UNDOCUMENTED MEMBERS, HARMING EVERYONE. ...............................18

     CONCLUSION...............................................................................................22

# **TABLE OF AUTHORITIES**

**Page(s)**

<u>Cases</u>

*Baker v. Carr,*
    396 U.S. 186 (1962)..................................................................................................9

*Utah v. Evans,*
    536 U.S. 452 (2002) (Thomas, J., concurring in part and dissenting in part)...................17, 18

*Evenwel v. Abbott,*
    136 S. Ct. 1120 (2016)........................................................................................7, 18

*New York Immigration Coalition v. U.S. Dep't of Commerce,*
    No. 18-CV-2921-JMF (S.D.N.Y.) ................................................................................9

*Reynolds v. Sims,*
    377 U.S. 533 (1964).................................................................................................1

*State of New York, et al. v. United States Department of Commerce, et al.,*
    Case 18-CV-2921.....................................................................................................3

*State of New York, et al. v. United States Department of Commerce, et al.,*
    Docket No. 18-CV-2921 (JMF)....................................................................................2

<u>Constitutions</u>

U.S. Constitution
    Article II, Section 2....................................................................................7, 17, 18
    Article II, Section 1, Clause 2.............................................................................9
    Fourteenth Amendment ...........................................................................7, 17, 18
    Nineteenth Amendment .........................................................................................5

<u>Statutes and Codes</u>

United States Code
    Title 2, Section 2(a)................................................................................................4

<u>Other Authorities</u>

Andrew Hacker, Congressional Districting: The Issue of Equal Representation
    (1963).................................................................................................................10

Beard, Mary Ritter. American Citizenship (1914)........................................................17

The Chilling Effect of ICE Courthouse Arrests: How Immigration and Customs
    Enforcement (ICE) Raids Deter Immigrants from Attending Child Welfare,
    Domestic Violence, Adult Criminal, and Youth Court Hearings, Ceres Policy
    Research (October 2019),
    https://static1.squarespace.com/static/58ba8c479f7456dff8fb4e29/t/5dae6ba65
    642ea5d1cef9705/1571711914510/ice.report.final.21oct2019.pdf ........................................22

Counting For Dollars 2020: The Role of the Decennial Census in the Geographic
    Distribution of Federal Funds, Report # 2: Estimating Fiscal Costs of a Census
    Undercount to States (Mar. 19, 2018),
    https://gwipp.gwu.edu/sites/g/files/zaxdzs2181/f/downloads/GWIPP%20Rea
    mer%20Fiscal%20Impacts%20of%20Census%20Undercount%20on%20FM
    AP-based%20Programs%2003-19-18.pdf ............................................................................10

Edith Honan, Citizenship Question Dropped from Census, but Advocates Fear
    'Damage Has Been Done,'" ABC News (July 12, 2019),
    https://abcnews.go.com/Politics/citizenship-question-dropped-census-
    advocates-fear-damage/story?id=64225417 ..............................................................................20

Gabrielle Jacobovitz & Sam Levine, Activists Blocked Census Citizenship
    Question.  Now They Have to Repair Trump's Damage, HuffPost (July 17,
    2019), https://www.huffpost.com/entry/2020-census-citizenship-
    question_n_5d2f378ce4b02fd71dddf974 ..................................................................................20

Gregory H. Cohen et al., Census 2020—A Preventable Public Health Catastrophe,
    American Journal of Public Health (August 2019), available at
    https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305074 ................................14

Hansi Lo Wang, Four States Are Sharing Driver's License Info to Help Find Out
    Who's a Citizen, NPR (July 14, 2020),
    https://www.npr.org/2020/07/14/890798378/south-dakota-is-sharing-drivers-
    license-info-to-help-find-out-who-s-a-citizen.........................................................................21

Holder, Fear Campaign.........................................................................................................22

https://www.americanimmigrationcouncil.org/research/immigrants-florida ...............................16

https://www.americanimmigrationcouncil.org/research/immigrants-in-california .......................16

https://www.americanimmigrationcouncil.org/research/immigrants-in-
    texas#:~:text=2.7%20million%20people%20in%20Texas,1%20million%20ch
    ildren%20in%20total ...............................................................................................................15

League of Women Voters of the United States, Impact on Issues (2018-2020),
    https://www.lwv.org/sites/default/files/2019-04/LWV%202018-
    20%20Impact%20on%20Issues.pdf#page=21 ...........................................................................1

Marc L. Berk & Claudia L. Schur, The Effect of Fear on Access to Care Among
    Undocumented Latino Immigrants," Journal of Immigrant Health 3, 151-56
    (2001) ................................................................................................................21

Matt Barreto et al., New Research Shows Just How Badly A Citizenship Question
    Would Hurt the 2020 Census, The Washington Post (April 22, 2019) ................................20

Memorandum on Excluding Illegal Aliens From the Apportionment Base
    Following the 2020 Census,
    85 Fed. Reg. 44,679, 44,680 (July 23, 2020) ................................................ passim

Miriam Jordan, 'We're Petrified': Immigrants Afraid to Seek Medical Care for
    Coronavirus," N.Y. Times (March 18, 2020),
    https://www.nytimes.com/2020/03/18/us/coronavirus-immigrants.html. ..............................22

Pedraza & Osorio, Courted and Deported: The Salience of Immigration Issues and
    Avoidance of Police, Health Care, and Education Services among Latinos, 42
    Aztlán: A Journal of Chicano Studies 2, 255-59 (2017) ..........................................22

Pew Res. Ctr., U.S. Unauthorized Immigrant Total Dips to Lowest Level in a
    Decade (Nov. 27, 2018), https://www.pewresearch.org/hispanic/wp-
    content/uploads/sites/5/2019/03/Pew-Research-Center_2018-11-27_U-S-
    Unauthorized-Immigrants-Total-Dips_Updated-2019-06-25.pdf ...........................................6

Raúl Hinojosa-Ojeda, Labor Market Impacts of Amnesty: A Comparative
    Analysis of IRCA and Current Conditions, 5 De Las Américas 1, 6-9 (2000),
    http://www.naid.ucla.edu/uploads/4/2/1/9/4219226/b46.pdf ...........................................20

Reamer, Andrew, GW Institute of Public Policy, Counting For Dollars
    2020:Texas, Florida, and California Reports (January 30, 2019), available at
    https://gwipp.gwu.edu/sites/g/files/zaxdzs2181/f/downloads/IPP-1819-
    3%20CountingforDollars_FL.pdf ........................................................................11

Roy Elis, Neil Malhotra, Marc Meredith, Apportionment cycles as natural
    experiments," 4 Political Analysis 17, 358–376 (2009) ............................................9

Sam Levine, Trump Orders Undocumented Immigrants Excluded From Key
    Census Count, The Guardian (July 21, 2020),
    https://www.theguardian.com/us-news/2020/jul/21/trump-executive-order-
    census-undocumented-immigrants ......................................................................21

Sarah Holder, What the Fear Campaign Against Immigrants Is Doing, Bloomberg
    (July 25, 2019), https://www.bloomberg.com/news/articles/2019-07-25/how-
    fear-of-ice-is-gripping-immigrant-communities ....................................................20

United States Census Bureau, Uses of Census Bureau Data in Federal Funds
  Distribution (September 2017), https://www2.census.gov/programs-
  surveys/decennial/2020/program-management/working-papers/Uses-of-
  Census-Bureau-Data-in-Federal-Funds-Distribution.pdf ........................................................12

Vic Miller, FY 2013 Federal Medical Assistance Percentages; Decennial Census
  Data Affect the Flow of Medicaid Funds, National Association of Medical
  Directors, October 2011, available at https://medicaiddirectors.org/wp-
  content/uploads/2015/08/vjm_the_impact_of_decennial_census_data_on_fede
  ral_medical_assistance_percentages.pdf ...............................................................................13

## STATEMENT OF INTEREST

This amicus brief is submitted on behalf of the League of Women Voters of the United States, the League of Women Voters of Texas, the League of Women Voters of Florida, and the League of Women Voters of California (collectively, "the League"). The League is a nonpartisan, community-based political organization that encourages informed and active participation of citizens in government and attempts to influence public policy through education and advocacy. Founded in 1920 as an outgrowth of the struggle to win voting rights for women, the League is organized in more than 850 communities and exists in every state, with more than 400,000 members and supporters nationwide.

One of the League's primary goals is to promote government that is representative, accountable, responsive, and that assures opportunities for effective and inclusive voter participation in government decision-making. A bedrock principle of the League is the "one person, one vote" guarantee of *Reynolds v. Sims*, 377 U.S. 533 (1964), which encompasses both mathematical proportionality in congressional districts, as well as the right to an effective vote and responsive representation. This grounding principle is long-held, dating back to 1966 when the League established their apportionment position: **that the U.S. Constitution should not be amended to allow for consideration of factors other than population in apportionment**.[1]

President Trump's Memorandum, dated July 21, 2020 (the "Memorandum"), directs the Secretary of Commerce to unconstitutionally exclude all undocumented immigrants from the apportionment base of the decennial census. If permitted to go into effect, the Memorandum would unfairly and artificially reduce certain states' representation in Congress, while improperly

---

[1] League of Women Voters of the United States, *Impact on Issues (2018-2020)*, https://www.lwv.org/sites/default/files/2019-04/LWV%202018-20%20Impact%20on%20Issues.pdf#page=21.

increasing the representation of other states.  Accordingly, the impact of the Memorandum will be felt by not only undocumented immigrants, but all citizens in every state.  Ultimately, the Memorandum will result in decreased political representation and substantial losses in federal funding for states with sizable populations of undocumented immigrants—including but not limited to Texas, Florida, New Jersey, and California—whose apportionment base would be artificially lowered (the "Artificially-Lowered Apportionment States" or "ALA States").  Further, the Memorandum will have a deleterious, and potentially irreversible, impact on not only American democracy, but also the ways in which Americans view and interact in this democracy throughout the entire country.

These harms will be felt by all Americans, including members of the League, not just undocumented immigrants.  For ALA States, implementation of the Memorandum would strain state and local public health, education and welfare systems for everyone; that is because these systems provide services for all residents, but their federal funding would be limited to citizens.  Many members of the League reside in ALA States that will see their representation in Congress diminished unjustly.  The League itself will be impacted because it maintains important public education, advocacy and social work programs in ALA States.   *See* Part III, *infra*.

Furthermore, implementation of the Memorandum will have broader (if less direct) effects on voters and residents of every state in the country because excluding a large number of residents from the apportionment base—in violation of the Constitution on which our democracy is premised—will erode faith and trust in our democracy and Constitutional system.  *See* Part IV, *infra*.  In addition, implementation of the Memorandum will likely cause societal withdrawal of families with undocumented members, which would harm everyone.  *See* Part V, *infra*.

## ARGUMENT

### I.   SUMMARY OF ARGUMENT.

The case before this Court is not just an "immigrant" issue.  Ensuring an accurate census and apportionment base goes to the very heart and soul of the American democratic process and the principle of full and fair representation.  It is also an issue familiar to this Court.  As this Court stated in *State of New York, et al. v. United States Department of Commerce, et al.*, Docket No. 18-CV-2921 (JMF):

> [T]he Constitution mandates that every ten years the federal government endeavor to count every single person residing in the United States, whether citizen or noncitizen, whether living here with legal status or without.  The population count derived from that effort is used not only to apportion Representatives among the states, but also to draw political districts and allocate power within them.  And it is used to allocate hundreds of billions of dollars in federal, state, and local funds. Given the stakes, the interest in an accurate count is immense.  Even small deviations from an accurate count can have major implications for states, localities, and the people who live in them — indeed, for the country as a whole.[2]

President Trump's Memorandum states "[f]or the purpose of the reapportionment of Representatives following the 2020 census, it is the policy of the United States to exclude" undocumented immigrants from the congressional apportionment base "to the maximum extent feasible and consistent with the discretion delegated to the executive branch."[3]  The Memorandum asserts that "[i]ncreasing congressional representation based on the presence of aliens who are not in a lawful immigration status would also create perverse incentives encouraging violations of Federal law," and that "states adopting policies . . . that hobble Federal efforts to enforce the immigration laws passed by the Congress should not be rewarded with greater representation in

---

[2] *New York v. United States Dep't of Commerce*, 351 F. Supp. 3d 502, 514-15 (S.D.N.Y.), *aff'd in part, rev'd in part and remanded sub nom. Dep't of Commerce v. New York*, 139 S. Ct. 2551, 204 L. Ed. 2d 978 (2019), *and appeal dismissed*, No. 19-212, 2019 WL 7668098 (2d Cir. Aug. 7, 2019).

[3] *Memorandum on Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census*, 85 Fed. Reg. 44,679, 44,680 (July 23, 2020) (the "Memorandum").

the House of Representatives."[4]

The Memorandum directs the Secretary of Commerce, "[i]n preparing his report to the President under Section 141(b) of Title 13," to "take all appropriate action, consistent with the Constitution and other applicable law, to provide information permitting the President, to the extent practicable," to exclude undocumented immigrants from the final determination regarding the "whole number of persons in each state" that the President transmits to Congress pursuant to 2 U.S.C. § 2(a).[5]

The Memorandum will cause severe and irreparable injury to all residents in the ALA States by unconstitutionally reducing their political representation in Congress through the exclusion of undocumented immigrants in the apportionment base.  This reduction in representation will have an impact on the federal funding that these states receive, resulting in ALA States lacking resources necessary to carry out vital functions in areas such as healthcare, education, and social welfare.  These repercussions will be felt not only by undocumented immigrants residing in ALA States, but also U.S. citizens and lawful residents (including League members) in these states.  *See* Part III.  Moreover, the broader impact of the Memorandum, if it is allowed to remain in place and eventually go into effect, will further erode Americans' trust in the government, depressing participation in the census as well as dampening voter turnout and civic involvement.[6]  *See* Part IV.  Furthermore, the Memorandum will likely cause withdrawal of undocumented immigrants and their families from society—including political and civic engagement—which will harm everyone.  *See* Part V.

---

[4] *Id.*

[5] *Id.*

[6] Given the history of federal government-sanctioned discrimination towards communities of color, it is likely that dampened participation in the census, voter turnout, and utilization of federal resources will disproportionately impact racial minorities, especially African-American and Hispanic communities.

## II. THE LEAGUE'S MISSION IS TO PROTECT DEMOCRACY THROUGH THE RIGHT TO VOTE AND EMPOWER ALL AMERICAN VOTERS.

Since its founding in 1920, six months before the Nineteenth Amendment was ratified and women won the national right to vote, the League has been advocating for voting rights and political empowerment. Initially, the League's advocacy focused on women's suffrage, but in the decades since, the League has continued advocating for voting rights and political empowerment of all voters regardless of gender, race, class, or political ideology. Through more than 700 state and local league chapters, the League has established robust programs to educate communities about their voting rights. Ensuring the accuracy of the census and apportionment base is central to the League's voting rights and political empowerment work because the census is used to apportion political representation among the states and delimit Congressional districts.[7]

The League performs its census-related work in three phases. First, the League spearheads numerous education programs to inform the public about what the census is, who is counted, and why it is important for political and economic representation. Second, through the League's "Get Out to Count" initiative, as well as other outreach activities, the League encourages all eligible persons to fill out their census forms. The League has established or joined local "Complete Count Committees" to organize and encourage people to fill out their census forms, particularly by identifying and targeting efforts towards those communities most likely to be undercounted. Third, the League has formed a watchdog group to ensure the census is operating in accordance with the Constitution and applicable law. The basic goal of each of these activities is to ensure that the census and apportionment base accurately reflects total population and, in turn, accurately reflects the needs of states and local communities, all of which depend on federal funding.

---

[7] League of Women Voters of the United States, *Census*, https://www.lwv.org/other-issues/census.

III.   **IMPLEMENTATION OF THE MEMORANDUM WILL HARM INDIVIDUAL STATES AND THEIR CITIZENS, REGARDLESS OF POLITICAL AFFILIATION OR LEGAL STATUS.**

A.   **Loss of Congressional Representation in Individual States.**

The most direct and tangible impact of the Memorandum is the near certainty that ALA States will lose representation in the U.S. House of Representatives.  The Memorandum compels undocumented immigrants to be excluded from the apportionment base, which will substantially affect many individual states.  An estimated 5.2%, 3.7%, and 5.6% of the populations of California, Florida, and Texas, respectively, would be inappropriately excluded by this mandate—an extraordinary change to the population count.[8]  While ALA States will experience the most significant impacts, *all* state populations will be incorrectly calculated for purposes of apportioning representatives to varying degrees because at least some portion of the population of every state is made up of undocumented immigrants.[9]  The extent of this impact is demonstrated in Figure 1, depicting the percent change in population expected from the failure to include undocumented immigrants.

---

[8] Expert Declaration of Dr. Christopher Warshaw ("Warshaw Decl."), ¶ 37, Table 6 (Dkt. 77, Ex. 58).

[9] Warshaw Decl., ¶ 37, Table 6; Pew Res. Ctr., U.S. Unauthorized Immigrant Total Dips to Lowest Level in a Decade (Nov. 27, 2018), https://www.pewresearch.org/hispanic/wp-content/uploads/sites/5/2019/03/Pew-Research-Center_2018-11-27_U-S-Unauthorized-Immigrants-Total-Dips_Updated-2019-06-25.pdf.



Figure 1: Effects on State Populations

10

Undercounting the actual population unlawfully impacts how congressional seats are apportioned among states.[11]   Article 1, Section 2, of the United States Constitution states: "Representatives and direct Taxes shall be apportioned among the several states which may be included within this Union, according to their respective Numbers."   Coupled with Article Fourteen's requirement that "Representatives shall be apportioned among the several states according to their respective numbers, counting the *whole number of persons in each state* . . ." (emphasis added), apportionment must be based on the number of all people residing in the United States regardless of whether they are here lawfully.  Indeed, the Supreme Court recently held that "the Fourteenth Amendment calls for the apportionment of congressional districts based on the total population," which includes non-citizen residents, irrespective of legal status.[12]

The wholesale omission of undocumented immigrants renders the apportionment

---

[10] Warshaw, Decl., ¶¶ 37-38, Figure 1.
[11] Warshaw Decl., ¶ 11
[12] *Evenwel v. Abbott*, 136 S. Ct. 1120, 1129 (2016)

"numbers" flawed. The ALA States will have their populations artificially decreased which, in turn, will cause those states to have less Congressional representation in the U.S. House of Representatives than they would otherwise have.[13]   The result will be immediate malapportionment within the House of Representatives and is repugnant to fundamental principles of representative democracy.

For example, Texas is almost certain to lose a seat if undocumented immigrants are excluded from the apportionment base.[14]  Even more striking is that just two-and-a-half years ago, it was estimated—based on recent population trends—that Texas would *gain* at least two, possibly three, congressional seats following the 2020 census.[15]   California and New Jersey are also likely to lose seats if undocumented immigrants are excluded from the apportionment base.[16]  In addition, Florida faces a 38.4% chance of losing a seat, New York is 18.9% likely to lose a seat, and Illinois is 10.1% likely to lose a seat.[17]  Thus, the ramifications of malapportionment will likely be felt by a large percentage of the U.S. population who live in and vote in the ALA States.

The Memorandum directly and fundamentally affects political representation in Congress by leaving residents of ALA States artificially underrepresented.  This removal of representation affects every single state resident—even those legal residents who will not be excluded from the apportionment base—by creating an unbalanced distribution of power which will subsequently lead to a decrease in the ALA States' share of federal funds.

---

[13] Warshaw Decl., ¶ 11
[14] Warshaw Decl., ¶¶ 11, 42-43, Table 7
 Election Data Service, *Some Change in Apportionment Allocations with New 2017 Census Estimates; But Greater Change Likely by 2020* (Dec. 26, 2017)
[16] Warshaw Decl., ¶¶ 11, 42, Table 7 (reporting that California is 72% and New Jersey is 69.8% likely to lose a congressional seat).
[17] *Id.*

This decrease in political power is tangible.[18]  Studies have shown that states that lose congressional seats are likely to "see decreases in their share of federal outlays due to their reduction in voting power in Congress."[19]  The distribution of federal funds is based, in part, on the number of seats a geographic area holds in Congress.[20]  Studies show that a 10% increase in a state's share of the number of representatives equates to a 0.7% increase in that state's share of the federal budget.[21]

A further ripple effect of the malapportionment of Congressional seats is that states whose population is artificially decreased will receive fewer Electoral College votes in future elections. Article II, Section 1, Clause 2 of the U.S. Constitution specifies that the sum of each state's electors is equal to the sum of the state's membership in Congress; the number of Electoral College votes is directly related to the size of a state's congressional delegation.  Thus, a loss of representation stemming from the Memorandum manipulates states' importance and influence in future presidential elections.  California and Texas, the two most populous states in the U.S., are inescapably harmed by this manipulation of the Electoral College.

As an organization that tirelessly strives to ensure that not only does every person have the right to vote, but that also seeks to create and encourage informed voters, this artificial shift in

---

[18] The 1962 case in which the U.S. Supreme Court ordered a correction to Tennessee's apportionment law, *Baker v. Carr*, 396 U.S. 186 (1962), is a natural experiment of this concept. Following the court-ordered apportionment correction, counties that were underrepresented prior to the suit due to malapportionment saw their representation increase when apportionment was corrected. *Id.* (citing Roy Elis, Neil Malhotra, Marc Meredith, *Apportionment cycles as natural experiments*," 4 POLITICAL ANALYSIS 17, 358–376 (2009)).  Further, previously underrepresented counties also saw their share of state spending increase—the result of a transfer of about $7 billion from overrepresented to underrepresented counties. *Id.* (citing Ansolabehere, Stephen, Alan Gerber, and Jim Snyder, 4 AMERICAN POLITICAL SCIENCE REVIEW 96, 767–777 (2002)).

[19] Warshaw Decl., ⁋ 44; *see also* Roy Elis, Neil Malhotra, Marc Meredith, *Apportionment cycles as natural experiments*," POLITICAL ANALYSIS 17 (4): 358–376 (2009). It is a well-established finding in political science and political economy that the loss of political power as a result of the loss of representation leads to the loss of funding. *New York Immigration Coalition v. U.S. Dep't of Commerce*, No. 18-CV-2921-JMF (S.D.N.Y.).

[20] Warshaw Decl., ⁋ 44.

[21] *Id.*

political power will significantly impair the League's own members in ALA States.  The loss in representation will be felt directly—in the form of reduced political power and federal funding on a per-resident basis—by League members who reside in the ALA States.  League members will also suffer from the ancillary injuries associated with such a loss of representation, such as having a significantly more difficult time in encouraging individuals to vote if those individuals believe their vote counts for less.

These negative impacts will be long-lasting.  For at least the next decade, the ALA States will suffer from reduced representation in Congress (relative to representation that reflects an accurate apportionment base).  "Fairness in representation, embodied in the concept of 'one person, one vote,' is one of the most important normative standards against which democratic institutions are measured."[22]  When a state is facing underrepresentation in Congress, all of its constituents suffer from the inequity in power of having to "share" their representative and their resources with more of their neighbors than do residents of other states.[23]  The malapportionment resulting from the Memorandum will force underrepresentation by eliminating congressional seats outright in states like California, Florida and Texas, and risks the loss of seats for other ALA States.

B.    **The Implementation of the President's Directive Will Decrease Federal Funding to ALA States for Public Services.**

At least 300 federally funded programs created by Congress rely on census-specific data to apportion approximately $900 billion dollars annually to state and local governments.[24]  In Texas, Florida and California, state and local governments received $59 billion, $44 billion and

---

[22] Elis, Malhotra, and Meredith (2009).

[23] Andrew Hacker, CONGRESSIONAL DISTRICTING: THE ISSUE OF EQUAL REPRESENTATION (1963).

[24] Reamer, Andrew, GW Institute of Public Policy, *Counting For Dollars 2020: The Role of the Decennial Census in the Geographic Distribution of Federal Funds, Report # 2: Estimating Fiscal Costs of a Census Undercount to States* (Mar. 19, 2018), https://gwipp.gwu.edu/sites/g/files/zaxdzs2181/f/downloads/GWIPP%20Reamer%20Fiscal%20Impacts%20of%20Census%20Undercount%20on%20FMAP-based%20Programs%2003-19-18.pdf.

$115 billion, respectively, through federal spending programs guided by data derived from the 2010 census.[25] States rely on an accurate count of their population and demographic representation of their residents for the provision of dollars for these vitally important programs.

For example, certain grant programs, including Medicaid, the Children's Health Insurance Program ("CHIP") and the Child Care and Development Fund ("CCDF"), use the Federal Medical Assistance Percentage ("FMAP") based on the decennial census population count to determine funding to the states.[26] Each state's FMAP is inversely related to its per capita income ("PCI"). PCI is determined by dividing state residents' total income by total state population. Thus, an undercount of a state's population results in an overestimate of its PCI.[27] As a result, an undercount will lead to a state's calculated FMAP being underestimated, and that state will lose out on federal funds. For example, studies have estimated that for FY2015, Texas and Florida lost out on $1,161 and $946, respectively, in federal funds for FMAP-guided programs for every person missed by the 2010 census.[28] An undercount of just 1% equated to total losses of $291,908,615 for Texas and $177,848,466 for Florida in FY2015.[29] These losses are likely to be even greater as a result of the Memorandum because undocumented immigrants account for an estimated 5.6% of Texas and 3.7% of Florida's population.[30] With Medicaid alone comprising about 40% of Texas and 30% of Florida's total funds received from federal spending programs, an undercount would result

---

[25] Reamer, Andrew, GW Institute of Public Policy, *Counting For Dollars 2020:Texas, Florida, and California Reports* (January 30, 2019), available at https://gwipp.gwu.edu/sites/g/files/zaxdzs2181/f/downloads/IPP-1819-3%20CountingforDollars_FL.pdf; https://gwipp.gwu.edu/sites/g/files/zaxdzs2181/f/downloads/IPP-1819-3%20CountingforDollars_TX.pdf; https://gwipp.gwu.edu/sites/g/files/zaxdzs2181/f/downloads/IPP-1819-3%20CountingforDollars_CA.pdf.

[26] Reamer, *Report # 2: Estimating Fiscal Costs of a Census Undercount to States*, at 2.

[27] To be clear, the Memorandum does not prohibit undocumented immigrants from filling out a census form, but because of this Administration's hostility towards undocumented immigrants, along with the Memorandum's advancement of such hostility, undocumented immigrants are effectively discouraged from filling out census forms.

[28] Reamer, *Report # 2: Estimating Fiscal Costs of a Census Undercount to States*, at 3.

[29] *Id.* at 4. California is one of thirteen States currently receiving the minimum FMAP rate, so, barring any other federal policy changes, FMAP-guided funding would not be affected by an undercount.

[30] *See* Warshaw Decl. Table 6.

in huge losses.[31]  Thirty-seven other states stand to lose out on similar proportions of their state budgets due to undercounting.[32]

Moreover, the fiscal impact of an undercount extends beyond FMAP-related funding programs.  Various other programs use census data in formulas to allocate funds or determine eligibility.  For example, the U.S. Department of Housing and Urban Development uses measures of income, population, housing overcrowding, age, and population growth to allocate funding through Community Development Block Grants.[33]  In addition, the calculation and distribution of Section 8 (and other housing programs) is based on data supplied by the Census Bureau.[34]  In FY2016, California received $4,641,696,018, Texas received $1,389,424,513, and Florida received $1,203,603,162 for administration of their Section 8 Voucher and Housing Assistance Payment programs.[35]  An undercount of population in the data that dictate this funding would cause a major loss of housing resources for communities that most need them.

Education programs will also be affected by a census undercount.  State education departments and offices of children and families rely on an accurate count of the state's population, and an accurate count of children living in low-income households, to receive adequate funding for educational programs.  For example, Title I Grants to Local Education Agencies and the National School Lunch Program provide funds based on poverty data generated by the decennial census.[36]  In FY2016, California, Texas, and Florida each received $3.2 billion, $2.8 billion and

---

[31]  Reamer, *Texas Report*, at 2, and *Florida Report*, at 2. Funding for Medicaid is separate from funding for other vital health and wellness programs, including CHIP, Women Infant and Children, and State Nutritional Assistance Program, all of which also rely on census data.

[32]  Reamer, *Report # 2: Estimating Fiscal Costs of a Census Undercount to States*, at 2-3.

[33]  United States Census Bureau, Uses of Census Bureau Data in Federal Funds Distribution (September 2017), https://www2.census.gov/programs-surveys/decennial/2020/program-management/working-papers/Uses-of-Census-Bureau-Data-in-Federal-Funds-Distribution.pdf.

[34]  Reamer, *California Report*, at 2, *Texas Report*, at 2, and *Florida Report*, at 2.

[35]  *Id.*

[36]  *Id.*

$1.6 billion, respectively, in federal funds for these programs.[37]  Special education grant funding

is also awarded to education departments based on census data.  In FY2016, California, Texas, and

Florida received approximately $1.3 billion, $1 billion and $659 million, respectively, for special

education.[38]

An undercount in the decennial census will reduce funds for not just the programs

highlighted above, but for hundreds of other vitally important programs. These inaccuracies will

persist for at least 10 years, resulting in chronic underfunding of state and local agencies as they

work to serve their residents, particularly those who are most vulnerable.[39]

Federally funded health, housing, and education programs are critical to supporting the

health and economic needs of communities facing hardships due to COVID-19 pandemic.  Census

data is critical for planning standard public health needs, addressing social inequities in health, and

identifying and managing emergent public health threats.[40]  Accurate population counts are needed

to determine disease prevalence rates; inaccurate counts limit states' ability to track disease.

Demographic factors assessed through the census are also critical to assessing social risk

factors to disease and creating appropriate responses.  Inaccuracies threaten public health in at

least four ways: (1) hindering planning efforts for standard population health needs; (2) hindering

monitoring and planning to address particular health needs for at-risk populations; (3) delaying

identification and response to novel public health threats such as COVID-19; and (4)

compromising effective tracking and management of emergent public health threats such as natural

---

[37] *Id.*

[38] *Id.*

[39] Vic Miller, *FY 2013 Federal Medical Assistance Percentages; Decennial Census Data Affect the Flow of Medicaid Funds,* National Association of Medical Directors, October 2011, available at https://medicaiddirectors.org/wp-content/uploads/2015/08/vjm_the_impact_of_decennial_census_data_on_federal_medical_assistance_percentages.pdf.

[40] Gregory H. Cohen et al., *Census 2020—A Preventable Public Health Catastrophe*, American Journal of Public Health (August 2019), available at https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305074.

disasters.[41]  Thus, undercounting leaves states vulnerable not only to a lack of funding to address their residents' ongoing health and economic needs during the pandemic, but may also lead to misguided and misinformed responses to the pandemic, as well as novel health crises that emerge in the future.

In sum, while the Memorandum proposes to exclude undocumented immigrants from the apportionment base, these individuals will remain part of their respective communities, will continue to contribute to society, and will be entitled to available social services, including healthcare and education.  Yet federal funding for state-provided and locally-provided healthcare and education will be artificially limited to citizens only.  As a result, all residents—citizens and non-citizens alike—who access and share the public healthcare and education system will be adversely affected.

## IV.   THE MEMORANDUM UNDERMINES DEMOCRACY, AND ERODES TRUST IN OUR CONSTITUTIONAL SYSTEM.

The Memorandum's clear intent—and its likely effect—is to shift the political representation among the states, reducing representation in Congress of states with sizable undocumented immigrant populations.[42]

The Memorandum's directive to not count undocumented immigrants in the apportionment base is constructed on President Trump's "determine[ation] that respect for the law and protection of the integrity of the democratic process warrant the exclusion" of undocumented immigrants from the apportionment base.[43]  Yet, in reality, the Memorandum has the opposite result, violating the Constitution and hundreds of years of precedent thereunder.[44]  The Memorandum's practical

---

[41] *Id.*

[42] *See* Memorandum.

[43] *Id.*

[44] While this *amicus* brief focuses on certain of the "policy" consequences of the Memorandum, we are in full agreement with the Constitutional and statutory arguments made by plaintiffs.

effect is an erosion of democracy through a reduction in political representation, diminution of federal funding, and increased political apathy, distrust and disinterest.

This result impacts all Americans.[45] Excluding undocumented immigrants from the apportionment base runs counter to the fundamental principle of representative democracy: accurate representation.

In addition, the broader societal impact of the Memorandum, following the Administration's efforts to include a citizenship question on the census, should be considered. The Administration's repeated attacks on undocumented immigrants and the census have caused undocumented immigrants and legal residents alike to lose faith in and even become fearful and distrustful of the government. Those who become apathetic or distrustful are likely to be less politically involved across all levels of civic life, including voting. In short, this is not just an "immigrant" issue, this is a democracy issue—an issue that the League throughout its history has worked hard to support. The Memorandum stands to erode faith in our democracy and Constitution.

### A.    Representation Based on Accurate Apportionment Base Is the Bedrock of Our Democracy.

Representative democracy depends on an accurate count of the population that is to be governed through its elected representatives. Indeed, the founders of our government viewed the idea of representation as even more important than suffrage itself.[46] From the start, representation was meant to extend further than the right to vote; indeed, women were counted in the first census, though they did not have the right to vote at that time. Similarly, children are counted today in the census. Accordingly, the Constitution makes clear that all persons should be counted for purposes

---

[45] The negative effects of the Memorandum will be most acutely and directly felt by states whose populations include sizable numbers of undocumented immigrants, i.e. that ALA States. *Supra*, Part III.

[46] Charles A. Beard, Mary Ritter. *American Citizenship* (1914).

of apportionment.[47]   Therefore, excluding undocumented immigrants from the congressional apportionment base undermines the "representative" core of representative democracy.

As noted in Plaintiffs' *Memorandum of Law in Support of Plaintiffs' Motion for Partial Summary Judgement or Preliminary Injunction*,[48] basing apportionment on numbers from the actual enumeration was meant to "limit political chicanery."[49]   By attempting to exclude undocumented immigrants from the congressional apportionment base, the Memorandum exemplifies the exact form of political chicanery that the founders sought to avoid.   The Memorandum makes clear that reallocating political power away from states with larger undocumented immigrant populations is not just a predictable impact, but the explicit purpose of excluding undocumented immigrants from the congressional apportionment base.   Exploiting congressional apportionment for political gain is an affront to our democracy that impacts all residents of the United States.

**B.     The Exclusion of Undocumented Immigrants from the Apportionment Base Would Create a Loss of Faith in the Democratic Process and Constitution.**

The census is critical for the equitable and accurate distribution of political power based on population.   The exclusion of undocumented immigrants from the apportionment base will create a loss of faith in the democratic process.   ALA States will "almost certainly" lose congressional seats and, thus, suffer loss of political power.[50]   In turn, those lost seats will shift to other states whose political power will increase by windfall.[51]   This inequity can be expected to discourage residents of ALA States from participating in a system tilted against them.

Our democratic system was built on the idea that our representatives would be "apportioned

---

[47] U.S. Const. amend. XIV, § 2; *see id.* art. I, § 2, cl. 3.
[48] Dkt. 77.
[49] *Utah v. Evans*, 536 U.S. 452, 500 (2002) (Thomas, J., concurring in part and dissenting in part).
[50] *See* Warshaw Decl. ¶ 11.
[51] *See id.*

16

among the several states according to their respective numbers, counting the whole number of persons in each state."[52]  The Supreme Court has stated that in order to establish a representative democracy "the Framers chose to use population . . . as the basis for representation,"[53] and that "representatives serve all residents,"[54] not only citizens.   The exclusion of undocumented immigrants from the census is contrary to the U.S. Constitution and the foundational principles which guide our democratic system.   Such flagrant disregard for the Constitution and our democracy[55] can be expected to breed distrust and discourage participation in civil institutions including—most immediately—participation in the census.

Indeed, the Memorandum, together with the Administrations other attacks on the census, has already dampened participation.  The League is heavily involved in promoting awareness and engagement in voting and the census, and the League has observed increasing levels of disinterest and apathy in responding to the current census.   The Administration's attempt to include a "citizenship question" and, most recently, the exclusion of undocumented immigrants from the apportionment base, has generated fear in immigrant communities around census participation—i.e. that immigrants cannot benefit from participating, but could face retaliation or other negative consequences.  Decreased participation due to fear of immigration consequences (and no benefits based on the Memorandum) is especially impactful in the ALA States, given the proportion of undocumented immigrants among their total population.[56] The Memorandum has already made

---

[52] U.S. Cons. Amend. XIV, § 2; *see id.* Art. I, § 2, cl. 3.

[53] *Utah v. Evans*, 536 U.S. 452, 478 (2002).

[54] *Evenwel v. Abbott*, 136 S. Ct. 1120, 1132 (2016).

[55] Expert Declaration of Matthew A. Barreto, Ph.D. ("Barreto Decl."), at ¶ 14 (Dkt 77, Ex. 56).

[56] In Texas alone there are 2.7 million people, including 1.4 million U.S. citizens, who lived with at least one undocumented family member (based on data from 2010 to 2014). https://www.americanimmigrationcouncil.org/research/immigrants-in-texas#:~:text=2.7%20million%20people%20in%20Texas,1%20million%20children%20in%20total).  In California, undocumented immigrants comprised nine percent of the state's workforce in 2016.

the League's efforts to galvanize the public to fill out the census (and vote) even more difficult.

Worse, the impacts of the Memorandum are likely to extend beyond just the next decade. Fear and distrust of the federal government is already entrenched among the African-American community, which has experienced long-term intentional discrimination in distribution of VA benefits, farm subsidies, and other benefits. The Memorandum will lead to decreased participation in the census and other government-based interactions, such as registering to vote and voting, which will likely impact immigrant communities and racial minorities disproportionately. As people choose not to respond to the census due to fear or a belief that their response will not matter, the enumeration becomes less accurate, and undercounting and under-representation spreads, eroding our representative democracy.

The League is adversely impacted as it becomes more difficult to convince distrustful and discouraged citizens—especially among immigrant communities and racial minorities—to fill out the census. Indeed, the League has already been forced to deal with confusion resulting from the census operations being suspended in March due to COVID-19 and subsequently resuming only recently. The Memorandum aggravates this problem.

## V.   THE MEMORANDUM WILL CAUSE SOCIETAL WITHDRAWAL OF FAMILIES WITH UNDOCUMENTED MEMBERS, HARMING EVERYONE.

The Memorandum is likely to cause tangible social harm to states across the country, regardless of whether their Congressional representation is compromised, due to the withdrawal

---

https://www.americanimmigrationcouncil.org/research/immigrants-in-california. In Florida, there are nearly one million people, including almost 500,000 U.S. citizens, who lived with at least one undocumented immigrant between 2010 and 2014. https://www.americanimmigrationcouncil.org/research/immigrants-florida. The Memorandum's effort to exclude undocumented immigrants from the congressional apportionment base will intimidate those families and citizens who live with an undocumented immigrant, as well as immigrants who are here legally, from participating not only in the census, but in civic life more broadly. *See infra*, Part V.

of immigrant families from civic and economic activity for fear of government monitoring, retaliation or other consequence. Just as legalization of immigration status causes social and economic benefits to society as a whole through *increased* immigrant participation—e.g., through a surge in investment in language skills, education, training, and general economic assimilation[57]—the converse is also true: increased spotlighting and delegitimization of undocumented status causes a reactionary *withdrawal* of undocumented immigrants, their families, and their communities, leading to overall social retraction and social and economic harm.[58] This, in turn, jeopardizes public health, public education, and public safety and will likely have a disparately negative impact on Hispanic communities and people of color.

Studies show that withdrawal behavior—where immigrants and their families disengage from interactions with government officials for fear of being persecuted, prosecuted, or deported— occurred in 2019 when the Administration announced its intention to add a question to the census form inquiring about the respondent's citizenship status.[59] The addition of the question caused distrust among noncitizens and fear of deportation, leading to a substantially lower likelihood they would fill out a census form.[60] Civic organizations and state governments have worked hard through public relations and educational campaigns to reverse the withdrawal effect after the

---

[57] Raúl Hinojosa-Ojeda, *Labor Market Impacts of Amnesty: A Comparative Analysis of IRCA and Current Conditions*, 5 DE LAS AMÉRICAS 1, 6-9 (2000), http://www.naid.ucla.edu/uploads/4/2/1/9/4219226/b46.pdf.

[58] *See, e.g.*, Sarah Holder, *What the Fear Campaign Against Immigrants Is Doing*, BLOOMBERG (July 25, 2019), https://www.bloomberg.com/news/articles/2019-07-25/how-fear-of-ice-is-gripping-immigrant-communities (describing the broad societal withdrawal effect of the threat of immigration raids) (hereinafter "Holder, *Fear Campaign*").

[59] Matt Barreto et al., *New Research Shows Just How Badly A Citizenship Question Would Hurt the 2020 Census*, THE WASHINGTON POST (April 22, 2019), https://www.washingtonpost.com/politics/2019/04/22/new-research-shows-just-how-badly-citizenship-question-would-hurt-census/ (hereinafter "Barreto, *New Research*"); *see New York v. United States Dep't of Commerce*, 351 F. Supp. 3d 578-593.

[60] Barreto, *New Research*; Edith Honan, *Citizenship Question Dropped from Census, but Advocates Fear 'Damage Has Been Done,'* ABC NEWS (July 12, 2019), https://abcnews.go.com/Politics/citizenship-question-dropped-census-advocates-fear-damage/story?id=64225417 ("[L]ike a bell tha[t] can't be unrung, the mere discussion of [a citizenship question], coupled with the President's Muslim ban and policies on immigrants at the southern border, has left people on edge.").

Supreme Court rejected the addition of the citizenship question.[61]  However, some of this damage cannot be undone, no matter the efforts taken by the League or other organizations.  For some people, once faith and trust in the government is lost, and potentially replaced with fear, that change cannot be reversed.

The Memorandum is likely to have an even greater chilling effect on public participation than the citizenship question.  Indeed, the Memorandum is uniquely tailored to sow distrust *because* of the lack of a citizenship status question on the census form:  Since the government cannot tell one's citizenship or immigration status from the census form itself, the logical conclusion that immigrant communities will draw is that the government will try to determine their legal status through other means, thus generating a chilling effect on public participation in civic life generally.[62]  The belief is hardly unwarranted:  The Administration has already instructed federal agencies to seek state and federal records to determine citizenship status, an effort with which at least four states are complying.[63]  Experts have suggested that, considering the legal rationale for the Memorandum is specious, the Administration's goal may not be to actually enact it, but to "create uncertainty or confusion among immigrants already wary of responding to the census."[64]

Withdrawal from public participation does not just mean that immigrant communities will fill out the census forms at lower rates.  It also means that mothers will be more reluctant to take

---

[61] Gabrielle Jacobovitz & Sam Levine, *Activists Blocked Census Citizenship Question.  Now They Have to Repair Trump's Damage*, HUFFPOST (July 17, 2019), https://www.huffpost.com/entry/2020-census-citizenship-question_n_5d2f378ce4b02fd71dddf974.

[62] Barreto Decl., at ¶ 31, State of N.Y., et al. v. Trump, No. 1:20-cv-5770 (S.D.N.Y. to be filed).

[63] Hansi Lo Wang, *Four States Are Sharing Driver's License Info to Help Find Out Who's a Citizen*, NPR (July 14, 2020), https://www.npr.org/2020/07/14/890798378/south-dakota-is-sharing-drivers-license-info-to-help-find-out-who-s-a-citizen.

[64] Sam Levine, *Trump Orders Undocumented Immigrants Excluded From Key Census Count*, THE GUARDIAN (July 21, 2020), https://www.theguardian.com/us-news/2020/jul/21/trump-executive-order-census-undocumented-immigrants.

their children to the hospital if they become sick or injured[65]—with negative long-term public

health effects in the best cases, and tragic consequences in the worst ones, especially while the

COVID-19 pandemic rages.[66]  It means pronounced fear-induced psychological trauma, especially

in children, for those who live in trepidation of interacting with the community outside their door.[67]

It means that individuals and families will be chilled from seeking redress of grievances in the

legal system or appearing in court for any reason, even in cases of blatant inequity and harm.[68]  It

means that immigrant parents will more often avoid sending their kids to school.[69]  And it means

that victims of crime will be less likely to contact the police, jeopardizing public safety.[70]

     The League of Women Voters has significant direct experience guiding and advocating for

vulnerable individuals and families who are timid or outright terrified—even under normal

circumstances—of interacting with the government or putting themselves in situations where they

may come in contact with authorities, especially in the arena of child public health.  The specter

of a government microscope conjured by this Memorandum will likely cause many of these

individuals and families to avoid civic life and engagement, or seek assistance from public

---

[65] *See, e.g.*, Marc L. Berk & Claudia L. Schur, *The Effect of Fear on Access to Care Among Undocumented Latino Immigrants*," JOURNAL OF IMMIGRANT HEALTH 3, 151-56 (2001) (finding that 39% of undocumented adult immigrants expressed fear about receiving medical services because of undocumented status).

[66] Miriam Jordan, *'We're Petrified': Immigrants Afraid to Seek Medical Care for Coronavirus*," N.Y. TIMES (March 18, 2020), https://www.nytimes.com/2020/03/18/us/coronavirus-immigrants.html.

[67] Holder, *Fear Campaign*.

[68] *See, e.g.*, Angela Irvine et al., *The Chilling Effect of ICE Courthouse Arrests: How Immigration and Customs Enforcement (ICE) Raids Deter Immigrants from Attending Child Welfare, Domestic Violence, Adult Criminal, and Youth Court Hearings*, CERES POLICY RESEARCH (October 2019), https://static1.squarespace.com/static/58ba8c479f7456dff8fb4e29/t/5dae6ba65642ea5d1cef9705/1571711914510/ice.report.final.21oct2019.pdf.

[69] *See, e.g.*, Pedraza & Osorio, *Courted and Deported: The Salience of Immigration Issues and Avoidance of Police, Health Care, and Education Services among Latinos*, 42 Aztlán: A Journal of Chicano Studies 2, 255-59 (2017). (study found that 25.9% of Latino non-citizens without a green card reported they were more likely to avoid school upon being primed to think about immigration issues) (hereinafter "Pedraza & Osorio").

[70] Pedraza & Osorio, at 255-59 (study found that 31.9% of Latino non-citizens without a green card reported they were more likely to avoid police services upon being primed to think about immigration issues).

programs or authorities, even when in dire need.[71]  This withdrawal from social and economic life adversely impacts society as a whole, as well as the immigrants themselves.

## CONCLUSION

For the reasons set forth herein, the League of Women Voters of the United States, the League of Women Voters of Texas, the League of Women Voters of Florida, and the League of Women Voters of California pray that this Court grant partial summary judgment in favor of the Plaintiffs in this action, or alternatively, a preliminary injunction.

---

[71] By no means will increased withdrawal come close to offsetting the strain on resources caused by undercounting and under-allocation discussed *supra* in Part III—*any* use of public resources by an uncounted individual would be one for which there was no allocation.  *See*, *e.g.*, Reamer, *Report # 2: Estimating Fiscal Costs of a Census Undercount to States*, at 3 (listing the fiscal losses by state in FMAP-guided programs per person missed in the 2010 Census).

Dated:  August 14, 2020

PILLSBURY WINTHROP SHAW PITTMAN LLP

Blaine I. Green (*pro hac vice forthcoming*)
Dustin Chase-Woods (*pro hac vice forthcoming*)
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Phone: +1.415.983.1476
Fax: 415.983.1200
blaine.green@pillsburylaw.com
dustin.chasewoods@pillsburylaw.com

Ashleigh K. Acevedo (*pro hac vice forthcoming*)
Two Houston Center
909 Fannin, Suite 2000
Houston, TX 77010-1018
Phone: +1.713.276.7631
Fax: 713.276.7673
ashleigh.acevedo@pillsburylaw.com

By:  */s/ Robert L. Sills*
Robert L. Sills
Michael J. Pisko
Patti Rothenberg
Melissa Pettit
West 52nd Street
New York, NY 10019-6131
Phone: +1.212.858.1114
Fax: 212.858.1500
robert.sills@pillsburylaw.com
michael.pisko@pillsburylaw.com
patricia.rothenberg@pillsburylaw.com
melissa.pettit@pillsburylaw.com

Shani Rivaux (*pro hac vice forthcoming*)
Jennifer Altman (*pro hac vice forthcoming*)
600 Brickell Avenue
Suite 3100
Miami, FL 33131
Phone: +1.786.913.4882
Fax: 786.913.4901

*Counsel for The League of Women Voters of the United States, the League of Women Voters of Texas, the League of Women Voters of Florida, and the League of Women Voters of California*

23