**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, et al.,<br><br>                     Plaintiffs,<br><br>        v.<br><br>DONALD J. TRUMP, *in his official capacity as President of the United States*, et al.,<br><br>                     Defendants. | Case No. 20-cv-05770 (JMF)<br><br>Consolidated with No. 20-cv-5781 (JMF) |

**BRIEF OF *AMICI CURIAE* HISTORIANS IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT OR PRELIMINARY INJUNCTION**

Richard W. Clary
Antony L. Ryan
Helam Gebremariam
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
   New York, New York 10019
      (212) 474-1000

Mark Trachtenberg
HAYNES AND BOONE LLP
   1221 McKinney, Suite 4000
      Houston, Texas 77010
         (713) 547-2000

*Attorneys for* Amici Curiae

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTEREST OF *AMICI CURIAE* ............................................................................................1

PRELIMINARY STATEMENT ................................................................................................2

ARGUMENT................................................................................................................................3

I.    The Plain Text of the Constitution and the Record of the Constitutional Convention
Evidence the Framers' Intent That Congressional Apportionment Should Include All
Persons, Unrelated to Citizenship or Immigration Status. ......................................................3

    A.  The Plain Text of the Constitution Commands That Congressional
Apportionment Include All Persons, Without Regard to Citizenship or
Immigration Status. .......................................................................................................3

    B.  The Record of the Constitutional Convention Further Demonstrates the Framers'
Intent That Congressional Apportionment Include All Persons Without Regard to
Citizenship or Immigration Status. ...............................................................................5

II.   The Census Act of 1790 and the Early Administrations of the Census Make Clear
That All Residents Must Be Counted for Apportionment Purposes, Regardless of
Citizenship or Immigration Status. .........................................................................................9

III.  The Fourteenth Amendment and Its Legislative History Reaffirm an Inclusive
Apportionment Base, Unrelated to Citizenship or Immigration Status. ...............................12

IV.  Since Reconstruction, It Has Remained Clear That All Residents Must Be Counted
for Apportionment Purposes, Regardless of Citizenship or Immigration Status. ................16

    A.  The Administration of the Census During the Immigration Boom of the Late
19th and Early 20th Centuries Confirms the Historical Practice. ...............................16

    B.  More Recent Efforts To Exclude Undocumented Immigrants from the
Apportionment Have Been Consistently Rejected........................................................22

CONCLUSION...........................................................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrus v. Glover Const. Co.*,
  446 U.S. 608 (1980) .................................................................................5

*Cherokee Nation v. Georgia*,
  30 U.S. (5 Pet.) 1 (1831) ...........................................................................4

*Dep't of Commerce v. New York*,
  139 S. Ct. 2551 (2019) .............................................................................16

*Evenwel v. Abbott*,
  136 S. Ct. 1120 (2016) .............................................................................12

*FAIR v. Klutznick*,
  486 F. Supp. 564 (D.D.C. 1980) ...............................................................22

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ...................................................................................9

*Minor v. Happersett*,
  88 U.S. 162 (1874) .....................................................................................9

*NLRB. v. Noel Canning*,
  573 U.S. 513 (2014) .................................................................................16

*Pollock v. Farmers' Loan & Trust Co.*,
  157 U.S. 429 (1895) ...................................................................................8

*Ridge v. Verity*,
  715 F. Supp. 1308 (W.D. Pa. 1989) .........................................................24

*Weisblum v. Prophase Labs, Inc.*,
  88 F. Supp. 3d 283 (S.D.N.Y. 2015) ..........................................................5

*Wesberry v. Sanders*,
  376 U.S. 1 (1964) .......................................................................................7

*Wisconsin v. City of New York*,
  517 U.S. 1 (1996) .....................................................................................16

**Constitutions, Statutes & Rules**

39th Cong., 1st Sess., Rep. of the Joint Comm. on Reconstruction (1866) ................................12

Act of Mar. 14, 1820, § 1, 2 Stat. 548 ..................................................................10

Act of Mar. 1, 1790, 1 Stat. 101 (1790) ............................................................9, 10

An Act For the apportionment of Representatives in Congress among the several
    States under the Thirteenth Census, Pub. L. 62-5, 37 Stat. 13 (1911) ..................18

An act making an apportionment of Representatives in Congress among the
    several states under the Eleventh Census, Pub. L. 51-64, § 1, 22 Stat. 735
    (1891) ..................................................................................................................18

An Act Making an apportionment of Representatives in Congress among the
    several States under the Twelfth Census, Pub. L. 56-93, 27 Stat. 734 (1901) ......18

An Act Making it a felony with penalty for certain aliens to enter the United
    States of America under certain conditions in violation of law, Pub. L. 70-
    1018 §§ 1, 2, 14 Stat. 1551 (1929) ....................................................................20

An act supplementary to the acts in relation to immigration (Page Act), Pub. L.
    43-141, § 5, 18 Stat. 477 (1875) ........................................................................17

An act to execute certain treaty stipulations relating to the Chinese ("Chinese
    Exclusion Act"), Pub. L. 47-26, § 1, 22 Stat. 58 (1882) ....................................17

An Act To limit the immigration of aliens into the United States, and for other
    purposes (Reed-Johnson Act), Pub. L. 68-139, §§ 13, 14, 43 Stat. 153 (1924) ....19

An act to prohibit the coming of Chinese laborers to the United States, § 1, 25
    Stat. 476 (1888) ..................................................................................................17

An Act To provide for the fifteenth and subsequent decennial censuses and to
    provide for apportionment of Representatives in Congress, Pub. L. 71-13, §
    22, 46 Stat. 21 (1929) ........................................................................................19

An act to regulate Immigration, Pub. L. 47-376, § 2, 22 Stat. 214 (1882) ................17

Indian Citizenship Act of 1924, 43 Stat. 253 ............................................................4

U.S. Const. Amend. XIV ..............................................................................passim

U.S. Const. Amend. XV ..........................................................................................15

U.S. Const. art. I............................................................................3, 4, 5, 7, 8

**Other Authorities**

71 Cong. Rec. (1929) ......................................................................................20, 21

74 Cong. Rec. 5454 (Feb. 19, 1931) (H.J. Res. 356) ................................................21

75 Cong. Rec. 2453 (Jan. 21, 1932) (H.J. Res. 97)...................................................21

78 Cong. Rec. 6637-41 (Apr. 14, 1934) (H.J. Res. 10)..............................................21

86 Cong. Rec. 4367 (Apr. 11, 1940) (S. 2505).....................................................21, 22

87 Cong. Rec. 465 (Feb. 3, 1941) (S.J. Res. 34) ......................................................21

93 Cong. Rec. 718 (Jan. 31, 1947) (S.J. Res. 50) .....................................................21

126 Cong. Rec. (1980) .............................................................................................23

133 Cong. Rec. (1987) .............................................................................................24

135 Cong. Rec. (1989) .............................................................................................24

151 Cong. Rec. H4355 (daily ed. June 9, 2005) (H.J. Res. 53)...............................24

155 Cong. Rec. (2009) .............................................................................................25

*1890 Index of Questions*, U.S. Census Bureau .......................................................18

*1900 Index of Questions*, U.S. Census Bureau .......................................................18

*1910 Index of Questions*, U.S. Census Bureau .......................................................18

*1920 Index of Questions*, U.S. Census Bureau .......................................................19

*1990 Census Procedures and Demographic Impact on the State of Michigan: Hearing before the H. Comm. on Post Off. and Civ. Serv.*, 100th Cong. (1988) ............21, 24

Adam Goodman, *The Deportation Machine: America's Long History of Expelling Immigrants* (2020)............................................................................................20

Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the United States* (rev. ed. 2009)...................................................................8, 10

Benjamin B. Kendrick, *The Journal of the Joint Committee of Fifteen on Reconstruction: 39th Congress, 1865-1867* (1914) ............................................14

Carroll Wright & William C. Hunt, *History and Growth of the U.S. Census* (1900)...................11

Catherine Drinker Bowen, *Miracle at Philadelphia: The Story of the Constitutional Convention, May to September 1787* (1966) ...................................3

*Census:  Counting Illegal Aliens, Hearing on S. 2366 of the Subcomm. on Energy, Nuclear Proliferation and Federal Services of the S. Comm. on Governmental Affairs*, 96th Cong. (Mar. 26, 1980) ...................................................................23

Census Office, *Compendium of the Eleventh Census: 1890, Pt. I* (1892) ...................................18

Cong. Globe, 39th Cong., 1st Sess. (1866) .............................................. 12, 13, 14, 15

Cong. Research Serv., R41048, *Constitutionality of Excluding Aliens from the Census for Apportionment and Redistricting Purposes* (2012) .............................................25

Congressional Apportionment, House Rep. 51-3280 (1890) ........................................18

*Counting the Vote:  Should Only U.S. Citizens Be Included in Apportioning Our Elected Representatives?, Hearing Before the Subcomm. on Federalism and the Census of H. Comm. on Gov't Reform*, 109th Cong. (2005) ..................................... 24, 25

David H. Gans, *The Cornerstone of Our Democracy: The Census Clause and the Constitutional Obligation to Count All Persons*, Const. Accountability Ctr., Mar. 19, 2018 ...........................................................................................13

Dennis L. Murphy, Note, *The Exclusion of Illegal Aliens from the Reapportionment Base: A Question of Representation*, 41 Case W. Res. L. Rev. 969 (1991).................................................................................................24

Dep't of Interior, Census Off., *Enumerator Instructions* (1880)..................................15

Dep't of Interior, Census Off., *Instructions to Assistant Marshals* (1870)...................15

Dorothee Schneider, *Crossing Borders: Migration and Citizenship in the Twentieth-Century United States* (2011) ................................................. 18, 19, 20

Enumeration of the Chinese Population of the United States, H.R. Rep. No. 51-486; 21 Cong Rec. 2309 (H.R. 6420)..................................................................18

*Enumeration of Undocumented Aliens in the Decennial Census: Hearing on S. 99-314 Before the S. Comm. on Governmental Affs.*, 99th Cong. (1985) ..............................12

Eric Foner, *Reconstruction: America's Unfinished Revolution, 1863–77* (1988).......................12

Erika Lee, *At America's Gates: Chinese Immigration During the Exclusion Era, 1882-1943* (2003)................................................................................. 16, 17, 18

1 Farrand, *Records of the Federal Convention*..................................................... 5, 6, 7

2 Farrand, *Records of the Federal Convention*..................................................... 6, 7, 8

*The Federalist* No. 54 (James Madison) ........................................................... 7, 8

George David Zuckerman, *A Consideration of the History and Present Status of Section 2 of the Fourteenth Amendment*, 30 Fordham L. Rev. 93 (1961) ............................ 13

George P. Smith, *Republican Reconstruction and Section 2 of the Fourteenth Amendment*, 23 W. Pol. Q. 829 (1970) ........................................................................... 13, 15

H. Rep. No. 91-1314, 91st Cong., 2d Sess. 24 (1970) ............................................... 11

Howard A. Ohline, *Republicanism and Slavery: Origins of the Three-Fifths Clause in the United States Constitution*, 28 Wm. & Mary Q. 563 (1971) ......................... 4, 5

Institute on Taxation and Economic Policy, *Undocumented Immigrants' State & Local Tax Contributions* (2017) ........................................................................................ 8

Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (2006) ........................................................................................................... 4

Libby Garland, *After They Closed the Gates: Jewish Illegal Immigration to the United States* (2014) ............................................................................................................ 20

Mae M. Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America* (2004) ......................................................................................................... 17, 19, 20

Margo J. Anderson, *The American Census: A Social History* (2d ed. 2015) ....................... passim

Maurice R. Davie, *World Immigration: With Special Reference to the United States* (1936) .......................................................................................................................... 19

*Message from the President of the United States to the Two Houses of Congress at the Beginning of the First Session of the Fifty-First Congress, with the Reports of the Heads of Departments* (1890) ....................................................... 18

Note, *A Territorial Approach to Representation for Illegal Aliens*, 80 Mich. L. Rev. 1342 (1982) ........................................................................................................... 21

Paul Schor, *Counting Americans: How the U.S. Census Classified the Nation* (2017) ............................................................................................................................ 18

Raymond L. Cohn, *Immigration to the United States*, EH.net ...................................... 16

Richard Beeman, *Plain, Honest Men: The Making of the American Constitution* (2009) ........................................................................................................................ 3, 4, 5

Ron Hayduk, *Democracy for All: Restoring Immigrant Voting Rights in the United States* (2006) ........................................................................................................... 9

Torrie Hester, *Deportation: The Origins of U.S. Policy* (2017) ................................... 20

U.S. Census Bureau, 1820 Instructions to Marshals, *Measuring America: The Decennial Censuses from 1790 to 2000* (2002)....................................................11

U.S. Dep't of Com., Fifteenth Decennial Census of the United States: Instructions to Enumerators (1930)....................................................11

U.S. Dep't of Com., Fourteenth Decennial Census of the United States: Instructions to Enumerators (1920)....................................................11

U.S. Dep't of Com., Sixteenth Decennial Census of the United States: Instructions to Enumerators (1940)....................................................11

*Undercount and the 1980 Decennial Census:  Hearing before the Subcomm. on Energy, Nuclear Proliferation and Fed. Servs. of the S. Comm. on Governmental Affs.*, 96th Cong. (Nov. 18, 1980) (statement of Vincent Barabba, director of the Census Bureau)....................................................23

24 Worthington C. Ford et al., eds., *Journals of the Continental Congress, 1774–1789* (1922)....................................................5

## INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are eight historians and social scientists who seek to assist the Court by providing relevant information about the history of the census and the Apportionment and Enumeration Clauses of the Constitution.  They are:  Margo Anderson, Distinguished Professor Emerita in History and Urban Studies at the University of Wisconsin, Milwaukee; Andrew Beveridge, Professor of Sociology at Queens College and the CUNY Graduate Center and the CEO of Social Explorer; Rachel Buff, Professor of History and Director of the Cultures and Communities Program at the University of Wisconsin, Milwaukee; Libby Garland, Associate Professor of History at Kingsborough Community College, The City University of New York; J. Morgan Kousser, Professor Emeritus of History and Social Science at the California Institute of Technology; Erika Lee, Rudolph J. Vecoli Chair in Immigration History and Director of the Immigration History Research Center at the University of Minnesota; Natalia Molina, Professor of American Studies and Ethnicity at the University of Southern California; and Steven Ruggles, Regents Professor of History and Population Studies and the Director of the Institute for Social Research and Data Innovation at the University of Minnesota.

*Amici* have studied and written extensively on issues relating to the census and immigration, and are uniquely positioned to explain the historical underpinnings of the inclusive apportionment scheme envisioned by the Framers.  *Amici* believe this brief will be helpful to the Court's understanding of the original and long-affirmed meaning of the Constitution:  that all persons residing in the United States, regardless of citizenship or immigration status, must be included in the apportionment base.

---

[1] No person or entity other than *amici* and their counsel assisted in or made a monetary contribution to the preparation or submission of this brief.

## PRELIMINARY STATEMENT

On July 21, 2020, the President issued a memorandum (the "July 21 Memorandum") declaring that it is the policy of the United States to exclude "aliens who are not in lawful immigration status" from the "actual Enumeration" required for congressional apportionment following the 2020 census. This policy violates the Constitution and contravenes the Framers' intent—and the unbroken historical practice—of an inclusive apportionment base of all persons, without regard to citizenship or immigration status.

The historical record shows that our nation's Framers adopted the census as the only reliable mechanism for ensuring nonpartisan, uniform reapportionment of congressional representation and curbing attempts to manipulate the balance of power among the states. To this end, the Framers decided to use the total number of persons as the apportionment base. They adopted explicit language defining the scope of the census to include "the whole Number of free Persons" with only two specific exceptions, neither of which relates to citizenship or immigration status (and neither of which survives today). This principle of an inclusive apportionment base has repeatedly been reaffirmed throughout the 230-year history of the census—including most notably through the adoption of Section 2 of the Fourteenth Amendment following the Civil War. Congress and the courts have uniformly rejected efforts to exclude noncitizens, or those without lawful immigration status, from the apportionment base. The July 21 Memorandum represents only the latest in a series of failed attempts to circumvent the Constitution and the Framers' clear intent, and the uniform history of administration of the census. Accordingly, it should be rejected.

2

**ARGUMENT**

I.    **The Plain Text of the Constitution and the Record of the Constitutional Convention Evidence the Framers' Intent That Congressional Apportionment Should Include All Persons, Unrelated to Citizenship or Immigration Status.**

Faced with tensions between large and small states, a growing population and the prospect of people moving between established and new states, the Framers had to develop a system of representation that could reliably accommodate shifts in power and the allocation of resources among states of different and changing sizes.[2]  Thus, the Great Compromise was born: the Framers created a bicameral legislature consisting of the Senate, designed to accommodate the interests of the smaller states, and the House of Representatives, in which representation would be apportioned based on each state's population.  To bring the latter to fruition, the Framers crafted two clauses:  (i) the Apportionment Clause, which provided that "Representatives and direct taxes shall be apportioned among the several States . . . according to their respective Numbers, which shall be determined by adding to the *whole Number* of free *Persons* . . . and excluding Indians not taxed, three fifths of all other Persons", and (ii) the Enumeration Clause, which facilitated reapportionment and provided that "[t]he actual Enumeration shall be made . . . within every subsequent Term of ten Years".[3]

A.    **The Plain Text of the Constitution Commands That Congressional Apportionment Include All Persons, Without Regard to Citizenship or Immigration Status.**

The plain language of the Apportionment and Enumeration Clauses confirms that the Framers intended representation for *all* inhabitants of the new nation with only two exceptions,

---

[2] For accounts of the Constitutional Convention, see Richard Beeman, *Plain, Honest Men: The Making of the American Constitution* (2009); Catherine Drinker Bowen, *Miracle at Philadelphia: The Story of the Constitutional Convention, May to September 1787* (1966).

[3] U.S. Const. art. I, § 2, cl. 3 (emphasis added).

3

unrelated to citizenship or immigration status.  The Apportionment Clause excluded "Indians not taxed" because Indian tribes were considered separate sovereigns, not subject to any state's jurisdiction for taxation purposes.[4]  If, however, a Native American left his or her tribe, he or she fell within a state's jurisdiction and was included in the census count.  Additionally, the so-called Three-Fifths Compromise provided that, for apportionment purposes, enslaved people counted as three-fifths of a person.  While the three-fifths ratio has become notorious for its indifference to the humanity of enslaved people, the approach dates back to 1783, four years before the Constitutional Convention, when the Continental Congress debated the size of the financial contribution each state should make to the new continental government.   The Continental Congress decided that population, not land, should form the basis of each state's tax obligation; however, Southerners opposed including enslaved people in their population base to lower their tax burden, whereas Northerners advocated including enslaved people on a one-to-one basis.[5] The Three-Fifths Compromise was borne out of this conflict and was later adopted in the Apportionment Clause; it reflected the Framers' effort to achieve the "closest approximation . . . to the principle of one person, one vote" and equal representation for *all inhabitants* of the new nation.[6]

But for these two heavily debated, carefully circumscribed and specific exceptions, the plain language of the Apportionment and Enumeration Clauses commands that representatives be apportioned based on an "actual Enumeration" consisting of "the whole Number of free

---

[4] U.S. Const. art. I § 2, cl. 3; *see also Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 43 (1831).  The Indian Citizenship Act of 1924, 43 Stat. 253, which declared Native Americans to be citizens of the United States, rendered the "Indians not taxed" exclusion moot.

[5] Margo J. Anderson, *The American Census: A Social History* 11-13 (2d ed. 2015); Beeman, *supra* note 2 at 152-55; Howard A. Ohline, *Republicanism and Slavery: Origins of the Three-Fifths Clause in the United States Constitution*, 28 Wm. & Mary Q. 563-64 (1971).

[6] Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* 74 (2006).

4

*Persons*", without further qualification.[7]  There is no basis in the historical record to "engraft[]

an additional exception" to that plain language based on citizenship or immigration status.[8]

> **B.    The Record of the Constitutional Convention Further Demonstrates the Framers' Intent That Congressional Apportionment Include All Persons Without Regard to Citizenship or Immigration Status.**

Earlier versions of the Apportionment and Enumeration Clauses confirm the Framers'

expansive approach to representation by consistently including all "free inhabitants" in the

baseline measure of apportionment, regardless of immigration status or eligibility to vote.  In an

initial proposal for the Apportionment Clause, a leading member of the Convention, James

Wilson of Pennsylvania, suggested language from the 1783 amendments to the Articles of

Confederation, which provided that "the common treasury" would be "supplied by the several

states in proportion to the whole number of white and other *free citizens and inhabitants, of*

*every age, sex and condition*, including those bound to servitude for a term of years, and three-

fifths of all other persons not comprehended in the foregoing description, except Indians, not

paying taxes".[9]  A subsequent draft of the Apportionment Clause similarly referred to a census of

"the free *inhabitants* of each State, and three fifths of the *inhabitants* of other description", which

later became a census of "*all the inhabitants* of the United States in the manner and according to

the ratio recommended by Congress in their resolution of April 18, 1783 [the three-fifths ratio]",

---

[7] U.S. Const. art. I § 2, cl. 3 (emphasis added).

[8] *Weisblum v. Prophase Labs, Inc.*, 88 F. Supp. 3d 283, 294 (S.D.N.Y. 2015) (Furman, J.) ("the ancient maxim *expression unius est exclusio alterius . . .* cautions the Court against engrafting an additional exception"); *see also Andrus v. Glover Const. Co.*, 446 U.S. 608, 616-17 (1980).

[9] 1 Max Farrand, ed., *The Records of the Federal Convention of 1787*, at 201 (1911) (June 11); 24 Worthington C. Ford et al., eds., *Journals of the Continental Congress, 1774–1789*, at 260-61 (1922) (adopting amendment to Articles of Confederation, Art. VIII); *see also* sources cited *supra* note 5.

and then an apportionment "upon the principle of their number of *inhabitants*; according to the provisions hereafter mentioned" (namely, the three-fifths ratio).[10]

By the time the Constitutional Convention completed its substantive deliberations, the operative document had an Apportionment Clause directing that Congress would "regulate the number of representatives by *the number of inhabitants*, according to the rule hereinafter made for direct taxation", and a Direct Taxation Clause, which mirrored the language from the 1783 revisions to the Articles of Confederation and provided that "[t]he proportions of direct taxation shall be regulated by *the whole number* of free *citizens and inhabitants of every age, sex, and condition*, including those bound to servitude for a term of years, and three fifths of all other persons not comprehended in the foregoing description, (except Indians not paying taxes)".[11] This document was referred to a Committee of Style, which was tasked with preparing a cohesive document without substantive change.  That committee reported back with the language of Article I, Section 2 that was ultimately adopted:  "Representatives and direct taxes shall be apportioned among the several states which may be included within this Union, *according to their respective numbers*, which shall be determined by adding to *the whole number* of free *persons*, including those bound to servitude for a term of years, and excluding Indians not taxed, three fifths of all other *persons*."[12]

Notably, the Framers ultimately chose to use the inclusive term "Persons" instead of the phrase "citizens and inhabitants of every age, sex, and condition" without comment or debate,

---

[10] 1 Farrand, *Records of the Federal Convention* 575-76 (July 11), 590-91 (July 12) and 599 (July 13) (emphasis added); *see also* 2 Max Farrand, ed., *Records of the Federal Convention* 178 (Aug. 6 report from the Committee of Detail), 219-23 (Aug. 8 debate) (1911).

[11] 2 Farrand, *Records of the Federal Convention* 566, 571 (emphasis added).

[12] *Id.* at 590 (emphases added); *see also id.* at 607-08 (approval of Article I § 2 on Sept. 13).

6

reflecting that "Persons" includes *both* citizens *and* inhabitants who were not citizens.[13] Population tabulations used at the Constitutional Convention reinforce the Framers' intent to count the total "number of inhabitants" in the United States, irrespective of citizenship.[14]

During the Constitutional Convention, the delegates considered both population and wealth as bases for apportionment, but decided that it was better to use population as the sole basis, as the Continental Congress had already done in the revision to the Articles of Confederation. William Johnson of Connecticut, who was chairman of the Committee on Style, spoke for many delegates in expressing the view "that wealth and population were the true, equitable rule of representation; but he conceived that these two principles resolved themselves into one; population being the best measure of wealth".[15] James Wilson agreed that "the rule of numbers, does not differ much from the combined rule of numbers & wealth", but also believed that as a matter of principle "numbers were surely the natural & precise measure of Representation".[16] In *The Federalist*, James Madison summarized the prevailing view when he wrote that "[i]t is agreed on all sides, that numbers are the best scale of wealth and taxation, as they are the only proper scale of representation".[17]

These debates help to explain the linkage in the Constitution between apportionment of the House of Representatives and direct taxation. The Revolution made clear that "Representation & taxation were to go together" and thus "direct Taxation ought to be proportioned according to representation".[18] For this reason, Article I, Section 9 of the

---

[13] 2 Farrand, *Records of the Federal Convention* 570, 590-91.

[14] 1 Farrand, *Records of the Federal Convention* 572-74; *see also Wesberry v. Sanders*, 376 U.S. 1, 13 (1964).

[15] 1 Farrand, *Records of the Federal Convention* 593.

[16] *Id.* at 605.

[17] *The Federalist* No. 54 (James Madison).

[18] 1 Farrand, *Records of the Federal Convention* 585, 589.

Constitution provides that "[n]o Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or enumeration herein before directed to be taken".[19]  This constitutional linkage reinforces that the census is an enumeration of the total population.[20]  As Madison pointed out:

> the establishment of a common measure for representation and taxation will have a very salutary effect. . . .  Were their share of representation alone to be governed by this rule, they would have an interest in exaggerating their inhabitants.  Were the rule to decide their share of taxation alone, a contrary temptation would prevail.  By extending the rule to both objects, the States will have opposite interests, which will control and balance each other, and produce the requisite impartiality.[21]

Another reason that the Framers decided on overall population, not eligible voters, as the basis for apportionment is that the suffrage differed so widely among the states.  All thirteen states had property ownership or tax payment restrictions on white male suffrage, but differed greatly in the proportion of the population that qualified for the right to vote.[22]  The delegates to the Constitutional Convention were well aware of the significant differences among the states in how widespread the suffrage was and intended the apportionment to remain agnostic to these differences by including *all* "inhabitants", even those denied the right to vote.[23]  The Framers left

---

[19] U.S. Const. art. I, § 9, cl. 4.

[20] Today, undocumented immigrants pay an estimated $3.6 billion a year in property taxes, which are "direct taxes" under the Constitution.  *See* Institute on Taxation and Economic Policy, *Undocumented Immigrants' State & Local Tax Contributions* 3 (2017), https://itep.sfo2.digitaloceanspaces.com/immigration2017.pdf; *see also Pollock v. Farmers' Loan & Trust Co.*, 157 U.S. 429 (1895) (holding that "taxes on real estate" are "indisputably direct taxes" under the Constitution).

[21] *The Federalist* No. 54 (James Madison).

[22] *See* Alexander Keyssar, *The Right to Vote: The Contested History of Democracy in the United States* 3-21 (rev. ed. 2009); *see also id.* at 330-31 (tables specifying suffrage restrictions by state).

[23] *See* 2 Farrand, *Records of the Federal Constitution* 57 (July 19) (James Madison noting that "the right of suffrage was much more diffusive in the Northern than the Southern States"); *id.* at 201-06 (August 7); *The Federalist* No. 54 (James Madison) ("In every state, a certain proportion of inhabitants are deprived of this right [to vote] by the constitution of the State, who will be included in the census by which the Federal Constitution apportions the representatives.").

these differences intact, and consequently specified that overall population was the basis for apportionment, so as not to penalize states with more restrictive franchises.[24]   Moreover, at the time of the founding, noncitizens had the right to vote in many states; it was not until the 1920s that the last group of states restricted suffrage to citizens.[25]   Thus, the linkage we take for granted between citizenship and the right to vote did not exist at the time of the founding, providing yet another reason why the Framers decided that apportionment would be based on overall population, without regard to citizenship or eligibility to vote.

II.   **The Census Act of 1790 and the Early Administrations of the Census Make Clear That All Residents Must Be Counted for Apportionment Purposes, Regardless of Citizenship or Immigration Status.**

Three years after the Constitutional Convention, the First Congress was tasked with carrying out the Constitution's census requirement.   To do so, Congress enacted the first Census Act on March 1, 1790.[26]   Because "the interpretations of the Constitution by the First Congress are persuasive", the Supreme Court has looked to the historical practice under the Census Act of 1790 as a guide to the meaning of the Enumeration Clause.[27]

The Census Act of 1790 established what is referred to as the "usual residence rule".   The Act adopted the basic rule of enumeration that "every person" should be counted at his or her "usual place of abode"; that a person "without a settled place of residence" should be reported at the location "where he or she shall be on" the census day; and that "every person occasionally absent at the time of the enumeration" should be reported at "that place in which he usually

---

[24] This changed only with the enactment of the Fourteenth Amendment.   *See infra* Part III.

[25] *See* Ron Hayduk, *Democracy for All: Restoring Immigrant Voting Rights in the United States* 15-40 (2006); *see also Minor v. Happersett*, 88 U.S. 162, 177 (1874) ("citizenship has not in all cases been made a condition precedent to the enjoyment of the right of suffrage") (listing states that permitted noncitizens to vote in 1875).

[26] Act of Mar. 1, 1790, 1 Stat. 101 (1790) (hereinafter "Census Act of 1790") (providing for the enumeration of the Inhabitants of the United States).

[27] *Franklin v. Massachusetts*, 505 U.S. 788, 803-04 (1992) (citing *Bowsher v. Synar*, 478 U.S. 714, 723-24 (1986)).

9

resides in the United States".[28]  This "usual residence rule" is consistent with the Framers'
repeated emphasis on counting "inhabitants" on United States soil—regardless of citizenship,
voter eligibility, stability of residence or property ownership—and has remained the guiding
principle for census-taking for 230 years.

Congress instructed the United States marshals who were tasked with conducting the
census to pose six questions, which confirm the focus on residence above all else.  Each
household was asked to report (i) the name of the head of the family, (ii) the number of free
white males sixteen and over, (iii) the number of free white males under sixteen, (iv) the number
of free white females, (v) the number of other free persons and (vi) the number of enslaved
people.[29]  The original census did not inquire how long any person in the household had resided
there, how long the person intended to stay, or whether that person was a citizen.  Indeed, unlike
state voting requirements at the time, which limited access to the franchise based on length of
residence in the state, there was no requirement to show "stability of residence" (as shown by the
fact that persons "without a settled place of residence" were counted); what mattered was
whether the person was in his or her "usual place of abode" on the designated counting date.[30]

The census evolved and Congress eventually added new questions in 1820, including a
question concerning "foreigners not naturalized".[31]  This was part of a growing interest in using
the census as an opportunity to gather ancillary demographic information.[32]  Notably, that
information did not matter for apportionment purposes because "foreigners not naturalized" were

---

[28] Census Act of 1790 § 5, 101 Stat. at 103.

[29] *Id.* § 1, 101 Stat. at 101-02; *see also* Margo J. Anderson, *supra* note 5 at 15.

[30] Keyssar, *supra* note 22 at 330-31 (table specifying the residency requirements by state, which were mostly from six months to two years).

[31] Act of Mar. 14, 1820, § 1, 2 Stat. 548, 548-50 (to provide for taking the fourth census, or enumeration of the inhabitants of the United States, and for other purposes).

[32] *See* Anderson, *supra* note 5 at 23-32.

*already* included as free persons and were therefore already included in the count.  Indeed, consistent with the Framers' original intent that all residents, regardless of citizenship, would be included in the apportionment base, the census instructions to the marshals noted that the data from the "foreigners not naturalized" subcategory should *not* be added to the total number of free persons (which would have resulted in double counting).[33]  These instructions confirm that earlier censuses *already included* free foreigners, and the new question did not add people to the census who had not previously been counted.  In any event, this question was short-lived and appeared only in the 1820 and 1830 censuses before Reconstruction.[34]

The only exceptions to including "foreigners not naturalized" in the "actual Enumeration" have been with respect to noncitizens who do not reside in the United States.  Thus, in the instructions for enumerators, crews of foreign vessels in harbor have been explicitly excluded from enumeration since 1920, transient foreign tourists since 1930, and diplomatic personnel since 1940.[35]  The rationale for excluding these limited categories of noncitizens is clear and entirely consistent with the Framers' intent, and longstanding census practice, to count all persons *residing* in the United States, regardless of citizenship or immigration status:  foreign

---

[33] *See* U.S. Census Bureau, 1820 Instructions to Marshals, *Measuring America: The Decennial Censuses from 1790 to 2000* 6 (2002), https://www2.census.gov/library/publications/2002/dec/pol_02-ma.pdf.

[34] Carroll Wright & William C. Hunt, *History and Growth of the U.S. Census* 90, 92 (1900), www.census.gov/history/pdf/wright-hunt.pdf.

[35] U.S. Dep't of Commerce, Fourteenth Decennial Census of the United States: Instructions to Enumerators 19 (1920), https://www.census.gov/history/pdf/1920instructions.pdf; U.S. Dep't of Com., Fifteenth Decennial Census of the United States: Instructions to Enumerators 11 (1930), https://www.census.gov/content/dam/Census/programs-surveys/decennial/technical-documentation/questionnaires/1930instructions.pdf; U.S. Dep't of Commerce, Sixteenth Decennial Census of the United States: Instructions to Enumerators 16, 20 (1940), https://www.census.gov/history/pdf/1940instructions.pdf; *see also* H. Rep. No. 91-1314, 91st Cong., 2d Sess. 24 (1970) (individuals "temporarily traveling or visiting in the United States" or "living on the premises of an embassy, ministry, legation, chancellery, or consulate" should not be enumerated).

diplomatic personnel live on embassy grounds, or on "foreign soil and thus not in a state", and foreign tourists and crews of foreign vessels in harbor "do not *reside* here".[36]

## III. The Fourteenth Amendment and Its Legislative History Reaffirm an Inclusive Apportionment Base, Unrelated to Citizenship or Immigration Status.

The abolition of slavery and the end of the Civil War prompted Congress to reconsider the basis for apportionment.  Absent a constitutional amendment, the Southern states could have increased their political power by counting formerly enslaved people as whole persons (rather than as three-fifths of a person) for apportionment, while simultaneously excluding them from any meaningful political participation.[37]  The solution to this problem was codified in Section 2 of the new Fourteenth Amendment, which repeated the general rule of the Apportionment Clause—that "representation shall be apportioned . . . counting the w*hole number of persons* . . . excluding Indians not taxed"[38]—while providing that states would lose some of their representation for denying "male inhabitants . . . twenty-one of years of age" the ability to vote.[39] The decision to repeat the original apportionment formulation, while maintaining the express exclusion of Native Americans living on tribal lands, demonstrates the framers' intention that, with that sole exception, the census enumeration would be truly all-inclusive.

This principle of a broad and inclusive apportionment base permeates the drafting history of the Fourteenth Amendment.  Indeed, before settling on the final language, the framers of the

---

[36] *Enumeration of Undocumented Aliens in the Decennial Census: Hearing on S. 99-314 Before the S. Comm. on Governmental Affs.*, 99th Cong. 24 (1985) (emphasis added).

[37] 39th Cong., 1st Sess., Rep. of the Joint Comm. on Reconstruction xiii (1866) ("The increase of representation necessarily resulting from the abolition of slavery was considered the most important element in the questions arising out of the changed condition of affairs, and the necessity for some fundamental action in this regard seemed imperative.").  *See generally* Anderson, *supra* note 5 at 76-79; Eric Foner, *Reconstruction: America's Unfinished Revolution, 1863–77*, at 251-61 (1988).

[38] U.S. Const., amend. XIV, § 2 (emphasis added).

[39] *Id.*

Fourteenth Amendment considered proposals to change the apportionment base from a population-based count to one based on voting eligibility or citizenship.[40]  One resolution proposed allocating House seats to states "according to their respective [number of] legal voters" and specified that "for this purpose none may be named as legal voters who are not either natural-born citizens or naturalized foreigners".[41]  This proposal was met with fierce resistance and was rejected.  As one leading critic, Representative James G. Blaine of Maine, explained: "As an abstract proposition no one will deny that population is the true basis of representation; for women, children, and other non-voting classes may have as vital an interest in the legislation of the country as those who actually deposit the ballot."[42]  Representative Blaine observed that a change to voter-based representation would be "an abandonment of one of the oldest and safest landmarks of the Constitution" and would "introduce[] a new principle in our Government, whose evil tendency and results no man can measure today".[43]  Other representatives expressed similar concerns about representational equality.[44]

A later draft of the Fourteenth Amendment proposed using "citizens" rather than "persons" for the apportionment base.  This proposal was likewise rejected as inconsistent with the original Constitution and because it would have penalized states with sizable populations of unnaturalized

---

[40] *See* Cong. Globe, 39th Cong., 1st Sess. 357-59, 2986-87 (1866).  For accounts of the drafting history, see George David Zuckerman, *A Consideration of the History and Present Status of Section 2 of the Fourteenth Amendment*, 30 Fordham L. Rev. 93, 94-107 (1961); George P. Smith, *Republican Reconstruction and Section 2 of the Fourteenth Amendment*, 23 W. Pol. Q. 829, 839-52 (1970).

[41] Cong. Globe, 39th Cong., 1st Sess. 10 (1866); *see Evenwel v. Abbott*, 136 S. Ct. 1120, 1127 (2016).

[42] Cong. Globe, 39th Cong., 1st Sess. 141 (1866).

[43] *Id.* at 377; *see* David H. Gans, *The Cornerstone of Our Democracy: The Census Clause and the Constitutional Obligation to Count All Persons*, Const. Accountability Ctr., Mar. 19, 2018 at 7-8, https://www.theusconstitution.org/wp-content/uploads/2018/03/Cornerstone-of-our-Democracy.pdf.

[44] *Id.* at 434 (remarks of Rep. Ward).

immigrants.[45]   Representative Roscoe Conkling of New York, who was responsible for the language of Section 2 of the Fourteenth Amendment as enacted, explained that basing apportionment on "persons" rather than "citizens" was the only constitutionally appropriate approach:  "'Persons,' and not 'citizens,' have always constituted the basis" and the "present Constitution is, and always was opposed to [using 'citizens' rather than 'persons']."[46]

The framers of the Fourteenth Amendment reaffirmed the decision to "leave the primary basis of representation where it was placed by our fathers, the whole body of the people".[47]  The Joint Committee on Reconstruction, where the Fourteenth Amendment was drafted, adopted Representative Conkling's motion to strike the words "citizens of the United States in each State" in the draft and replace them with "persons in each State, excluding Indians not taxed".[48]  On the Senate floor, Jacob Howard of Michigan, the floor manager for the Fourteenth Amendment, explained that "numbers", *i.e.*, total population, is

> the most just and satisfactory basis, and this is the principle upon which the Constitution itself was originally framed, that the basis of representation should depend upon numbers; and such . . . is the safest and most secure principle upon which the Government can rest.  Numbers, not voters; numbers, not property; this is the theory of the Constitution.[49]

Senator George Edmunds of Vermont further noted that "[t]he fathers who founded this Government acted upon the idea . . . that the representation, as a principle, in general was to be

---

[45] Cong. Globe, 39th Cong., 1st Sess. 359 (1866) (remarks of Rep. Conkling); *see also id.* at 411 (remarks of Rep. Cook) (arguing in favor of "persons", as a census of voters would be impracticable, would be unjust toward northeastern states, which had more women and children than western states, and would "take[] from the basis of representation all unnaturalized foreigners").

[46] *Id.* at 359; *see also id.* (remarks of Rep. Conkling) (further noting that "many of the large States held their representation [in the House] in part by reason of their aliens").

[47] *Id.* at 385 (remarks of Rep. Baker).

[48] Benjamin B. Kendrick, *The Journal of the Joint Committee of Fifteen on Reconstruction: 39th Congress, 1865-1867* at 52 (1914).

[49] Cong. Globe, 39th Cong., 1st Sess. 2767 (1866).

14

based upon population, independent of the franchise, independent of citizenship", and refused to "discard the original principle that all society in some form is to be represented in a Republican Government", calling apportionment by population an "impregnable principle".[50]

In the debate over the Fourteenth Amendment, the framers consistently and explicitly rejected proposals to exclude noncitizens from the apportionment base.  For example:

- Representative John Bingham of Ohio dismissed the idea of striking "from the basis of representation the entire immigrant population not naturalized", observing that "[u]nder the Constitution as it now is and as it always has been, the entire immigrant population of this country is included in the basis of representation."[51]  He urged that the "whole immigrant population should be numbered with the people and counted as part of them".[52]

- Representative Burton Cook of Illinois noted that representation based on voting improperly "takes from the basis of representation all unnaturalized foreigners".[53]

- Senator Henry Wilson of Massachusetts firmly opposed any amendment that would "strike from the basis of representation two million one hundred thousand unnaturalized foreigners" who were then counted.[54]

Section 2 of the Fourteenth Amendment reflects the agreement that apportionment is based "on the largest basis of population, counting every man, woman, and child", and that "the whole population is represented; that although all do not vote, yet all are heard.  That is the idea of the Constitution."[55]  As political scientist George Smith summarized the history:  "The section does not base representation on voters . . . .  Section Two *bases representation on numbers*, all inhabitants of the State . . . ."[56]  The instructions to the 1880 Census enumerators—disseminated

---

[50] *Id.* at 2944.

[51] *Id.* at 432.

[52] *Id.*

[53] *Id.* at 411.

[54] *Id.* at 2986-87.  Senator Wilson believed that this number of noncitizens provided the northern states with seventeen representatives.  *Id.* at 2987.

[55] *Id.* at 705, 1280 (remarks of Sen. Fessenden).

[56] Smith, *supra* note 40 at 851.

in the wake of the Fourteenth Amendment's ratification—confirm this understanding:  "It is the prime object of the enumeration to obtain the name, and the requisite particulars as to personal description, of every person in the United States, of whatever age, sex, color, race, or condition, with this single exception, viz.: that 'Indians not taxed' shall be omitted from the enumeration."[57]

## IV.    Since Reconstruction, It Has Remained Clear That All Residents Must Be Counted for Apportionment Purposes, Regardless of Citizenship or Immigration Status.

The Supreme Court has instructed that constitutional interpretation is guided by government practices that have "been open, widespread, and unchallenged since the early days of the Republic".[58]  The inclusion of undocumented immigrants within the meaning of "persons" as used in Article I of the Constitution and Section 2 of the Fourteenth Amendment meets that standard.  The historical practice in the early Republic (*see supra* Section II) has continued since.

### A.    The Administration of the Census During the Immigration Boom of the Late 19th and Early 20th Centuries Confirms the Historical Practice.

Following Reconstruction, the United States experienced unprecedented population growth fueled by immigration.[59]  Most of these new arrivals went to live in urban centers, and many were from countries other than those that had previously formed the base of immigration to the United States.[60]  This immigration boom, and the resulting changes in immigration law,

---

[57] Dep't of Interior, Census Off., *Enumerator Instructions* (1880), https://www.census.gov/history/pdf/1880enumerator-instructions.pdf.  The 1870 census is the only one in which the Census Office attempted to separately enumerate adult men over the age of 21 who were denied the right to vote. *See* Anderson, *supra* note 5 at 82-85.  Once the Fifteenth Amendment was ratified, census officials interpreted the new provision to mean that any state law denying the right to vote to freedmen was legally void and thus did not "come within the view of Marshals and their Assistants in respect to the Census."  Dep't of Interior, Census Off., *Instructions to Assistant Marshals* 12 (1870), https://www.census.gov/history/pdf/1870instructions-2.pdf.

[58] *NLRB. v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment); *see also Wisconsin v. City of New York*, 517 U.S. 1, 21 (1996) (noting "importance of historical practice" in census context); *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2567 (2019).

[59] Anderson, *supra* note 5 at 138.

[60] *See* Raymond L. Cohn, *Immigration to the United States*, EH.net, https://eh.net/encyclopedia/immigration-to-the-united-states/ ("After 1881, immigrant volume from central, eastern, and southern Europe began to increase rapidly. Between 1894 and 1914, immigrants from southern, central, and eastern Europe accounted for 69% of the total.");

shaped the political discourse regarding the census and apportionment in the late nineteenth and early twentieth centuries.  By the 1920s, immigration restriction was the subject of intense public attention and debate.  The Census Bureau (and its predecessor, the Census Office) continued to count all persons, without regard to immigration status, and Congress consistently rejected proposals to exclude either noncitizens or the subset of undocumented immigrants from the apportionment for the House of Representatives.  This history demonstrates powerfully that excluding undocumented immigrants from the apportionment base is inconsistent with the Constitution and historical practice.

At the start of the immigration boom, the concept of an unlawfully present or illegal alien did not exist.[61]  In 1875, however, Congress passed the first modern restrictions on entry to the United States, the Page Act, which banned the entry of "women imported for the purposes of prostitution" and persons convicted of felonies other than political offenses.[62]  Soon thereafter, the Chinese Exclusion Act and the Immigration Act of 1882 expanded the list of persons excludable from the United States to include Chinese laborers,[63] "lunatics", "idiots" and persons who would be public charges.[64]  Chinese immigrants were the first immigrants required to obtain documents establishing their lawful presence in the United States.[65]  These new restrictions gave

---

Erika Lee, *At America's Gates:  Chinese Immigration During the Exclusion Era, 1882-1943*, at 32 (2003) (ebook) (from 1870 to 1880, 4.3 percent of immigrants were Chinese).

[61] Mae M. Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America* 44-47, 82-84 (2004) (ebook).

[62] An act supplementary to the acts in relation to immigration (Page Act), Pub. L. 43-141, § 5, 18 Stat. 477, 477-78 (1875).

[63] An act to execute certain treaty stipulations relating to the Chinese ("Chinese Exclusion Act"), Pub. L. 47-26, § 1, 22 Stat. 58, 59 (1882).  In 1888, the prohibition on Chinese laborers was extended to all Chinese, except "teachers, students, merchants, or travelers for pleasure or curiosity."  An act to prohibit the coming of Chinese laborers to the United States, § 1, 25 Stat. 476, 476 (1888).

[64] An act to regulate Immigration, Pub. L. 47-376, § 2, 22 Stat. 214, 214 (1882).

[65] Chinese Exclusion Act § 4, 22 Stat. at 59; *see also* Lee, *supra* note 60 at 45-46.

rise to reports that Chinese immigrants were arriving in the United States by crossing the border from Mexico or Canada without inspection by the authorities.[66]

Against this backdrop, Congress considered using—but did not use—the 1890 census as an immigration enforcement mechanism by requiring census officials to enumerate and register Chinese laborers with the goal of deporting those unlawfully present.[67]  Ultimately, the census included questions designed to gather data on the assimilation of foreign-born residents of the United States, including where they were born, where their parents were born, whether they could speak English, and whether they had been naturalized as citizens or taken out naturalization papers.[68]  However, *no* questions were asked to determine the lawfulness of any person's presence as an alien, and all persons counted were included in the base for apportionment in the 1890 census, regardless of immigration status.[69]  The same was true for the 1900 and 1910 censuses.[70]

In 1920, as with past practice, all residents of the United States were counted in the

---

[66] *Message from the President of the United States to the Two Houses of Congress at the Beginning of the First Session of the Fifty-First Congress, with the Reports of the Heads of Departments* 109 (1890) (report of the Secretary of the Treasury); *see also* Lee, *supra* note 60 at 137-48 (describing illegal border crossings following the Chinese Exclusion Act); Dorothee Schneider, *Crossing Borders: Migration and Citizenship in the Twentieth-Century United States* 88-100 (2011) (ebook) (describing the weak points at the Canadian and Mexican borders).

[67] Enumeration of the Chinese Population of the United States, H.R. Rep. No. 51-486; 21 Cong Rec. 2309 (H.R. 6420) (introduction of an amendment to the census enabling legislation that would have enumerated Chinese persons in the United States and provided them with certificates documenting their lawful presence for later immigration enforcement); *id.* at 2313 (passage, with amendment, by the House); *id.* at 3430 (tabled by the Senate); *see also* Paul Schor, *Counting Americans*: *How the U.S. Census Classified the Nation* 196-99 (2017).

[68] Census Office, *Compendium of the Eleventh Census: 1890, Pt. I*, at cxxxviii-cxxxix (1892); *see also 1890 Index of Questions*, U.S. Census Bureau, https://www.census.gov/history/www/through_the_decades/index_of_questions/ 1890_1.html.

[69] Congressional Apportionment, House Rep. 51-3280 (1890); An act making an apportionment of Representatives in Congress among the several states under the Eleventh Census, Pub. L. 51-64, § 1, 22 Stat. 735 (1891).

[70] *1900 Index of Questions*, U.S. Census Bureau, https://www.census.gov/history/www/through_the_decades/ index_of_questions/1900_1.html; *1910 Index of Questions*, U.S. Census Bureau, https://www.census.gov/history/ www/through_the_decades/ index_of_questions/1910_1.html; An Act Making an apportionment of Representatives in Congress among the several States under the Twelfth Census, Pub. L. 56-93, 27 Stat. 734 (1901); An Act For the apportionment of Representatives in Congress among the several States under the Thirteenth Census, Pub. L. 62-5, 37 Stat. 13 (1911).

census without any inquiry into whether they were lawfully present in the United States.[71]  But the impact of immigrant-fueled population growth in urban centers sparked tensions among legislators, who could not agree on the terms of reapportionment.[72]  Between 1910 and 1920, the nation's population had grown by 14 million people, but the urban population had grown by 19 million while the rural population had declined by five million.[73]  Representatives from states that would have lost seats blocked reapportionment following the 1920 census.[74]  It was not until 1929 that Congress passed another reapportionment bill, specifying a formula to be used following the 1930 census and each subsequent census.[75]

Following the 1920 census, Congress further restricted immigration.  The Immigration Act of 1924 (also known as the Reed-Johnson Act) created quotas for immigration based on national origin, eliminated any statute of limitations on removal for nearly all types of unlawful entry, and provided that any person who entered the United States without a valid visa or without inspection could be deported at any time.[76]  By this time, the concept of the undocumented or illegal alien was firmly entrenched, as legal immigration became nearly impossible for many people.[77]  Estimates placed the number of persons entering the United States illegally after implementation of the quotas at 175,000 per year.[78]  Congress responded by creating a well-

---

[71] *1920 Index of Questions*, U.S. Census Bureau, https://www.census.gov/history/www/through_the_decades/index_of_ questions/1920_1.html.

[72] Anderson, *supra* note 59 at 134-40.

[73] *Id.* at 135-36.

[74] *Id.* at 140-41, 149-54.

[75] An Act To provide for the fifteenth and subsequent decennial censuses and to provide for apportionment of Representatives in Congress, Pub. L. 71-13, § 22, 46 Stat. 21, 26-27 (1929).

[76] An Act To limit the immigration of aliens into the United States, and for other purposes (Reed-Johnson Act), Pub. L. 68-139, §§ 13, 14, 43 Stat. 153, 161-62 (1924).

[77] Ngai, *supra* note 61 at 83 ("[N]umerical restriction created a new class of persons within the national body—illegal aliens—whose inclusion was at once a social reality and a legal impossibility."); *see also id.* at 82-115; Schneider, *supra* note 66 at 118-20.

[78] Maurice R. Davie, *World Immigration: With Special Reference to the United States* 400 (1936).

19

funded border patrol at the Canadian and Mexican borders, and off the coast of Florida.[79]  In 1929, Congress made unlawful entry a misdemeanor and a second unlawful entry a felony.[80]

Despite the changing political landscape around immigration, proposals to exclude noncitizens from the apportionment for the House of Representatives failed.  Senator Frederic Sackett of Kentucky introduced an amendment to the Census Act of 1929 to base the apportionment on "the whole number of persons in each State, exclusive of aliens and excluding Indians not taxed".[81]  The Senate legislative counsel opined that, based on the text of Article I, Section 2 and the Fourteenth Amendment and the uniform practices of Congress, "there is no constitutional authority for the enactment of legislation excluding aliens from enumeration for the purposes of apportionment of Representatives among the States".[82]  Opponents of the Sackett amendment emphasized its unconstitutionality based on the word "person" in the Constitution[83] and maintained the principle that "a Member of Congress represents every single human being residing within the State of which he is a Representative, and every class".[84]  The amendment was defeated by a vote of 29 to 48.[85]

The very same day, attempts to separately identify noncitizens in the census count likewise failed.  Senator Pat Harrison of Mississippi proposed an amendment to conduct the

---

[79] *Id.* at 401.

[80] An Act Making it a felony with penalty for certain aliens to enter the United States of America under certain conditions in violation of law, Pub. L. 70-1018 §§ 1, 2, 14 Stat. 1551, 1551 (1929).  There is ample historical evidence of the presence of undocumented immigrants in the country.  *See generally* Libby Garland, *After They Closed the Gates: Jewish Illegal Immigration to the United States* (2014); Adam Goodman, *The Deportation Machine: America's Long History of Expelling Immigrants* (2020); Torrie Hester, *Deportation: The Origins of U.S. Policy* (2017); Ngai, *supra* note 61; Schneider *supra* note 65.

[81] 71 Cong. Rec. 2065 (May 28, 1929) (S. 312).

[82] *Id.* at 1822.

[83] *See, e.g.*, *id.* at 1962 (Sen. Wagner of New York), 1970 (Sen. Borah of Idaho).

[84] *Id.* at 1971 (Sen. Blaine of Wisconsin).

[85] *Id.* at 2065.

census enumeration both with and without noncitizens, such that "upon the ratification of any amendment to the Constitution excluding aliens from the persons to be counted in making an apportionment of Representatives", apportionment could take place on that basis.[86]  This proposal was defeated by a vote of 24 to 55.[87]  Later the same day, then-Senator Hugo Black of Alabama introduced an amendment to the same bill to require the Census Bureau to "include an enumeration of aliens lawfully in the United States and of aliens unlawfully in the United States."[88]  That amendment was also defeated, by a vote of 24 to 56.[89]

Acknowledging the constitutional barrier to excluding noncitizens from the count for apportionment, proponents of exclusion over the next several years introduced a series of resolutions to "amend the Constitution of the United States to exclude aliens in counting the whole number of persons in each State for apportionment of Representatives among the several States".[90]  None of these resolutions was voted on after referral to committee.[91]  In 1940, the House considered a bill which, among other things, "provid[ed] for the exclusion of aliens from the population totals in making the apportionment".[92]  A supporter, Representative John Rankin of Mississippi, asked whether "aliens who are in this country in violation of law have the right to

---

[86] *Id.*

[87] *Id.* at 2068.

[88] 71 Cong. Rec. 2078 (May 28, 1929) (S. 312).

[89] *Id.* at 2083.  Similar debates took place in the House.  *See* 71 Cong. Rec. 747-52, 2361-63.

[90] *See, e.g.*, 71 Cong. Rec. 33 (Apr. 15, 1929) (H.J. Res. 20); 74 Cong. Rec. 5454 (Feb. 19, 1931) (H.J. Res. 356); 75 Cong. Rec. 2453 (Jan. 21, 1932) (H.J. Res. 97); 78 Cong. Rec. 6637-41 (Apr. 14, 1934) (H.J. Res. 10); 87 Cong. Rec. 465 (Feb. 3, 1941) (S.J. Res. 34); 93 Cong. Rec. 718 (Jan. 31, 1947) (S.J. Res. 50) (in introducing the joint resolution, Representative Capper noted that he had "been attempting to have Congress submit such an amendment to the States" for "25 years").

[91] *See* Note, *A Territorial Approach to Representation for Illegal Aliens*, 80 Mich. L. Rev. 1342, 1342 n.4 (1982); *see also 1990 Census Procedures and Demographic Impact on the State of Michigan:  Hearing before the H. Comm. on Post Off. and Civ. Serv.*, 100th Cong. 142 (1988) (report by the Congressional Research Service).

[92] 86 Cong. Rec. 4367 (Apr. 11, 1940) (S. 2505).

be counted and be represented" in Congress.[93]   Representative Emmanuel Celler of New York,

who believed the proposed bill was unconstitutional,[94] responded that "[t]he Constitution says

that all persons shall be counted", including "aliens here illegally".[95]   Representative Celler's

arguments carried the day.[96]

### B. More Recent Efforts To Exclude Undocumented Immigrants from the Apportionment Have Been Consistently Rejected.

Efforts targeting the specific exclusion from apportionment of undocumented immigrants

(as opposed to all noncitizens) became more prominent surrounding the 1980 census.  In 1979, a

group of plaintiffs, including the Federation for American Immigration Reform (FAIR) and

Representative Joseph M. McDade of Pennsylvania, brought suit to exclude undocumented

immigrants from the apportionment count, arguing that their inclusion would distort the

allocation of representatives among the states.[97]   The three-judge court held that plaintiffs lacked

standing to assert their claims, but also noted that plaintiffs' case was "very weak on the merits"

because "immigrants, legal and illegal alike, are clearly 'persons'" under any reading of the

Constitution.[98]   Moreover, the court observed that the "Census Bureau has always attempted to

count every person residing in a state on census day, and the population base for purposes of

apportionment has always included all persons, including aliens both lawfully and unlawfully

within our borders".[99]

---

[93] *Id.* at 4372.

[94] Representative Charles Gifford of Massachusetts stated that he was "amazed" to see the proposal to exclude aliens from the apportionment, given that it was "too plainly unconstitutional".  *Id.* at 4378.  Representative John Cochran of Missouri labeled the proposal a "direct violation of the Constitution".  *Id.*

[95] *Id.* at 4372.

[96] *Id.* at 4386, 4401.

[97] *See generally FAIR v. Klutznick*, 486 F. Supp. 564 (D.D.C. 1980) (three-judge panel).

[98] *Id.* at 569-73, 576.

[99] *Id.* at 576.

22

In the wake of the *FAIR* decision, some members of Congress introduced a flurry of bills in an effort to achieve through legislation that which could not be achieved through the courts.[100] None of these bills made it far enough even to be voted on; they were all rejected out of hand as unconstitutional.  The Office of Legal Counsel in the Department of Justice (DOJ) opined that the term "whole number of persons" in the Fourteenth Amendment means all persons and "it is unconstitutional for so-called illegal aliens to be excluded from the figures that are used to allot Representatives among the States".[101]

In the fall of 1980, Representative McDade proposed an amendment that sought to block the funding to certify the 1980 census figures.[102]  The stated reason for this proposed amendment was "the problem" of including illegal aliens in the count.[103]  Opponents of the McDade amendment made clear that the proposal was "a legislative ploy to sanction a policy" that violates the Constitution.[104]  The director of the Census Bureau similarly opined that the underlying purpose of the McDade amendment "would violate Article I, Sec. 2 of the Constitution as well as the 14th Amendment".[105]  The McDade amendment was rejected.[106]

---

[100] *See* 126 Cong. Rec. H1199 (daily ed. Feb 22, 1980) (H.R. 6577); 126 Cong. Rec. S1976 (daily ed. Feb. 28, 1980) (S. 2366); 126 Cong. Rec. H1549 (daily ed. Mar. 4, 1980) (H. Res. 594); 126 Cong. Rec. H1782 (daily ed. Mar. 11, 1980) (H.R. 6769); 126 Cong. Rec. H1898 (daily ed. Mar. 13, 1980) (H.R. 6812).

[101] *Census:  Counting Illegal Aliens, Hearing on S. 2366 of the Subcomm. on Energy, Nuclear Proliferation and Federal Services of the S. Comm. on Governmental Affairs*, 96th Cong. 95 (Mar. 26, 1980) (analysis of Senate Bill 2366).

[102] 126 Cong. Rec. H7263-72 (daily ed. Aug. 20, 1980) (H.R. 7542).

[103] *Id.*

[104] *Id.* at H7265 (remarks of Rep. Garcia).

[105] *Undercount and the 1980 Decennial Census:  Hearing before the Subcomm. on Energy, Nuclear Proliferation and Fed. Servs. of the S. Comm. on Governmental Affs.*, 96th Cong. 44 (Nov. 18, 1980) (statement of Vincent Barabba, director of the Census Bureau).

[106] *See* 126 Cong. Rec. H11714-22 (daily ed. Dec. 3, 1980).  For an earlier vote, see *id.* at H7272 (daily ed. Aug. 20, 1980).

History repeated itself in the lead-up to the 1990 census.[107]  Certain members of Congress introduced bills requiring the Secretary of Commerce to make adjustments to the census count to exclude undocumented immigrants from the apportionment.[108]  The Congressional Research Service (CRS) analyzed the term "whole number of persons" in the Fourteenth Amendment and concluded that "the phrase . . . is to be the basis for congressional apportionment as determined by the census and would include aliens, both legal and illegal".[109]  The DOJ Office of Legislative Affairs similarly concluded that excluding undocumented immigrants from the apportionment is unconstitutional and stated that it "would recommend that the President veto" the bill if it were passed.[110]  Once again, a few members of Congress and groups such as FAIR sued to challenge the inclusion of undocumented immigrants for purposes of congressional apportionment.  As in *FAIR*, the court held that the plaintiffs lacked standing.[111]

In 2005, Representative Candice Miller of Michigan introduced a resolution to amend the Constitution to provide that "congressional representation shall be apportioned based on the number of citizens, not persons".[112]  Representative Miller explained that she proposed a constitutional amendment rather than legislation because "if we tried to do this by statute, even if

---

[107] *See generally* Dennis L. Murphy, Note, *The Exclusion of Illegal Aliens from the Reapportionment Base:  A Question of Representation*, 41 Case W. Res. L. Rev. 969, 970 n.12 (1991).

[108] *See, e.g.*, 133 Cong. Rec. H9936 (daily ed. Nov. 10, 1987) (H.R. 3639); 133 Cong. Rec. H11865 (daily ed. Dec. 18, 1987) (H.R. 3814); 135 Cong. Rec. 22518 (1989) (S. Amdt. 900 to H.R. 2991); 135 Cong. Rec. H144 (1989) (H.R. 744); 135 Cong. Rec. H709 (1989) (H.R. 1468); 135 Cong. Rec. H2816 (1989) (H.R. 2661); 135 Cong. Rec. H648 (1989) (H.J. Res. 199); 135 Cong. Rec. S7939 (1989) (S. 358).

[109] *1990 Census Procedures and Demographic Impact on the State of Michigan:  Hearing before the H. Comm. on Post Off. and Civ. Serv.*, 100th Cong. 148 (1988) (report by the Congressional Research Service).

[110] *Id.* at 240.

[111] *Ridge v. Verity*, 715 F. Supp. 1308, 1322 (W.D. Pa. 1989).

[112] *Counting the Vote:  Should Only U.S. Citizens Be Included in Apportioning Our Elected Representatives?, Hearing Before the Subcomm. on Federalism and the Census of H. Comm. on Gov't Reform*, 109th Cong. 12 (2005) (hereinafter *Counting the Vote*, 109th Cong.); *see also* 151 Cong. Rec. H4355 (daily ed. June 9, 2005) (H.J. Res. 53).

24

we were successful in passing it, we would be facing endless litigation, and so I thought a constitutional amendment would be the more prudent course".[113]  Congress did not put the proposed amendment to a vote.  Leading up to the 2010 census, certain members of Congress renewed their efforts to identify undocumented immigrants in the census count or exclude them from apportionment.[114]  Each of these proposals failed.  The CRS again concluded that the Constitution requires that "all individuals, regardless of citizenship status be included in the population count for legislative apportionment".[115]

    The historical practice is thus longstanding and unbroken.  The census has always counted all persons in the United States, regardless of citizenship or immigration status, and included them in the congressional apportionment.  All proposals to the contrary have been properly rejected as unconstitutional.

## CONCLUSION

    Based on the plain language of the Constitution, the history of that language's enactment, and the consistent practice over the past 230 years interpreting and applying that language, the July 21 Memorandum is unconstitutional.

---

[113] *Counting the Vote*, 109th Cong. 27.

[114] *See* 155 Cong. Rec. S10192 (2009) (S. Amdt. 2644 to H.R. 2847); 155 Cong. Rec. H71 (2009) (H.J. Res. 11); 155 Cong. Rec. H11297 (daily ed. Oct. 13, 2009) (H.R. 3797); 155 Cong. Rec. S9555 (daily ed. Sept. 17, 2009) (S. 1688).

[115] Cong. Research Serv., R41048, *Constitutionality of Excluding Aliens from the Census for Apportionment and Redistricting Purposes* 10 (2012).

Dated: August 14, 2020

HAYNES AND BOONE LLP,


by   */s/ Mark Trachtenberg*
      Mark Trachtenberg
      *Pro Hac Vice* Pending


1221 McKinney, Suite 4000
    Houston, Texas 77010-2007
      (713) 547-2000

Respectfully submitted,

CRAVATH, SWAINE & MOORE LLP,


by   */s/ Antony L. Ryan*
      Richard W. Clary
      Antony L. Ryan
      Helam Gebremariam


Worldwide Plaza
   825 Eighth Avenue
     New York, NY 10019
       (212) 474-1000

*Counsel for Amici Curiae*

26