# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | No. 20 Civ. 5770 (JMF) |
| NEW YORK IMMIGRATION COALITION, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>Defendants. | No. 20 Civ. 5781 (JMF) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT OR PRELIMINARY INJUNCTION**

**Table of Contents**

Introduction...................................................................................................................1

Background...................................................................................................................3

I. The Census and Apportionment Generally ...............................................................3

II. The July 21, 2020, Presidential Memorandum ........................................................4

III. Plaintiffs' Challenge ...............................................................................................5

Argument .....................................................................................................................6

I. The Court Lacks Jurisdiction Because Plaintiffs' Claims Are Unripe .......................6

    A. It Is Currently Unknown What Numbers the Secretary
    May Report to the President.................................................................................7

    B. Other Considerations Underscore that Plaintiffs' Claim Are Not Ripe ...............8

II. This Court Lacks Jurisdiction Because Plaintiffs Lack Standing ............................10

    A. Plaintiffs' Alleged Apportionment Injuries Are Too Speculative to Confer Standing ......10

    B. Plaintiffs' Allegations That the Presidential Memorandum Will Reduce Participation
    in the 2020 Census Are Also Speculative, Not Traceable to the Memorandum,
    and Not Redressable by a Favorable Ruling.......................................................11

        1.  Plaintiffs' Alleged Enumeration Injuries Are Too
            Speculative to Confer Standing..............................................................12

        2. The Alleged Chilling Effect Is Not Traceable to the Memorandum.....................15

        3. A Favorable Ruling Would Not Redress Plaintiffs' Alleged Enumeration
           Injuries ..................................................................................................18

III. Plaintiffs Fail to State a Claim ..............................................................................19

    A. *Franklin* Mandates Dismissal of Plaintiffs' APA Claims .................................19

    B. The Government Plaintiffs Have Failed to Plausibly Plead That the Presidential
    Memorandum Amounts to "Coercion" in Violation of the Tenth Amendment .............21

    C. Plaintiffs Have Failed to Sufficiently Allege an Equal Protection Claim Under
    the Fifth Amendment ........................................................................................24

    D. Plaintiffs Have Failed to State an Apportionment Clause Claim ........................27

1. Only "Inhabitants" Who Have Their "Usual Residence" in a State Need Be Included in the Apportionment ................................................................. 27

2. The Executive Has Significant Discretion to Define Who Qualifies as an "Inhabitant" ........................................................................................................ 31

3. The Apportionment Clause Does Not Require Inclusion of All Illegal Aliens as "Inhabitants" Having a "Usual Residence" in a State ............................. 34

E. Plaintiffs Have Failed to State an *Ultra Vires* or "Separation of Powers" Claim ............... 40

F. Plaintiffs' Demands for Relief Against the President Must Be Dismissed .......................... 44

IV. Plaintiffs Are Not Entitled To A Preliminary Or Permanent Injunction ........................................ 46

A. Plaintiffs Cannot Establish Any Imminent and Irreparable Harm ........................................ 47

1. Plaintiffs Cannot Establish Any Irreparable Apportionment Injury ...................... 47

2. Plaintiffs' Allegations of Enumeration Injury Do Not Withstand Scrutiny .......... 49

a. Plaintiffs' Theory of Harm Relies on Attenuated Events Involving the Independent Actions of Third Parties ...................................................... 49

b. Plaintiffs' Theory of Harm is Limitless .......................................................... 50

c. The Alleged Harm is at Odds with Existing Evidence ................................. 51

B. The Remaining Factors Weigh Against an Injunction .......................................................... 53

Conclusion ........................................................................................................................................ 54

## Table of Authorities

Page(s)

**Cases**

*Abbott Laboratories v. Gardner,*
    387 U.S. 136 (1967) ........................................................................................................... 6

*Air Espana v. Brien,*
    165 F.3d 148 (2d Cir. 1999) .............................................................................................. 19

*Alabama v. Dep't of Commerce,*
    396 F. Supp. 3d 1044 (N.D. Ala. 2019) ............................................................................ 41

*Amoco Prod. Co. v. Vill. of Gambell,*
    480 U.S. 531 (1987) ......................................................................................................... 46

*Bas v. Steele,*
    2 F. Cas. 988 .................................................................................................................... 30

*Baur v. Veneman,*
    352 F.3d 625 (2d Cir. 2003) .............................................................................................. 10

*Bernal v. Fainter,*
    467 U.S. 216 (1984) ......................................................................................................... 36

*Broidy Capital Mgmt., LLC v. Benomar,*
    944 F.3d 436 (2d Cir. 2019) ......................................................................................... 12, 13

*Chae Chan Ping v. United States (The Chinese Exclusion Case),*
    142 U.S. 651 (1892) ......................................................................................................... 36

*Chamberlain Estate of Chamberlain v. City of White Plains,*
    960 F.3d 100 (2d Cir. 2020) .............................................................................................. 45

*Chinese Exclusion Case,*
    130 U.S. 581 (1889) ......................................................................................................... 36

*City of New York v. Beretta U.S.A. Corp.,*
    524 F.3d 384 (2d Cir. 2008) .............................................................................................. 23

*City of Newburgh v. Sarna,*
    690 F. Supp. 2d 136 (S.D.N.Y. 2010) ............................................................................... 46

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) .......................................................................................... 10, 11, 15, 17

*Connecticut v. Physicians Health Servs. of Connecticut, Inc.,*
    287 F.3d 110 (2d Cir. 2002) .............................................................................................. 23

*Dalton, v. Specter,*
   511 U.S. 462 (1994) ................................................................................................ 19, 20

*Dep't of Commerce v. Montana,*
   503 U.S. 442 (1992) ................................................................................................ 10, 48

*Dep't of Commerce v. New York,*
   139 S. Ct. 2551 (2019) ............................................................................ 17, 37, 42, 48

*Dep't of Commerce v. U.S. House of Representatives,*
   525 U.S. 316 (1999) ....................................................................................................48

*Dep't of Homeland Security v. Regents of Univ. of Cal.,*
   140 S. Ct. 1891 (2020) ................................................................................... 24, 25, 26

*Deshawn E v. Safir,*
   156 F.3d 340 (2d Cir. 1998) .......................................................................................39

*Evenwell v. Abbott,*
   136 S. Ct. 1120 (2016) ...............................................................................................38

*Flue-Cured Tobacco Cooperative Stabilization Corp. v. EPA,*
   313 F.3d 852 (4th Cir. 2003) ............................................................................... 20, 41

*Fong Yue Ting v. United States,*
   149 U.S. 698 (1893) ....................................................................................................36

*Franchise Tax Board v. Hyatt,*
   139 S. Ct. 1485 (2019) ...............................................................................................38

*Franklin v. Massachusetts,*
   505 U.S. 788 (1992) ............................................................................................ passim

*Gonzalez v. Holder,*
   771 F.3d 238 (5th Cir. 2014) ......................................................................................38

*Grand River Enter. Six Nations, Ltd. v. Pryor,*
   481 F.3d 60 (2d Cir. 2007) .........................................................................................47

*Hayden v. Patterson,*
   594 F.3d 150 (2d Cir. 2010) .......................................................................................22

*Himber v. Intuit, Inc.,*
   2012 WL 4442796 (E.D.N.Y. Sept. 25, 2012) .........................................................15

*Hylton v. Brown,*
   12 F. Cas. 1123 (1804) ...............................................................................................30

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*,
   725 F.3d 65 (2d Cir. 2013) ....................................................................................... 7

*Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006) .................................................................................................. 46

*Ashcroft v. Iqbal*,
   566 U.S. 662 (2009) .................................................................................................. 21

*J.S. ex rel. N.S. v. Attica Cent.*,
   386 F.3d 107 (2d Cir. 2004) ..................................................................................... 12

*Kaplan v. Tod*,
   267 U.S. 228 (1925) ................................................................................... 34, 35, 38

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972) .......................................................................................... 35, 36

*Kravitz v. Dep't of Commerce*,
   366 F. Supp. 3d 681 (D. Md. 2019) .......................................................................... 25

*Lamar, Archer & Cofrin, LLP v. Appling*,
   138 S. Ct. 1752 (2018) .............................................................................................. 40

*Landon v. Plasencia*,
   459 U.S. 21 (1982) ............................................................................................. 36, 40

*Leng May Ma v. Barber*,
   357 U.S. 185 (1958) .................................................................................................. 35

*Lewis v. Thompson*,
   252 F.3d 567 (2d Cir. 2001) ..................................................................................... 24

*Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ............................................................................................. 50, 51

*Lower East Side People's Credit Union v. Trump*,
   289 F.Supp.3d 568, (S.D.N.Y 2018) ......................................................................... 15

*Lunney v. United States*,
   319 F.3d 550 (2d Cir. 2003) ..................................................................................... 19

*Malmo AB v. Wabtec Corp.*,
   559 F.3d 110 (2d Cir. 2009) ..................................................................................... 52

*Mathews v. Diaz*,
   426 U.S. 67 (1976) ............................................................................................. 24, 37

*Mazurek v. Armstrong,*
   520 U.S. 968 (1997) ............................................................................................ 46, 47

*Mississippi Com'n on Environmental Quality v. EPA,*
   790 F.3d 138 (D.C. Cir. 2015) ....................................................................................21

*Mississippi v. Johnson,*
   4 Wall 475 (1867) ............................................................................................ 44, 45

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela,*
   863 F.3d 96 (2d Cir. 2017) ........................................................................................40

*Nat'l Archives & Record Admin. v. Favish,*
   541 U.S. 157 (2006) ..................................................................................................22

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
   567 U.S. 519 (2012) ..................................................................................................21

*Nat'l Org. for Marriage, Inc. v. Walsh,*
   714 F.3d 682 (2d Cir. 2013) ............................................................................ 6, 7, 8, 9

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
   538 U.S. 803 (2003) ....................................................................................................6

*New York v. Dep't of Commerce,*
   315 F. Supp. 3d 766 (S.D.N.Y. 2018) .................................................................. 12, 17

*New York v. United States,*
   505 U.S. 144 (1992) ..................................................................................................21

*New York v. U.S. Dep't. of Commerce,*
   351 F. Supp. 3d 502 (S.D.N.Y. 2019) ................................................................25, 42, 43

*Nixon v. Fitzgerald,*
   457 U.S. 731 (1982) ..................................................................................................44

*Nken v. Holder,*
   556 U.S. 418 (2009) ............................................................................................ 22, 52

*Ohio Forestry Ass'n, Inc. v. Sierra Club,*
   523 U.S. 726 (1998) ............................................................................................ 6, 7, 9

*Patsy's Italian Rest., Inc. v. Banas,*
   658 F.3d 254 (2d2011) ...............................................................................................46

*Pers. Admin. of Mass. v. Feeney,*
   442 U.S. 256 (1979) ..................................................................................................26

*Plyler v. Doe,*
  457 U.S. 202 (1982)......................................................................................... 37, 40

*Printz v. United States,*
  521 U.S. 898 (1997)................................................................................................21

*Public Citizen v. U.S. Trade,*
  5 F.3d 549 (D.C. Cir. 1994) ............................................................................ 20, 41

*Raines v. Byrd,*
  521 U.S. 811 (1997)................................................................................................10

*Rizzo v. Goode,*
  423 U.S. 362 (1976)................................................................................................50

*Roach v. Morse,*
  440 F.3d 53 (2d2006)..............................................................................................46

*Newdow v. Roberts,*
  603 F.3d 1002 (D.C. Cir. 2010)..............................................................................45

*Ross v. Bank of Am., NA.,*
  524 F.3d 217 (2d Cir. 2008) .....................................................................................7

*Schooner Exchange v. McFaddon,*
  11 U.S. (7 Cranch) 116 (1812) ...............................................................................36

*Sharkey v. Quarantillo,*
  541 F.3d 75 (2d Cir. 2008) ......................................................................................19

*Simmonds v. INS,*
  326 F.3d 351 (2d Cir. 2003) .............................................................................. 9, 37

*Simon v. Eastern Kentucky Welf. Rights. Org.,*
  426 U.S. 26 (1976)......................................................................................15, 22, 24

*Spokeo, Inc. v. Robins,*
  136 S. Ct. 1540 (2016) ............................................................................................11

*St Mary's Honor Ctr. v. Hicks,*
  509 U.S. 502 (1993)................................................................................................26

*State of Cal. v. Dep't of Justice,*
  114 F.3d 1222 (D.C. Cir. 1997)..............................................................................19

*State of New York v. Mnuchin,*
  408 F. Supp. 3d 399 (S.D.N.Y. 2019).....................................................................23

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998)............................................................................................................15

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.,*
  559 U.S. 662 (2010)............................................................................................................6

*Summers v. Earth Island Institute,*
  555 U.S. 488 (2009)..........................................................................................................18

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014)..........................................................................................................11

*Swan v. Clinton,*
  100 F.3d (D.C. Cir. 1996)................................................................................................45

*Taylor v. Bernanke,*
  2013 WL 4811222 (E.D.N.Y. Sept. 9, 2013)................................................................15

*Texas v. United States,*
  523 U.S. 296 (1998).......................................................................................................6, 9

*U.S. Dep't of Homeland Security v. Thuraissigiam,*
  140 S. Ct. 1959 (2020) ....................................................................................................35

*Toland v. Sprague,*
  23 F. Cas. 1353 (C.C.E.D. Pa. 1834) ............................................................................30

*Doe v. Trump,*
  319 F. Supp. 3d 539 (D.D.C. 2018)................................................................................45

*Citizens for Responsibility and Ethics in Washington v. Trump,*
  953 F.3d 178 (2d Cir. 2020) ...........................................................................................15

*U.S. ex rel. De Rienzo v. Rodgers,*
  185 F. 334 (3d Cir. 1911) ...............................................................................................38

*U.S. Steel Corp. v. Multistate Tax Comm'n,*
  434 U.S. 452 (1978).........................................................................................................38

*United States v. Armstrong,*
  517 U.S. 456 (1996).........................................................................................................22

*United States v. Laverty,*
  26 F. Cas. 875 (D. La. 1812) ..........................................................................................30

*United States v. The Penelope,*
  27 F. Cas. 486 (D. Pa. 1806) ..........................................................................................30

*Utah v. Evans,*
    536 U.S. 452 (2002).................................................................... 10, 28, 43, 48

*Venus,*
    12 U.S. (8 Cranch.) 253 (1814) ..........................................................32

*Wesberry v. Sanders,*
    376 U.S. 1 (1964) .............................................................................28

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990)...........................................................................11

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) .................................................................... 10, 11

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ....................................................... 46, 50, 52, 53

*Wisconsin v. City of New York,*
    517 U.S. 1 (1996) ........................................................ 10, 31, 35, 48

*Zartarian v. Billings,*
    204 U.S. 170 (1907)...........................................................................35

**Statutes**

2 U.S.C. § 2a...................................................................................passim

2 U.S.C. § 2a(a) ......................................................................4, 31, 40, 42

5 U.S.C. § 706 .....................................................................................5

8 U.S.C. § 1101 ..................................................................................39

8 U.S.C. § 1182(a)(9)...........................................................................37

13 U.S.C. § 9 ...............................................................................16, 50

13 U.S.C. § 141 ........................................................................2, 5, 8, 40

13 U.S.C. § 141(b) ..................................................................4, 20, 31, 40

13 U.S.C. § 2 .................................................................................3, 27

13 U.S.C. § 141(a) .................................................................................3

28 U.S.C. § 2284 ............................................................................12, 48

U.S. Const. amend. XIV ........................................................................29

**Other Authorities**

83 Fed. Reg. 5525 (February 8, 2018) ................................................................ 1, 4, 41

84 Fed. Reg. 33,821 (July 11, 2019) ....................................................................... 4

85 Fed. Reg. 44,679 (July 23, 2020) ................................................................. 1, 39

**Other**

*The Exclusion of Illegal Aliens from the Reapportionment Base: A Question of Representation*,
    41 Case W. Res. L. Rev. 969 (1991) ............................................................... 29, 30

## INTRODUCTION

Plaintiffs—a group of states and localities ("Government Plaintiffs") and a group of non-profit organizations ("NGO Plaintiffs")—bring constitutional and statutory challenges to a memorandum that the President issued on July 21, 2020, entitled Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census (the "Presidential Memorandum" or "Memorandum"), 85 Fed. Reg. 44,679 (July 23, 2020).  That Memorandum provides that for purposes of reapportionment of Representatives in Congress following the 2020 census, "it is the policy of the United States to exclude" illegal aliens from the apportionment base "to the extent feasible and to the maximum extent of the President's discretion under the law."  *Id.* at 44,680.  It directs the Secretary of Commerce to submit to the President two tabulations in connection with the apportionment—one tabulation includes an enumeration according to the methodology set forth in the Final 2020 Census Residence Criteria and Residence Situations, 83 Fed. Reg. 5,525 (Feb. 8, 2018) ("Residence Criteria"), and the second, "to the extent practicable," requires the Secretary to provide information permitting the President to exclude illegal aliens from the apportionment base.  Because Plaintiffs' various challenges to this Memorandum fail as a matter of law, they should be dismissed.

As a threshold matter, this Court lacks subject-matter jurisdiction over Plaintiffs' claims both because the claims are not ripe and because Plaintiffs lack standing to challenge the Presidential Memorandum.  Plaintiffs' alleged injuries, including lost representation in Congress, decreased federal funding, and diversion of resources, are speculative.  At this point it is unknown what numbers the Secretary of Commerce will provide the President.  Accordingly, any allegation as to the impact of the President's apportionment decision on matters such as congressional representation or federal funding is wholly theoretical and legally insufficient to meet the ripeness and standing requirements.

Plaintiffs' allegations that the Presidential Memorandum will have a significant chilling effect on immigrant communities' participation in the census likewise are speculative and conclusory.  They are also based on hearsay.  Plaintiffs rely on affidavits from fact and expert witnesses that contain only generalized, second- or third-hand accounts of alleged harm and unsubstantiated conjectures.  The

Court should therefore dismiss all of Plaintiffs' claims pursuant to Rule 12(b)(1) for lack of ripeness and standing.

In addition to these jurisdictional defects, Plaintiffs' claims are subject to dismissal for failure to state a claim pursuant to Rule 12(b)(6). Plaintiffs assert that the Presidential Memorandum violates the Administrative Procedure Act ("APA"), the constitutional separation of powers, the Tenth Amendment, principles of equal protection under the Fifth and Fourteenth Amendments, the Apportionment Clauses of Article I and the Fourteenth Amendment, 13 U.S.C. § 141, and 2 U.S.C. § 2a. Each of these claims fails as a matter of law.

First, there is no viable basis for APA review of the Presidential Memorandum—both because the President is not an "agency" under the APA and because Plaintiffs fail to allege any "final agency action" by the Secretary of Commerce. Second, to the extent the NGO Plaintiffs allege that the Presidential Memorandum contravenes the separation of powers, that claim fails because the Supreme Court in *Franklin v. Massachusetts* expressly recognized the broad scope of congressional delegation of authority to the President in relation to apportionment. 505 U.S. 788, 799 (1992). Third, the claim that the Presidential Memorandum amounts to "coercion" or "punish[ment]" in violation of the Tenth Amendment must be dismissed because Plaintiffs have offered only conclusory allegations as to the Memorandum's supposedly invidious purpose and have not alleged any commandeering of state resources. Fourth, Plaintiffs' equal protection claims fail because they rely on misleading characterizations of the Presidential Memorandum and because Plaintiffs fail to plausibly allege "animus" or "discriminatory intent." Fifth, Plaintiffs' claims under the Apportionment Clauses, 13 U.S.C. § 141, and 2 U.S.C. § 2a, are legally deficient, because they are inconsistent with the Executive Branch's longstanding discretion to define who qualifies as "inhabitants" (or "persons in each State") for purposes of apportionment. Finally, insofar as Plaintiffs seek an injunction against the President, such relief is precluded by Supreme Court precedents barring judicial intrusion on the President's exercise of policy-making discretion.

For the same reasons that their Complaints must be dismissed, Plaintiffs are not entitled to either partial summary judgment or a preliminary injunction. Plaintiffs cannot succeed on their claims

both because of threshold jurisdictional flaws, but also because their claims are meritless.  And even if Plaintiffs had standing to bring these actions, which they do not, they have failed to plausibly assert a threat of imminent irreparable harm from the Memorandum.  Accordingly, if the Court declines to grant Defendants' Motion to Dismiss, it should deny Plaintiffs' Motion for Partial Summary Judgment or Preliminary Injunction.

## BACKGROUND

### I.       The Census and Apportionment Generally

The Constitution provides that "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State."  U.S. Const. amend. XIV, § 2.  To make apportionment possible, the Constitution requires that the federal government conduct a census every ten years in such a manner as directed by Congress.  *Id.* art. I, § 2, cl. 3.  Each State's number of Representatives, together with its two Senators, also determines the number of electors for President and Vice President in the Electoral College.  *See id.* art. II, § 1, cl. 2.

Congress, in turn, has by law directed the Secretary of Commerce to conduct a census of the "total population" every 10 years "in such form and content as he may determine."  13 U.S.C. § 141(a) and (b).  The Census Bureau assists the Secretary of Commerce in the performance of this responsibility.  *See* 13 U.S.C. §§ 2, 4.  For purposes of the 2020 census, the Census Bureau has announced that field data collection will end on September 30, 2020.  *See* August 3, 2020, Statement from U.S. Census Bureau Director Steven Dillingham ("Director Dillingham"): Delivering a Complete and    Accurate    2020    Census    Count,    https://www.census.gov/newsroom/press-releases/2020/delivering-complete-accurate-count.html.  According to Director Dillingham, the Census Bureau will take various actions, such as increasing training and providing awards to census takers who maximize the hours worked, to "improve the speed of [the] count without sacrificing completeness."  *Id.*  The Census Bureau "intends to meet a similar level of household responses as collected in prior censuses, including outreach to hard-to-count communities."  *Id.*

The Census Bureau has promulgated criteria to count most people for census purposes "at their usual residence, which is the place where they live and sleep most of the time."  Residence

Criteria, 83 Fed. Reg. at 5,533.  Following completion of the 2020 census, by December 31, 2020, the Secretary of Commerce must submit to the President "[t]he tabulation of total population by States . . . as required for the apportionment of Representatives in Congress among the several States."  13 U.S.C. § 141(b).  "On the first day, or within one week thereafter, of the first regular session of the [117th Congress]," the President must "transmit to the Congress a statement showing the whole number of persons in each State . . . and the number of Representatives to which each State would be entitled . . . by the method known as equal proportions."  2 U.S.C. § 2a(a).

## II.     The July 21, 2020, Presidential Memorandum

On July 21, 2020, the President issued a Memorandum to the Secretary of Commerce regarding the exclusion of illegal aliens from the apportionment base following the 2020 census.  *See* 85 Fed. Reg. at 44,679-81.  The Presidential Memorandum states that "it is the policy of the United States to exclude" such aliens from the apportionment base "to the extent feasible and to the maximum extent of the President's discretion under the law."  *Id.* at 44,680.  The Presidential Memorandum directs the Secretary of Commerce to submit to the President two tabulations.  One is an enumeration "tabulated according to the methodology set forth in" the Residence Criteria.  *Id.*  The second calls for "information permitting the President, to the extent practicable," to carry out the stated policy, *i.e.*, an apportionment excluding illegal aliens.  *Id.*

To date, the Census Bureau is still evaluating the usability of administrative records pertaining to citizenship status in connection with the decennial census, *see* Exec. Order 13880, 84 Fed. Reg. 33,821-25 (July 16, 2019), and formulating a methodology for potentially excluding illegal aliens.  *See* August     3,     2020,     Dillingham     Statement,     https://www.census.gov/ newsroom/press-releases/2020/delivering-complete-accurate-count.html ("The Census Bureau continues its work on meeting the requirements of Executive Order 13,880 issued July 11, 2019 and the Presidential Memorandum issued July 21, 2020.  A team of experts [is] examining methodologies and options to be employed for this purpose.  The collection and use of pertinent administrative data continues.").

### III.    Plaintiffs' Challenge

On July 24, 2020, the Government Plaintiffs and NGO Plaintiffs filed complaints challenging the Presidential Memorandum; they amended their complaints on August 3 and August 6, respectively. *See* ECF Nos. 34 ("Gov't Pls.' Am. Compl."), 62 ("NGO Pls.' Am. Compl.").  Plaintiffs allege, among other things, that the Presidential Memorandum violates requirements contained in Article I, the Fourteenth Amendment, 13 U.S.C. § 141, and 2 U.S.C. § 2a to base apportionment on the "whole number of persons in each State"; the Fifth and Fourteenth Amendment's Due Process Clause's prohibition against unlawful discrimination; the Tenth Amendment by punishing states that refuse to assist in enforcement of federal immigration law; the Administrative Procedure Act ("APA"), 5 U.S.C. § 706; separation of powers; and 13 U.S.C. §§ 141 and 195 with respect to the use of statistical sampling.  Gov't Pls.' Am. Compl. ¶¶ 4-5, 142-74; NGO Pls.' Am. Compl. ¶¶ 1, 8, 11, 182-262.

Plaintiffs further allege that if the President excludes illegal aliens from the apportionment base, some Plaintiffs will be injured by losing one or more Representatives (and corresponding electors in the Electoral College), undermining their ability to conduct congressional and state-level redistricting, depriving them of federal funding, and degrading the quality of the census data on which Plaintiffs rely to perform government functions; the NGO Plaintiffs further allege loss of political power and diversion of resources to census outreach efforts "to combat fear and disinformation resulting from the Presidential Memorandum."  Gov't Pls.' Am. Compl. ¶¶ 6, 117-127, 135-36; NGO Pls.' Am. Compl. ¶¶ 8, 21-83, 161-69.  Plaintiffs assert that the Presidential Memorandum will reduce the number of aliens who participate in the census by making them think that their responses are less valuable and causing "fears . . . that their data will not be safe."  Gov't Pls.' Am. Compl. ¶¶ 130, 132-34; NGO Pls.' Am. Compl. ¶¶ 9, 170-74.  Plaintiffs seek declaratory and injunctive relief.  Gov't Pls.' Am. Compl. ¶¶ 7 & Prayer for Relief ¶¶ 1-9; NGO Pls.' Am. Compl. Request for Relief ¶¶ i-ix.

In support of their motion for partial summary judgment or a preliminary injunction (ECF No. 77), Plaintiffs submitted a declaration from Matthew Colangelo, an attorney representing the State of New York, which attached over 900 pages of documents, including three expert declarations and 51 fact witness declarations (ECF No. 76, "Colangelo Decl.").  The expert reports come from (1)

Mathew A. Barreto, Ph.D., a political science professor, Colangelo Decl. Ex. 56 ("Barreto Decl."); (2) John Thompson, a former Director of the Census Bureau, Colangelo Decl. Ex. 57 ("Thompson Decl."); and (3) Christopher Warshaw, Ph.D., an assistant professor of political science, Colangelo Decl. Ex. 58. The 51 fact declarations, from various state and local governmental and non-governmental sources, forecast purported injuries that the Presidential Memorandum could inflict on aliens' participation in the remaining portion of the 2020 census. Colangelo Decl. Exs. 1-51.

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 94 (2d Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Plaintiffs fail this straightforward standard, so summary judgment should be denied and this case should be dismissed.

## I.  The Court Lacks Jurisdiction Because Plaintiffs' Claims Are Unripe

"To be justiciable, a cause of action must be ripe—it must present 'a real, substantial controversy, not a mere hypothetical question.' . . . . A claim is not ripe if it depends upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013); *see also Texas v. United States*, 523 U.S. 296, 300 (1998). Ripeness incorporates both a constitutional requirement and a prudential requirement. *See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 670 n.2 (2010); *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). The ripeness doctrine "is designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732-33 (1998) (quoting *Abbott Laboratories*, 387 U.S. at 148-49).

The constitutional requirement "overlaps with the standing doctrine, 'most notably in the shared requirement that the plaintiff's injury be imminent rather than conjectural or hypothetical.'" *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 110 (2d Cir. 2013) (quoting *Ross v. Bank of Am., NA.*, 524 F.3d 217, 226 (2d Cir. 2008)). Under the ripeness doctrine, the Court also

considers: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n, Inc.*, 523 U.S. at 733; *see also Nat'l Org. for Marriage*, 714 F.3d at 691 ("To determine whether to abstain from a case on prudential ripeness grounds, we proceed with a two-step inquiry, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." (citation and internal quotation marks omitted)).

Here, Plaintiffs' claims do not meet the constitutional requirement for ripeness because the claims are, at bottom, about apportionment, rather than census procedures—and any alleged apportionment injury that States may, or may not, suffer is at this point "conjectural or hypothetical" rather than "imminent."

**A.      It Is Currently Unknown What Numbers the Secretary May Report to the President**

The Presidential Memorandum states that "it is the policy of the United States to exclude" illegal aliens from the apportionment base "*to the extent feasible* and to the maximum extent of the President's discretion under the law." 85 Fed. Reg. at 44,680 (emphasis added). It directs the Secretary of Commerce to provide two sets of numbers—one tabulated "according to the methodology set forth in" the Residence Criteria for counting everyone at their usual residence, and a second "permitting the President, *to the extent practicable*," to carry out the stated policy of excluding illegal aliens from the apportionment base. *Id.* at 44,680 (emphasis added).

The extent to which it will be feasible for the Census Bureau to provide the Secretary of Commerce a second tabulation is, at this point, unknown. *See* Decl. of Dr. John M. Abowd ¶ 15. As Director Dillingham recently publicly stated, the Census Bureau is still evaluating the usability of administrative records pertaining to citizenship status in connection with the decennial census and formulating a methodology for potentially excluding illegal aliens. *See* August 3, 2020, Statement from Director Steven Dillingham, available https://www.census.gov/newsroom/press-releases/2020/delivering-complete-accurate-count.html. Indeed, Plaintiffs themselves repeatedly

allege that the Census Bureau is currently unable to comply with the Presidential Memorandum's directive for an enumeration excluding illegal aliens. *See, e.g.*, NGO Pls.' Am. Compl. ¶ 176 ("The Census Bureau . . . does not currently have a means to individually enumerate undocumented immigrants separate and apart from the rest of the population in each jurisdiction."); Gov't Pls.' Am. Compl. Sec. VI & ¶ 137 ("Defendants have not identified any reliable method to accurately enumerate the population of undocumented immigrants," noting that "[j]ust months ago, the Federal Government represented . . . that there is a 'lack of accurate estimates of the resident undocumented population' on a state-by-state basis."), ¶ 138 (administrative records do not provide accurate information about the number of undocumented immigrants), ¶ 140 ("[T]he Census Bureau has not yet 'formulated a methodology' to estimate the undocumented population"); *see also generally* Gov't Pls.' Am. Compl. Sec. ¶¶ 137-41 & NGO Pls.' Am. Compl. ¶¶ 175-79 (containing similar allegations and citing statements by the federal government in support).[1]

Because it is not known what the Secretary may ultimately transmit to the President, it is necessarily not yet known whether the President will be able to exclude some or all illegal aliens from the apportionment base. As a result, Plaintiffs' apportionment claims are unripe as they depend upon "'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *See Nat'l Org. for Marriage, Inc.*, 714 F.3d at 687. Put simply, until the Census Bureau and Secretary of Commerce transmit the information specified in the Presidential Memorandum, and until the President acts on the information, any claim of apportionment injury is speculative.

### B.   Other Considerations Underscore that Plaintiffs' Claims Are Not Ripe

Given that the effects of the Presidential Memorandum and any apportionment injuries to Plaintiffs are at this point unknown, other considerations, such as the hardship to the parties and the fitness of the issues for judicial consideration, also counsel against the Court's exercise of jurisdiction.

---

[1] The specific claim brought by the NGO Plaintiffs pursuant to 13 U.S.C. §§ 141, 195—alleging that the Census Bureau will impermissibly rely on sampling to enumerate the illegal alien population (NGO Pls.' Am. Compl. ¶¶ 251-62)—is similarly unripe because it is conjectural and hypothetical. Plaintiffs have provided nothing other than speculation that the Census Bureau will rely on sampling. Gov't Pls.' Am. Compl. Sec. ¶¶ 137-41; NGO Pls.' Am. Compl. ¶¶ 175-79.

*Nat'l Org. for Marriage, Inc.*, 714 F.3d at 691.  For example, given the above-discussed uncertainties with respect to the effects of the Presidential Memorandum, delayed review would not cause undue hardship to Plaintiffs.  *See, e.g.*, *Ohio Forestry Ass'n*, 523 U.S. at 733-34 (challenge to agency action unripe where there is no "significant practical harm" at the present time because a number of future actions would need to occur to make the harm more "imminent" and "certain"); *Texas*, 523 U.S. at 300, 302 (claim unripe where a number of actions would need to occur to cause the alleged harm, rendering it "too speculative whether the problem . . . will ever need solving"); *Simmonds v. INS*, 326 F.3d 351, 360 (2d Cir. 2003) ("The mere possibility of future injury, unless it is the cause of some present detriment, does not constitute hardship.").  Further, judicial review would improperly interfere with the census, which is currently in progress, and could impede the apportionment, which has not yet occurred.  *See, e.g.*, *Ohio Forestry Ass'n, Inc.*, 523 U.S. at 735 (action unripe where judicial review "could hinder agency efforts to refine its policies").  Finally, the Court would benefit from further real-world factual development.  *See, e.g.*, *id.* at 736 (action was unripe where it would require court to engage in "time-consuming judicial consideration . . . of an elaborate, technically based plan, which predicts consequences that may affect many different parcels of land in a variety of ways," involved issues that could change in the future, and "depending upon the agency's future actions . . . review now may turn out to have been unnecessary").  The actual tabulations that are called for by the Memorandum must be reported by no later than the end of this year, assuming the statutory deadlines in § 141 and § 2a are not extended by Congress.

Perhaps unsurprisingly, census and apportionment cases generally are decided post-apportionment, when census enumeration procedures are no longer at issue and the actual apportionment figures are known.  *See, e.g.*, *Franklin v. Massachusetts*, 505 U.S. 788, 79-91 (1992) (challenging allocation of Department of Defense's overseas employees to particular states following census); *Dep't of Commerce v. Montana*, 503 U.S. at 445-46 (challenging method of equal proportions to determine representatives); *Utah v. Evans*, 536 U.S. 452, 458-59 (2002) (challenging sampling method known as "hot-deck imputation" used by Census Bureau after analyzing census figures); *Wisconsin v. City of New York*, 517 U.S. 1, 4 (1996) (challenging decision not to use particular statistical adjustment

to correct an undercount).   Here, Plaintiffs are not challenging the enumeration procedures themselves, but only the hypothetical apportionment that might result from actions that might be taken pursuant to the Presidential Memorandum.   *See, e.g.*, Gov't Pls.' Am. Compl. ¶¶ 142-46; NGO Pls.' Am. Compl. ¶¶ 184-93.   Consistent with this long line of Supreme Court precedent, such a challenge should await the actual apportionment.

## II.   This Court Lacks Jurisdiction Because Plaintiffs Lack Standing

For similar reasons, Plaintiffs lack standing to pursue their claims.   The doctrine of standing requires a plaintiff to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent; (2) a causal connection between the injury and defendants' challenged conduct, such that the injury is "fairly traceable to the challenged action of the defendant"; and (3) a likelihood that the injury suffered will be redressed by a favorable decision.   *Defs. of Wildlife*, 504 U.S. at 560-61. The standing inquiry is "'especially rigorous when reaching the merits of the dispute would force [the court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional.'"   *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997)).   Plaintiffs bear the burden of establishing the required elements of standing.   *Defs. of Wildlife*, 504 U.S. at 561.   "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," *id.*, but "a plaintiff cannot rely solely on conclusory allegations of injury."   *Baur v. Veneman*, 352 F.3d 625, 637 (2d Cir. 2003).   Here, none of the injuries Plaintiffs allege satisfy these requirements.

### A.   Plaintiffs' Alleged Apportionment Injuries Are Too Speculative to Confer Standing

The standing requirement of "injury in fact" requires an allegation that "the plaintiff 'has sustained or is immediately in danger of sustaining a direct injury'" as a result of the challenged action. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1552 (2016) (citations omitted).   The injury or threat of injury must be "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Defs. of Wildlife*, 504 U.S. at 560.   Thus, an alleged future injury must be "'certainly impending,' *or* there

is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper*, 568 U.S. at 409 n.5). "'Allegations of possible future injury' are not sufficient." *Clapper*, 568 U.S. at 409 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).  As discussed above, *see supra* at 7-10, Plaintiffs' alleged apportionment injuries are speculative and conclusory, and at this point in time, there is no "substantial risk" that harm will occur.  *See Susan B. Anthony List*, 573 U.S. at 158.  In fact, Plaintiffs' own allegations that the Census Bureau has not yet "formulated a methodology" for excluding all illegal aliens contradicts their alleged harm.  *See supra* at 8.  Therefore, any injury to Plaintiffs—be it in the form of loss of a Representative, loss of funding, or otherwise— is conjectural or hypothetical.  *Defs. of Wildlife*, 504 U.S. at 560.

> **B.      Plaintiffs' Allegations That the Presidential Memorandum Will Reduce Participation in the 2020 Census Are Also Speculative, Not Traceable to the Memorandum, and Not Redressable by a Favorable Ruling**

Plaintiffs alternatively allege that they will suffer injury because the Presidential Memorandum will purportedly reduce the number of aliens who participate in the census by making them think that their responses are less valuable and causing "fears . . . that their data will not be safe," thereby affecting the distribution of federal funds and degrading the quality of census data.  Gov't Pls.' Am. Compl. ¶¶ 130, 132-36; NGO Pls.' Am. Compl. ¶¶ 9, 170-74.  However, these alleged injuries are far too speculative to establish standing.  In addition, those injuries are neither traceable to the Memorandum nor redressable by a favorable ruling from this Court.

1.      **Plaintiffs' Alleged Enumeration Injuries Are Too Speculative to Confer Standing**

As this Court noted in requesting the appointment of a three-judge panel pursuant to 28 U.S.C. § 2284, "the Presidential Memorandum does not purport to change the conduct of the census itself[;] [i]nstead, it relates to the calculation of the apportionment base used to determine the number of representatives to which each state is entitled." ECF No. 68 at 2. There is, facially, no reason why such a Memorandum should have any effect on census response rates. To the contrary, as explained by the Census Bureau's Associate Director for Decennial Census Programs, Albert E. Fontenot, Jr., the Census Bureau's enumeration is almost complete, and the Memorandum does *not* affect how the Census Bureau is conducting its remaining enumeration operations or "the Census Bureau's commitment to count each person in their usual place of residence." Decl. of Albert E. Fontenot, Jr. ¶¶ 7, 12. And although Plaintiffs submit a variety of declarations to purportedly bolster their claims that the Memorandum has a chilling effect on respondents,[2] those declarations are impermissibly conjectural, conclusory, and hearsay.

For example, Dr. Barreto's declaration provides an opinion regarding the so-called "chilling effect" of the Memorandum on individuals' participation in the 2020 Census that is based on multiple levels of conjecture. Dr. Barreto cites several Spanish-language news sources as providing hearsay statements that activists and organizations are concerned about the Memorandum causing fear in Hispanic and immigrant communities; that several studies have found that immigrant communities will rely on Spanish-language news sources; and that various studies, many of them from decades ago, suggest that response rates are affected by the overall socio-political environment. Barreto Decl. ¶¶ 15-16, 32-38. This "evidence" is insufficient to support Plaintiffs' allegations that the Memorandum will significantly reduce the number of aliens who participate in the census so as to materially affect

---

[2] A court "'may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but [the Court] may not rely on conclusory or hearsay statements contained in the affidavits.'" *New York v. Dep't of Commerce*, 315 F. Supp. 3d 766, 780 (S.D.N.Y. 2018) (Furman, J.) (alteration in original) (quoting *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004)); *see also Broidy Capital Mgmt., LLC v. Benomar*, 944 F.3d 436, 441 (2d Cir. 2019) ("The district court can refer to evidence outside the pleadings when resolving a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1)."

federal funding and degrade the quality of census data.  Although Dr. Barreto discusses studies reflecting concerns among aliens about citizenship information in the census generally and a citizenship question on the census specifically (*see, e.g.*, Barreto Decl. ¶¶ 24-25, 54-55, 61, 68), this is far attenuated from the issues in this case, which involves the Presidential Memorandum.  This case does not involve a citizenship question on the census questionnaire or a change to the Census Bureau's enumeration under the Residence Criteria.

Tellingly, Dr. Barreto cites no study actually addressing the Presidential Memorandum's effect on the 2020 Census.  And Dr. Barreto's discussion of citizenship-question studies is grounded in inaccuracies.  Notably, Dr. Barreto fails to address, or even acknowledge, the shortcomings that this Court identified in the very study Dr. Barreto now cites for the proposition that the placement of a citizenship question on a census questionnaire would depress response rates.  *Compare* Barreto Decl. ¶ 68 *with New York v. Department of Commerce*, 351 F. Supp. 3d 502, 581 n.36 (S.D.N.Y. 2019) (noting that the Court would place "only limited weight on Dr. Barreto's study" because it had a flawed design, and did not weigh the resulting data "to match the population totals").

Further, Dr. Barreto fails to consider the results of the randomized controlled trial published by the Census Bureau after the Supreme Court issued its opinion in the citizenship question litigation, which found *no* statistically-significant depression of response rates for households that received a test questionnaire containing a citizenship question.  *See* Abowd Decl. ¶ 13; *see also 2019 Census Test Report,* Census Bureau (Jan. 3, 2020), https://www2.census.gov/programs-surveys/decennial/2020/program-management/census-tests/2019/2019-census-test-report.pdf (Census Test Report).  That study contained a sample of 480,000 housing units, and was "capable of detecting response differences as small as 0.5 percentage points."  *See* Abowd Decl. ¶ 13.  Overall, "[t]he test questionnaire with the citizenship question had a self-response rate of 51.5 percent; [while] the test questionnaire without the citizenship question had a self-response rate of 52.0 percent."  Census Test Report at ix.  And while some narrow subgroups exhibited statistically-significant lower self-response rates, *id.* at x, the Census Bureau concluded that "[c]urrent plans for staffing for Nonresponse Followup would have sufficiently accounted for subgroup differences seen in this test."

*Id. See generally* Abowd Decl. ¶ 13. As Dr. Abowd reports, this new finding illustrates the benefit of a "randomized controlled design," which properly isolates the independent variable (there, the citizenship question) and measures its effects. Abowd Decl. ¶ 13.

Mr. Thompson's expert declaration—expressing the subjective opinion that he is "extremely concerned" that the Presidential Memorandum will significantly increase the risk of undercounting immigrant communities—also cannot establish standing. Mr. Thompson's citation of studies conducted in planning for the 2020 Census that generally indicate immigrants' fear of the government and their concern about responses being used against them, and a 2018 study that he claims supports that a citizenship question would reduce response rates, again, have little bearing on this case. Despite discussing these studies, Mr. Thompson's declaration likewise does not address the June 2019 randomized controlled trial showing no statistically significant difference in response rates with and without a citizenship question. *See* Abowd Decl. ¶ 13. Nor do the studies Mr. Thompson cites— which have nothing to do with the Presidential Memorandum—support a significant chilling effect from the Presidential Memorandum.

Likewise, the statements contained in various fact witness declarations that the Presidential Memorandum will have a chilling effect on participation of immigrants in the 2020 census also offer nothing more than speculative, conclusory statements and hearsay. For example, many of the declarations provide no support whatsoever for their assertions. *See, e.g.*, Colangelo Decl. Exs. 9 ¶ 9-12; Ex. 11 ¶ 11; Ex. 12 ¶ 8-9; Ex. 16 ¶¶ 8-12; Ex. 22 ¶ 8; Ex. 26 ¶¶ 11-13; Ex. 33 ¶¶ 7-8; Ex. 38 ¶¶ 7-9; Ex. 41 ¶¶ 8-12; Ex. 47 ¶¶ 2, 13, 20. Other declarations vaguely reference that they heard from "community partners," "Census advocates," and the like that the Presidential Memorandum was decreasing participation among immigrants. *See, e.g.*, Colangelo Decl. Exs. 1 ¶ 10; Ex. 4 ¶¶ 8-9; Ex. 5 ¶ 5; Ex. 10 ¶ 6; Ex. 14 ¶¶ 15-19; Ex. 30 ¶¶ 9-10; Ex. 35 ¶¶ 5-7; Ex. 36 ¶¶ 10-14; Ex. 42 ¶¶ 5, 7; Ex. 43 ¶¶ 12-16; Ex. 44 ¶¶ 13, 17, 21-22; Ex. 51 ¶ 7. Very few of these declarations provide any examples to support their allegations, and the few that do, are vague and based on hearsay. *See, e.g.*, Colangelo Decl. Exs. 17 ¶¶ 6-9; Ex. 18 ¶¶ 10-13; Ex. 34 ¶¶ 8-10; Ex. 45 ¶¶ 11-12. They certainly do not provide sufficient support that the Presidential Memorandum would have an appreciable effect on the

participation of illegal aliens in the remaining months of the 2020 census—for which field operations are to be completed by September 30, 2020.

Simply put, Plaintiffs' alleged injuries all depend on (i) the assumption that a significant percentage of illegal aliens who otherwise would have participated in the census will be deterred from doing so despite outreach by the Census Bureau, and that (ii) the belief this lack of participation will materially degrade the census data which will (iii) result in an appreciable effect on apportionment, redistricting, and funding.  Plaintiffs fail to allege sufficient facts that the above sequence of events will occur with any likelihood.  *See supra* at 12-14.

### 2.     The Alleged Chilling Effect Is Not Traceable to the Memorandum

Separate from the question of injury, the materials submitted by Plaintiffs fail to show that any diminution in census response rates is fairly traceable to the Memorandum.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 03 (1998) (for plaintiff to establish standing "there must be causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant").  To satisfy the "'traceability'" or "'causation'" prong of the Article III standing test, allegations must provide more than "'unadorned speculation'" to "'connect their injury to the challenged actions.'"  *CREW v. Trump*, 953 F.3d 178, 191 (2d Cir. 2020) (quoting *Simon v. Eastern Kentucky Welf. Rights. Org.*, 426 U.S. 26, 44-45 (1976)), *reh'g en banc denied*, 2020 WL 4745067 (Aug. 17, 2020).  The allegations of fact must plausibly support a "substantial likelihood" that the plaintiff's injury was the consequence of the defendant's allegedly unlawful actions (and that prospective relief could mitigate the harm).  *Id.*  Where a theory of injury rests on a "highly attenuated chain of possibilities," *Clapper v. Amnesty Int'l*, 568 U.S. 398, 410 (2013), "speculation regarding the future actions of third parties is not sufficient to establish an imminent injury, *Lower East Side People's Credit Union v. Trump*, 289 F. Supp. 3d 568, 580 (S.D.N.Y 2018); *see also Taylor v. Bernanke*, No. 13-CV-1013 (ARR), 2013 WL 4811222, at *6 (E.D.N.Y. Sept. 9, 2013) ("Where the occurrence of the future injury depends on the actions of a third party not included in the plaintiff's suit, the Supreme Court has shown particular reluctance to conclude that the 'imminence' requirement is met.");  *Himber v. Intuit,*

*Inc.*, No. 10-CV-2511 (JFB), 2012 WL 4442796, at *7 (E.D.N.Y. Sept. 25, 2012) ("As the jurisprudence of the Supreme Court and Second Circuit has clearly articulated, claims of harm based upon speculation regarding decisions by third parties is insufficient to confer Article III standing.").

Here, as noted above, the primary basis for linking the Memorandum to response rates comes from Plaintiffs' expert Dr. Barreto.  He opines that immigrant communities are less likely to respond to the census after the Memorandum because (1) immigrant communities' trust in the government and willingness to share information was undermined, Barreto Decl. ¶¶ 14, 19, by; (2) third-party reports featuring "immigrants, as well as individuals who worked with community-based organizations that serve immigrants, and even journalists, all stat[ing] that they believed the July 21 Memorandum was an effort to sow confusion and distrust, and to reduce the count of Latinos and immigrants on the 2020 Census," Barreto Decl. ¶¶ 33, 15; carried on (3) various media sources, particularly Spanish-language ones, which are highly influential in the immigrant and Latino communities, Barreto Decl. ¶¶ 16, 32.  Dr. Barreto posits this chain as an unbroken line.  But the media, and the community activists they feature, are independent actors; those entities' messages about the Memorandum are the product of their own interpretations and views, many of which are at odds with the plain terms of the Memorandum.  *See, e.g.*, Torres Decl. ¶ 18, ECF No. 76.47 (stating that CASA de Maryland, Inc. "was approached by a number of media outlets, including CNN, to represent the reaction of our community . . . [and] conveyed how harmful the action is and our commitment to ensuring that our members are fully counted."); Barreto Decl. ¶ 33 (listing media messages characterizing the Memorandum as something "intended to promote fear").

It makes little sense for Plaintiffs to attribute whatever harm is caused by those independent actors to the Memorandum itself, particularly if their messages convey the incorrect impression that the Memorandum increases the "risk of [individuals'] information being linked to immigration records and [those individuals] facing immigration enforcement."  Barreto Decl. ¶ 62, Pls.' Br. at 43 (citing various declarations speculating that the Memorandum is likely to create fear of immigration enforcement).  Simply put, any contention or concern that the Secretary's compliance with the Memorandum will somehow facilitate immigration enforcement is contrary to established statutory

provisions mandating strict confidentiality for census responses. *See generally* 13 U.S.C. § 9 (providing that personal information collected by the Census Bureau cannot be used against respondents by any government agency or court); *id.* § 214 (setting forth penalty for wrongful disclosure of information). Indeed, the Census Bureau devotes resources to educating the public about the privacy and confidentiality of census responses specifically to allay such fears of adverse use. *See, e.g.*, *Data Protection and Privacy Program*, Census Bureau, available at https://www.census.gov/about/policies/privacy.html (last visited August 17, 2020); Fontenot Decl. ¶ 10. Because nothing in the Memorandum undermines these statutory protections, it is unreasonable to trace fear of immigration enforcement to the Memorandum itself, rather than to the messages conveyed by other actors in Plaintiffs' chain of causation. *See, e.g.*, Barreto Decl. ¶ 46 (noting that immigrants "may not do the full research to realize they can still fill out the Census safely, *because they hear the news which is connecting* the July 21 [Memorandum] to Trump's longstanding desire to increase deportation of undocumented immigrants" (emphasis added)); *see also supra* at 4.

The presence of such independent sources distinguishes this case from the litigation over the placement of a citizenship question on the census form, in which both this Court and the Supreme Court found that the placement of such a question could predictably cause lower self-response rates among certain communities. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019). That case presented a situation not found here: namely, the direct collection of information from respondents. The Memorandum is not itself directed at census respondents and appears, even in Plaintiffs' telling, to be filtered to them through third-party intermediary sources. How those sources interpret the Memorandum should not be dispositive of the Memorandum's effects. Put another way, the alleged injuries here depend on "a chain of causation" with multiple "discrete links, each of which 'rest[s] on [the plaintiffs'] highly speculative fear that governmental actors" would exercise their "discretion in a [] way" that would adversely affect Plaintiffs. *See Dep't of Commerce*, 315 F. Supp. 3d at 787 (summarizing *Clapper*, 568 U.S. at 410-14, and distinguishing citizenship question case from *Clapper* partly on this basis). Such a speculative chain of causation is insufficient to establish standing.

### 3.   A Favorable Ruling Would Not Redress Plaintiffs' Alleged Enumeration Injuries

Finally, even if Plaintiffs could establish the existence of a "chilling" effect traceable to the Memorandum, they still fail to establish the last prong of standing:  namely, that the effect would be cured by a favorable ruling from this Court.  The redressability requirement "lies at the core of the standing doctrine" because "[a]n abstract decision without remedial consequence seems merely advisory, an unnecessary expenditure of judicial resources that burdens the adversary and carries all the traditional risks of making bad law and trespassing on the provinces of the executive and legislature."  *E.M. v. New York City Dep't of Educ.*, 758 F.3d 442, 450 (2d Cir. 2014); *see also Hewitt v. Helms*, 482 U.S. 755, 761 (1987).  Where a plaintiff requests prospective relief in the form of a declaratory judgment or injunction, the plaintiff must show that "prospective relief will remove the harm" and the plaintiff "personally would benefit in a tangible way from the court's intervention."  *Warth v. Seldin*, 422 U.S. 490, 505, 508 (1975).  "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement."  *Steel Co.*, 523 U.S. at 107.

Here, it is entirely speculative that there are enough aliens who, while currently deterred from participating in the census, would *decide* to participate if this Court granted Plaintiffs relief.  Indeed, nothing that Plaintiffs have submitted speaks to this issue with any particularity.  The closest Plaintiffs come to attempting this showing is Dr. Barreto's report discussing research studies from 2018 that endeavored to predict how the removal of a citizenship question from the census questionnaire would affect response rates.  Barreto Decl. ¶¶ 68–69.  But, as noted above, those studies are inconsistent with the large, and statistically rigorous, study published in 2020 by the Census Bureau, which showed no statistically-significant diminution of response rates in the first instance.  Abowd Decl. ¶¶ 13, 17.  Further, there is no reason to expect the Memorandum, which asks nothing of respondents, to have a significant effect on response rates—and even less reason to expect that any people deterred from responding to the census would change their mind if the Memorandum were enjoined, especially since

the census would conclude long before any such injunction would become final on appeal. *See supra* at 4.

If anything, the declarations proffered by Plaintiffs tend to paint the opposite picture. The declarations repeatedly lament an alleged "macro environment" of mistrust around immigration. Thompson Decl. ¶¶ 19–20; *see also* Barreto Decl. ¶ 46. It is hard to imagine that precluding the Secretary from complying with a Memorandum that does not implicate immigration enforcement or change census operations would alter the kind of mistrust that Plaintiffs allege to be in effect currently.

<div align="center">***</div>

The Supreme Court has emphasized that standing is not an "ingenious academic exercise in the conceivable." *Summers v. Earth Island Institute*, 555 U.S. 488, 499 (2009). Plaintiffs cannot "establish standing simply by claiming that they experienced a 'chilling effect' that resulted from a governmental policy that does not regulate, constrain, or compel any action on their part." *Clapper*, 568 U.S. at 419. Rather, Plaintiffs can establish standing only by shouldering the substantial burden of establishing that the Court, in a real way, can remedy an injury Plaintiffs have suffered as a result of some action Defendants took. *Id.* Because Plaintiffs have failed to make that showing here, their complaint should be dismissed for lack of subject matter jurisdiction.

## III.   Plaintiffs Fail to State a Claim

Even if the Court concludes that it has subject-matter jurisdiction over Plaintiffs' claims, Plaintiffs' failure to adequately plead any claim serves as an independent additional basis for the Court to dismiss these consolidated actions.

### A.   *Franklin* Mandates Dismissal of Plaintiffs' APA Claims

Plaintiffs seek APA review of both the President's policy directives in the Presidential Memorandum and steps that the Secretary of Commerce may have taken to prepare and transmit a set of "total population numbers for each state that exclude undocumented immigrants . . . to the President" in accordance with the Presidential Memorandum. *See* NGO Pls.' Am. Compl. ¶¶ 237-250 (asserting APA claim against "Defendants"); Gov't Pls.' Am. Compl. ¶¶ 159-163 (same). Their pleadings, however, challenge conduct by the President that is not subject to review under the APA

and, in any event, fail to identify any act that satisfies the "final agency action" standard set forth in *Franklin*, 505 U.S. at 796-801 (applying the definition of final agency action in 5 U.S.C. § 704 to the apportionment context); *see also State of Cal. v. Dep't of Justice*, 114 F.3d 1222, 1225 (D.C. Cir. 1997) ("No final administrative action, no judicial review"). Accordingly, Plaintiffs' APA claims should be dismissed.[3]

First, insofar as Plaintiffs seek review of the President's action under the APA, the law is clear that the APA does not provide a basis for such review. In *Franklin*, for example, the Supreme Court held that because "the APA does not expressly allow review of the President's actions," such "actions are not subject to [the APA's] requirements." 505 U.S. at 800; *accord Dalton, v. Specter*, 511 U.S. 462, 468 (1994); *Lunney v. United States*, 319 F.3d 550, 554 (2d Cir. 2003) (recognizing that under *Franklin* and *Dalton*, "the APA does not allow courts to review the President's actions"). Accordingly, Plaintiffs' APA challenges to the Presidential Memorandum should be dismissed under Rule 12(b)(6).

Second, to the extent that Plaintiffs also seek APA review of a "directive" that they believe the Secretary of Commerce has given to "the Census Bureau to effectuate the [Memorandum's] policy of excluding undocumented immigrants from the census" as well as the report the Secretary of Commerce is expected to submit to the President in January 2021, *see* NGO Pls.' Am. Compl. ¶ 242, that claim fails as well because there is no final agency action. In *Franklin*, the Supreme Court directly confronted the question whether a "statutory basis [existed] … under the APA" for judicial review of the Secretary of Commerce's report to the President regarding the decennial census data under 13 U.S.C. § 141(b). *See* 505 U.S. at 796-800. The Court concluded that the Secretary's report to the President is "not final and therefore not subject to [APA] review" because it "serves more like a tentative recommendation than a final and binding determination." *Id.* at 798. More specifically, the Court identified two prerequisites for an agency action to be deemed "final" for APA purposes — *one*,

---

[3] The Second Circuit has left open the question whether a plaintiff's threshold failure to identify a "final agency action" requires dismissal under Rule 12(b)(6) or Rule 12(b)(1). *Compare Air Espana v. Brien*, 165 F.3d 148, 152 (2d Cir. 1999) ("The APA . . . requirement of finality is jurisdictional"); *with Sharkey v. Quarantillo*, 541 F.3d 75, 87 (2d Cir. 2008) (suggesting that whether the "threshold requirements" of APA review are satisfied may be analyzed under Rule 12(b)(6) instead of 12(b)(1)).

that "the agency has completed its decisionmaking process," and, *two*, that "the result of that process is one that will directly affect the parties."  *Id.* at 797.

Here, both the alleged directive from the Secretary of Commerce and his submission of a report to the President are the acts "of a subordinate official" preceding "the final action" to be taken the President.  *See Franklin*, 505 U.S. at 796-97.  Neither type of action by the Secretary of Commerce, therefore, is "final agency action" subject to review under the APA.  *See id.* at 797.[4]

**B.      The Government Plaintiffs Have Failed to Plausibly Plead That the Presidential Memorandum Amounts to "Coercion" in Violation of the Tenth Amendment**

The Government Plaintiffs also have failed to plead a viable Tenth Amendment Claim.  The Tenth Amendment "reserve[s] to the states [] or to the people" those "powers not delegated to the [federal government] by the Constitution" or "prohibited by it to the states."  The Government Plaintiffs conclusorily assert that Defendants have violated the Tenth Amendment because the Presidential Memorandum "punishes" Plaintiffs "for refusing to assist in the enforcement of federal immigration laws, in an attempt to coerce plaintiffs to change their policies."  Gov't Pls.' Am. Compl. ¶ 155.

Plaintiffs' Tenth Amendment claim appears to derive from the "anti-commandeering" doctrine articulated by the Supreme Court.  *See generally New York v. United States*, 505 U.S. 144, 161 (1992) ("Congress may not simply commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program"); *Printz v. United States*, 521 U.S. 898, 925 (1997) ("the Federal Government may not compel the States to implement ... federal regulatory

---

[4] *See also Dalton*, 511 U.S. at 470 (holding the Secretary of Defense's implementation of the President's decision to close a naval yard is not a "final agency action" reviewable under the APA); *Public Citizen v. U.S. Trade Rep.*, 5 F.3d 549, 551-52 (D.C. Cir. 1994) (holding that the NAFTA trade agreement negotiated by the Trade Representative is not a "final agency action" subject to APA review because it was up to the President to decide whether to submit the agreement to Congress); *see also Flue-Cured Tobacco Cooperative Stabilization Corp. v. EPA*, 313 F.3d 852, 860-61 (4th Cir. 2003) ("even when agency action significantly impacts the choices available to the final decisionmaker, this distinction does not transfer [a] challenged action into reviewable agency action under the APA").

programs"). But nothing in the Memorandum requires States to do *anything*, and this claim should therefore be dismissed.

While Plaintiffs allege that the federal government is attempting to coerce them to "assist the enforcement of federal immigration laws" or to "change their policies," Gov't Pls.' Am. Compl. ¶ 155, the Presidential Memorandum does not demand or require any specific effort that the Government Plaintiffs should devote toward immigration enforcement, let alone offer any "inducement [that is] impermissibly coercive," *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580 (2012). Instead, to the extent that the Memorandum refers to immigrant populations at all, it does so only in the context of setting forth the President's views on the scope of his delegated authority under 2 U.S.C. § 2a and on "principles of representative democracy." 85 Fed. Reg. at 44,679-80.

Indeed, the Memorandum does not incentivize or pressure the States to cooperate in enforcing federal immigration law in any way. Rather, the apportionment policy set forth in the Memorandum is wholly divorced from immigration enforcement, and its implementation is not conditioned on some unspecified degree of enforcement cooperation from the States. Even if the Plaintiff States here were to begin cooperating with federal immigration enforcement, the Memorandum, if implemented to its maximal extent, would (crediting Plaintiffs' allegations) nonetheless reduce their apportionment population base (just as it would for States which *have* rendered such cooperation). And the converse is also true: Plaintiff States may continue not to assist in federal immigration efforts, but the Memorandum would operate without regard to that independent stance.

Beyond the text of the Presidential Memorandum, Plaintiffs also have not proffered "sufficient factual matter" that supports a reasonable inference about the existence of an unstated, improper, and "coercive" purpose. Conclusory allegations as to the Memorandum's "coercive" purpose are clearly not enough under *Iqbal*. *See Hayden v. Patterson*, 594 F.3d 150, 161 (2d Cir. 2010) (under *Iqbal*, "allegations that are conclusory … are not entitled to the assumption of truth").[5]

---

[5] As the courts have long recognized, the Government's stated reason for its policy decision is entitled to a "presumption of legitimacy." *See Nat'l Archives & Record Admin. v. Favish*, 541 U.S. 157, 174 (2006) (recognizing that "a presumption of legitimacy [is] accorded to the Government's official conduct");

Further, insofar as Plaintiffs seek to ascribe a hidden, improper, coercive motive to the Presidential Memorandum because, in their view, this is of a piece with Defendants' immigration policies writ large, this also would not satisfy *Iqbal's* plausibility requirement. *See* 556 U.S. at 678 ("Where a complaint pleads facts that are *merely consistent with* a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.") (emphasis added and internal quotation marks omitted). Indeed, as another court in this District recently recognized in dismissing a Tenth Amendment coercion claim, it is well-established that courts "will not typically inquire into the hidden motives" for federal legislations and policies. *New York v. Mnuchin*, 408 F. Supp. 3d 399, 420 (S.D.N.Y. 2019) (internal quotation marks omitted) (dismissing Tenth Amendment challenge to federal tax law).

Similarly, courts have routinely held that directives and statutes do not violate the Tenth Amendment if they do not commandeer the states. *See, e.g.*, *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 396–97 (2d Cir. 2008) (the "critical inquiry with respect to the Tenth Amendment is whether the PLCAA commandeers the states," and holding that "[t]he PLCAA 'does not violate the Tenth Amendment as it does not commandeer any branch of state government because it imposes no affirmative duty of any kind on any of them.'") (quoting *Connecticut v. Physicians Health Servs. of Connecticut, Inc.*, 287 F.3d 110, 122 (2d Cir. 2002)). Here, the Presidential Memorandum does not implicate the Tenth Amendment because it does not command or compel state actors to take any action at all. Indeed, the Government Plaintiffs' Complaint does not allege that state actors were compelled to take specific action or refrain from taking specific action as a result of the Memorandum. Therefore, the Memorandum raises no commandeering issues, and the Court should dismiss the Tenth Amendment claim.

---

*United States v. Armstrong*, 517 U.S. 456, 464687 (1996) ("in the absence of clear evidence to the contrary, courts presume that [Government agents] have properly discharged their official duties").

### C.   Plaintiffs Have Failed to Sufficiently Allege an Equal Protection Claim Under the Fifth Amendment

Plaintiffs allege that the Presidential Memorandum was impermissibly motivated by discriminatory animus based on race, ethnicity, and national origin.  *See* Gov't Pls. Am. Compl. ¶¶ 147-52; NGO Pls.' Am. Compl. ¶¶ 208-21.  To make these claims, however, Plaintiffs rely on two faulty pleading devices—*first*, they improperly equate the Memorandum's scrutiny of illegal aliens' status as "inhabitants of a state" with defining those individuals as non-persons; and, *second*, they inaccurately conflate the Memorandum's facially neutral distinction between lawful and unlawful aliens with racial or ethnicity-based disparate treatment.  Shorn of these devices, Plaintiffs fail to allege the unlawful "animus" or "racially discriminatory intent" required to plead an equal protection violation.  *See Dep't of Homeland Security v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020) ("*Regents*") ("To plead animus, a plaintiff must raise a plausible inference that an 'invidious discriminatory purpose was a motivating factor' in the relevant decision.").

At the outset, and citing *Dred Scott*, the NGO Plaintiffs allege that the Presidential Memorandum is "denying the *personhood* of people living in the United States."  NGO Pls.' Am. Compl. ¶ 214 (emphasis in original).  This hyperbolic claim, however, cannot be squared with the text of the Memorandum, which specifically explains that "[d]etermining *which persons* should be considered '*inhabitants*' for the purpose of apportionment requires the exercise of judgment."  85 Fed. Reg. at 44,679 (emphasis added).  Plaintiffs' unfounded inference of animus also fails to acknowledge that the Memorandum treats foreign business and tourist visitors just as it treats illegal aliens—that is, as "persons" who should be excluded from apportionment, *id.*—yet no one, including Plaintiffs, contends the former category need be included in apportionment.  In short, the Presidential Memorandum expressly acknowledges the "personhood" of illegal aliens, but seeks to "examine" their status, *vel non*, as "inhabitants of each state."  *Id.* at 44,679-80.

Further, Plaintiffs inaccurately conflate the distinction drawn in the Presidential Memorandum between lawful and illegal aliens with racial or ethnicity-based disparate treatment.  Notwithstanding Plaintiffs' suggestion to the contrary, there can be no dispute that the Memorandum is facially neutral

with respect to race, ethnicity, or national origin.  To the extent that it makes any distinction between persons, the Presidential Memorandum is focused on the distinction between illegal aliens and citizens and other lawful residents.  *See* 85 Fed. Reg. at 44,680.  As the Supreme Court and the Second Circuit have both recognized, relying on this distinction does not require heightened scrutiny for equal protection purposes because non-citizens—much less illegal aliens—do not constitute a protected class.  *See, e.g.*, *Mathews v. Diaz*, 426 U.S. 67 (1976) (limitation on eligibility for a federal medical insurance program to citizens and long-term permanent residents did not violate Equal Protection Clause); *Lewis v. Thompson*, 252 F.3d 567, 583-84 (2d Cir. 2001) (upholding Welfare Reform Act's denial of prenatal care coverage to unqualified noncitizens against Equal Protection challenge).

Without the benefits of these two artifices, Plaintiffs are left with only conclusory allegations of animus, *see* Gov't Pls.' Am. Compl. ¶ 149; NGO Pls.' Am. Compl. ¶ 215, which are not sufficient to state an equal protection claim.  Specifically, insofar as Plaintiffs rest their claim on a supposedly "disproportionate burden on Hispanics and immigrant communities of color," Gov't Pls.' Am. Compl. ¶ 150, this argument is foreclosed by the Supreme Court's recent *Regents* decision.  As the Court recognized there, if the fact that an immigration policy would have "an outsized" impact on "Latinos" "because [they] make up a large share of the unauthorized alien population" by itself "were sufficient to a state a claim," then "'virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Regents*, 140 S. Ct. at 1916.  Instead, as *Regents* concluded, an allegation of disproportionate burden on a specific racial or ethnic group is, in this context, inadequate to "establish[] a plausible equal protection claim."  *Id.* at 1915.

Further, to the extent that Plaintiffs seek to base their equal protection claim on a purported link to the Commerce Secretary's decision to add a citizenship question to the 2020 Census, *see* Gov't Pls.' Am. Compl. ¶¶ 98, 150; NGO Pls.' Am. Compl. ¶ 132, the claim is implausible because these two actions involve separate decisions made by different decisionmakers that are distinct in terms of timing and implementation.  In any event, Plaintiffs cannot bootstrap their equal protection claim here to the earlier decision because they "failed to prove, by a preponderance of the evidence, that a discriminatory purpose motivated Defendants' decision to reinstate the citizenship question on the

2020 census questionnaire."[6]  *New York*, 351 F. Supp. 3d at 671; *see also Kravitz v. Dep't of Commerce*, 366 F. Supp. 3d 681, 712 (D. Md. 2019).[7]

Finally, Plaintiffs cite a number of alleged statements by the President and other individuals. *See* NGO Pls.' Am. Compl.  ¶¶ 130-31, 138-39 (citing statements by Richard Hofeller, Kris Kobach, and Matt Schlapp).  At the outset, because the President is the only decision-maker with respect to issuance of the Presidential Memorandum, statements of other individuals are immaterial.  *See Regents*, 140 S. Ct. at 1916 (statements by non-decisionmakers "remote in time and made in unrelated contexts" are "unilluminating").  Moreover, to the extent that Plaintiffs discuss the President's statements, *see, e.g.*, Gov't Pls.' Am. Compl. ¶¶ 114-15; NGO Pls.' Am. Compl. ¶ 141, they fail to draw any specific link between those statements and the specific policy announced in the Presidential Memorandum. Thus, they cannot plausibly serve as evidence for his subjective motivations in issuing that discrete policy.

The face of the Presidential Memorandum plainly states that the policy's purpose was to promote "the principles of representative democracy underpinning our system of Government."  85 Fed. Reg. at 44,630.  Plaintiffs have failed to plausibly allege that, notwithstanding this permissible purpose, it was merely a pretext for a "real reason" to discriminate against Hispanics, *St Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993), or that it was motivated by such animus, *Pers. Admin. of Mass. v. Feeney*, 442 U.S. 256,  279 (1979).   Accordingly, the Equal Protection claim should be dismissed.

---

[6] Merely alleging that the Presidential Memorandum is a continuation of the attempt to add a citizenship question is insufficient to plausibly assert discriminatory intent.  Indeed, Plaintiffs' allegations on this score are circular—they want to rely on the earlier decision to bolster their claim of animus here, without acknowledging their own failure to prove animus as to the earlier decision. Further, Plaintiffs have not identified any basis for imputing the motivation of the earlier decision by Secretary Ross to the President's decision-making here—even though that is a flaw the Court specifically identified in the earlier proceeding. *See New York*, 351 F. Supp. 3d at 670 ("Plaintiffs failed to prove a sufficient nexus between President Trump and Secretary Ross's decision to make the President's statements or policies relevant to the equal protection analysis.").

[7] In a decision that later became moot, a district court in the citizenship-question context concluded that "newly discovered evidence" raised a "substantial issue" because it suggested "that Dr. Hofeller was motivated to recommend the addition of a citizenship question to the 2020 Census to advantage Republicans by diminishing Hispanics' political power."  *Kravitz v. Dep't of Commerce*, No. 18-cv-1041 (D. Md. June 3, 2019), ECF No. 162-1 at 1.

### D. Plaintiffs Have Failed to State an Apportionment Clause Claim

The operative Apportionment Clause mandates that Representatives shall be "apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed." U.S. Const. amend. XIV, § 2. But, after accounting for the express exclusion of "Indians not taxed," neither this Clause nor its predecessor in Article I was ever understood to mandate the inclusion of every person present within the boundaries of each State at the time of the census. *See id.* art. I, § 2, cl. 3. To the contrary, from the time of the Founding through the ratification of the Fourteenth Amendment and continuing to the present day, the Apportionment Clause has been understood to require counting "inhabitants." In other words, only usual residents—those with a fixed and enduring tie to a State, as recognized by the Executive— need be deemed "persons *in [that] State*," *id.* amend. XIV, § 2 (emphasis added). And because the word "inhabitants" is sufficiently indeterminate, the Supreme Court has recognized that the term confers significant discretion on the Executive to make legal determinations about the "usual residence" of an individual without treating his physical presence in a particular jurisdiction (or lack thereof) as dispositive. *See Franklin*, 505 U.S. at 804-06.

This well-established framework plainly forecloses Plaintiffs' facial challenge to the Presidential Memorandum. For Plaintiffs to succeed, they must establish that the Constitution requires including *all* illegal aliens in the apportionment base. But that is obviously incorrect. To give just one example, nothing in the Constitution requires that illegal aliens residing in a detention facility after being arrested while crossing the border must be accounted for in the allocation of Representatives (and hence political power). This is fatal to Plaintiffs' Motion.

### 1. Only "Inhabitants" Who Have Their "Usual Residence" in a State Need Be Included in the Apportionment.

As the Supreme Court has explained, "'[u]sual residence,' was the gloss given the constitutional phrase 'in each State' by the first enumeration Act [of 1790] and has been used by the Census Bureau ever since to allocate persons to their home States." *Franklin*, 505 U.S. at 804. The Act also uses "other words [ ] to describe the required tie to the State: 'usual place of abode,' [and] 'inhabitant[.]'"

*Id.* at 804-05.  These terms "can mean more than mere physical presence, and [have] been used broadly enough to include some element of allegiance or enduring tie to a place."  *Id.*

The settled understanding that only "inhabitants" who have their "usual residence" in the country must be counted stems from the drafting history of the Apportionment Clause.  In the draft Constitution submitted to the Committee of Style, the Apportionment Clause required "the Legislature [to] regulate the number of representatives by the number of *inhabitants*."  2 The Records of the Federal Convention of 1787, at 566, 571 (Max Farrand ed., rev. ed. 1966) (emphasis added).  The Committee of Style changed the language to provide that "Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons."  U.S. Const. art. I, § 2, cl. 3.  But "the Committee of Style 'had no authority from the Convention to alter the meaning' of the draft Constitution," *Utah v. Evans*, 536 U.S. 452, 475 (2002), and the Supreme Court has thus found it "abundantly clear" that, under the original Clause, apportionment "should be determined solely by the number of the State's inhabitants," *Wesberry v. Sanders*, 376 U.S. 1, 13 (1964); *see also Franklin*, 505 U.S. at 804-05 (observing that "the first draft" of the Apportionment Clause "used the word 'inhabitant,' which was omitted by the Committee of Style in the final provision").

Historical sources confirm this reading.  In *The Federalist*, James Madison repeatedly explained that apportionment under the new Constitution would be based on a jurisdiction's "inhabitants."  *See The Federalist* No. 54, at 369 (Jacob E. Cooke ed., 1961) (observing that "the aggregate number of representatives allotted to the several States[] is to be determined by a federal rule founded on the aggregate number of inhabitants"); *The Federalist* No. 56, at 383 (noting that the Constitution guarantees "a representative for every *thirty thousand inhabitants*"); *The Federalist* No. 58, at 391 (noting that the Constitution mandates a "readjust[ment] from time to time [of] the apportionment of representatives to the number of inhabitants"); *see also Evenwel v. Abbott*, 136 S. Ct. 1120, 1127 (2016) ("'[T]he basis of representation in the House was to include all inhabitants" (emphasis omitted)).

Similarly, as the Supreme Court recognized, the first enumeration Act of 1790—titled "an act providing for the enumeration of the inhabitants of the United States"—directed "the marshals of the several districts of the United States" to count "the number of the inhabitants within their respective districts." Act of Mar. 1, 1790, § 1, 1 Stat. 101, 101; *see Franklin*, 505 U.S. at 803-05 (relying on the Census Act of 1790 to apply the Apportionment Clause).

This understanding of "usual residence" and "inhabitant" was enshrined in the constitutional text and incorporated by historical practice when the Fourteenth Amendment's Apportionment Clause was ratified almost 80 years later.  According to Representative Roscoe Conkling, a member of the committee that drafted the Fourteenth Amendment, the operative Apportionment Clause's streamlined language—requiring apportionment based on "the whole number of persons in each State"—was meant to fully include former slaves in the apportionment base and otherwise "adhere[] to the Constitution as it is."  Cong. Globe, 39th Cong., 1st. Sess. 359 (1866).  The Amendment's text confirms that understanding: it underscores that a person who possesses sufficient ties to a State will be included by specifying that "the persons *in each State*" must be counted, U.S. Const. amend. XIV, § 2 (emphasis added)—a phrase that the Supreme Court later explained to be equivalent to the term "inhabitant."  *Franklin*, 505 U.S. at 804-05.  Indeed, the very next sentence of section 2 of the Fourteenth Amendment equates "persons in each State" with "inhabitants" by penalizing in the apportionment any State that denies the right to vote to the "male inhabitants of such State" who would otherwise be eligible to vote (principally by reason of citizenship and age).  *Id.*  Unsurprisingly, the first census after ratification of the Fourteenth Amendment was conducted in accordance with the same procedures that had been used for the 1850 census, *see* Act of May 6, 1870, ch. 87, § 1, 16 Stat. 118, 118, which, in turn had required  "all [States'] inhabitants to be enumerated," Act of May 23, 1850, ch. 11, § 1, 9 Stat. 428, 428; *see also Franklin*, 505 U.S. at 804 ("'Usual residence,' was the gloss given the constitutional phrase 'in each State' by the first enumeration Act [of 1790] and has been used by the Census Bureau ever since to allocate persons to their home States.").

Reading the Apportionment Clause to contemplate apportionment of Representatives based on "inhabitants" (or "usual residents") also helps explain the historical exclusion of certain people

from the apportionment base.  For example, transient aliens, such as those temporarily residing here for vacation or business, are not included in the apportionment base. *See, e.g.*, *Final 2020 Census Residence Criteria and Residence Situations*, 83 Fed. Reg. 5,526, 5,533 (2018) (Residence Criteria); Dennis L. Murphy, Note, *The Exclusion of Illegal Aliens from the Reapportionment Base: A Question of Representation*, 41 CASE W. RES. L. REV. 969, 980 (1991).  That makes sense, as such aliens were not considered "usual residents" or "inhabitants" either at the Founding or the ratification of the Fourteenth Amendment.  As contemporaneous sources using the term make clear, to qualify as an "inhabitant," one had to, at a minimum, establish a fixed residence within a jurisdiction and intend to remain there.  *See, e.g.*, *Bas v. Steele*, 2 F. Cas. 988, 993 (Washington, Circuit Justice, C.C.D. Pa. 1818) (No. 1088) (concluding that a Spanish subject who had remained in Philadelphia as a merchant for four months before seeking to leave, "was not an inhabitant of this country, as no person is an inhabitant of a place, but one who acquires a domicil there").[8]

Likewise, foreign diplomats stationed overseas arguably remained "inhabitants" of their native countries rather than of their diplomatic posts.  *See Franklin*, 505 U.S. at 805 (confirming that American diplomat stationed overseas could still qualify as an "inhabitant" who is "in" his home State for

---

[8]  *See also, e.g, Hylton v. Brown*, 12 F. Cas. 1123, 1129 (Washington, Circuit Justice, C.C.D. Pa. 1806) (No. 6,981) (charging jury while riding circuit that a particular individual "was no more an inhabitant of this state than I am, who spend one-third of each year in this city; or any other person, who comes here to transact a certain piece of business, and then returns to his family"); *Toland v. Sprague*, 23 F. Cas. 1353, 1355 (C.C.E.D. Pa. 1834) (No. 14,076) (distinguishing an "inhabitant" from a "transient passenger"); *United States v. Laverty*, 26 F. Cas. 875, 877 (D. La. 1812) (No. 15,569A) ("An inhabitant is one whose domicile is here, and settled here, with an intention to become a citizen of the country."); *United States v. The Penelope*, 27 F. Cas. 486, 489 (D. Pa. 1806) (No. 16,204) ("[T]he following has always been my definition of the words 'resident,' or 'inhabitant,' which, in my view, mean the same thing. 'An inhabitant, or resident, is a person coming into a place with an intention to establish his domicil, or permanent residence; and in consequence actually resides … .'"); 41 Annals of Cong. 1595 (1824) (referring to "the common acceptation" of "inhabitant" as "the persons whose abode, living, ordinary habitation, or home" is within a particular jurisdiction); Thomas Dyche & William Pardon, *A New General English Dictionary* (16th ed. 1781) ("a person that resides or ordinarily dwells in a place or home"); 1 & 2 Samuel Johnson*, A Dictionary of the English Language s. v.* abode, inhabitant, reside, residence, resident (6th ed. 1785) (a "[d]weller," or one who "lives or resides" in a place, with the terms "reside," "residence," and "resident" defined with reference to an "abode"—*i.e.*, a "continuance in a place"); Noah Webster, *American Dictionary of the English Language* (1828) (defining "inhabitant" as a "dweller; one who dwells or resides permanently in a place, or who has a fixed residence, as distinguished from an occasional lodger or visitor").

purposes of "the related context of congressional residence qualifications"); Emer de Vattel, *The Law of Nations*, ch. 19, § 213 (1817) (explaining that diplomats could not qualify as "inhabitants" because "the envoy of a foreign prince has not his settlement at the court where he resides"). And unsurprisingly, foreign diplomatic personnel living on embassy grounds have previously been excluded from the apportionment base. Murphy, *supra*, at 980.

Tourists and diplomats may be "persons" within a State's boundaries at the time of the Enumeration, but no one seriously contends that they must be included in the apportionment base under the Constitution. Physical location does not, in short, necessarily dictate whether one is an "inhabitant" (or "usual resident") of a particular jurisdiction.

## 2. The Executive Has Significant Discretion to Define Who Qualifies as an "Inhabitant."

Crucially, the term "inhabitant"—and the concept of "usual residence"—is sufficiently ambiguous to give Congress, and by delegation the Executive, significant discretion to define the contours of "inhabitants" for apportionment purposes. That discretion is rooted in the Constitution. Article I provides that apportionment numbers are determined by an "actual Enumeration" performed every 10 years "in such Manner as" Congress "shall by Law direct." U.S. Const. art. I, § 2, cl. 3; *see also id.* amend. XIV, § 5 (giving Congress the power to "enforce, by appropriate legislation, the provisions of" the Fourteenth Amendment, including the operative Apportionment Clause). This "text vests Congress with virtually unlimited discretion in conducting the 'actual Enumeration,' [and] … [t]hrough the Census Act, Congress has delegated its broad authority over the census to the Secretary." *Wisconsin v. City of New York*, 517 U.S. 1, 19 (1996) (citations omitted). But the Secretary is not the final word on apportionment, and indeed is not the one responsible for determining the apportionment base. Instead, by statute, the Secretary must report census numbers to the President. *See* 13 U.S.C. § 141(b). And it is the President, then, who "transmit[s] to the Congress a statement showing the whole number of persons in each State, excluding Indians not taxed, as ascertained under the seventeenth and each subsequent decennial census of the population, and the number of Representatives to which each State would be entitled under an apportionment of the then existing

number of Representatives." 2 U.S.C. § 2a(a). In doing so, the President has full "authority to direct the Secretary in making policy judgments that result in 'the decennial census'; he is not expressly required to adhere to the policy decisions reflected in the Secretary's report." *Franklin*, 505 U.S. at 799. So "the Secretary cannot act alone; she must send her results to the President, who makes the calculations and sends the final apportionment to Congress." *Id.* at 800. That "final act" by the President is "not merely ceremonial or ministerial," but remains "important to the integrity of the process." *Id.* Indeed, it is "the President's personal transmittal of the report to Congress" that "settles the apportionment" of Representatives among the States. *Id.* at 799.

Of course, the Executive's decisions in this area must be "consonant with … the text and history of the Constitution," *Franklin*, 505 U.S. at 806, but the term "inhabitants"—and the concept of "usual residence"—are sufficiently indeterminate to give him significant discretion within constitutional bounds. *See id.* at 804-06 (discussing how the notion of "usual residence" has been applied differently over time). Indeed, Madison himself acknowledged that the word "inhabitant" was "vague" in discussing the House Qualifications Clause. 2 The Records of the Federal Convention of 1787, at 216-17; *cf. Franklin*, 505 U.S. at 805 (in the course of applying the Apportionment Clause, drawing on Madison's interpretation of the "term 'inhabitant'" in "the related context of congressional residence qualifications"). As noted, historical evidence confirms that the term "inhabitant" was understood to require, at a minimum, a fixed residence within a jurisdiction and intent to remain there. *See supra* at 30 n.8. Moreover, Founding-era sources also reflect that, especially with respect to aliens, the term could be understood to further require a sovereign's permission to enter and remain within a given jurisdiction. *See, e.g., The Venus*, 12 U.S. (8 Cranch.) 253, 289 (1814) (Marshall, C.J., concurring in part and dissenting in part) (quoting Vattel for the proposition that "inhabitants, as distinguished from citizens, are strangers who are *permitted* to settle and stay in the country" (emphasis added)); *The Federalist* No. 42, at 285 (Madison) (discussing provision of the Articles of Confederation that required every State "to confer the rights of citizenship in other States … upon any whom *it may allow to become inhabitants* within its jurisdiction" (emphasis added)).

Accordingly, the Executive has wide discretion to make legal determinations about who does and does not qualify as an "inhabitant" for purposes of inclusion in or exclusion from the apportionment base. In *Franklin*, for example, the Supreme Court held that the Executive Branch could allocate over 900,000 military personnel living overseas to their home States on the basis of the Secretary's judgment that such people "had retained their ties to the States." 505 U.S. at 806. That allocation "altered the relative state populations enough to shift a Representative from Massachusetts to Washington"—and had not been used "until 1970," save for a "one-time exception in 1900." *Id.* at 791-93. Nevertheless, as the Court explained, even though the recent approach was "not dictated by" the Constitution, it was "consonant with [its] text and history" and thus a permissible "judgment" within the Executive Branch's discretion, even where Congress had not expressly authorized this practice. *Id.* at 806. In the course of reaching this judgment, the Court also listed a number of other legal determinations of usual residency that the Executive Branch has permissibly chosen to use over the years—including determinations the Census Bureau has since abandoned. For example, "up until 1950, college students were counted as belonging to the State where their parents resided, not to the State where they attended school," and at the time the case was decided, "[t]hose persons who are institutionalized in out-of-state hospitals or jails for short terms [were] also counted in their home States." *Id.* Under the current Residence Criteria, however, college students who live at school during the academic year and prisoners housed in out-of-state jails, even for the short term, are counted in the State in which those institutions are located. Residence Criteria, 83 Fed. Reg. at 5,534, 5,535.

Plaintiffs have never challenged the Residence Criteria in court. To the contrary, they intervened to defend it *against* challenge in another case. *See Alabama v. Dep't of Commerce*, No. 18-cv-772 (N.D. Ala.), Mot. to Intervene, ECF No. 97 at 15 (Aug. 12, 2019). Plaintiffs' ongoing defense of the Residence Criteria suggests that not even they dispute that the Executive has discretion to define "inhabitant" and to determine who meets its strictures. *See Franklin*, 505 U.S. 804-06. Nor can they, given constitutional text, history, and Supreme Court precedent. The Presidential Memorandum is no different insofar as it reflects the Executive Branch's discretionary decision to direct the Secretary in making policy judgments that result in the decennial census. *Franklin*, 505 U.S. at 799.

3.    **The Apportionment Clause Does Not Require Inclusion of All Illegal Aliens as "Inhabitants" Having a "Usual Residence" in a State.**

Plaintiffs maintain that the Presidential Memorandum facially violates the Apportionment Clause because *all* illegal aliens necessarily qualify as "persons in each State," and because the Memorandum contemplates the exclusion of such aliens—in some as-yet unknown number—for apportionment purposes.  Put differently, Plaintiffs posit that the Constitution prohibits the exclusion of *any* illegal alien from the apportionment base, and that the Memorandum's announcement of that possibility violates the Apportionment Clause.  But none of the constitutional constraints on the Executive's discretion to define the contours of "inhabitants" or "usual residence" require including *all* illegal aliens in the apportionment.

For example, if the Census Bureau finds it feasible to identify unlawfully present aliens who resided in a Customs and Border Patrol (CBP) or Immigration and Customs Enforcement (ICE) facility within a State on census day after being arrested while illegally entering the country, it would be permissible to exclude them.  Such individuals—like alien tourists who happen to be staying in the country for a brief period on and around census day—cannot reasonably be said to have established "the required tie to [a] State," *Franklin*, 505 U.S. 804, or to be "inhabitants" under any definition of that term.[9]

Likewise, if feasibly identified, the Executive may exclude aliens who have been detained for illegal entry and paroled into the country pending removal proceedings, or who are subject to final

_____

[9] These populations may be significant.  During fiscal year 2019, ICE held in custody an average daily population of 50,165 aliens.  U.S. ICE ERO, *U.S. Immigration and Customs Enforcement Fiscal Year 2019 Enforcement and Removal Operations Report*, at 5 (2019) (ICE ERO Report), https://www.ice.gov/sites/default/files/documents/Document/2019/eroReportFY2019.pdf.  And on any given day in the summer of 2019, CBP held in custody between 8,000 and 12,000 detainees.  *U.S. Customs and Border Protection – Border Patrol Oversight: Hearing Before the H. Subcomm. on Homeland Security of the Comm. on Appropriations*, 116th Cong. (2019) (testimony of Carla L. Provost, Chief, U.S. Border Patrol), https://docs.house.gov/meetings/AP/AP15/20190724/109834/HHRG-116-AP15-Wstate-ProvostC-20190724.pdf.

orders of removal.[10]   Such aliens do not have enduring ties to any State sufficient to become "inhabitants" with their "usual residence" in the United States.  The government has either allowed them into the country solely conditionally while it is deciding whether they should be removed, or has conclusively determined that they must be removed from the country.  In *Kaplan v. Tod*, 267 U.S. 228 (1925), for instance, the Supreme Court addressed the case of an alien minor who had been denied entry at Ellis Island in 1914 but could not be returned to Russia during the First World War and was therefore paroled into the country to live with her father in 1915.  When the case reached the Supreme Court almost ten years later in 1925, it turned entirely on the question whether the alien minor had been "dwelling in the United States" or had "begun to reside permanently" in the United States for purposes of federal immigration statutes, which would have conferred derivative citizenship on her upon her father's naturalization in 1920.  *Id.* at 230.  The Court held that, during her parole, she "never has been dwelling within the United States" and "[s]till more clearly she never has begun to reside permanently in the United States."  *Id.*  As the Court explained, she "could not lawfully have landed in the United States" because she fell within an inadmissible category of aliens, and "until she legally landed [she] 'could not have dwelt within the United States.'"  *Id.* (quoting *Zartarian v. Billings*, 204 U.S. 170, 175 (1907)).  In the Court's view, she was in "the same" position as an alien "held at Ellis Island for deportation."  *Id.* at 230; *see also, e.g.*, *Leng May Ma v. Barber*, 357 U.S. 185, 190 (1958) (holding that parole cannot affect an alien's status and does not place an alien "legally 'within the United States'").  Indeed, the Supreme Court recently reaffirmed that "aliens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are 'treated' for due process purposes 'as if stopped at the border,'" and that the same principle applies to those detained "shortly after unlawful entry."  *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020).

---

[10] ICE's non-detained docket surpassed 3.2 million cases in fiscal year 2019, a population large enough to fill more than four congressional districts under the 2010 apportionment.  ICE ERO Report at 10; Kristin D. Burnett, *Congressional Apportionment*, U.S. Census Bureau (Nov. 2011), https://www.census.gov/prod/cen2010/briefs/c2010br-08.pdf.  The non-detained docket includes aliens who are both pre- and post-final order of removal, and who have been released on parole, bond, an order of recognizance, an order of supervision, or who are in process for repatriation.  ICE ERO Report at 10.

Plaintiffs emphasize that Framers of both the original Apportionment Clause and the Fourteenth Amendment intended to include aliens in the apportionment base. Dkt. 77, at 16; *see id.* at 13-17. But Plaintiffs' historical evidence about the treatment of aliens does not and cannot resolve the distinct question whether *illegal* aliens must be included—for the simple reason that there were no federal laws restricting immigration (and hence no illegal aliens) until 1875. *See Kleindienst v. Mandel*, 408 U.S. 753, 761 (1972). And Plaintiffs provide no evidence to support the proposition that by employing the concepts of "inhabitants" and "usual residence," the Framers of either the original Constitution or Fourteenth Amendment were understood to have bound future generations to allocate political power on the basis of aliens living in the country in violation of federal law. To the contrary, as the Supreme Court has explained, the Framers understood the "fundamental proposition[]" that the "power to admit or exclude aliens is a sovereign prerogative." *Thuraissigiam*, slip op. at 35.[11] This "ancient principle[] of the international law of nation-states" is necessary to the sovereign's rights to define the polity ("the people") that make up the nation and to preserve itself, as both the Supreme Court and 19th-century international law scholars recognized.[12] It is fundamentally

---

[11] *See also, e.g.*, *Landon v. Plasencia*, 459 U.S. 21, 32 (1982); *Chae Chan Ping v. United States*, 130 U.S. 581, 604 (1889); *Fong Yue Ting v. United States*, 149 U.S. 698, 711 (1893).

[12] *Kleindienst v. Mandel*, 408 U.S. 753, 765 (1972); *see, e.g.*, *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892) ("It is an accepted maxim of international law, that every sovereign nation has the power, as inherent in sovereignty, and essential to self- preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe.") (citing Vattel and Phillimore); Vattel, *The Law of Nations*, bk. 2, §§ 94, 100 (explaining that the sovereign's authority to "forbid the entrance of his territory either to foreigners in general, or in particular cases," "flow[ed] from the rights of domain and sovereignty"); 1 Robert Phillimore, *Commentaries Upon International Law*, ch. 10, § CCXIX (1854) (similar); *see also, e.g.*, *Bernal v. Fainter*, 467 U.S. 216, 221 (1984) ("The exclusion of aliens from basic governmental processes is not a deficiency in the democratic system but a necessary consequence of the community's process of political self-definition. Self-government, whether direct or through representatives, begins by defining the scope of the community of the governed and thus of the governors as well: Aliens are by definition those outside of this community."); *Chae Chan Ping*, 130 U.S. at 603–04 (recognizing that a sovereign's power to "exclude aliens from its territory" is "an incident of every independent nation" and is "part of its independence," and "[i]f it could not exclude aliens it would be to that extent subject to the control of another power"); *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812) (Marshall, C.J.) ("The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself. Any restriction upon it, deriving validity from an

antithetical to those elementary principles to say, as Plaintiffs do, that illegal aliens can arrogate to themselves the right to redistribute "political power" within this polity by flouting the sovereign power of the United States to define who can enter and become part of the polity.  Pls.' Br. 10, 41, 51. Rejecting Plaintiffs' approach is certainly "consonant with" with the terms and history of the Fourteenth Amendment.  *Franklin*, 505 U.S. at 806.

If anything, the debates over the Fourteenth Amendment on which Plaintiffs rely indicate that the rationale the Framers offered for including aliens in the apportionment base do not apply to illegal aliens.  Specifically, various legislators made clear that unnaturalized aliens should be included in the apportionment base precisely because the law provided them with a direct pathway to citizenship— mainly, an oath of loyalty and five years of residence in the United States, *see* Act of Apr. 14, 1802, 2 Stat. 153.  As Representative Conkling pointed out, "[t]he political disability of aliens was not for this purpose counted against them, *because it was certain to be temporary*, and they were admitted at once into the basis of apportionment."  Cong. Globe, 39th Cong., 1st Sess., at 356 (1866) (emphasis added); *see also, e.g.*, *id.* at 3035 (Senator Henderson explaining that "[t]he road to the ballot is open to the foreigner; it is not permanently barred").  Indeed, the five-year residency requirement meant that aliens could "acquire [the vote] in the current decade"—and thus unnaturalized aliens could be voting citizens before the next apportionment.  *Id.* at 354 (Representative Kelley).  And even an opponent of the inclusion of aliens in the apportionment agreed that unnaturalized aliens were on "a short period of probation—five years; and in most of the states the great body of them are promptly admitted to citizenship."  *Id.* at 2987 (Sen. Sherman).  That rationale plainly does not extend to illegal aliens, who generally are prohibited by law from becoming citizens and are subject to removal.  8 U.S.C. §§ 1182(a)(9), 1227(a), 1255(a) & (c), 1427(a).

Plaintiffs are also wrong in arguing that *Plyler v. Doe*, 457 U.S. 202 (1982), requires the inclusion of illegal aliens in the apportionment base.  Dkt 77, at 12.  *Plyler* held only that illegal aliens are "persons

---

external source, would imply a diminution of its sovereignty to the extent of the restriction, and an investment of that sovereignty to the same extent in that power which could impose such restriction.").

within the jurisdiction" of a State for purposes of the Equal Protection Clause, 457 U.S. at 210, which is inapposite here.  In contrast to the Apportionment Clause, the Equal Protection Clause has never been understood to be limited to "inhabitants" or "usual residents" of a State.  That is why no one seriously contends that alien tourists visiting the United States should be included in the apportionment base, even though they are undoubtedly "persons" protected by the Equal Protection Clause.  *See also Mathews v. Diaz*, 426 U.S. 67, 78 (1976) ("The fact that all persons, aliens and citizens alike, are protected by the Due Process Clause does not lead to the further conclusion that all aliens are entitled to enjoy all the advantages of citizenship or, indeed, to the conclusion that all aliens must be placed in a single homogeneous legal classification.").

Indeed, Plaintiffs' reading of *Plyler*—that *all* illegal aliens must be included in the apportionment—is at odds with history and precedent.  Likewise, Plaintiffs' reliance on a redistricting decision, *Evenwel v. Abbott*, for the proposition that "the basis of representation in the House was to include all inhabitants," 136 S. Ct. 1120, 1127 (2016); Pls.' Br. 14, does not dispose of this case as Plaintiffs contend, but rather begs the central question here as to the limits on how "inhabitant" may be defined.  Nothing in the terms "inhabitants" or "usual residence" suggests that this concept covers all illegal aliens.  Rather, as noted above, the Supreme Court has observed that the term "'[u]sual residence' … has been used broadly enough to include some element of allegiance or enduring tie to a place."  *Franklin* 505 U.S. at 804.  In addition, the Founding generation was aware that the term "inhabitant" could be understood to require that an alien be given *permission* to settle and stay in a jurisdiction according to the definition provided by Vattel, whom the Supreme Court has extolled as the "founding era's foremost expert on the law of nations."  *Franchise Tax Board v. Hyatt*, 139 S. Ct. 1485, 1493 (2019); *see* 1 Vattel, *The Law of Nations* ch. 19, § 213 (defining "inhabitants, as distinguished from citizens," as "foreigners, who are permitted to settle and stay in the country").[13]  And in *Kaplan*,

---

[13]  As the Supreme Court has observed: "The international jurist most widely cited in the first 50 years after the Revolution was Emmerich de Vattel.  In 1775, Benjamin Franklin acknowledged receipt of three copies of a new edition, in French, of Vattel's Law of Nations and remarked that the book 'has been continually in the hands of the members of our Congress now sitting.'"  *U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 463 n.12 (1978) (ellipsis and citations omitted omitted).

the Supreme Court held that an alien who had not effected a lawful entry into the country could not be characterized as "dwelling" in the country under the latest version of a naturalization law dating from 1790 that had conditioned derivative citizenship for certain aliens on their "dwelling" in the United States—a concept linked with "inhabitants" since the Founding Era. 267 U.S. at 230; *see* Act of Mar. 26, 1790, § 1, 1 Stat. 103, 104. Illegal aliens, however, are necessarily limited in claiming that they have "enduring ties" to, or are "dwelling" in, this country, because as a matter of law they may be removed from the country at any time. *See also Gonzalez v. Holder*, 771 F.3d 238, 245 (5th Cir. 2014) (applying *Kaplan* to an alien who "entered the United States at the age of seven, albeit illegally, and … remained in the country" for 16 years); *U.S. ex rel. De Rienzo v. Rodgers*, 185 F. 334, 338 (3d Cir. 1911) (explaining that an alien "cannot begin" to "reside permanently" in the United States "if he belongs to a class of aliens debarred from entry into the country by the act to regulate the immigration of aliens into the United States").

Ultimately, however, it is neither necessary nor appropriate for this Court to resolve whether any particular category of illegal aliens must be deemed "inhabitants" for purposes of the apportionment. In order to prevail on this facial challenge to the Presidential Memorandum, Plaintiffs must establish that there is *no* category of illegal aliens that may be lawfully excluded from the apportionment. *See, e.g., Deshawn E v. Safir*, 156 F.3d 340, 347 (2d Cir. 1998) ("A facial challenge will only succeed if there is no set of circumstances under which the challenged practices would be constitutional."). Plaintiffs have not, and indeed cannot, make that showing. Rather than facing that question, Plaintiffs divert attention by asking the Court to decide a much different question—and more than is necessary to resolve this case—by seeking a holding that the Apportionment Clause would prohibit the exclusion of all categories of aliens. That question is not properly presented here. The Presidential Memorandum states that it will be the policy of the United States "to exclude from the apportionment base aliens who are not in a lawful immigration status under the Immigration and Nationality Act, as amended (8 U.S.C. 1101 et seq.), to the *maximum extent feasible and consistent with the discretion delegated to the executive branch.*" 85 Fed. Reg. at 44,679 (emphasis added). And Plaintiffs have rushed to Court before the Census Bureau has determined which illegal aliens it may be "feasible" to

exclude, before the Census Bureau has reported any numbers to the Secretary, before the Secretary has reported any numbers to the President, and before the President has reported any numbers to Congress. Accordingly, this Court need not and should not resolve whether the Apportionment Clause necessarily *excludes* or *includes* any particular category of illegal aliens from the apportionment base. Rather, for Plaintiffs to prevail, they must establish that there is *no* category of illegal aliens that could ever be excluded. They cannot do so.

### E.     Plaintiffs Have Failed to State an *Ultra Vires* or "Separation of Powers" Claim

Plaintiffs posit that "[b]y requiring the exclusion of undocumented immigrants from the statutory phrases 'total population' and 'whole number of persons in each State,' the Memorandum directs the President and the Secretary of Commerce to perform unlawful, *ultra vires* actions." Pls.' Br. at 29. NGO Plaintiffs also allege that the President has violated the Constitution's separation-of-powers principle because Congress "delegated authority over the census to the *Commerce Secretary*, not the *President*." *See* NGO Pls.' FAC ¶¶ 222–36. However characterized, these claims fail. Like every other census and apportionment conducted under 13 U.S.C § 141 and 2 U.S.C. § 2a, the Memorandum fully complies with powers delegated by Congress under this statutory scheme.

Nothing in the statutory language of "total population," 13 U.S.C. § 141(b), or "whole number of persons in each State," 2 U.S.C. § 2a(a), requires counting every person physically present on Census Day, even if they lack "usual residence" in the United States.[14] It is, of course, true that "the word 'person' in § 2a makes no distinction based on citizenship or immigration status." Pls.' Br. at 29. And no one disputes that aliens (legal or illegal) are "persons." *Cf. Plyler v. Doe*, 457 U.S. 202 (1982). But § 2a does not reference only "persons"; it tracks the Fourteenth Amendment's text mandating apportionment based on the "whole number of persons *in each State*." 2 U.S.C. § 2a(a) (emphasis

---

[14]   Everyone seems to agree that the Executive may lawfully *exclude* individuals from the enumeration and apportionment if they do not have a "usual residence" or "enduring tie" to a State. *See* Section III.E, *supra*; Pls.' Br. at 23 ("[T]emporary visitors are not included in the apportionment base precisely because the United States is not their 'usual residence.'"); Br. of *Amici Curiae* Historians at 11, ECF No. 105-1 ("The rationale for excluding [ ] limited categories of noncitizens is clear and entirely consistent with the Framers' intent, and longstanding census practice, to count all persons *residing* in the United States.").

added).  So while Plaintiffs argue that Congress is "presumed to legislate with familiarity of the legal backdrop for its legislation," Pls.' Br. at 30 (quoting *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 114 (2d Cir. 2017)), that legal backdrop only *supports* the exclusion of individuals from apportionment if they do not have a "usual residence" in the United States.  *Franklin*, 505 U.S. at 804; *accord* Pls.' Br. at 30 (arguing that when "Congress used the materially same language in a statute it . . . intended for [the language] to retain its established meaning" (quoting *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1762 (2018)); *id.* at 32 (contending that "2 U.S.C. § 2a, has always been understood to include people who *reside* in a particular State" (emphasis added)).  That is why no apportionment conducted under the Census Act has included literally everyone physically present in the country.  *See* Br. of *Amici Curiae* Historians at 10 ("This 'usual residence rule' is consistent with the Framers' repeated emphasis on counting 'inhabitants' on United States soil . . . and has remained the guiding principle for census-taking for 230 years.").  Just as the Memorandum does not violate the Constitution merely by contemplating the exclusion of some as-yet-unknown number of illegal aliens for lack of "usual residence," neither does it violate the identical language of § 2a.[15]  *See* Section III.E, *supra*.

Nor does it matter that the President is making an independent choice in the apportionment process.  While the apportionment calculation itself—feeding numbers into a mathematical formula known as the "method of equal proportions"—is "admittedly ministerial," there is nothing "ministerial" about the President's role in obtaining the numbers used in that formula.  *Franklin*, 505 U.S. at 799 (explaining that "the admittedly ministerial nature of the apportionment calculation itself does not answer the question [of] whether the apportionment is foreordained by the time the Secretary

---

[15]  This "usual residence" approach is consistent with the approach taken in the Census Bureau's 2018 Residence Criteria, which Plaintiffs are currently defending in other litigation and touting here.  *See* Section III.E, *supra*; Pls.' Br. at 31–32.  As with every census, the Census Bureau always planned to exclude some people from the 2020 Census without a "usual residence" in a particular State.  *See Final 2020 Census Residence Criteria and Residence Situations*, 83 Fed. Reg. 5525, 5526 (Feb. 8, 2018).

gives her report to the President"). To the contrary, "§ 2a does not curtail the President's authority to direct the Secretary in making policy judgments that result in 'the decennial census.'" *Id.*[16] And that is exactly what the President has done here: direct the Secretary to report two sets of numbers, of which the President will choose one to plug into the "method of equal proportions. *See* 2 U.S.C. § 2a(a); 85 Fed. Reg. at 44,680.

Plaintiffs' position is incompatible with the Supreme Court's view of the President's role as more than "merely ceremonial or ministerial." *Compare* Pls.' Br. 32, 36–37 *with Franklin*, 505 U.S. at 789. "[I]t is the President's personal transmittal of the report to Congress" that "settles the apportionment" of Representatives, making the President "important to the integrity of the process." *Franklin*, 505 U.S. at 799–800. Plaintiffs' attempt to reduce the President to mere statistician cannot be squared with the Supreme Court's holding that § 2a contemplates his exercise of substantial discretion.[17]

Plaintiffs also seek to contravene Supreme Court precedent (and 230 years of history) by arguing that the numbers used for apportionment must be derived solely from individual responses

---

[16] Other courts since *Franklin* have likewise understood that § 2a allows the President to perform a significant role beyond the mere "ministerial" calculation leading to reapportionment. *See Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852, 860 (4th Cir. 2002) (likening an EPA report to the Secretary's § 141(b) report because it "is advisory and does not trigger the mandatory creation of legal rules, rights, or responsibilities," allowing the President "to embrace or disregard" the Secretary's report); *Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993) (characterizing the Commerce Secretary's report to the President a "moving target" because "the President has statutory discretion to exercise supervisory power over the agency's action); *Alabama v. Dep't of Commerce*, 396 F. Supp. 3d 1044, 1055 (N.D. Ala. 2019) (noting that in fulfilling his responsibilities under § 2a, "the President is not necessarily bound to follow the Secretary's tabulation").

[17] Plaintiffs also seem to suggest that that the Memorandum is unlawful merely because the President has directed the Secretary to provide information about illegal aliens. *See, e.g.*, Pls.' Br. 29, 38. But that contention also fails. Article II empowers the President to supervise the conduct of subordinate officials like the Secretary, *see* U.S. Const., art. 2, § 1, and the Opinions Clause further empowers the President to "require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices," *id.*, art. 2, § 2, cl. 2. In *Franklin*, even the dissenting Justices acknowledged that § 2a "does not purport to limit the President's 'accustomed supervisory powers' over the Secretary of Commerce." 505 U.S. at 813 n.11 (Stevens, J., dissenting). So Plaintiffs cannot preclude the President from obtaining information from the Secretary, nor the Secretary from providing it.

to the census questionnaire.  *See* Pls.' Br. at 33–36.  But the census has *never* tallied the total number of "usual residents" based only on questionnaire responses.  In fact, for the first 170 years of American census taking, no census questionnaire existed because all enumeration was done in person.  *See New York v. Dep't of Commerce*, 351 F. Supp. 3d 502, 520 (S.D.N.Y.) (Furman, J.), *aff'd in part, rev'd in part and remanded,* 139 S. Ct. 2551 (2019).   And for the 2020 Census, individuals have been, and will be, enumerated through (1) census-questionnaire responses online, by mail, or by phone; (2) in-person visits by enumerators; (3) "proxy" responses given by those such as a neighbor or landlord; (4) high-quality administrative records from other federal agencies; and, as a last resort, (5) filling gaps in enumeration data by imputing other data from the same area.  *Id.* at 521.  In the citizenship-question litigation, Plaintiffs elicited extensive testimony on each of those enumeration methods, but never suggested that any of them violated the Census Act.  *See generally id.* at 572–626.  Indeed, the Supreme Court has *specifically approved* the use of purported "non-census data"—like administrative records and imputation—in apportionment without remotely hinting that either one was unlawful.  *Compare* Pls.' Br. at 35–36 (taking issue with the hypothetical use of administrative records from other federal agencies) *with Franklin*, 505 U.S. at 794–96, 803–06 (approving the Census Bureau's use of "home of record" information from Defense Department personnel files for apportionment) *and Utah v. Evans*, 536 U.S. 452, 457–59, 473–79 (2002) (approving the Census Bureau's use of "hot-deck imputation" for apportionment).

In any event, it is entirely premature for Plaintiffs to surmise that "the President will necessarily have to rely on information that is not contained within the census" if he is going to exclude some as-yet-unknown number of illegal aliens from apportionment.  Pls.' Br. at 35.  As discussed above, it is not yet known what numbers the Secretary will transmit to the President pursuant to the Presidential Memorandum.  *See supra* at 8.  And Plaintiffs cannot assume that those numbers will be derived from purported "non-census data.".

Put simply, Plaintiffs' attempt to manufacture an *ultra vires* or separation-of-powers claim detached from their Apportionment Clause claim is unavailing.  By delegation of the Census Act, the Executive stands in the shoes of Congress and may properly exclude individuals from apportionment

for lack of "usual residence"—just as he has done in every other apportionment calculated under the Census Act.

### F.      Plaintiffs' Demands for Relief Against the President Must Be Dismissed

Plaintiffs ask this court to enjoin the President from implementing the policy in the Presidential Memorandum, to issue a writ of mandamus to that effect, and to declare his policy decision unlawful.  *See* Gov't Pls.' Am. Compl. at 45 (Prayer for Relief ¶¶ 1-4, 7); NGO Pls.' Am. Compl. at 88 (Request for Relief ¶¶ (i)-(iv), (vi), (vii)).  As the Supreme Court has long recognized, however, federal courts cannot exercise injunctive authority over the President's discretionary policy judgments.  *See Mississippi v. Johnson*, 4 Wall 475, 501 (1867) (the judicial branch has "no jurisdiction of a bill to enjoin the President in the performance of his official duties").  This limitation reflects the respect due to the President's "unique position in the constitutional scheme."  *See Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27, 749-50 (1982) (declining to assume that implied damages "cause[s] of action run[] against the President").  In *Franklin*, the Supreme Court reaffirmed this constitutional principle.  *See* 505 U.S. at 802 (noting that "grant of injunctive relief against the President [] is extraordinary, and should have raised judicial eyebrows").   Plaintiffs may contend that their injunctive claims fit within a narrow exception that the Supreme Court potentially left open for injunctive claims that seek to direct the President to perform "ministerial" functions.  *See Franklin*, 505 U.S. at 802-03 (noting that *Mississippi v. Johnson* "left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty"); *see also Mississippi v. Johnson*, 4 Wall at 500 (defining "ministerial duty" as "one in respect to which nothing is left to discretion").

*Franklin*, however, forecloses that argument in this case.  Specifically, the Supreme Court recognized that under 2 U.S.C. § 2a, "the Secretary [of Commerce] cannot act alone"; instead, the President has the "authority to direct the Secretary in making policy judgments."  *Franklin*, 505 U.S. at 799-800.  This "clear[ly]" demonstrates Congress's belief that "it was important to involve a constitutional officer," *i.e.*, the President, "in the apportionment process."  *Id.* at 799.  The President's role and "duties" in the congressional apportionment process, therefore, "are not merely ceremonial or ministerial."  *Id.* at 800.

Put simply, even if *Franklin* and *Mississippi v. Johnson* could be read to allow injunctive claims seeking performance of purely ministerial functions, that possible exception has no application here—because the President's implementation of the Presidential Memorandum is part of his duties under 2 U.S.C. § 2a, which "are not merely ceremonial or ministerial."  Instead, *Franklin* applies squarely to Plaintiffs' injunctive claims against the President, and requires the dismissal of those claims.  505 U.S. at 802-03.

Moreover, and at a minimum, even if injunctive relief against the President in the performance of his statutory duties were theoretically available, *Franklin* makes clear that it "would require an express statement by Congress" authorizing such relief.  *Franklin*, 505 U.S. at 801.  Plaintiffs have identified no such "express statement" and none exists.

Finally, although declaratory relief claims against the President may be viable under existing Second Circuit law, *see Knight First Amendment Inst. v. Trump*, 928 F.3d 226 (2d Cir. 2018), other courts have questioned the appropriateness of such claims.  For example, the D.C. Circuit, following *Franklin*, has determined, "declaratory relief" against the President for his non-ministerial conduct "is unavailable."  *Newdow v. Roberts*, 603 F.3d 1002, 1012–13 (D.C. Cir. 2010).  This is because "a court—whether via injunctive or declaratory relief—does not sit in judgment of a President's executive decisions."  *Id.* at 1012 (emphasis added) (citing *Mississippi*, 71 U.S. at 499); *see also Doe 2 v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018) ("Sound separation-of-power principles counsel the Court against granting [injunctive and declaratory] relief against the President directly.").  Thus, "similar considerations regarding a court's power to issue [injunctive] relief against the President himself apply to [a] request for a declaratory judgment."  *Swan v. Clinton*, 100 F.3d at 973, 978 (D.C. Cir. 1996).

## IV.   PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY OR PERMANENT INJUNCTION

If the Court declines to dismiss Plaintiffs' claims, it should nonetheless deny Plaintiffs' request for the extraordinary relief of a permanent or preliminary injunction.

Although Plaintiffs seek partial summary judgment on their Apportionment Clause and *ultra vires* claims, they do not specify what remedy they wish to accompany that judgment.  Presumably,

however, Plaintiffs would have this Court enter, at minimum, a permanent injunction prohibiting Defendants "from excluding undocumented immigrants from the apportionment base following the 2020 Census, or taking any action to implement or further such a policy." NY FAC at 45, ¶ 4; *see* NGO FAC at 88, ¶¶ 3-4. Unlike the motion-to-dismiss context in which Plaintiffs' well-pleaded allegations are accepted as true, *Chamberlain Estate of Chamberlain v. City of White Plains*, 960 F.3d 100, 105 (2d Cir. 2020), the "extraordinary remedy" of an injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *City of Newburgh v. Sarna*, 690 F. Supp. 2d 136, 169 (S.D.N.Y. 2010) (contrasting the standing inquiry on a motion to dismiss with the "heavy burden of clearly establishing the 'actual and imminent' threat of irreparable harm" for an injunction). To obtain permanent injunctive relief, Plaintiffs bear the burden of demonstrating (1) that they have suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the parties, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

While Plaintiffs appear to understand that these factors are required to obtain a *preliminary* injunction, Pls.' Br. at 40, they fail to acknowledge that these same factors must be met to obtain permanent relief as well. Insofar as Plaintiffs believe they are entitled to any form of injunctive relief without satisfying other factors, they are incorrect. *Winter*, 555 U.S. at 32 ("An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course."); *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."); *Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254, 272 (2d 2011); *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006). As explained above, Plaintiffs' Apportionment Clause and *ultra vires* claims lack merit and their request for partial summary judgment and an injunction should be rejected for that reason alone. *Winter*, 555 U.S. at 32–33. Even if these

claims were meritorious, however, Plaintiffs could not satisfy the remaining factors, so they would not be entitled to either preliminary or permanent injunctive relief.

### A.       Plaintiffs Cannot Establish Any Imminent and Irreparable Harm

Most significantly, Plaintiffs fail to establish that they are "likely to suffer irreparable harm in the absence of preliminary relief."  *Winter*, 555 U.S. at 20; *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." (internal quotes and citations omitted; emphasis in original)).  To establish a likelihood of irreparable harm, a plaintiff "must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm."  *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted).  Because a preliminary injunction "is one of the most drastic tools in the arsenal of judicial remedies," *id.*, Plaintiffs' burden to show irreparable harm is necessarily higher than what is required to establish standing.  *See, e.g.*, *Mazurek*, 520 U.S. at 972.  Here, Plaintiffs fail this test at every step—and further fail to establish that the remaining injunction factors tilt in their favor.

#### 1.       Plaintiffs Cannot Establish Any Irreparable Apportionment Injury

Because Plaintiffs rushed to Court before the Secretary has implemented the Memorandum— and before any census enumeration has even been completed—Plaintiffs cannot show any imminent threat of apportionment injury.

As detailed above, it is currently unknown what numbers the Secretary may ultimately transmit to the President.  *See supra* at 8; Abowd Decl. ¶ 15.  Plaintiffs' expert declarations posit only that the *wholesale* exclusion of illegal aliens may cause certain states to lose a Congressional seat.  *See* Pls.' Br. at 49–50; *see generally* Warshaw Decl.  But those experts do not—and cannot—predict what apportionment injury any state might suffer from some hypothetical smaller exclusion, assuming a state suffers any injury at all.  Given that the Secretary of Commerce has not yet transmitted his report to the President, and the President has not yet transmitted any numbers to Congress, any effort to

predict the ultimate effect of the Memorandum on apportionment, or the resulting "political power of Plaintiffs' constituents," Pls.' Br. at 41, is entirely speculative.

More fundamentally, any purported apportionment injury that Plaintiffs could suffer is, as a legal matter, not irreparable. The Supreme Court has regularly decided census cases that, like this one, contest the relative apportionment of representatives post-apportionment, because an erroneous or invalid apportionment number can be remedied after the fact.[18] *See, e.g., Utah*, 536 U.S. at 462 (holding that post-apportionment redress is possible if the apportionment calculation contains an error); *see also Franklin*, 505 U.S. at 803 (finding that a post-apportionment order against the Secretary would provide redress for plaintiffs); *Dep't of Commerce v. Montana*, 503 U.S. 445-46 (1992); *Wisconsin v. City of New York*, 517 U.S. 1 (1996). Indeed, in *Wisconsin*, it was not until *six years* after the 1990 census that the Court resolved an apportionment dispute based on those results. This case is not different. As this Court noted in requesting the appointment of a three-judge panel pursuant to 28 U.S.C. § 2284, "the Presidential Memorandum does not purport to change the conduct of the census itself[;] [i]nstead, it relates the calculation of the apportionment base used to determine the number of representatives to which each state is entitled." ECF 68 at 2. Accordingly, this Court could order adequate relief after apportionment when any injury to Plaintiffs is known with certainty, assuming there is any at all. Indeed, the very fact that the Memorandum calls for the Secretary to report two numbers—one arrived at after the Census Bureau applies its Residency Criteria, and another reflecting the number of illegal aliens that the Secretary is able to identify—makes clear that a post-apportionment remedy would be easy to craft.

---

[18] The only census cases decided by the Supreme Court pre-apportionment involved challenges to the mechanics of conducting the census, which could not be undone post-apportionment. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019) (challenge to a citizenship question on the 2020 Census); *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999) (challenge to the use of statistical sampling in the census).

2.    **Plaintiffs' Allegations of Enumeration Injury Do Not Withstand Scrutiny**

Plaintiffs' alternative efforts to link the Memorandum to some ongoing enumeration injury fare no better.  As explained by Associate Director Fontenot, the Memorandum does *not* affect how the Census Bureau is conducting its remaining enumeration operations.  *See* Fontenot Decl. ¶¶ 7, 12; *see generally* Census Bureau, *Review of 2020 Operational Plan Schedule*, Aug. 17, 2020, https://2020census.gov/content/dam/2020census/materials/news/2020-operational-plan-schedule-review.pdf ("Operational Plan")  Those operations include a variety of protocols specifically designed over the course of the past decade to ensure that hard-to-count and minority communities— some of the core constituencies for which Plaintiffs advocate—are accurately reflected in the census. *See generally* Fontenot Decl. ¶¶ 11, 12; Operational Plan at 2-11 (describing non-response follow-up, and other efforts to achieve "acceptable level of accuracy and completeness, with a goal of resolving at least 99% of Housing Units in every state, comparable with previous censuses").[19]  Plaintiffs speculate that, notwithstanding these protocols, the Memorandum "and Defendants' corresponding public statements" will render the enumeration less accurate—purportedly by deterring immigrant communities from participating.  Pls. Br. at 42, 47.  But these claims suffer from at least three fundamental flaws, each of which seriously undermines the causation Plaintiffs are trying to establish.

a.    Plaintiff's Theory of Harm Relies on Attenuated Events Involving the Independent Actions of Third-Parties

*First*, as discussed in the standing section, Plaintiffs' theory for why the Memorandum may depress response rates relies on a highly attenuated chain of events.  Plaintiffs' expert, Dr. Barreto, opines that immigrant communities are less likely to respond to the census after the Memorandum because of how that Memorandum is discussed in the media and by community activists.   Barreto Decl. ¶¶ 15-16, 32.   But those independent actors' messages are the product of their own

---

[19] *See also 2020 Census Detailed Operational Plan for: 18. Nonresponse Followup Operation (NRFU)*, Apr. 16, 2018, https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/NRFU-detailed-operational-plan.pdf; *see also 2020 Census Research and Testing Management Plan*, Dec. 28, 2015, https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/research-testing-plan.pdf, at 7.

interpretation, and often at odds with the plain terms of the Memorandum.  *See, e.g.*, Torres Decl. ¶ 18., ECF No. 76.47 (stating that CASA de Maryland, Inc. "was approached by a number of media outlets, including CNN, to represent the reaction of our community . . . [and] conveyed how harmful the action is and our commitment to ensuring that our members are fully counted."); Barreto Decl. ¶ 33 (listing media messages characterizing the Memorandum as something "intended to promote fear"); *id.* ¶ 46 (noting that aliens "may not do the full research to realize they can still fill out the Census safely, *because they hear the news which is connecting* the July 21 [Memorandum] to Trump's longstanding desire to increase deportation of undocumented immigrants" (emphasis added)).  It makes little sense to attribute whatever harm is caused by those independent actors' messaging to the Memorandum itself, particularly if their messages convey the incorrect impression that the Memorandum increases the "risk of [individuals'] information being linked to immigration records and [those individuals] facing immigration enforcement."  Barreto Decl. ¶¶ 62, Pls. Br. at 43 (citing various declarations speculating that the Memorandum is likely to create fear of immigration enforcement).  Given the strong privacy protections for census response data, any suggestion that the Secretary's compliance with the Memorandum will somehow facilitate immigration enforcement is flatly wrong.  *See generally* 13 U.S.C. § 9 (providing that personal information collected by the Census Bureau cannot be used against respondents by any government agency or court); *id.* § 214 (setting forth penalty for wrongful disclosure of information).

### b.  Plaintiffs' Theory of Harm Is Limitless

*Second*, setting aside the role of independent actors, Plaintiffs' theory of harm proves too much. Plaintiffs' core claim is that the Memorandum will depress aliens' participation in the census by allegedly "send[ing] a clear message that this community does not count and should be left out of the democratic process."  Pls. Br. at 42; *see, e.g.*, Barreto Decl. ¶ 14; Choi Decl. ¶¶ 16-18 (Ex. 14); Torres Decl. ¶ 19 (Ex. 47).  But the same line of reasoning could apply to almost any government action or statement that Plaintiffs find disagreeable.  As Plaintiffs themselves acknowledged during the initial status conference with the Court, their theory would recognize harm sufficient for standing (and presumably for a preliminary injunction) based on a President's mere statements suggesting that he is

exploring new legislation that would permit the Census Bureau to share data with immigration enforcement agencies. *See, e.g.*, Conference Tr. 34:13–35:6. That makes little sense.

The transmission of a general policy message—like the kind Plaintiffs claim the Memorandum sends—cannot suffice to show that irreparable harm is imminent or likely. *Winter*, 555 U.S. at 12, 20. The Supreme Court has repeatedly rejected efforts to conjure irreparable injury from a hypothetical series of events that could theoretically cause a plaintiff injury. *See, e.g.*, *Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983); *Rizzo v. Goode*, 423 U.S. 362, 372–73 (1976). Indeed, it has explicitly noted that allegations of "fear[]" of future harm must be assessed for reasonableness: "[i]t is the *reality* of the threat of" future harm that is relevant, "not the plaintiff's subjective apprehensions." *Lyons*, 461 U.S. at 107 n.8 (emphasis added). Where, as here, fear is based on a series of conjectures and subjective misinterpretations—tethered not to something the government has actually done, but to some different policy the government might (or might not) pursue in the future—such fear cannot form the basis for irreparable harm. *See id.* at 107. Merely harboring an objection to the President's expression of a policy preference falls far short of the standard for injunctive relief.

### c. The Alleged Harm is at Odds with Existing Evidence

*Third*, and finally, Plaintiffs' claims that the Memorandum is likely to decrease response rates is simply inconsistent with empirical evidence. Plaintiffs go to great lengths to analogize the Memorandum to a citizenship question on a census questionnaire. *See, e.g.*, Pls. Br. at 42; Barreto Decl. ¶¶ 14, 18, 24, 28, 57, 68, 86. But, as noted above, a randomized control trial published by the Census Bureau after the Supreme Court issued its opinion in the citizenship question litigation found *no* statistically-significant depression of response rates for households that received a test questionnaire containing a citizenship question. *See* Abowd Decl. ¶ 13; *see also 2019 Census Test Report,* Census Bureau (Jan. 3, 2020), https://www2.census.gov/programs-surveys/decennial/2020/program-management/census-tests/2019/2019-census-test-report.pdf (Census Test Report). As explained by Dr. Abowd, this test contained a sample of 480,000 housing units, and was "capable of detecting response differences as small as 0.5 percentage points." *See* Abowd Decl.¶ 13. And while some narrow subgroups did exhibit statistically-significant lower self-response rates, Census Test Report at x, the

Census Bureau concluded that "[c]urrent plans for staffing for Nonresponse Followup would have sufficiently accounted for subgroup differences seen in this test." *Id.*  This result was contrary to the prediction of experts who previously testified during the citizenship-question litigation, and some of whose declarations Plaintiffs again submit now.  *See generally* Abowd Decl. ¶ 13; *see, e.g.*, Barreto Decl. ¶ 68.  As Dr. Abowd reports, this finding illustrates the benefit of a "randomized controlled design," which properly isolates the independent variable (there, the citizenship question) and measures its effects.  Abowd Decl. ¶ 13.

Plaintiffs cannot reasonably contend that the Memorandum would have a greater effect on response rates than did the citizenship question.  Unlike a question on a census questionnaire, the Memorandum does not call for respondents to submit any information, and it changes nothing about the enumeration process.  *See* 85 Fed. Reg. at 44,679 (directing the Secretary to make use of existing information).  Indeed, neither Dr. Barreto nor any other declarant proffered by Plaintiffs identifies a rigorous survey or statistical study measuring whether this kind of internal Government action, which seeks nothing of respondents and has no connection to immigration enforcement, has any effect on response rates within immigrant communities.  *See generally* Barreto Decl. ¶¶ 39-86.  And nothing Plaintiffs submit purports to statistically measure the effect of the Memorandum itself on response rates.  *See generally* Barreto Decl. ¶¶ 39-86; Thompson Decl. ¶¶ 21–23 (offering an opinion about the effect of the Memorandum without relying on a source of data).

Under these circumstances, Plaintiffs cannot be said to establish anything more than the abstract "possibility of irreparable injury." *Nken*, 556 U.S. at 434.  But, as the Supreme Court has emphasized, the "'possibility' standard is too lenient" a basis upon which to issue the drastic remedy of a preliminary injunction. *Winter*, 555 U.S. at 22.  Given that irreparable harm "is the single most important prerequisite for the issuance of a preliminary injunction," *Faiveley Transport. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009), Plaintiffs' failure to establish anything more than the theoretical possibility of harm is sufficient basis to deny the injunction they seek.

**B.      The Remaining Factors Weigh Against an Injunction**

On the other side of the ledger, the harm to the government and to the public interest from an injunction would be great, and immediate. *See Nken*, 556 U.S. at 435 (explaining that harm to opposing party and weighing the public interest "merge" when relief is sought against the government).   In particular, an injunction would impede the Executive's historic discretion in conducting both the census and the apportionment, contrary to Congressional intent. *See generally Franklin*, 505 U.S. at 796-800.  Plaintiffs discount these interests, arguing that the Government cannot have an interest in enforcing "an unconstitutional law," Pls. Br. at 51, but that argument only holds if Plaintiffs are correct on the merits of their argument—which, as explained above, they are not.

In any event, Plaintiffs' conception of the balance and hardship and public interest collapses those two parts of the traditional four-part injunction test into the very first prong:  merits.  As the Supreme Court has emphasized, however, that should not be done. *See Winter*, 555 U.S. at 32.  The public interest prong is a stand-alone requirement that must be met separately, and cannot be short-circuited at plaintiffs' whim. *Id.*

Plaintiffs vaguely suggest that enjoining the Memorandum would allegedly remedy "Defendants' misinformation."  Pls. Br. 52.  But the only misinformation Plaintiffs have identified in this case is the misinterpretation of the Memorandum by the various activists and news sources that their expert, Dr. Barreto, and their other declarants describe in their declarations. *See* Barreto Decl. ¶¶ 66-69 (Ex. 56); Choi Decl. ¶ 24-25 (Ex. 14); Seon Decl. ¶ 22 (Ex. 43); Torres Decl. ¶ 24 (Ex. 47). Plaintiffs have never identified one piece of "misinformation" that the Defendants disseminated about the Memorandum.  Any attempt to remedy misinformation would therefore require an injunction against some other entity.  The public interest may favor that injunction, but it does not favor an injunction against Defendants here.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss and dismiss these consolidated actions.  In the event the Court declines to grant Defendants' motion to dismiss, Plaintiffs' motion for partial summary judgment or preliminary injunction should be denied.

Dated:  New York, New York

August 19, 2020

<div style="margin-left: 50%;">

Respectfully submitted,

ETHAN P. DAVIS
Acting Assistant Attorney General

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York

DAVID MORRELL
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Branch Director

DIANE KELLEHER
BRAD ROSENBERG
Assistant Branch Directors


/s/ Elliott M. Davis
DANIEL D. MAULER (VA Bar No. 73190)
ELLIOTT M. DAVIS (NY Reg. No. 4596755)
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L St. NW
Washington, DC  20005
Phone: (202) 353-5639
Fax: (202) 616-8470
E-mail: elliott.m.davis@usdoj.gov

*Counsel for Defendants*

</div>

54