**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STATE OF NEW YORK, et al., | |
| Plaintiffs, | 20-CV-5770 (JMF) |
| v. | |
| DONALD J. TRUMP, *in his official capacity as President of the United States*, et al., | |
| Defendants. | |

| | |
|---|---|
| NEW YORK IMMIGRATION COALITION, et al., | |
| Plaintiffs, | 20-CV-5781 (JMF) |
| v. | |
| DONALD J. TRUMP, *in his official capacity as President of the United States*, et al., | |
| Defendants. | |

**PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND**
**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR**
**PARTIAL SUMMARY JUDGMENT OR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 1

I.     Plaintiffs have standing to challenge the Presidential Memorandum. ............................... 1

      A.     Plaintiffs have demonstrated injury-in-fact. ........................................................ 1

      B.     Plaintiffs' injuries are caused by the Memorandum and will be redressed by
          its invalidation. ....................................................................................................... 5

II.    Plaintiffs' claims are ripe for judicial review. ................................................................. 6

III.   Summary judgment is warranted on Plaintiffs' claims that the Presidential
      Memorandum violates the Constitution and the Census Act. ......................................... 12

      A.     Defendants' decision to exclude undocumented immigrants from the
          apportionment base violates Article I and the Fourteenth Amendment. ............... 12

      B.     The Memorandum is *ultra vires* under the statutory scheme implementing
          the required decennial census and reapportionment of House seats. ...................... 19

IV.    Defendants' motion to dismiss for failure to state a claim should be denied. ................... 22

      A.     There is no basis to dismiss Plaintiffs' claims for relief under the APA. ............. 22

      B.     The Governmental Plaintiffs' complaint plausibly alleges that the
          Memorandum violates the Tenth Amendment. ..................................................... 23

      C.     Plaintiffs have adequately stated a claim that the Presidential Memorandum
          was motivated by intentional discrimination. ....................................................... 24

      D.     The President is a proper defendant in this action. ............................................... 27

V.     Injunctive relief is warranted to prevent irreparable harm. ............................................ 29

      A.     The Memorandum imposes imminent and irreparable harms. ............................. 29

      B.     The balance of equities and public interest favor a preliminary injunction. .......... 30

CONCLUSION ................................................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1977)................................................................................................12

*Alabama v. Dep't of Commerce*,
    396 F. Supp. 3d 1044 (N.D. Ala. 2019)................................................................21

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
    458 U.S. 592 (1982)..............................................................................................5

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................................22

*Boumediene v. Bush*,
    553 U.S. 723 (2008)............................................................................................27

*Carey v. Klutznick*,
    508 F. Supp. 404 (S.D.N.Y. 1980) ......................................................................7

*Carey v. Klutznick*,
    637 F.2d 834, 838 (2d Cir. 1980)..........................................................................5

*Cent. Delta Water Agency v. U.S.*,
    306 F.3d 938 (9th Cir. 2002) ...............................................................................8

*Chem. Waste Mgmt., Inc. v. EPA*,
    869 F.2d 1526 (D.C. Cir. 1989) .........................................................................11

*City & Cty. of San Francisco v. Trump*,
    897 F.3d 1225 (9th Cir. 2018) .............................................................................7

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013).............................................................................................1

*Clinton v. Jones*,
    520 U.S. 681 (1997)............................................................................................27

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019)................................................................... *passim*

*Dep't of Commerce v. U.S. House of Representatives*,
    525 U.S. 316 (1999)..................................................................... *passim*

*Department of Homeland Security v. Regents of Univ. of California*,
    140 S. Ct. 1891 (2020)........................................................................................25

*Evenwel v. Abbott,*
    136 S. Ct. 1120 (2016) ...................................................................................15, 16

*Flue-Cured Tobacco Coop. Stabilization Corp. v. U.S. E.P.A.,*
    313 F.3d 852 (4th Cir. 2002) ........................................................................21

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ............................................................................ *passim*

*Glavin v. Clinton,*
    19 F. Supp. 2d 543 (E.D. Va. 1998) (three-judge court), *aff'd* 525 U.S. 316
    (1999) ...........................................................................................................7, 8

*Grand River Enter. Six Nations, Ltd. v. Pryor,*
    481 F.3d 60 (2d Cir. 2007) ...........................................................................29

*Kaplan v. Tod,*
    267 U.S. 228 (1925) ......................................................................................18

*Kidder, Peabody & Co. v. Maxus Energy Corp.,*
    925 F.2d 556 (2d Cir. 1991) ...........................................................................7

*Knight First Amendment Inst. at Columbia Univ. v. Trump,*
    302 F. Supp. 3d 541 (S.D.N.Y. 2018), *aff'd,* 928 F.3d 226 (2d Cir. 2019) ......................27, 28

*LaFleur v. Whitman,*
    300 F.3d 256 (2d Cir. 2002) ...........................................................................1

*Marbury v. Madison,*
    1 Cranch 137 (1803) .....................................................................................27

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ........................................................................................5

*Massachusetts v. U.S. Dep't of Health & Human Servs.,*
    923 F.3d 209 (1st Cir. 2019) ...........................................................................2

*Mayor & City Council of Baltimore v. Trump,*
    416 F. Supp. 3d 452 (D. Md. 2019) .............................................................28

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.,*
    725 F.3d 65 (2d Cir. 2013) .............................................................................6

*Miller v. Brown,*
    462 F.3d 312 (4th Cir. 2006) ........................................................................10

*Mississippi v. Johnson,*
    71 U.S. 475 (1866) ........................................................................................28

*Mountain States Legal Found. v. Glickman*,
   92 F.3d 1228 (D.C. Cir. 1996) ........................................................................... 8

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012) ........................................................................................ 23

*New York v. U.S. Dep't of Commerce*,
   351 F. Supp. 3d 502 (S.D.N.Y. 2019) ....................................................... *passim*

*New York v. United States*,
   505 U.S. 144 (1992) .......................................................................................... 7

*Nixon v. Fitzgerald*,
   457 U.S. 731 (1982) ........................................................................................ 27

*NRDC v. U.S. E.P.A.*,
   859 F.2d 156 (D.C. Cir. 1988) ........................................................................... 9

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
   461 U.S. 190 (1983) ........................................................................................ 10

*Plaut v. Spendthrift Farm, Inc.*,
   514 U.S. 211 (1995) ........................................................................................ 27

*Plyler v. Doe*,
   457 U.S 202 (1982) ......................................................................................... 27

*Printz v. United States*,
   521 U.S. 898 (1997) ........................................................................................ 23

*Pub. Citizen v. U.S. Trade Representative*,
   5 F.3d 549 (D.C. Cir. 1993) ............................................................................. 21

*Ragbir v. Homan*,
   923 F.3d 53 (2d Cir. 2019) .............................................................................. 17

*Ramos v. Nielsen*,
   336 F. Supp. 3d 1075 (N.D. Cal. 2018) ........................................................... 26

*Ross v. AXA Equitable Life Ins. Co.*,
   115 F. Supp. 3d 424 (S.D.N.Y. 2015) ................................................................ 1

*Ross v. Bank of America, N.A. (USA)*,
   524 F.3d 217 (2d Cir. 2008) .............................................................................. 6

*Saget v. Trump*,
   375 F. Supp. 3d 280 (E.D.N.Y. 2019) ........................................................ 27, 28

*Shelby Cty., Ala. v. Holder,*
   570 U.S. 529 (2013)....................................................................................24

*Spokeo, Inc. v. Robins,*
   136 S. Ct. 1540 (2016)..................................................................................1

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014)..............................................................................7, 8, 9

*Takao Ozawa v. United States,*
   260 U.S. 178 (1922)....................................................................................18

*Texas v. United States,*
   523 U.S. 296 (1998)......................................................................................8

*U.S. Dep't of Agric. v. Moreno,*
   413 U.S. 528 (1973)....................................................................................26

*United States v. Burr,*
   25 F. Cas. 187 (CC Va. 1807).....................................................................27

*United States v. Nixon,*
   418 U.S. 683 (1974)....................................................................................27

*United States v. Yonkers Bd. of Educ.,*
   837 F.2d 1181 (2d Cir. 1987)......................................................................25

*Utah v. Evans,*
   536 U.S. 452 (2002)..........................................................................11, 12, 21

*Victoria Cruises, Inc. v. Changjiang Cruise Overseas Travel Co.,*
   630 F. Supp. 2d 255 (E.D.N.Y. 2008) ........................................................25

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.,*
   429 U.S. 252 (1977)....................................................................................25

*Wesberry v. Sanders,*
   376 U.S. 1 (1964)........................................................................................16

*Youngstown Sheet & Tube Co. v. Sawyer,*
   535 U.S. 579 (1952)....................................................................................27

**Constitutional Provisions, Statutes, and Rules**

Colo. Const. Art. V, § 44.2(1)(a) .................................................................10

Conn. Const. Art. XXVI, § 2(a) ...................................................................10

Conn. Const. Art. XXVI, § 2(b)....................................................................10

Me. Const. art. IV, pt. 1, § 3 .................................................................................10

Me. Const. art. IV, pt. 2, § 2 .................................................................................10

Me. Const. art. IX, § 24 .........................................................................................10

U.S. Const. amend. XIV, § 2 ...............................................................................6, 12

U.S. Const. art. I, § 2, cl. 3..................................................................................12

2 U.S.C. § 2a .................................................................................................19, 20

13 U.S.C. § 141 ....................................................................................................19

An Act to Limit the Immigration of Aliens into the United States, Pub. L. No. 68-
139.............................................................................................................19

Chinese Exclusion Act, Pub. L. No. 47-126, § 14, 22 Stat. 59 (1882) .........................18

29 Del. C. § 805 ...................................................................................................10

N.C. Gen. Stat. § 163-291(2)(a)............................................................................10

1847 N.Y. Laws 182, 184 Ch. 195, § 3 ..................................................................15

83 Fed. Reg. 5525 (Feb. 8, 2018) ..............................................................14, 17, 20

85 Fed. Reg. 44,679 (July 23, 2020)................................................................. *passim*

Exec. Order No. 13,880, 84 Fed. Reg. 33,821 (July 11, 2019).......................................9

Fed. R. Evid. 801(a) ...............................................................................................3

Fed. R. Evid. 801(c) ...............................................................................................3

**Other Authorities**

Br. of Amicus Curiae Immigration Reform Law Inst. in Supp. of Appellants,
*Evenwel*, No. 14-940, 2015 WL 4747986 (U.S. Aug. 7, 2015)...............................16

Kunal M. Parker, *State, Citizenship, and Territory: The Legal Construction of
Immigrants in Antebellum Massachusetts*, 3 Law & History Review 583
(2001)........................................................................................................15

Pew Research Center, *Five Facts about Illegal Immigration in the U.S.* (June 12,
2019) .........................................................................................................17

*Remarks by Attorney General William P. Barr on Census Citizenship Question*
(July 11, 2019) ..............................................................................................9

TRAC Immigration, *Immigration Judges Decide 57 Percent Entitled to Remain in U.S.* ............17

U.S. Census Bureau, *2019 Census Test Report* (Jan. 3, 2020) .....................................................4

U.S. Census Bureau, *Community Partners and Supporters* 1767 (Feb. 25, 2020).........................3

U.S. Census Bureau, *Decennial Census P.L. 94-171 Redistricting Data* (May 8, 2017).............10

U.S. Census Bureau, *National Partners and Supporters List* ........................................................3

U.S. Census Bureau, Quick Facts: California...................................................................................25

U.S. Census Bureau, Quick Facts: Florida .....................................................................................25

U.S. Census Bureau, Quick Facts: New Jersey ..............................................................................25

U.S. Census Bureau, Quick Facts: New York .................................................................................25

U.S. Census Bureau, Quick Facts: Texas .......................................................................................25

U.S. Dep't of Homeland Sec., *Population Estimates: Illegal Alien Population
   Residing in the United States: January 2015*  (Dec. 2018)......................................................25

U.S. Dep't of Justice, Executive Office for Immigration Review, Statistics
   Yearbook Fiscal Year 2018, at 27..............................................................................................17

Yurij Rudensky, Michael Li, & Annie Lo, *How Changes to the 2020 Census
   Timeline Will Impact Redistricting* (May 4, 2020) ..................................................................10

## INTRODUCTION

Plaintiffs challenge an order by the President targeting a fundamental underpinning of our democracy—the apportionment of seats in the House of Representatives based on the total population of each State. The President has declared an official policy of excluding *all* undocumented immigrants from the apportionment base, and Defendants are actively implementing that policy. The Constitution and laws of the United States unambiguously forbid this attempted manipulation of representative government, which injures Plaintiffs now and is capable and worthy of judicial resolution now. For these and other reasons set forth below, the Court should grant Plaintiffs' motion for summary judgment and deny Defendants' motion to dismiss.

## ARGUMENT

### I.     Plaintiffs have standing to challenge the Presidential Memorandum.

#### A.     Plaintiffs have demonstrated injury-in-fact.

An injury establishing standing "need not be large." *LaFleur v. Whitman*, 300 F.3d 256, 270 (2d Cir. 2002). And threatened harm need not be "literally certain" to come about." *Ross v. AXA Equitable Life Ins. Co.*, 115 F. Supp. 3d 424, 433 (S.D.N.Y. 2015) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)).

Plaintiffs' injuries more than suffice here. *First*, Plaintiffs have demonstrated a "substantial risk" of a "concrete" apportionment injury. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016); *see* Pls.' Mem. 8–10. The PM acknowledges that excluding undocumented immigrants "for the purpose of apportionment" will redistribute political power to punish immigrant-friendly jurisdictions and impact the "allocation of two or three" congressional seats. 85 Fed. Reg. 44,679, 44,680 (July 23, 2020). And the federal government estimates that California and Texas are respectively home to 2.9 and 1.9 million undocumented residents—

populations larger than a congressional district. Pls.' 56.1 Stmt. ¶¶ 3–7; Defs.' 56.1 Resp. ¶¶ 3–7.

The PM itself thus establishes Plaintiffs' standing. *See, e.g.*, *Massachusetts v. U.S. Dep't of Health & Human Servs.*, 923 F.3d 209, 224–25 (1st Cir. 2019). Moreover, Plaintiffs' unrebutted expert evidence confirms that excluding undocumented immigrants will "almost certainly" cause these States and others to lose House seats. Pls.' 56.1 Stmt. ¶¶ 21–22; Pls.' Mem. 9; *see Dep't of Commerce v. U.S. House of Reps.* ("*U.S. House*"), 525 U.S. 316, 330 (1999).

Defendants' suggestion that this is speculative because they may not do what the PM *requires* is absurd. Defs.' Mem. 11. The President has declared an official "policy" of excluding *all* undocumented immigrants from the apportionment and has ordered Defendants to carry out that policy. 85 Fed. Reg. at 44,680. Defendants cannot evade review on the premise that they may fail to carry out the official policy of the United States—contrary to the presumption of regularity that Defendants frequently invoke. There is certainly a "substantial risk" that Defendants will follow the President's direction, causing the loss of congressional seats that "satisfies the injury-in-fact requirement of Article III standing."[1] *New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 607 (S.D.N.Y. 2019) (quotation marks omitted).

*Second*, the overwhelming evidence reflects that the PM will harm Plaintiffs by deterring immigrant families from responding to the census. *See* Pls.' Mem. 42–45; Barreto Reply Decl. ¶¶ 2–3, 14, 18 (Ex. 65); Espinosa Supp. Decl. ¶¶ 4–6 (Ex. 62); Oshiro Supp. Decl. ¶ 3 (Ex. 63); Seon Supp. Decl. ¶ 4 (Ex. 64); Awawdeh Decl. ¶ 3 (Ex. 60). Defendants contend there is "no reason why such a Memorandum should have any effect on census response rates." Defs.'

---

[1] Dr. Abowd states that, "consistent with best practices for a federal statistical agency," it is "impossible to assess precisely the effects of the PM on apportionment." Abowd Decl. ¶ 15 (ECF No. 119). But "[t]he Court's task is not to determine whether the evidence . . . can satisfy the Census Bureau's high statistical standards," *New York*, 351 F. Supp. 3d at 593, only whether Plaintiffs are substantially likely to lose representation in Congress.

Mem. 12. But this ignores the "[f]ar-ranging social science research" demonstrating that the PM "sends a signal of government monitoring citizenship status as it relates to the 2020 Census population count," Barreto Decl. ¶ 14 (Ex. 56), thereby eroding trust in the census and causing avoidant behavior. *Id.* ¶¶ 14–23; *see also* Barreto Reply Decl. ¶¶ 20–23, 32 (Ex. 65); Espinosa Supp. Decl. ¶¶ 4–6 (Ex. 62); Oshiro Supp. Decl. ¶ 3(Ex. 63); Seon Supp. Decl. ¶¶ 4–6 (Ex. 64); Awawdeh Decl. ¶ 3 (Ex. 60); *cf. New York*, 351 F. Supp. 3d at 579 ("macroenvironment" factors, "including a higher 'level of concern about using citizenship data for enforcement purposes,' could exacerbate the effects of adding a citizenship question"). And the PM "discredits the essential message that everyone's response matters" and undermines the effectiveness of Plaintiffs' outreach. Salvo Decl. ¶ 10 (Ex. 41); Pls.' Mem. 42–43. Defendants' blithe dismissal of dozens of fact witnesses, including from groups the Census Bureau has itself engaged as "partners" and trusted messengers to immigrant communities,[2] *see* Barreto Reply Decl. ¶¶ 28–29, 34–35 (Ex. 65); Awawdeh Decl. ¶ 6 (Ex. 60); Espinosa Supp. Decl. ¶ 6 (Ex. 62), ignores the compelling and specific evidence that the PM is deterring census participation *right now*.[3]

---

[2] *See, e.g.*, U.S. Census Bureau, *National Partners and Supporters List*, https://2020census.gov/en/partners/directory.html (listing Plaintiff American-Arab Anti-Discrimination Committee as a "National Partner"); U.S. Census Bureau, *Community Partners and Supporters* 1767 (Feb. 25, 2020), https://bit.ly/31pHRma (listing Plaintiff New York Immigration Coalition as a "Community Partner").

[3] There is no merit to Defendants' argument that this uncontroverted factual evidence should be disregarded as hearsay or conclusory. Many of Plaintiffs' witnesses describe concerns in immigrant communities regarding whether—because of the PM—the census will be used to deport them. *See, e.g.*, Choi Decl. ¶¶ 19, 27 (Ex. 14); Cullinane Decl. ¶ 8 (Ex. 17); Espinosa Supp. Decl. ¶ 5 (Ex. 62); Seon Supp. Decl. ¶ 3 (Ex. 64). This testimony is not hearsay because it is not offered for truth, but rather to show state of mind. *See* Fed. R. Evid. 801(a), (c). This evidence is detailed and specific, not conclusory. *See, e.g.*, Soto Decl. ¶ 12 (Ex. 45). This explains why the PM has forced Plaintiffs to divert resources for increased census outreach. *See* Awawdeh Decl. ¶¶ 4–5 (Ex. 60); Choi Decl. ¶ 26 (Ex. 14); Espinosa Decl. ¶ 14 (Ex. 18); Espinosa Supp. Decl. ¶ 4–7 (Ex. 62); Oshiro Supp. Decl. ¶¶ 3–4 (Ex. 63); Seon Decl. ¶¶ 16–17 (Ex. 43); Seon Supp. Decl. ¶¶ 4–7 (Ex. 64).

Moreover, contrary to Defendants' suggestion, the Census Bureau's 2019 randomized control test regarding the effect of a citizenship question—which does not purport to measure the effect of excluding undocumented immigrants from the apportionment—actually *supports* Plaintiffs' standing. It found "statistically significant lower self-response rates" for mixed status households and Latino households. U.S. Census Bureau, *2019 Census Test Report* at ix–x (Jan. 3, 2020), https://www2.census.gov/programs-surveys/decennial/2020/program-management/census-tests/2019/2019-census-test-report.pdf ("2019 Census Test Report"); *see* Barreto Reply Decl. ¶¶ 5, 9–12 (Ex. 65). Although the study concluded that *overall* response rates did not decline significantly, *see* 2019 Census Test Report at ix; Defs.' Mem. 51–52, the Bureau found "*statistically significant lower self-response rates* for the test questionnaire with the citizenship question" among, *inter alia*, "census tracts with greater than 4.9 percent noncitizens," "greater than 49.1 percent Hispanic residents," and significant numbers of Asian residents. *Id.* at x (emphasis added).[4] Plaintiffs' members and constituents include substantial immigrant populations and will bear the brunt of these effects. *E.g.*, Baldwin Decl. ¶¶ 8–9 (Ex. 4); Bird Decl. ¶ 12 (Ex. 9); Choi Decl. ¶ 27 (Ex. 14); Espinosa Decl. ¶¶ 10–13 (Ex. 18); Khalaf Decl. ¶¶ 11–12 (Ex. 26); Mostofi Decl. ¶ 9 (Ex. 34); Oshiro Decl. ¶¶ 11–14 (Ex. 36); Sarmiento Decl. ¶ 7 (Ex. 42); Seon Decl. ¶¶ 13–17 (Ex. 43); Sivongxay Decl. ¶ 13 (Ex. 44); Soto Decl. ¶ 12 (Ex. 45); Torres Decl. ¶¶ 2, 16 (Ex. 47); Aranda-Yanoc Decl. ¶ 7 (Ex. 51). This predictably harms Plaintiffs in numerous ways, including by degrading the "statistical backbone of our country," Salvo Decl. ¶ 13 (Ex. 41); forcing the NGO Plaintiffs to divert resources and revise

---

[4] Dr. Abowd's declaration also fails to note that this study "did not include the Nonresponse Followup operation, so we are not able to measure the impact of a citizenship question for the completeness and accuracy of the 2020 Census overall." 2019 Census Test Report at x. "[E]ach of NRFU's steps will replicate or exacerbate the effects of the net differential decline in self-response rates among noncitizen households." *New York*, 351 F. Supp. 3d at 583.

census outreach plans; and exacerbating the undercount of immigrant communities. *See, e.g.*, *id.*; Pls.' Mem. 45, 48 (listing witness testimony in support); *New York*, 351 F. Supp. 3d at 597–98.

*Third*, the PM also injures the State Plaintiffs' quasi-sovereign, or *parens patriae*, interests in the well-being of their residents. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982). In *Carey v. Klutznick*, the Second Circuit held that "the State of New York has standing in its capacity as *parens patriae*" to sue the Commerce Department on a claim that the 1980 decennial census unlawfully undercounted New York residents. 637 F.2d 834, 838 (2d Cir. 1980); *see also Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007). The State Plaintiffs have standing in their capacity as *parens patriae* based on their quasi-sovereign interests in census accuracy and related representational, data quality, and resource interests. Warshaw Decl. ¶ 47 tbl. 8 (Ex. 58); Pls.' Mem. 47.

## B. Plaintiffs' injuries are caused by the Memorandum and will be redressed by its invalidation.

Plaintiffs' injuries are fairly traceable to the PM. There is no genuine dispute that the PM's stated aim—to exclude undocumented immigrants from the apportionment base—will *directly* affect apportionment in Plaintiffs' jurisdictions. 85 Fed. Reg. at 44,680; *see* Warshaw Decl. ¶ 11 (Ex. 58). And the predictable effects of Defendants' actions on the accuracy of the census establish traceability, even when those effects are caused by irrational or illegal acts by third parties. *See Dep't of Commerce v. New York* ("*New York*"), 139 S. Ct. 2551, 2566 (2019).

Defendants' efforts to distance themselves from messages carried by "independent actors" such as community groups, *see* Defs.' Mem. 16–17, cannot be taken seriously: The Census Bureau intentionally relies on third party organizations as trusted partners to encourage self-responses. *New York*, 351 F. Supp. 3d at 521; Thompson Reply Decl. ¶¶ 11–13 (Ex. 66); *see also supra* at 3 n.3. These trusted partners are now reporting that the PM directly undermines

their efforts. *See* Barreto Reply Decl. ¶¶ 34–35 (Ex. 65); Awawdeh Decl. ¶¶ 4, 6 (Ex. 60); Choi Decl. ¶ 12 (Ex. 14); Espinosa Decl. ¶¶ 10–14 (Ex. 18); Espinosa Supp. Decl. ¶¶ 6–7 (Ex. 62).

Plaintiffs' injuries will be remedied by a favorable ruling. Requiring Defendants to "count[] the whole number of persons in each State," U.S. Const. amend. XIV, § 2, would both resolve Plaintiffs' apportionment harms and help assuage fears that the Administration is surveilling undocumented immigrants via the census to deport them. Pls.' Mem. 42–44, 51–52; Barreto Reply Decl. ¶ 27 (Ex. 65); Espinosa Decl. ¶ 13 (Ex. 18); Choi Decl. ¶ 19 (Ex. 14); Oshiro Decl. ¶ 10 (Ex. 36); Seon Supp. Decl. ¶¶ 5–7 (Ex. 64); Torres Decl. ¶ 20 (Ex. 47). A favorable ruling will also convey that everyone *does* count for the census, restoring the effectiveness of Plaintiffs' messaging efforts, *see* Barreto Decl. ¶ 68 (Ex. 56); Thompson Reply Decl. ¶¶ 11, 13 (Ex. 66), and freeing up organizational resources for other purposes, *see* Espinosa Supp. Decl. ¶¶ 7–8 (Ex. 62); Oshiro Supp. Decl. ¶ 5 (Ex. 63).

## II.     Plaintiffs' claims are ripe for judicial review.

Plaintiffs' claims are ripe for review as both a constitutional and prudential matter. The constitutional ripeness inquiry essentially mirrors the Article III standing analysis. *See In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 110 (2d Cir. 2013). Plaintiffs' claims are constitutionally ripe because Plaintiffs face both present injury and a "substantial risk" of future injury unless this Court halts the PM. *New York*, 139 S. Ct. at 2565; *see Ross v. Bank of America, N.A. (USA)*, 524 F.3d 217, 226 (2d Cir. 2008). Defendants' ripeness argument (Defs.' Mem. 6–10) entirely ignores the present injury that the NGO Plaintiffs are suffering from being forced to divert their resources, due to the deterrent effect that the PM is having on participation in the ongoing census. *See* Pls.' Mem. 42–46; *supra* Part I.A.

In addition, Plaintiffs' apportionment injury is not "conjectural or hypothetical." Defs.' Mem. 7. Defendants do not dispute that a claim can be ripe when future injury is "certainly

impending, or [when] there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quotation marks omitted); *see New York v. United States*, 505 U.S. 144, 175 (1992) (claims ripe where statutory provision did not take effect for three years). The Supreme Court and lower courts have made clear that courts may review a decision that would alter the enumeration or the resulting apportionment even before the census begins. *U.S. House of Representatives*, 525 U.S. at 332; *see New York*, 351 F. Supp. 3d at 573–74; *Carey v. Klutznick*, 508 F. Supp. 404, 407, 411–12 (S.D.N.Y. 1980).

Here, there is far more than a "substantial risk" that Plaintiffs will suffer apportionment injury. The PM definitively announces a policy of excluding undocumented immigrants from the apportionment base. It directs the Secretary of Commerce to help "carry out the policy" by providing a count of the number of undocumented immigrants in each State, 85 Fed. Reg. at 44,680—and Defendants admit they are already carrying out that policy (Defs.' Mem. 7). *See City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1238 (9th Cir. 2018). And the PM explicitly acknowledges that this will cause California to lose "two or three . . . congressional seats." 85 Fed. Reg. at 44,680; *see* Pls.' Mem. 4 & n.2; *Kidder, Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 563 (2d Cir. 1991) (declaring "the rights of the parties in accordance with the very representations" made by defendant). Plaintiffs' claims here are thus not an "abstract disagreement[]" over an informal proposal that might affect apportionment, Defs.' Mem. 6; rather, they challenge an official "policy" that is already being implemented and that is expressly intended to reallocate House seats. *See Glavin v. Clinton*, 19 F. Supp. 2d 543, 547–48 (E.D. Va. 1998) (three-judge court) (finding ripeness "[g]iven the finality of the Department's decision to

utilize statistical sampling" for 2020 census), *aff'd* 525 U.S. 316 (1999).[5]

Defendants' only response is to speculate (Defs.' Mem. 7-8) that the Secretary might fail to do what the President has ordered. That possibility does not address the PM's ongoing effect of deterring census participation or forcing Plaintiffs to divert resources to mitigate that impact. And the mere possibility that Defendants may prove incapable of implementing their unlawful policy cannot insulate that policy from judicial review. A claim is ripe when a plaintiff faces a "threat of injury resulting from the [government] employing an operational plan that will likely lead" to injury. *Cent. Delta Water Agency v. U.S.*, 306 F.3d 938, 948 (9th Cir. 2002). Injury need not be guaranteed. *See Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1234 (D.C. Cir. 1996). The possibility that Defendants "may change their course of conduct is not the type of contingency" that can defeat ripeness. *Cent. Delta Water Agency*, 306 F.3d at 950. It is always possible that the federal government might abandon a course of conduct, "but that hardly renders the litigation nonjusticiable before that event occurs." *Glavin*, 19 F. Supp. 2d at 547–48. "It would be inequitable in the extreme" for Defendants "to create a significantly increased risk of harm" to Plaintiffs from excluding undocumented immigrants from the apportionment base, but then thwart judicial review by saying that they might not do what the President has commanded. *Cent. Delta Water Agency*, 306 F.3d at 950; *see Susan B. Anthony*, 573 U.S. at 165.[6]

Defendants' relentless efforts to identify immigrants for purposes of excluding them from

---

[5] Defendants misplace their reliance (Defs.' Mem. 9-10) on decisions that addressed a completed enumeration or apportionment. None of those decisions even addressed ripeness, let alone held that apportionment-related census litigation is ripe only after the apportionment.

[6] *Texas v. United States*, 523 U.S. 296 (1998), is not to the contrary. Defs.' Mem. 6. There, the Supreme Court concluded that Texas was prematurely seeking a declaration that Section 5 of the Voting Rights Act was inapplicable to a possible future change in local elections where those changes were not "currently foreseen or even likely." 523 U.S. at 300. Here, Defendants have already decided to exclude undocumented immigrants from the apportionment base and will do so unless they unilaterally decide to change their own conduct.

apportionment and redistricting make it implausible that Secretary Ross will not carry out the President's directive. Secretary Ross began taking steps to add a citizenship question to the census shortly after his appointment in February 2017; disregarded warnings from the Census Bureau that adding the question would undermine the accuracy of the enumeration; and ultimately engineered—and presented to this Court—a "contrived" rationale that did not honestly reflect his actual objective. *New York*, 139 S. Ct. at 2575. After the Supreme Court ruled, the President then directed all executive agencies to provide to Secretary Ross "the maximum assistance permissible" to determine "the number of citizens and noncitizens in the country," Exec. Order No. 13,880, 84 Fed. Reg. 33,821, 33,824 (July 11, 2019); and the Attorney General declared that this information could be used to determine "whether illegal aliens can be included for apportionment purposes."[7] The PM is thus the latest action in a nearly four-year effort to exclude immigrants from apportionment, and presumably reflects a year's worth of "maximum assistance" to come up with a count of the undocumented population. It beggars belief that Secretary Ross might now abandon the PM's policy. This Court is "not required to exhibit a naiveté from which ordinary citizens are free." *New York*, 139 S. Ct. at 2575 (internal quotation marks and citation omitted).

Defendants' arguments on prudential ripeness are also meritless. No further factual or administrative development is needed to resolve the "purely legal" issue of whether the PM's policy directing the categorical exclusion of undocumented immigrants from the apportionment base violates the Constitution and the Census Act. *Susan B. Anthony*, 573 U.S. at 167; *NRDC v. U.S. E.P.A.*, 859 F.2d 156, 168 (D.C. Cir. 1988). That exclusion would be unlawful no matter

---

[7] *Remarks by Attorney General William P. Barr on Census Citizenship Question* (July 11, 2019), https://www.justice.gov/opa/speech/remarks-attorney-general-william-p-barr-census-citizenship-question.

how Defendants choose to accomplish it. More fundamentally, "time is of the essence," and "[d]elayed review would cause hardship to Plaintiffs." *New York*, 351 F. Supp. 3d at 626; *see also Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006). Defendants' actions are already impairing the Census Bureau's ability to conduct an accurate enumeration, to the detriment of Plaintiffs and the public—harm that has been exacerbated by Defendants' sudden decision to shorten NRFU operations by a month. *See* Pls.' Mem. 46; *see also infra* Part V.B.

Waiting until Defendants actually impair the apportionment in January 2021 would also create extensive confusion and disrupt the State Plaintiffs' redistricting processes, which begin soon after the President transmits his apportionment statement to Congress.[8] Plaintiffs cannot meaningfully engage in these processes under the specter of substantial uncertainty about how many House seats each State will have. *See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201–02 (1983). If a State does redistrict and its number of House seats is later altered, confusion and collateral litigation will result. If litigants

---

[8] After the 2010 census, for example, the Census Bureau began delivering the redistricting data summary files required by Pub. L. No. 94-171 for state redistricting on February 3, 2011. *See* U.S. Census Bureau, *Decennial Census P.L. 94-171 Redistricting Data* (May 8, 2017), https://www.census.gov/programs-surveys/decennial-census/about/rdo/summary-files.2010.html. Many Plaintiff States are required by their constitutions or laws to propose or enact maps just a few months later. *E.g.*, Maine must enact its statewide plans by June 11, 2021. Me. Const. art. IV, pt. 1, § 3; *id.* pt. 2, § 2; *id.* art. IX, § 24. Delaware must complete legislative redistricting by June 30. *See* 29 Del. C. § 805. Other States must begin redistricting immediately after the apportionment data are released to meet interim or final deadlines. *E.g.*, Colo. Const. Art. V, § 44.2(1)(a) (Mar. 15 deadline to convene redistricting commission); Conn. Const. Art. XXVI, §§ 2(a), (b) (Feb. 15 deadline to appoint reapportionment committee); N.C. Gen. Stat. § 163-291(2)(a) (July 26 deadline to complete redistricting in time for candidate filing); *see generally* Yurij Rudensky, Michael Li, & Annie Lo, *How Changes to the 2020 Census Timeline Will Impact Redistricting* (May 4, 2020), https://www.brennancenter.org/sites/default/files/2020-05/2020_04_RedistrictingMemo.pdf. Waiting until *after* the apportionment count is reported to adjudicate Plaintiffs' claims would disrupt these deadlines, harming Plaintiffs' "sovereign interests in the making and enforcement of their own laws." *New York*, 351 F. Supp. 3d at 611.

had to file new challenges to an unconstitutional apportionment in January 2021, the Supreme

Court may not resolve them until 2022, which could be too late to re-redistrict before the 2022

primaries. There is no reason to invite such chaos when Defendants' exclusion of undocumented

immigrants from apportionment will "occur by a clearly determinable time in the near (if not

immediate) future." *Chem. Waste Mgmt., Inc. v. EPA*, 869 F.2d 1526, 1534 (D.C. Cir. 1989).[9]

By contrast, Defendants will suffer no prejudice from immediate judicial resolution of the

legal issues presented here. There is an irreconcilable inconsistency between Defendants'

conclusory arguments that (a) judicial review of the PM "would improperly interfere with the

Census, which is currently in progress" (Defs.' Mem. 9), but that (b) the PM itself has no

disruptive effect on the census at all (Defs.' Mem. 12). Defendants are half-right: Both the PM

and judicial review will affect the census; however, the weight of evidence shows that the former

is harming response rates and the latter would undo some of that damage. *See* Pls.' Mem. 42–46;

Barreto Decl. ¶ 68 (Ex. 56); Awawdeh Decl. ¶ 3 (Ex. 60); Espinosa Supp. Decl. ¶¶ 5–8 (Ex. 62);

Oshiro Supp. Decl. ¶¶ 3–5 (Ex. 63); Seon Supp. Decl. ¶¶ 4–7 (Ex. 64). Defendants' inconsistent

argument seems designed to avoid merits review, contending simultaneously that this case is not

ripe because they might not succeed at excluding undocumented immigrants from

apportionment, but also that review might impede their ability to succeed at that objective. *See*

*New York*, 351 F. Supp. 3d at 628. Even if it were plausible to believe that Secretary Ross is

genuinely debating whether will comply with the President's directive, "a judicial decision" here

"would hardly 'interfere' with [that] administrative action." *Id.* at 627 (challenge to citizenship

---

[9] Defendants assert that Plaintiffs' claims can be decided after the President's report is
transmitted to Congress in January 2021, Defs.' Mem. 9, but notably refused to confirm that the
apportionment figures can be altered after that time. *See* Tr. 16:11–14 (ECF No. 79), *New York v.
Trump*, No. 20-cv-5770 (S.D.N.Y. Aug. 5, 2020); *cf. Utah v. Evans*, 536 U.S. 452, 462 (2002).

question ripe despite possibility that OMB might disapprove question). "[T]he hardship to the parties of withholding court consideration" thus weighs decisively in favor of deeming this dispute to be ripe. *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1977).

**III.   Summary judgment is warranted on Plaintiffs' claims that the Presidential Memorandum violates the Constitution and the Census Act.**

**A.   Defendants' decision to exclude undocumented immigrants from the apportionment base violates Article I and the Fourteenth Amendment.**

The exclusion of undocumented immigrants from the apportionment base violates two distinct constitutional requirements: first, the mandate to apportion representatives based on "the whole number of persons in each State," U.S. Const. amend. XIV, § 2 (Pls.' Mem. 10-24); and second, the requirement that apportionment be based solely on the "Numbers" from the "actual Enumeration," *id.* art. I, § 2, cl. 3 (Pls.' Mem. 24-27).

Defendants entirely fail to address the second issue. They ignore Plaintiffs' claim that the Constitution forbids them from manipulating the actual enumeration numbers—by subtracting out people who *are* enumerated—in allocating House seats. Plaintiffs are accordingly entitled to summary judgment on this ground alone. Indeed, Defendants concede that they will violate this requirement. They admit that they will conduct an actual enumeration that counts undocumented immigrants at the residence where they live, Fontenot Decl. ¶ 11 (ECF No. 120), "according to the methodology set forth in the Final 2020 Census Residence Criteria and Residence Situations." Defs.' Mem. 4. Defendants further admit that the Secretary will then produce "two sets of numbers": the actual enumeration, and a separate count that *reduces* the actual enumeration by subtracting out undocumented immigrants, and then will use the lower figure for apportionment. Defs.' Mem. 7, 42. Such manipulation of the actual enumeration is the kind of "political chicanery" that the Founders sought to avoid. *See Utah v. Evans*, 536 U.S. 452, 500, 503 (2002) (Thomas, J., concurring in part and dissenting in part); *see* Pls.' Mem. 24–25.

Nor is the exclusion of undocumented immigrants from the apportionment base compatible with the Fourteenth Amendment. The Constitution's express terms, more than two centuries of unbroken history and practice, and controlling Supreme Court precedent prohibit the exclusion of millions of undocumented immigrants who indisputably reside here. Pls.' Mem. 10–23. The Framers of both the original Article I and the Fourteenth Amendment purposefully made a person's residence the constitutional lodestar for apportionment. Defendants do not and cannot dispute that the Framers repeatedly specified that they adopted all "persons" as the apportionment base—rather than "citizens"—specifically to include "the *entire* immigrant population" in the apportionment count. *Id.* at 16. And Defendants fail to respond to the universal understanding expressed by courts, Congress, the Census Bureau, the Commerce Department, and the Department of Justice that the Constitution mandates that the apportionment base include all undocumented immigrants who reside here.

Defendants' arguments to the contrary are fatally undermined by two fundamental errors. *First*, Defendants assert the relevant question is whether the Fourteenth Amendment "require[s] including *all* illegal aliens in the apportionment," and that Defendants thus prevail so long as *some* hypothetical subset of undocumented immigrants could be excluded—including for reasons unrelated to their immigration status. Defs.' Mem. 34. This framing is untethered from the policy the President adopted. The PM does not purport to exclude some subcategory of undocumented immigrants from the apportionment base. To the contrary, it expressly states that "it is the policy of the United States to exclude from the apportionment base aliens who are not in a lawful immigration status under the Immigration and Nationality Act," and accordingly directs that *all* of "these illegal aliens" be excluded solely because they are "not in a lawful immigration status." 85 Fed. Reg. at 44,680. Nor does the PM direct the Secretary to provide a count of any

subpopulation of undocumented immigrants, but rather *all* undocumented immigrants in each State. *See* Defs.' Mem. 4, 7, 32. This policy of categorical exclusion cannot be insulated from review by incanting the words "to the extent permissible and consistent with law" and hypothesizing that some nonexistent, narrower policy might be lawful.

*Second*, Defendants ignore the fact that, by definition, the undocumented immigrants who would be excluded from the apportionment base under the PM are those whom the Census Bureau will *already* have determined have their "usual residence" in a particular State—and thus are "inhabitants" of that State even under Defendants' theory. *See, e.g.*, Defs.' Mem. 29 (equating "inhabitants" with "usual residents"). Under the Residence Rule, the 2020 census will follow the "constitutional and statutory mandates to count all residents of the several states" by enumerating all persons "in accordance with the concept of 'usual residence,'" that is, "the place where a person lives and sleeps most of the time." Final 2020 Census Residence Criteria and Residence Situations, 83 Fed. Reg. 5525, 5526 (Feb. 8, 2018). There is no dispute that this enumeration includes undocumented immigrants where they usually reside.

Many of Defendants' arguments are strawmen that ignore this fact. For example, Defendants note that "transient aliens, such as those temporarily residing here for vacation or business, are not included in the apportionment base," Defs.' Mem. 30, but that exclusion, consistent with the Residence Rule, is due to such individuals' *transient* status, not their *immigration* status. Indeed, even U.S. citizens who usually reside outside this country would not be counted here if they were only transiently present. *See* 83 Fed. Reg. at 5533. And Defendants' assertion that "physical presence" is not "dispositive," Defs.' Mem. 27, is beside the point because their policy would exclude undocumented immigrants who are not only physically present but whom the Census Bureau concludes are usual residents of a State.

Defendants also ignore the historical record in asserting that the Framers' embrace of immigrants in the apportionment count not have contemplated persons who are unlawfully present because the first federal immigration law was enacted only after the Fourteenth Amendment. Defs.' Mem. 36. Defendants ignore the fact that certain States had immigration laws that predated the Fourteenth Amendment's adoption, such as laws that prohibited entry of persons who were mentally ill or "likely to become permanently a public charge." Ch. 195, § 3, 1847 N.Y. Laws 182, 184; *see* Kunal M. Parker, *State, Citizenship, and Territory: The Legal Construction of Immigrants in Antebellum Massachusetts*, 3 Law & History Review 583, 622–25 (2001) (describing Massachusetts' immigration laws from 1840 to 1860). There is no indication that the Fourteenth Amendment's Framers believed that immigrants who were here in violation of those state laws should be excluded from the apportionment base. *Cf.* Cong. Globe, 39th Cong., 1st Sess. 1256 (1866) (Massachusetts Senator Henry Wilson objecting to voter-population apportionment base because it would "throw out of the basis two and half millions of unnaturalized foreign-born men and women" and cost Massachusetts House seats).

In any event, the Constitution's history is unmistakably clear that the Framers affirmatively rejected using an apportionment base that turns on *any* legal status, including voter, citizenship, and immigration status. The Framers understood that mandating an apportionment base that includes "every single person residing in the United States," *New York*, 351 F. Supp. 3d at 514, would forbid such status-based exclusions and fulfill the Framers' conviction that "[a]ll the people, or all the members of a State or community, are equally entitled" to representation in the House. Cong. Globe, 39th Cong., 1st Sess. 2962 (1866) (Sen. Luke Poland).

The Supreme Court explained in *Evenwel v. Abbott*, 136 S. Ct. 1120, 1128–29 (2016), that the Framers adopted this "theory of the constitution." Defendants remarkably devote just a

single sentence in their brief to *Evenwel*, claiming that it "begs the central question here as to the limits on how 'inhabitant' may be defined." Defs.' Mem. 38. But *Evenwel* upheld intra-state redistricting on the basis of "total population," 136 S. Ct. at 1123—which indisputably encompassed undocumented immigrants, *see* Br. of Amicus Curiae Immigration Reform Law Inst. in Supp. of Appellants, *Evenwel*, No. 14-940, 2015 WL 4747986 (U.S. Aug. 7, 2015)— *because* the Constitution *requires* the use of the same "total population" base for inter-state apportionment. *Evenwel*, 136 S. Ct. at 1129. Defendants' position is irreconcilable with *Evenwel*.

Defendants' repeated references to the President's supposed "discretion" (Defs.' Mem. 31–33) thus miss the point: whatever discretion the President might have in conducting the census, that discretion does not extend to the categorical exclusion of a class of residents based solely on their immigration status. Tellingly, the principal example that Defendants marshal was a policy to *include* overseas military personnel in the enumeration because they could reasonably be considered "usual residents of the United States" and had maintained their "ties to their home States" during their *temporary* postings abroad. *Franklin v. Massachusetts*, 505 U.S. 788, 806 (1992). That more embracive policy offers no support for Defendants' decision here to *exclude* undocumented immigrants *despite* the fact that they indisputably reside here. The invidiousness of Defendants' argument is laid bare by their reliance on *Franklin* to suggest that Defendants may deem undocumented immigrants who indisputably live here to be "noninhabitants" based on their purported lack of "allegiance." Defs.' Mem. 26–28. Under that limitless theory, Defendants could exclude *all noncitizens*—or many other residents who have not shown sufficient "allegiance"—from the apportionment base. The Framers based apportionment on total population to prevent precisely such dangerous erosion of the foundational principle of "equal representation for equal numbers of people." *Wesberry v. Sanders*, 376 U.S. 1, 18 (1964).

Defendants also err in arguing that they may unilaterally deem people in immigration detention or removal proceedings "nonresidents" for purposes of apportionment. Defs.' Mem. 33. Such a unilateral determination is inconsistent with constitutional and statutory mandates, uniform historical practice, and the Residence Rule. And detained individuals comprise a small subset of the undocumented population; undocumented adults have lived in the United States for a median of 15.1 years, with 66% having lived in the United States for more than 10 years. Pew Research Center, *Five Facts about Illegal Immigration in the U.S.* (June 12, 2019), https://www.pewresearch.org/fact-tank/2019/06/12/5-facts-about-illegal-immigration-in-the-u-s. In any event, many people in immigration custody or removal proceedings have *lawful* immigration status, *see, e.g.*, *Ragbir v. Homan*, 923 F.3d 53, 56 (2d Cir. 2019), and their placement in custody or removal proceedings does not automatically render them unlawfully present. Immigration judges ultimately decide that many in custody or removal proceedings are entitled to remain in this country. *See* TRAC Immigration, *Immigration Judges Decide 57 Percent Entitled to Remain in U.S.*, https://trac.syr.edu/immigration/reports/435/. And many individuals initially designated as "undocumented"—including those intercepted at the border— ultimately obtain lawful status, such as asylum. *See* U.S. Dep't of Justice, Executive Office for Immigration Review, Statistics Yearbook Fiscal Year 2018, at 27, https://www.justice.gov/eoir/file/1198896/download (55% of asylum applications granted in 2015). Indeed, because inclusion in the apportionment turns on residence, not legal status, Defendants count people in immigration detention facilities in the apportionment base, at the detention facility where they are living. 83 Fed. Reg. at 5535.

Defendants' remaining arguments are irrelevant, wrong, or both. For example, the federal government's general authority to set criteria for entering the United States or obtaining

citizenship (Defs.' Mem. 36–37) is not at issue here—particularly given that such legal status has never mattered for inclusion in the apportionment base. Defendants rely on inapposite cases unrelated to apportionment in contending that, contrary to two hundred years of census history, "inhabitant" means solely persons who have "permission" to stay in a jurisdiction (Defs.' Mem. 32).[10] Defendants are also incorrect in contending (*id.* at 37) that immigrants' ability to gain citizenship and the right to vote through naturalization motivated the Framers to include immigrants in the apportionment base; that argument makes no sense given that the Framers' broad inclusion of all "persons" in the apportionment base swept in individuals who could not vote at all at the time, such as women. *See* Cong. Globe, 39th Cong., 1st Sess. 10 (1865). And the apportionment count has also long included immigrants who might never be eligible for citizenship. *See, e.g.*, Chinese Exclusion Act, Pub. L. No. 47-126, § 14, 22 Stat. 59 (1882) (precluding Chinese immigrants from receiving citizenship); *Takao Ozawa v. United States*, 260 U.S. 178, 192–93 (1922). The debates over the Fourteenth Amendment also make clear that the Framers were motivated to include immigrants in the apportionment base in part because States with large immigrant populations would otherwise decline to ratify the Fourteenth Amendment—which would make little sense if such immigrants could freely be excluded anyway. *See, e.g.*, *id.* at 359 (Representative Conkling).

None of the snippets of congressional debates cherry-picked by Defendants alter this analysis. For example, when properly read in context, two of the quotations in Defendants' brief (at 37) address the Fourteenth Amendment's penalization of States that continued to deny the

---

[10] Whatever the term "inhabitant" might mean in unrelated contexts, for purposes of apportionment, it has always meant a person who usually lives in the United States. *Franklin*, 505 U.S at 804. For example, Esther Kaplan of *Kaplan v. Tod*, 267 U.S. 228 (1925), whom Defendants say never resided in the U.S. because she was denied lawful entry (Defs.' Mem. 35), was in fact counted as an inhabitant in the 1920 census. *See* Mendelsohn Decl. (Ex. 61).

franchise to Black men (by explaining that States did not entirely deny the franchise to noncitizens). *See* Cong. Globe, 39th Cong., 1st Sess., at 354, 3035. And Representative Conkling referred to immigrants' ability to gain various political rights through naturalization in condemning the continued political subjugation of former slaves who were denied the right to vote. None of these quotations remotely suggest that persons who plainly live here, including undocumented immigrants, may be removed from the apportionment base—a remarkable contention that is belied by any plausible understanding of the Constitution's text and history.

**B.   The Memorandum is *ultra vires* under the statutory scheme implementing the required decennial census and reapportionment of House seats.**

In accordance with the above-described constitutional mandates, Congress enacted an "interlock[ing]" statutory scheme directing the Commerce Secretary and President to include the "total population" and "whole number of persons in each State"—including undocumented immigrants—in the decennial census used to apportion representatives. 13 U.S.C. § 141; 2 U.S.C. § 2a; *see generally* Pls.' Mem. 27–32. "[T]he historical background of the decennial census and the Act that governs it" unambiguously favors Plaintiffs. *U.S. House*, 525 U.S. at 335; *see also id.* at 350 (Scalia, J., concurring in part). Defendants concede that the term "persons" includes undocumented immigrants, Defs.' Mem. 40, but purport to find ambiguity in the phrase "in each State," *id.* This argument fails with respect to Defendants' statutory violations just as it fails with respect to their constitutional violations.

Defendants have no answer for the clear statutory text and history of the Census Act. For example, Congress required an apportionment based on the whole number of persons in each State, including non-citizens (*see* Pls.' Mem. 27–32), knowing that would include undocumented immigrants. Indeed, prior to adopting the 1929 Census Act, Congress had enacted many statutes restricting immigration (*e.g.*, An Act to Limit the Immigration of Aliens into the United States,

Pub. L. No. 68-139), and expressly rejected an amendment to the 1929 Act to require census enumerators to count immigrants and ascertain whether they had lawfully entered the United States. 71 Cong. Rec. at 2456 (1929). As Defendants essentially concede, the statutory provisions at issue here have *never* been understood to allow exclusion of undocumented immigrants. *See* Pls.' 56.1 Stmt. ¶ 1; Defs' 56.1 Resp. ¶ 1; 83 Fed. Reg. at 5526.

Moreover, once the actual enumeration includes undocumented immigrants, Defendants cannot exclude them in apportioning House seats. The statutes require that both the Secretary's Section 141 apportionment report to the President, and the President's Section 2a apportionment report to Congress, use the "total population" and "whole number of persons" reflected in the actual enumeration, which will include undocumented immigrants in 2020. Pls.' Mem. 33–36. And, for the Section 2a report, the President must conduct the "admittedly ministerial" (Defs.' Mem. 41) calculation of the apportionment using the equal-proportions method. 2 U.S.C. § 2a; *see* Pls.' Mem. 36–37. The PM violates this ministerial duty because it contemplates an apportionment based on data that is not the actual enumeration but rather subtracts millions of people from the enumeration before performing the equal-proportions calculation.

*Franklin* does not support Defendants' argument that excluding undocumented immigrants is within the President's discretionary power to "mak[e] policy judgments that result in 'the decennial census.'" Defs.' Mem. 65 (citing *Franklin*, 505 U.S. at 799). As this Court already noted and Defendants admit, "the [PM] does not purport to change the conduct of the census itself," ECF 68 at 2; *see* Defs.' Mem. 7, 10, 12. Instead, it purports to exercise discretion to exclude undocumented immigrants from apportionment *after* the enumeration is completed. 85 Fed. Reg. at 44,680. Whatever non-ministerial duties the President may have with respect to the *conduct* of the census, *see* Pls.' Mem. 33 n.21, he lacks authority to *depart* from the actual

enumeration for the apportionment. Rather, as *Franklin* affirmed, Section 2a "expressly require[s] the President to use . . . the data from the 'decennial census.'" 505 U.S. at 797.[11] Defendants' attempt to untether the actual enumeration from the apportionment undermines the Census Act's purpose of ensuring an "automatic connection" between the enumeration and apportionment, *Franklin*, 505 U.S. at 809 (Stevens, J., concurring in part and concurring in the judgment), and improperly "give[s] the party controlling [the Presidency] the power to distort representation in its own favor," *U.S. House*, 525 U.S. at 348 (Scalia, J., concurring in part).

Defendants cite cases regarding the Census Bureau's use of data other than responses to census questionnaires to complete the enumeration of the total population. Defs.' Mem. 42–43. But none of those cases involved the use of non-enumeration data to *subtract* persons already counted *post hoc*, and thereby manipulate the apportionment. *See Utah*, 536 U.S. at 471 (affirming use of imputation to "fill in" missing census questionnaire responses and thereby tabulate total population); *Franklin*, 505 U.S. at 803 (affirming use of home-of-record data for overseas employees to "allocate[ them] to their place of usual residence" as part of the enumeration). Indeed, the Supreme Court has made clear that the President must use the census's total population count for apportionment. *See, e.g.*, *New York*, 139 S. Ct. at 2568–69 (Acts "mandat[e] a population count that will be used to apportion representatives"); *U.S. House*, 525 U.S. at 321–22 ("Using this information [from the Census], the President must then "transmit to

---

[11] Defendants' other cases also do not recognize presidential discretion to depart from the enumeration for purposes of apportionment. All three cases, *Flue-Cured Tobacco Coop. Stabilization Corp. v. U.S. E.P.A.*, 313 F.3d 852, 859 (4th Cir. 2002), *Pub. Citizen v. U.S. Trade Representative*, 5 F.3d 549, 552 (D.C. Cir. 1993), and *Alabama v. Dep't of Commerce*, 396 F. Supp. 3d 1044, 1055 (N.D. Ala. 2019), discuss *Franklin*'s treatment of the Secretary's report as not final, because it is "still subject to correction." 505 U.S. at 797. While "Section 2a does not expressly require the President to use the data in the Secretary's report" because the report itself may be amended or corrected at a later date, the President's Section 2a report must use still "the data from the 'decennial census.'" *Id*.

the Congress a statement showing the whole number of persons in each State . . . and the number of Representatives to which each State would be entitled.").

Finally, Defendants assert that it is "premature" to say whether the President will rely on non-census data in conducting the apportionment. Defs.' Mem. 43. But as noted above, *supra* Part III.A, Defendants concede that the Secretary will send to the President "two sets of numbers": the actual census including undocumented immigrants counted in accordance with the "usual residence" rule, and a second number excluding them. Defs.' Mem. 42. Then, the "President will choose [the latter] to plug into the method of equal proportions." *Id*. If there are two sets of numbers, and one is the census enumeration, then the other by definition will *not* be. It is inconsistent with the "automatic connection" Congress intended between enumeration and apportionment for the President to use different data and perform extra-statutory calculations to manipulate the enumeration and resulting apportionment to his liking. *Franklin*, 505 U.S. at 809.

## IV.   Defendants' motion to dismiss for failure to state a claim should be denied.

### A.   There is no basis to dismiss Plaintiffs' claims for relief under the APA.

Defendants' argument that *Franklin* requires the dismissal of Plaintiffs' APA claims because there is not yet "final agency action" is premature. Here, Plaintiffs have alleged that final agency action has taken place or will shortly take place because, among other things, the Secretary "has issued (or will imminently issue) directives to the Census Bureau . . . to implement President Trump's directive to exclude noncitizens from the enumeration and apportionment base." Am. Compl. ¶ 104. There is a plausible basis for such allegations. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Defendants have been preparing for this exclusionary policy since the President's announcement in the Rose Garden more than a year ago that all executive agencies should provide "maximum assistance" to the Secretary to count the immigrant population. Am. Compl. ¶ 91. And although Defendants now assert that they have not

yet taken any reviewable action (*e.g.*, Defs.' Mem. 7–8), they have not produced evidence to support such an assertion; the Census Bureau declarations are notably silent on this point.

In any event, if final agency action has not yet taken place, it will likely take place soon because scant time remains before the Secretary must report the figures that the PM directs him to report. Plaintiffs have not sought summary judgment or a preliminary injunction on their APA claims, and there is no pressing need to address those claims when fast-changing circumstances on the ground (and additional disclosures by Defendants) will clarify whether there is a defect on this point. Defendants' argument assumes (Defs.' Mem. 20–21) that no set of circumstances exists under which any action taken by the Secretary or the Census Bureau will constitute final agency action, but that argument is plainly too broad: courts including this one have repeatedly subjected to APA review steps taken by the Department of Commerce or the Census Bureau in advance of the final apportionment numbers submitted by the Secretary or the President. *See, e.g.*, *U.S. House of Representatives*, 525 U.S. at 332; *New York*, 351 F. Supp. 3d at 573–74.

## B. The Governmental Plaintiffs' complaint plausibly alleges that the Memorandum violates the Tenth Amendment.

The Tenth Amendment prohibits the federal government from compelling the States "to implement, by legislation or executive action, federal regulatory programs." *Printz v. United States*, 521 U.S. 898, 925 (1997). "That is true whether [the federal government] directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012). Here, the Governmental Plaintiffs plausibly allege that by intentionally targeting states that decline to assist in federal immigration enforcement, the PM "indirectly coerces" States to legislate or promote policies that capitulate to federal interests. Am. Compl. ¶¶ 103–04, 154–55.

Defendants counterfactually respond that the "apportionment policy set forth in the

Memorandum is wholly divorced from immigration enforcement," Defs.' Mem. 22, but the PM *says* its policy is to reduce the political power of states that "hobble Federal efforts to enforce the immigration laws." 85 Fed. Reg. at 44,680. Defendants also assert that Plaintiffs have not alleged facts supporting a "reasonable inference" regarding an "unstated" coercive purpose, Defs.' Mem. 22, but the PM states its coercive goal right out loud. 85 Fed. Reg. at 44,680 ("States adopting policies that encourage illegal aliens to enter this country . . . should not be rewarded with greater representation in the House of Representatives.").

In addition, the Governmental Plaintiffs separately alleged (in a claim Defendants ignore) that by targeting certain states for unfavorable treatment, the PM violates the Tenth Amendment's guarantee of "equal sovereignty." Am. Compl. ¶¶ 156–57. This "fundamental principle"—which reflects "the constitutional equality of the States"—requires that when the federal government engages in "differential treatment" of the States, any "disparate geographic coverage is sufficiently related to the problem that it targets." *Shelby Cty., Ala. v. Holder*, 570 U.S. 529, 542, 544 (2013) (emphasizing that the government's intent is highly relevant to a court's assessment of the fit between the action and its rationale).

The Governmental Plaintiffs plausibly allege both that the PM targets certain States for unfavorable treatment, Am. Compl. ¶¶ 103–04, and that this disparate treatment is not adequately justified by the problem it claims to target—here, protecting "the integrity of the democratic process," 85 Fed. Reg. at 44,680—because it is instead motivated by discriminatory animus, *see* Am. Compl. ¶¶ 109–16, 157. These allegations state a Tenth Amendment claim.

### C. Plaintiffs have adequately stated a claim that the Presidential Memorandum was motivated by intentional discrimination.

To state a claim for intentional discrimination based on race, ethnicity, and national origin, Plaintiffs must allege only that the policy was "motivated at least in part" by improper

animus. *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1216–17 (2d Cir. 1987). Courts

assess five non-exclusive factors in considering such a claim: disparate impact; the decision's

"historical background"; "[d]epartures from the normal procedural sequence"; "[s]ubstantive

departures" from past practice; and "contemporary statements" by the decisionmakers. *Vill. of*

*Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266–68 (1977).

The complaints sufficiently allege that the PM will have a disparate impact on Latinx and

Asian Americans,[12] *see* NGO Plaintiffs' First Am. Compl. ¶¶ 23, 161–69, 215, as Defendants do

not dispute. Defendants instead argue (Defs.' Mem. 25) that disparate impact is insufficient to

state a claim for intentional discrimination, citing Chief Justice Roberts's recent plurality opinion

in *Department of Homeland Security v. Regents of Univ. of California*, 140 S. Ct. 1891 (2020).

But *Regents* did not overrule *Arlington Heights*—it merely applied the relevant factors and held

that the disparate impact there was insufficient to state a claim. *Id.* at 1915–16.

The complaints here, however, allege facts regarding all of the other *Arlington Heights*

factors, which Defendants largely ignore, including: the PM's connection to past discriminatory

efforts to strip Latinx and Asian American communities of political power; the dramatic

departure from decades of counting of undocumented residents for apportionment; the irregular

---

[12] The Court may take judicial notice of government statistics showing a correlation between States with high percentages of Latinx and Asian Americans and those with the largest percentages of undocumented residents. *See Victoria Cruises, Inc. v. Changjiang Cruise Overseas Travel Co.*, 630 F. Supp. 2d 255, 263 n.3 (E.D.N.Y. 2008). *Compare* U.S. Dep't of Homeland Sec., *Population Estimates: Illegal Alien Population Residing in the United States: January 2015* at 5 (Dec. 2018), https://www.dhs.gov/sites/default/files/publications/18_1214_PLCY_pops-est-report.pdf, *with* U.S. Census Bureau, Quick Facts: California, https://www.census.gov/quickfacts/CA; U.S. Census Bureau, Quick Facts: Texas, https://www.census.gov/quickfacts/TX; U.S. Census Bureau, Quick Facts: New Jersey, https://www.census.gov/quickfacts/NJ; U.S. Census Bureau, Quick Facts: Florida, https://www.census.gov/quickfacts/FL; U.S. Census Bureau, Quick Facts: New York, https://www.census.gov/quickfacts/NY.

and ill-timed procedural sequence involving political interference with Census Bureau operations; and Defendant Trump's overt expressions of animus. NGO Plaintiffs' First Am. Compl. ¶¶ 6, 94–106, 114–125, 127–141, 143–151, 216; Governmental Plaintiffs' Am. Compl. ¶¶ 2, 60, 63–68, 73–76, 109–116; *cf. Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1098 (N.D. Cal. 2018) ("President Trump has expressed animus against non-white, non-European immigrants.").

Defendants also mischaracterize the connection between the PM and the earlier effort to add a citizenship question to the census. Defs.' Mem. 25–26. Although the district court held in the citizenship question litigation that—based on evidence available at trial in November 2018— Plaintiffs did not meet their burden of showing the citizenship question was motivated by intentional discrimination, *New York*, 351 F. Supp. 3d at 669–71, substantial new evidence emerged after trial establishing a direct connection between the efforts to add the citizenship question and a study advising that the question would benefit "Republicans and Non-Hispanic Whites" by allowing for the exclusion of non-citizens in redistricting. NGO Plaintiffs' First Am. Compl. ¶¶ 129–31. And a week after the Supreme Court's decision, Defendant Trump made clear that the motivation for the citizenship question was not Voting Rights Act enforcement, but "to find out if someone is a citizen as opposed to an illegal" and to use it "for Congress . . . for districting." *Id.* ¶ 134.

To the extent Defendants contend that the PM is not discriminatory so long as it is rationally related to a legitimate government interest, Defs.' Mem. 25, Plaintiffs have easily pled facts to clear this hurdle, because "a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). And Defendants rely on the wrong standard of review in any event: The Supreme Court employs heightened scrutiny when evaluating the claims of a "discrete class" that is "not

accountable for their disabling status." *Plyler v. Doe*, 457 U.S 202, 223 (1982). Here, citizens

and non-citizens with legal status who are members of communities with undocumented

immigrants will be injured by the PM but did not create their "disabling status." *See* NGO

Plaintiffs' First Am. Compl. ¶¶ 23, 32, 51–52, 66–68, 77–80, 219–20.

> ### D.     The President is a proper defendant in this action.

It is the courts' constitutional duty "'to say what the law is' in particular cases and

controversies," *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218 (1995) (quoting *Marbury v.*

*Madison*, 1 Cranch 137, 177 (1803)), and this obligation is especially crucial when the

lawfulness of the President's conduct is at issue. *Boumediene v. Bush*, 553 U.S. 723, 765 (2008).

Defendants concede (Defs.' Mem. 45) that declaratory relief is available against the President.

*See Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 579–80

(S.D.N.Y. 2018) ("*Knight Inst.*"), *aff'd*, 928 F.3d 226 (2d Cir. 2019). Injunctive relief is available

as well, and Defendants' motion to dismiss the President should be denied.[13]

"It is settled law that the separation-of-powers doctrine does not bar every exercise of

jurisdiction over the President of the United States." *Clinton v. Jones*, 520 U.S. 681, 705 (1997)

(quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 753–54 (1982)). Courts recognize presidential

immunity only where "the dangers of intrusion on the authority and functions of the Executive

Branch" outweigh "the constitutional weight of the interest to be served" by the court's exercise

of jurisdiction. *Nixon*, 457 U.S. at 754; *see also, e.g.*, *Saget v. Trump*, 375 F. Supp. 3d 280, 334

(E.D.N.Y. 2019) (denying motion to dismiss the President where "injunctive relief against the

President corrects unlawful conduct"). Here, "the census is a matter of national importance,"

---

[13] Courts have enjoined past presidents or orders they have issued. *See, e.g.*, *United States v.*
*Nixon*, 418 U.S. 683, 706 (1974); *Youngstown Sheet & Tube Co. v. Sawyer*, 535 U.S. 579, 582,
584, 587–88 (1952); *United States v. Burr*, 25 F. Cas. 187, 191, 196 (No. 14,694) (CC Va. 1807).

with "massive and lasting consequences." *New York*, 351 F. Supp. 3d at 517. The "constitutional weight" of the interest in ensuring that the census is conducted in accordance with Article I and the Fourteenth Amendment cannot be overstated.

Moreover, where the President lacks discretion to take the challenged action, injunctive relief poses no separation of powers concerns. As Defendants admit, Defs.' Mem. 44, a President can be "subject to judicial injunction requiring the performance of a purely 'ministerial' duty." *Franklin*, 505 U.S. at 802–03. Here, the President purports to exercise discretion to exclude undocumented immigrants from apportionment after the decennial census is completed. 85 Fed. Reg. at 44,680. But he lacks such discretion. *See supra* Part III.A.[14]

Moreover, "the correction of an unconstitutional act" is ministerial, as "[n]o government official . . . possesses the discretion to act unconstitutionally." *Knight Inst.*, 302 F. Supp. 3d at 579; *see also Saget*, 375 F. Supp. 3d at 334. Enjoining unconstitutional presidential action cannot impinge on the President's discretion or executive authority. Defendants' reliance on *Mississippi v. Johnson*, 71 U.S. 475 (1866) is therefore misplaced. In *Mississippi*, states sought an injunction to prevent the President from exercising his discretion in enforcing the post-Civil War Reconstruction Acts; "[h]ere, unlike in *Mississippi*, injunctive relief against the President corrects unlawful conduct (rather than promotes it)." *Saget*, 375 F. Supp. 3d at 335; *see also Knight Inst.*, 302 F. Supp. 3d at 579.[15]

---

[14] Defendants assert that, under *Franklin*, an express statement by Congress would be required for this Court to issue injunctive relief. Defs.' Mem. 45. But *Franklin* held that "the President's actions may still be reviewed for constitutionality," though not under the APA. *Id.* at 801.

[15] Also, it would be premature to dismiss Plaintiffs' claims for injunctive relief against the President. Despite the "delicate" nature of the question, courts have declined to dismiss the President at the motion-to-dismiss stage. *See Mayor & City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452, 516-517 (D. Md. 2019); s*ee also Saget v. Trump*, 345 F. Supp. 3d at 297–98.

V.   **Injunctive relief is warranted to prevent irreparable harm.**

A.   **The Memorandum imposes imminent and irreparable harms.**

The harms caused by the PM are imminent and irreparable. Plaintiffs allege two primary types of harms attributable to the Presidential Memorandum: harms stemming from the exclusion of undocumented immigrants in the apportionment count, and harms caused by the Memorandum's deterrent effect on census participation. Both require immediate injunctive relief. Although Defendants urge that harms stemming from excluding immigrants in the apportionment count "can be remedied after the fact," Defs.' Br. 48, reporting unlawful apportionment numbers would wreak havoc on Plaintiffs and their state redistricting processes. *See supra* Part II. These harms cannot be unwound after the fact, and the Court should reject Defendants' invitation to wait for these injuries to be inflicted. Defs.' Mem. 48.

The PM is also causing immediate injury by deterring census participation—which, in turn, forces Plaintiffs to divert resources to additional census outreach, will degrade the quality of census data, and will exacerbate the differential undercount of immigrant communities. *See supra* Part I.A; Pls.' Mem. 42–48. Absent a preliminary injunction, Plaintiffs "will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if a court waits until the end of trial to resolve the harm.'" *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007).

Defendants note that the PM "has had no impact on the design of field operations for decennial census." Fontenot Decl. ¶ 12 (ECF No. 120). But Plaintiffs' immediate injuries stem from the effect of the PM on census response rates, not from any change to the conduct of the census itself. If anything, the Census Bureau's failure to adjust its operations to offset the PM's effect only supports Plaintiffs' claims. Barreto Reply Decl. ¶¶ 15, 25, 30 (Ex. 65).

Defendants also argue that the PM simply transmits a "general policy message" and not

"something the government has actually done"; therefore, any fear it instills cannot form the basis of irreparable harm. Defs.' Mem. 51. It is hard to fathom how an official statement from the President directing the Secretary to "take all appropriate action" to carry out federal policy is not something the government has "done." And Defendants cannot ignore harms stemming from the "predictable effect of government action." *New York*, 139 S. Ct. at 2566.

> **B.     The balance of equities and public interest favor a preliminary injunction.**

The balance of the equities and public interest also weigh strongly in Plaintiffs' favor. *See* Pls.' Mem. 50–52. As this Court has recognized, "[t]he integrity of the census is a matter of national importance." *New York*, 351 F. Supp. 3d at 517. The population count has immense consequences for political power and funding decisions over the next decade. By contrast, Defendants will suffer no injury if the PM is enjoined pending a final decision on the merits. Defendants argue that "an injunction would impede the Executive's historic discretion in conducting the census." Defs.' Mem. 53. But this cannot be squared with Defendants' concession that "the PM does *not* affect how the Census Bureau is conducting its remaining enumeration operations," *id.* at 12. The Plaintiffs' and public's interest in maintaining the integrity of the census and apportionment process far outweighs Defendants' interest in enacting a policy that runs counter to the Constitution and hundreds of years of settled practice.

> **CONCLUSION**

For the foregoing reasons, the Court should grant Plaintiffs' motion for partial summary judgment or preliminary injunction, and should deny Defendants' motion to dismiss.[16]

---

[16] Notably, Defendants failed to move to dismiss the NGO Plaintiffs' claim that Defendants are violating the Census Act's prohibition on statistical sampling. *See* NGO Pls.' Am. Compl. ¶¶ 251-62 (ECF No. 57). And Defendants' motion to dismiss with respect to Plaintiffs' *ultra vires* statutory claims fails to directly address the NGO Plaintiffs' separate claim that the President has usurped authority delegated to the Secretary of Commerce. *See id.* ¶¶ 222-36.

DATED:  August 25, 2020

Respectfully submitted,

LETITIA JAMES
*Attorney General of the State of New York*

Steven C. Wu
  *Deputy Solicitor General*
Judith N. Vale
  *Senior Assistant Solicitor General*
Eric R. Haren*, Special Counsel*

*Of Counsel*

By: */s/ Matthew Colangelo*
Matthew Colangelo
  *Chief Counsel for Federal Initiatives*
Morenike Fajana, *Special Counsel*
Elena Goldstein
  *Deputy Chief, Civil Rights Bureau*
Fiona J. Kaye, *Assistant Attorney General*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6057
Matthew.Colangelo@ag.ny.gov

*Attorneys for the Plaintiffs in* 20-CV-5770

/s/ Dale Ho
Dale E. Ho
Davin Rosborough
Adriel I. Cepeda Derieux
Jonathan Topaz
Sophia Lin Lakin*
American Civil Liberties Union
Foundation
125 Broad St.
New York, NY 10004
(212) 549-2693
dho@aclu.org
drosborough@aclu.org
acepedaderieux@aclu.org
jtopaz@aclu.org
slakin@aclu.org

/s/ John A. Freedman
John A. Freedman
R. Stanton Jones*
Daniel F. Jacobson*
Chase Raines**
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
(202) 942-5000
John.Freedman@arnoldporter.com
Stanton.Jones@arnoldporter.com
Daniel.Jacobson@arnoldporter.com
Chase.Raines@arnoldporter.com

/s/ Sarah Brannon* ***
Ceridwen Cherry*
American Civil Liberties Union
Foundation
915 15th Street, NW
Washington, DC 20005-2313
(202) 675-2337

/s/ Perry Grossman
Perry Grossman
pgrossman@nyclu.org
New York Civil Liberties Union
Foundation
125 Broad Street
New York, NY 10004
Phone: (212) 607-3329
Andre Segura**
Edgar Saldivar**

31

sbrannon@aclu.org
ccherry@aclu.org

Julia A. Gomez
Peter Eliasberg**
ACLU Foundation of Southern California
1313 West 8th Street
Los Angeles, CA 90017
(213) 977-9500
jgomez@aclusocal.org
peliasberg@aclusocal.org

Thomas Buser-Clancy**
ACLU Foundation of Texas, Inc.
P.O. Box 8306
Houston, TX 77288
Telephone: (713) 942-9146
Fax: (713) 942-8966
asegura@aclutx.org
esaldivar@aclutx.org
tbuser-clancy@aclutx.org

*Attorneys for the Plaintiffs in* 20-CV-5781

\* Admitted *pro hac vice*

\*\* Designates *pro hac vice* application forthcoming.

\*\*\* Not admitted in the District of Columbia; practice limited pursuant to D.C. App. R. 49(c)(3).