UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                   :

STATE OF NEW YORK, et al.,             :

                                   :

                      Plaintiffs,     :        20-CV-5770 (RCW) (PWH) (JMF)

                                   :

          -v-                    :          <u>OPINION AND ORDER</u>

                                   :

DONALD J. TRUMP, *in his official capacity as*  :
*President of the United States*, et al.,       :

                                   :

                    Defendants.   :

                                   :
-------------------------------------------------------------------X

Before:      RICHARD C. WESLEY, United States Circuit Judge
               PETER W. HALL, United States Circuit Judge
               JESSE M. FURMAN, United States District Judge

BACKGROUND ............................................................................................. 6

  A.   The Constitutional and Statutory Scheme.......................................................... 6

  B.   The Use of Census Data.................................................................................... 8

  C.   The Citizenship Question Litigation and Its Aftermath..................................... 10

  D.   The 2020 Census............................................................................................. 12

  E.   The Presidential Memorandum......................................................................... 15

  F.   This Litigation................................................................................................. 17

SUMMARY JUDGMENT STANDARD ................................................................. 19

STANDING AND RIPENESS ................................................................................ 20

  A.   The Law of Standing....................................................................................... 21

  B.   Facts Relevant to Standing.............................................................................. 25

  C.   Standing Analysis ........................................................................................... 36

1.  Injury in Fact ................................................................................................. 40

    a.  Degradation of Census Data ......................................................... 41

    b.  Diversion of Resources ................................................................. 46

2.  Traceability ...................................................................................................... 50

3.  Redressability .................................................................................................. 53

4.  Conclusion ....................................................................................................... 57

D.  Prudential Ripeness .................................................................................................... 58

THE MERITS ............................................................................................................................. 62

A.  Apportionment Must Be Based on the Results of the Census Alone .............................. 63

B.  The Apportionment Base Cannot Exclude Illegal Aliens Who Reside in a State ........... 69

C.  Conclusion ................................................................................................................... 77

REMEDIES ................................................................................................................................. 79

A.  Injunctive Relief .......................................................................................................... 79

B.  Declaratory Relief ........................................................................................................ 84

CONCLUSION ............................................................................................................................ 85

PER CURIAM.

The Constitution provides that "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State."  U.S. Const. amend. XIV, § 2.  To enable that apportionment, it mandates that an "actual Enumeration" be conducted "every . . . ten Years, in such Manner as [Congress] shall by Law direct," an effort commonly known as the decennial census.  *Id.* art. I, § 2, cl. 3.  Congress has delegated the task of conducting the census to the Secretary of Commerce, who is required to

report "[t]he tabulation of total population by States" to the President.  13 U.S.C. § 141(a)-(b).
The President, in turn, is required to transmit to Congress "a statement showing the whole
number of persons in each State . . . as ascertained under the . . . decennial census of the
population, and the number of Representatives to which each State would be entitled" using a
mathematical formula "known as the method of equal proportions."  2 U.S.C. § 2a(a).
Throughout the Nation's history, the figures used to determine the apportionment of Congress —
in the language of the current statutes, the "total population" and the "whole number of persons"
in each State — have included every person residing in the United States at the time of the
census, whether citizen or non-citizen and whether living here with legal status or without.

On July 21, 2020, however, the President announced that this long-standing practice will
no longer be the case.  In a Presidential Memorandum issued on that date (and entered into the
Federal Register two days later), the President declared that, "[f]or the purpose of the
reapportionment of Representatives following the 2020 census" — which, as of today, is still
ongoing — "it is the policy of the United States to exclude from the apportionment base aliens
who are not in a lawful immigration status."  Excluding Illegal Aliens From the Apportionment
Base Following the 2020 Census, 85 Fed. Reg. 44,679, 44,680 (July 23, 2020) (ECF No. 1-1)
(the "Presidential Memorandum").[1]  To implement this new policy, the President ordered the
Secretary of Commerce (the "Secretary") to provide him two sets of numbers for each State:
first, the total population as determined in the 2020 census and, second, the total population as
determined in the 2020 census minus the number of "aliens who are not in a lawful immigration
status."  Id.  The President left it to the Secretary of Commerce to figure out how to calculate the
number of "aliens who are not in a lawful immigration status" in each State.  But one thing is

---

[1]        Unless otherwise noted, all docket references are to 20-CV-5770.

clear: that number would not come from the census itself, as the 2020 census is not collecting information regarding citizenship status, let alone legal immigration status in this country, and the 2020 census will count illegal aliens according to where they reside.

In these consolidated cases, filed only three days after the Presidential Memorandum, two sets of Plaintiffs — one, a coalition of twenty-two States and the District of Columbia, fifteen cities and counties, and the United States Conference of Mayors (the "Governmental Plaintiffs") and the other, a coalition of non-governmental organizations (the "NGO Plaintiffs") — challenge the decision to exclude illegal aliens from the apportionment base for Congress on the ground that it violates the Constitution, statutes governing the census and apportionment, and other laws. On August 7, 2020, they filed a motion for summary judgment or, in the alternative, a preliminary injunction. Plaintiffs allege that the Presidential Memorandum will cause, or is already causing, two forms of irreparable harm. First, noting that the Presidential Memorandum itself identifies a State — believed to be California — that would stand to lose two or three seats in the House of Representatives if illegal aliens are excluded from the apportionment base, they argue that the Memorandum will result in the loss of seats in the House. Second, they argue that the Presidential Memorandum is having an immediate impact on the census count — which is still ongoing — and that that, in turn, is resulting, and will result, in various forms of injury. Defendants — the President, Secretary of Commerce Wilber L. Ross, Jr., Director of the U.S. Census Bureau Steven Dillingham (the "Director"), the United States Department of Commerce (the "Department"), and the Bureau of the Census (the "Census Bureau") — oppose Plaintiffs' motion and filed a cross-motion to dismiss, arguing that the Court lacks jurisdiction to entertain Plaintiffs' claims and that the exclusion of illegal aliens from the apportionment base is a lawful

exercise of the President's discretion with respect to the conduct of the census and apportionment.

For the reasons that follow, Plaintiffs are entitled to summary judgment.  The Presidential Memorandum violates the statutes governing the census and apportionment in two clear respects. First, pursuant to the virtually automatic scheme established by these interlocking statutes, the Secretary is mandated to report a single set of numbers — "[t]he tabulation of total population by States" under the decennial census — to the President, and the President, in turn, is required to use the same set of numbers in connection with apportionment.  By directing the Secretary to provide two sets of numbers, one derived from the decennial census and one not, and announcing that it is the policy of the United States to use the latter in connection with apportionment, the Presidential Memorandum deviates from, and thus violates, the statutory scheme.  Second, the Presidential Memorandum violates the statute governing apportionment because, so long as they reside in the United States, illegal aliens qualify as "persons in" a "State" as Congress used those words.

On those bases, we declare the Presidential Memorandum to be an unlawful exercise of the authority granted to the President by statute and enjoin Defendants — but not the President himself — from including in the Secretary's report to the President any information concerning the number of aliens in each State "who are not in a lawful immigration status under the Immigration and Nationality Act."  Presidential Memorandum, 85 Fed. Reg. at 44,680.  Because the President exceeded the authority granted to him by Congress by statute, we need not, and do not, reach the overlapping, albeit distinct, question of whether the Presidential Memorandum constitutes a violation of the Constitution itself.

The merits of the parties' dispute are not particularly close or complicated.  Before getting to the merits, however, we must confront a question that is closer: whether we have jurisdiction to even consider the merits.

It is axiomatic that federal courts are courts of limited jurisdiction and may consider the merits of a case only if the case is of the sort traditionally amenable to, and resolvable by, the judicial process.  That requires a plaintiff seeking relief in federal court to demonstrate that it has "standing" to bring suit and that its claims are ripe for decision.  Here, if the sole harm that Plaintiffs alleged were the harm to their apportionment interests, they might not satisfy the requirements of standing and ripeness, as the Secretary has not yet taken any public action in response to the Presidential Memorandum and could conceivably conclude that it is not feasible (or lawful) to exclude illegal aliens from the apportionment base.  But Plaintiffs allege — and have proved — that they are suffering, and will suffer, more immediate and certain injuries by virtue of the harm that the Presidential Memorandum is causing to the accuracy of the census count itself.  In light of those injuries, we conclude that we have jurisdiction to grant Plaintiffs the relief they are seeking.

## BACKGROUND

The following background facts, drawn from the admissible materials submitted by the parties and materials of which the Court may take judicial notice, are undisputed except where noted.  *See, e.g.*, *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).[2]

### A.  The Constitutional and Statutory Scheme

Article I of the Constitution requires that an "actual Enumeration" of the population, known as the decennial census, be conducted "every . . . ten Years, in such Manner as [Congress]

---

[2]        We discuss facts relevant to the issues of standing and ripeness below.

shall by Law direct." U.S. Const. art I, § 2, cl. 3. The primary purpose of this enumeration was to apportion congressional representatives among the States "according to their respective Numbers." *Id.* The number of Representatives apportioned to each State determines, in turn, that State's share of electors in the Electoral College. *See id.* art. II, § 1, cl. 2; *see also* 3 U.S.C. § 3. For the first eighty years of the Nation's history, the States' "respective Numbers" were calculated according to the formula set forth in the Constitution's infamous "Three-Fifths Clause," which provided that the "actual Enumeration" established by the census would be arrived at by "adding to the whole Number of free Persons . . . , and excluding Indians not taxed, three fifths of all other Persons" — "all other Persons" being people then held as slaves. U.S. Const. art I, § 2, cl. 3. In 1868, that provision was modified by the Fourteenth Amendment, which provides that "Representatives shall be apportioned among the several States according to their respective numbers, *counting the whole number of persons in each State*, excluding Indians not taxed." U.S. Const. amend. XIV, § 2 (emphasis added).[3]

The modern census is governed by the Census Act, which Congress most recently amended in 1976. *See* Act of Oct. 17, 1976 (the "Census Act" or the "Act"), Pub. L. No. 94-521, 90 Stat. 2459 (codified in scattered sections of 13 U.S.C.). Section 141(a) of the Act broadly delegates to the Secretary the duty to "take a decennial census of population as of the first day of April of such year . . . in such form and content as he may determine." 13 U.S.C. § 141(a). The Act then mandates that "[t]he tabulation of total population by States under subsection (a) of this section as required for the apportionment of Representatives in Congress among the several States shall be completed within 9 months after the census date" — in this

---

[3]     For practical purposes, the "Indians not taxed" proviso was rendered moot by the Indian Citizenship Act of 1924, Pub. L. No. 68-175, 43 Stat. 253 (codified as amended at 8 U.S.C. § 1401(b)), which declared that all Native Americans born in the United States are citizens.

case, January 1, 2021 — "and reported by the Secretary to the President of the United States."

*Id.* § 141(b).  Within a short time thereafter — in this case, between January 3 and January 10,

2021 — "the President shall transmit to the Congress a statement showing the whole number of

persons in each State, excluding Indians not taxed, as ascertained under the . . . decennial census

of the population, and the number of Representatives to which each State would be entitled under

an apportionment of the then existing number of Representatives by the method known as the

method of equal proportions, no State to receive less than one Member."  2 U.S.C. § 2a(a).  The

Clerk of the House of Representatives must, in turn, "send to the executive of each State a

certificate of the number of Representatives to which such State is entitled" within fifteen days

of the President's statement.  *Id.* § 2a(b).  With limited exceptions not relevant here, the Census

Act strictly prohibits disclosure — even to other federal agencies — of any data or information

concerning individual respondents to the census.  *See* 13 U.S.C. §§ 8-9; *New York v. U.S. Dep't

of Commerce*, 351 F. Supp. 3d 502, 523 (S.D.N.Y.), *aff'd*, 139 S. Ct. 2551 (2019).

**B.  The Use of Census Data**

Although the "initial" — and core — "constitutional purpose" of the census was to

"provide a basis for apportioning representatives among the states in the Congress" (and, in turn,

allocating members of the Electoral College), the census has long "fulfill[ed] many important

and valuable functions for the benefit of the country."  *Baldrige v. Shapiro*, 455 U.S. 345, 353

(1982).  As the Supreme Court has observed, it "now serves as a linchpin of the federal statistical

system by collecting data on the characteristics of individuals, households, and housing units

throughout the country."  *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316,

341 (1999) (internal quotation marks and citation omitted).  Indeed, "[t]oday, policy makers at

all levels of government, as well as private businesses, households, researchers, and nonprofit

organizations, rely on an accurate census in myriad ways that range far beyond the single fact of how many people live in each state." *New York v. Dep't of Commerce*, 351 F. Supp. 3d at 519 (citation omitted).  Among other things, the data are now used not only for apportionment, but also "for such varied purposes as computing federal grant-in-aid benefits, drafting of legislation, urban and regional planning, business planning, and academic and social studies." *Baldrige*, 455 U.S. at 353 n.9.

In *New York v. Department of Commerce*, the court described many of the varied uses beyond congressional apportionment to which the federal, state, and local governments put census data, which Plaintiffs reiterate in this case.  *See* 351 F. Supp. 3d at 596-99, 610-13.  To provide a few examples here:

- The federal government relies on census data to allocate vast sums of money among and within States.  In fiscal year 2016, for example, at least 320 such programs allocated about $900 billion using census-derived data.  *See id.* at 596.

- State governments — including those among the Governmental Plaintiffs here — mandate the use of census data to draw intrastate political districts.  *See id.* at 594-95, 612; *House of Representatives*, 525 U.S. at 333 n.4, 334; *see also, e.g.*, ECF No. 76-11 ("Brower Decl."), ¶ 16-18 (Minnesota); ECF No. 76-37 ("Rapoza Decl."), ¶ 5 (Rhode Island).

- State law requires the use of census data for various purposes, ranging from the allocation of governmental resources and imposition of expenses among local governments to the setting of utility fees and official salaries.  *See New York v. Dep't of Commerce*, 351 F. Supp. 3d at 612-13 (citing various state statutes).

- State and local governments — including those among the Governmental Plaintiffs here — rely on census data, including granular local-level "characteristic data," to perform essential government functions.  New York City, for example, makes important decisions about how to allocate public services in reliance on demographic data derived from the census, as when its Department of Education redraws school zone boundary lines, ECF No. 76-21, ("Salvo Decl."), ¶ 15; when its Department of Health deploys resources based on its best understanding of the age, race, and Hispanic origin characteristics within particular communities, *id.* ¶ 14; and when its Population Division uses age data to target services for aged individuals, *id.* ¶ 16.

Thus, inaccuracies in federal census data would affect state and local governments — and, by extension, their residents — in many ways, only some of which would be measurable.  Critically, in many instances, that would be true even if the total population counts were not materially affected — because of the importance of accuracy at the local or subgroup level.[4]

## C.  The Citizenship Question Litigation and Its Aftermath

This is not the first time issues relating to the 2020 census have been brought in this District.  On March 22, 2018, the Secretary announced that he had decided to include "a question about citizenship on the 2020 decennial census questionnaire," claiming "that he was acting at the request of the Department of Justice (DOJ), which sought improved data about citizen voting-age population for purposes of enforcing the Voting Rights Act."  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2562 (2019).  Shortly thereafter, two groups of plaintiffs — including most, if not all, Plaintiffs here — filed suit in this District, alleging that the decision to include the citizenship question violated the Constitution and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*  On January 15, 2019, after an eight-day bench trial, Judge Furman issued detailed findings of fact and conclusions of law, holding that the Secretary's decision was arbitrary and capricious, contrary to law, and pretextual.  *New York v. Dep't of*

---

[4]     Although less relevant here, accurate census data is also critical to others, including scholars and private-sector businesses.  *See, e.g.*, Br. of *Amici Curiae* 16 Businesses & Business Organizations at 3, ECF No. 103-1 ("Businesses Amicus") ("The Census provides critical data that informs decision-making in both the private and public sectors. . . .  Consequently, government action that threatens the accuracy of Census data directly harms the businesses nationwide that rely on that data."); MARGO J. ANDERSON, THE AMERICAN CENSUS: A SOCIAL HISTORY 260-61 (2d ed. 2015) (describing how "[s]ocial scientists in university settings, in businesses, or in stand-alone research organization [have become] the market" for census data in the modern era).  For instance, businesses rely on census data "to make a variety of decisions, including where to put new brick-and-mortar locations, how to market their products, and how to predict which products will be successful in a given market. . . .  All of these things depend on the availability of accurate Census data."  Businesses Amicus 2.

*Commerce*, 351 F. Supp. 3d at 516; *see id.* at 635-64.  He vacated the Secretary's decision and

enjoined its implementation.  *See id.* at 671-80.  The defendants filed a notice of appeal and a

petition for certiorari before judgment in the Supreme Court.  The Supreme Court granted their

petition and then affirmed on the ground that the Secretary's stated rationale was pretextual.  *See*

*Dep't of Commerce v. New York*, 139 S. Ct. at 2573-76.  Thereafter, on consent, Judge Furman

entered a permanent injunction barring the Secretary from asking persons about citizenship status

as part of the 2020 decennial census.  *See* Order at 2, ECF No. 653, *New York*, No. 18-CV-2921

(JMF) (S.D.N.Y. Aug. 7, 2019).

Shortly after the Supreme Court affirmed Judge Furman's judgment, the President

responded with an Executive Order aimed at "compil[ing]" citizenship data "by other means."

Collecting Information About Citizenship Status in Connection With the Decennial Census,

Exec. Order No. 13,880 § 1, 84 Fed. Reg. 33,821, 33,821 (July 16, 2019).  The Executive Order

directed "all executive departments and agencies" to provide to the Department "the maximum

assistance permissible, consistent with law, in determining the number of citizens and non-

citizens in the country, including by providing any access that the Department may request to

administrative records."  *Id.* § 3 at 33,824.  The Executive Order explained that data identifying

citizens would, among other things, "help . . . generate a more reliable count of the unauthorized

alien population in the country," which "would," in turn, "be useful . . . in evaluating many

policy proposals."  *Id.* § 1 at 33,823.  Noting that the Supreme Court's decision in *Evenwel v.*

*Abbott*, 136 S. Ct. 1120 (2016), had "left open the question whether 'States may draw districts to

equalize voter-eligible population rather than total population,'" the Executive Order also

explained that citizenship data could be used by states "to design State and local legislative

districts based on the population of voter-eligible citizens."  *Id.* § 1 at 33,823-24.  The Executive

Order said nothing about using citizenship data for purposes of congressional apportionment. Similarly, in remarks he made when announcing the Executive Order, the President made no mention of using citizenship data in connection with congressional apportionment.  *See* Remarks on Citizenship and the Census, 2019 DAILY COMP. PRES. DOC. 465 (July 11, 2019), https://www. govinfo.gov/content/pkg/DCPD-201900465/pdf/DCPD-201900465.pdf.

**D.  The 2020 Census**

On February 8, 2018 the Census Bureau promulgated the "Residence Rule" establishing the residence criteria for the 2020 census.  *See* Final 2020 Census Residence Criteria and Residence Situations, 83 Fed. Reg. 5525 (Feb. 8, 2018) (the "Residence Rule" or the "Rule"). "The residence criteria are used to determine where people are counted during each decennial census."  *Id.* at 5526.  "[G]uided by the constitutional and statutory mandates to count all residents of the several states," the Rule explains, "[t]he state in which a person resides and the specific location within that state is determined in accordance with the concept of 'usual residence,' which is defined by the Census Bureau as the place where a person lives and sleeps most of the time. . . .  This concept of 'usual residence' is grounded in the law providing for the first census, the Act of March 1, 1790, expressly specifying that persons be enumerated at their 'usual place of abode.'"  *Id.*  Applying these criteria, the Rule explains that all "[c]itizens of foreign countries living in the United States" are to be "[c]ounted at the U.S. residence where they live and sleep most of the time," with the exception of "[c]itizens of foreign countries living in the United States who are members of the diplomatic community" (who are counted at the embassy, consulate, United Nations' facility, or other residences where diplomats live) and "[c]itizens of foreign countries visiting the United States, such as on a vacation or business trip" (who are not counted at all).  *Id.* at 5533.  Notably, during the notice-and-comment process, the

Census Bureau considered a comment "express[ing] concern about the impact of including undocumented people in the population counts for redistricting because these people cannot vote." *Id.* at 5530.  But the Census Bureau decided to "retain the proposed residence situation guidance for foreign citizens in the United States," reiterating that "[f]oreign citizens are considered to be 'living' in the United States if, at the time of the census, *they are living and sleeping most of the time at a residence in the United States*."  *Id.* (emphasis added).

The Census Bureau relies on various means to obtain census data, beginning with a questionnaire to which households are asked to self-respond and ending with a set of procedures known as "Non-Response Follow-Up" operations.  *See New York v. Dep't of Commerce*, 351 F. Supp. 3d at 521.  The 2020 census count "officially began in the rural Alaskan village of Toksook Bay" on January 21, 2020.  U.S. Census Bureau, *Important Dates*, U.S. CENSUS 2020, https://2020census.gov/en/important-dates.html (last visited September 7, 2020).  Census operations were in full swing by mid-March, when the Census Bureau was confronted with the unprecedented challenge of the COVID-19 pandemic.  On April 13, 2020, the Secretary and the Director announced that, due to the pandemic, the Census Bureau would temporarily suspend field data collection activities; seek a 120-day extension from Congress of the deadline "to deliver final apportionment counts"; and "extend the window for field data collection and self-response to October 31, 2020, which will allow for apportionment counts to be delivered to the President by April 30, 2021."  *U.S. Department of Commerce Secretary Wilbur Ross and U.S. Census Bureau Director Steven Dillingham Statement on 2020 Census Operational Adjustments Due to COVID-19*, U.S. CENSUS BUREAU (Apr. 13, 2020), https://www.census.gov/newsroom/ press-releases/2020/statement-covid-19-2020.html.  In the following months, representatives of

the Census Bureau reiterated on multiple occasions that additional time was required to complete the apportionment count and deliver it to the President.[5]

The Census Bureau resumed field operations in May 2020.  *See* U.S. Census Bureau, *2020 Census Operational Adjustments Due to COVID-19* ("*Census Operations Adjustments*"), U.S. CENSUS 2020, https://2020census.gov/en/news-events/operational-adjustments-covid-19.html (last visited Sept. 9, 2020).  Despite the Census Bureau's earlier statements indicating the need for more time to complete the census, Director Dillingham announced on August 3, 2020, that the Census Bureau would end field operations on September 30, 2020, a month earlier than the previously announced deadline of October 31, 2020.  *See Statement from U.S. Census Bureau Director Steven Dillingham: Delivering a Complete and Accurate 2020 Census Count*, U.S. CENSUS BUREAU (Aug. 3, 2020), https://www.census.gov/newsroom/press-releases/2020/delivering-complete-accurate-count.html; *see also* ECF No. 62 ("NGO Pls. Compl."), ¶¶ 10 & n.3, 114, 174 n.69.  As of today, therefore, the census is still ongoing — with enumerators conducting in-person Non-Response Follow-Up work to ensure that any household that did not self-respond to the census is nonetheless counted as part of the "actual Enumeration."  *See Census Operations Adjustments*; *see also* ECF No. 34 ("Gov't Pls.' Compl."), ¶ 130 & n.20.  In fact, there is some doubt about the date on which these efforts will end and the counting will

---

[5]       *See, e.g.*, U.S. CENSUS BUREAU, OPERATIONAL PRESS BRIEFING – 2020 CENSUS UPDATE 21 (July 8, 2020), https://www.census.gov/content/dam/Census/newsroom/press-kits/2020/news-briefing-program-transcript-july8.pdf (statement of Albert Fontenot, Assoc. Dir. for Decennial Census Programs) (explaining that the Bureau was "past the window of being able" to produce the apportionment count by December 31, 2020); *see also, e.g.*, Nat'l Conf. of Am. Indians, 2020 Census Webinar: American Indian/Alaska Native, YOUTUBE (May 26, 2020), https://www.youtube.com/watch?v=F6IyJMtDDgY&feature=youtu.be&t=4689 (statement of Tim Olson, Assoc. Dir. For Field Operations) (explaining that "[w]e have passed the point where [the Bureau] could even meet the current legislative requirement of December 31.  We can't do that anymore.  We've passed that for quite a while now.").

stop.  On September 5, 2020, the Honorable Lucy H. Koh, United States District Judge for the

Northern District of California, entered a temporary restraining order enjoining the Census

Bureau from "implementing the August 3, 2020 [plan] or allowing to be implemented any

actions as a result of the shortened timelines in the August 3, 2020 [plan]."  *Nat'l Urban League*

*v. Ross*, No. 20-CV-5799 (LHK), 2020 WL 5291452, at *4 (N.D. Cal. Sept. 5, 2020).  A

preliminary injunction hearing is scheduled in that case for September 17, 2020.  *See id.*

### E.  The Presidential Memorandum

In the meantime — that is, with the census count still being conducted — on July 21,

2020, the President issued the Presidential Memorandum, titled "Excluding Illegal Aliens From

the Apportionment Base Following the 2020 Census."  Presidential Memorandum, 85 Fed. Reg.

at 44,679.  In it, the President declared that, "[f]or the purpose of the reapportionment of

Representatives following the 2020 census, it is the policy of the United States to exclude from

the apportionment base aliens who are not in a lawful immigration status . . . to the maximum

extent feasible and consistent with the discretion delegated to the executive branch."  *Id.* at

44,680.  "Excluding these illegal aliens from the apportionment base," the President posited, "is

more consonant with the principles of representative democracy underpinning our system of

Government.  Affording congressional representation, and therefore formal political influence, to

States on account of the presence within their borders of aliens who have not followed the steps

to secure a lawful immigration status under our laws undermines those principles."  *Id.*

Additionally, the President asserted that "[i]ncreasing congressional representation based on the

presence of aliens who are not in a lawful immigration status would also create perverse

incentives encouraging violations of Federal law" and that "States adopting policies that

encourage illegal aliens to enter this country and that hobble Federal efforts to enforce the

immigration laws passed by the Congress should not be rewarded with greater representation in the House of Representatives."  *Id.*  Referring to one State with "more than 2.2 million illegal aliens" — apparently California, *see* ECF No. 75 ("Pls.' Rule 56.1 Statement"), ¶ 4 — the Presidential Memorandum noted that "[i]ncluding these illegal aliens in the population of the State for the purpose of apportionment could result in the allocation of two or three more congressional seats than would otherwise be allocated."  Presidential Memorandum, 85 Fed. Reg. at 44,680.

To implement this new "policy of the United States," the President directed the Secretary to provide him with two sets of data.  First, the Presidential Memorandum mandates that, "[i]n preparing his report to the President under section 141(b) of title 13, United States Code, the Secretary shall take all appropriate action, consistent with the Constitution and other applicable law, to provide information permitting the President, to the extent practicable, to exercise the President's discretion to carry out the policy."  *Id.*  Second, "[t]he Secretary shall *also* include in that report information tabulated according to the methodology set forth in *Final 2020 Census Residence Criteria and Residence Situations*, 83 FR 5525 (Feb. 8, 2018)."  *Id.* (emphasis added). In other words, to the extent "feasible" or "practicable," the Secretary is now required to include *two* sets of numbers for each State in his report to the President under Section 141(b) of the Census Act: first, the total population as determined in accordance with the Residence Rule, which includes citizens of foreign countries "living in the United States," without regard for the legal status of such persons in this country, Residence Rule, 83 Fed. Reg. at 5533; and second, the total population *minus* the number of "aliens who are not in a lawful immigration status." Presidential Memorandum, 85 Fed. Reg. at 44,680.

**F. This Litigation**

On July 24, 2020 — only three days after the Presidential Memorandum — both the Governmental Plaintiffs and the NGO Plaintiffs filed their initial complaints.  *See* ECF No. 1; 20-CV-5781, ECF No. 1.[6]  In their now-amended Complaints, Plaintiffs contend that the Presidential Memorandum violates the Constitution's Enumeration Clause, as modified by the Fourteenth Amendment; is motivated by discriminatory animus toward Hispanics and immigrant communities of color, in violation of the equal protection component of the Fifth Amendment's Due Process Clause; coerces state and local governments and denigrates the equal sovereignty of the States in violation of the Tenth Amendment; violates the constitutional separation of powers by usurping the authority Congress delegated to the Secretary; constitutes an *ultra vires* violation of 2 U.S.C. § 2a and 13 U.S.C. § 141; violates the APA; and violates the Census Act's prohibition on the use of statistical sampling for purposes of congressional apportionment, *see* 13 U.S.C. §§ 141, 195.  They seek a declaration that the Presidential Memorandum is unlawful, an injunction prohibiting Defendants from taking any action to implement or further the Memorandum, and writs of mandamus compelling the Secretary and the President to transmit figures that do not exclude illegal aliens based on immigration status.

The cases were initially assigned to Judge Furman alone, who consolidated them pursuant to Rule 42(a)(2) of the Federal Rules of Civil Procedure.  ECF No. 43, at 1.  On August 5, 2020, Judge Furman held an initial pretrial conference by telephone.  During the conference,

---

[6]     At least six other cases in four other Districts have been filed challenging the Presidential Memorandum.  *See* Compl., *Common Cause v. Trump*, No. 20-CV-2023 (D.D.C. July 23, 2020); Compl., *Haitian-Ams. United, Inc. v. Trump*, No. 20-CV-11421 (D. Mass. July 27, 2020); Compl., *City of San Jose v. Trump*, No. 20-CV-5167 (N.D. Cal. July 27, 2020); Compl., *California v. Trump*, No. 20-CV-5169 (N.D. Cal. July 28, 2020); Compl., *Useche v. Trump*, No. 20-CV-2225 (D. Md. July 31, 2020); Second Am. Compl., *La Union Del Pueblo Entero v. Trump*, No. 19-CV-2710 (D. Md. Aug. 13, 2020).

Plaintiffs advised that they intended to immediately file a motion for summary judgment (or, in the alternative, a preliminary injunction), and Defendants advised that they intended to file a motion to dismiss.  ECF No. 79 ("Aug. 5, 2020 Tr."), at 11, 27, 36-38; *see also* ECF No. 37 ("Joint Pre-Conference Ltr."), at 6.  Noting that Plaintiffs disclaimed the need for any discovery in connection with their motion for summary judgment or a preliminary injunction, Judge Furman set an expedited schedule and cautioned that, "[i]f defendants believe[d]" upon seeing Plaintiffs' motion papers "that there is any need for discovery," they were required "to confer" with Plaintiffs "immediately and then submit a joint letter."  Aug. 5, 2020 Tr. at 46.

At Plaintiffs' request, and without objection from Defendants, Judge Furman filed a formal request on August 7, 2020, for the appointment of a three-judge district court pursuant to 28 U.S.C. § 2284(b).  *See* ECF No. 68; *see also* ECF Nos. 58, 65.  On August 10, 2020, the Honorable Robert A. Katzmann, then the Chief Judge of the Second Circuit, designated Judges Wesley and Hall to serve as the other members of a three-judge panel to hear these cases.  *See* ECF No. 82.  Thereafter, the panel adopted the scheduling order previously entered by Judge Furman alone.  *See* ECF No. 86.

Pursuant to that scheduling order, Plaintiffs filed their motion on August 7, 2020.  *See* ECF No. 74.  Plaintiffs seek summary judgment (or, in the alternative, a preliminary injunction) on only some of their claims, namely that the Presidential Memorandum violates the Enumeration Clause and Fourteenth Amendment and constitutes an *ultra vires* violation of the statutes governing the census and apportionment.  *See* ECF No. 77 ("Pls.' Mem."), at 10-40. Plaintiffs' motion is supported by declarations of both fact and expert witnesses.  *See* ECF No. 76 ("Colangelo Decl."); ECF No. 149 ("Goldstein Decl.").

In response, Defendants did not ask to depose Plaintiffs' declarants or request discovery of any kind; nor did they seek a hearing.  Instead, on August 19, 2020, they filed their opposition to Plaintiffs' motion and a cross-motion to dismiss.  *See* ECF No. 117.  To the extent relevant here, they argue that the Court lacks jurisdiction to hear Plaintiffs' claims because they are unripe and Plaintiffs lack standing; that the Enumeration Clause and *ultra vires* claims fail because the decision to exclude illegal aliens from the apportionment base is a lawful exercise of the President's discretion with respect to the census and apportionment; that Plaintiffs are not entitled to injunctive relief because they cannot show irreparable harm; and that the President is not a proper defendant.  *See* ECF No. 118 ("Defs.' Mem.").  On August 28, 2020, the motions became fully briefed, *see* ECF No. 154 ("Defs.' Reply"), and on September 3, 2020, the Court held oral argument by telephone.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate where the admissible evidence and pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam).  A dispute over an issue of material fact qualifies as genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008).  The initial burden of establishing that no genuine factual dispute exists rests upon the party seeking summary judgment.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994).  If the moving party shows a *prima facie* entitlement to summary judgment,

"the burden shifts to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006).

In ruling on a motion for summary judgment, a court must view all evidence "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Mil. & Naval Affs.*, 373 F.3d 83, 89 (2d Cir. 2004), and must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). To defeat a motion for summary judgment, the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).

## STANDING AND RIPENESS

As noted, Plaintiffs move for summary judgment on two grounds: that Defendants' decision to exclude illegal aliens from the apportionment base violates the Enumeration Clause and the Fourteenth Amendment of the Constitution; and that it exceeds the authority granted by Congress in the statutes that govern the census and congressional apportionment. *See* Pls.' Mem. 10-40. Before reaching the merits of either argument, however, we must address Defendants' contention that we lack jurisdiction. *See, e.g., Steel Co. v. Citizens for a Better Env't*, 523 U.S.

83, 88-89 (1998) (noting that subject-matter jurisdiction cannot be assumed and is a "threshold question that must be resolved . . . before proceeding to the merits").

Defendants argue and move to dismiss on the ground that we lack jurisdiction for two reasons: because Plaintiffs fail to establish that they have standing to sue and because their claims are not yet ripe.  Where, as here, the question is whether a plaintiff's injury is sufficiently "real and concrete rather than speculative and hypothetical, the ripeness inquiry merges almost completely with standing."  *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138-39 (9th Cir. 2000) (citation omitted); *accord Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014); *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013) (quoting *Simmonds v. INS*, 326 F.3d 351, 357 (2d Cir. 2003).  Thus, courts often address them together under the single umbrella term of "standing," *see, e.g.*, *Susan B. Anthony List*, 573 U.S. at 157 n.5; *Nat'l Org. for Marriage*, 714 F.3d at 689 n.6, and we will do the same here.  But there is a second, arguably distinct form of ripeness doctrine that Defendants invoke: prudential ripeness, which concerns whether a case that might qualify as a bona fide case or controversy is nevertheless better decided later.  *See, e.g.*, *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 670 n.2 (2010) ("Ripeness reflects constitutional considerations that implicate Article III limitations on judicial power, as well as prudential reasons for refusing to exercise jurisdiction." (internal quotation marks and citation omitted)).  We will begin with the issue of standing — the toughest issue in this case — and then turn briefly to prudential ripeness.

## A.  The Law of Standing

Article III of the Constitution limits the "judicial Power" of the United States to "Cases" and "Controversies."  *See* U.S. Const. art. III, § 2.  This means that all suits filed in federal court must be "cases and controversies of the sort traditionally amenable to, and resolved by, the

judicial process." *Steel Co.*, 523 U.S. at 102.  One way courts implement that requirement is by

ensuring that "at least one plaintiff" in any federal case has "standing."  *Dep't of Commerce v.*

*New York*, 139 S. Ct. at 2565; *see also Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,

547 U.S. 47, 52 n.2 (2006) (noting that, in a case with multiple plaintiffs, "the presence of one

party with standing is sufficient to satisfy Article III's case-or-controversy requirement").

Standing, in turn, is measured by a "familiar three-part test," which requires a plaintiff to show

(1) "an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and

(3) that is likely to be redressed by a favorable judicial decision."  *Gill v. Whitford*, 138 S. Ct.

1916 (2018) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)).  The plaintiff must

make this showing "in the same way as any other matter on which the plaintiff bears the burden

of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the

litigation."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  To prevail on a motion for

summary judgment, therefore, "mere allegations of injury are insufficient.  Rather, a plaintiff

must establish that there exists no genuine issue of material fact as to justiciability . . . ."  *House*

*of Representatives*, 525 U.S. at 329; *see Lujan*, 504 U.S. at 561 (stating that, on summary

judgment, a plaintiff "can no longer rest on such 'mere allegations,'" as at the pleading stage,

"but must 'set forth' by affidavit or other evidence 'specific facts'" that demonstrate standing.

(quoting Fed. R. Civ. P. 56(e)).

Injury in fact is "the first and foremost of standing's three elements."  *Spokeo*, 136 S. Ct.

at 1547 (internal quotation marks, alterations, and citation omitted).  "To establish injury in fact,

a plaintiff must show that he or she suffered an invasion of a legally protected interest that is

concrete and particularized and actual or imminent, not conjectural or hypothetical."  *Id.* at 1548

(internal quotation marks and citation omitted).  Significantly, an injury "need not be actualized"

to satisfy Article III.  *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008).  Instead, a

"future injury" can suffice, so long as it is "certainly impending, or there is a substantial risk that

the harm will occur."  *Susan B. Anthony List*, 573 U.S. at 157 (internal quotation marks and

citation omitted); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) (noting

that plaintiffs need not "demonstrate that it is literally certain that the harms they identify will

come about"); *House of Representatives*, 525 U.S. at 332-33 (finding standing "on the basis of

the expected effects . . . on intrastate redistricting" — namely, that certain jurisdictions were

"substantially likely . . . [to] suffer vote dilution").  Ultimately, the injury-in-fact requirement is

meant to "ensure that the plaintiff has a personal stake in the outcome of the controversy."  *Susan

B. Anthony List*, 573 U.S. at 158 (internal quotation marks and citation omitted).

  The second element requires proof that the plaintiff's injury is "fairly traceable" to the

defendant's challenged conduct.  Put differently, "there must be a causal connection between the

injury and the conduct complained of — the injury has to be fairly traceable to the challenged

action of the defendant, and not the result of the independent action of some third party not

before the court."  *Lujan*, 504 U.S. at 560 (internal quotation marks, alterations, and citation

omitted).  Importantly, "[p]roximate causation is *not* a requirement of Article III standing, which

requires only that the plaintiff's injury be *fairly traceable* to the defendant's conduct."  *Lexmark

Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014) (emphases added);

*see also Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) ("[T]he 'fairly traceable' standard

is lower than that of proximate cause.").  Accordingly, "Article III 'requires no more than *de

facto* causality.'"  *Dep't of Commerce v. New York*, 139 S. Ct. at 2566 (quoting *Block v. Meese*,

793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.)).  Relatedly, for an injury to be "fairly

traceable" to a defendant's conduct, that conduct need not be "the very last step in the chain of

causation." *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997).  Indeed, as the Supreme Court explained in finding that the plaintiffs challenging the decision to add a citizenship question to the census had standing, when a "theory of standing" relies "on the predictable effect of Government action on the decisions of third parties," traceability is satisfied.  *Dep't of Commerce v. New York*, 139 S. Ct. at 2566.  This may be so "even when the decisions are illogical or unnecessary."  *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 59 (2d Cir. 2020).

Third and finally, a plaintiff's injury must be "redressable" by the relief sought — that is, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan*, 504 U.S. at 561 (internal quotation marks and citation omitted).  "[T]he very essence of the redressability requirement" is that a request for "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court."  *Steel Co.*, 523 U.S. at 107.  But if there is "a likelihood that the requested relief will redress the [plaintiff's] injury," the requirement is satisfied.  *Id.* at 103; *see also Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185-86 (2000) ("[F]or a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress.").  Notably, the redressability requirement does not require a plaintiff to show that the relief sought will remedy all injuries alleged.  Instead, "'the relevant inquiry is whether . . . the plaintiff has shown *an* injury to himself that is likely to be redressed by a favorable decision.'  In other words, a plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself.  He need not show that a favorable decision will relieve his *every* injury."  *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (citations omitted) (quoting

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976)).  Nor need the plaintiff prove that

judicial relief will remedy an injury entirely.  It is enough that the "risk [of the alleged harm]

would be reduced to some extent if [the plaintiffs] received the relief they seek."  *Massachusetts*

*v. E.P.A.*, 549 U.S. 497, 526 (2007); *cf. Church of Scientology of Cal. v. United States*, 506 U.S.

9, 13 (1992) ("Even though it is now too late to prevent, or to provide a fully satisfactory remedy

for, the [injury], a court does have power to effectuate a partial remedy.").

## B.  Facts Relevant to Standing

Plaintiffs press two categories of harm: (1) "harms stemming from the exclusion of

undocumented immigrants in the apportionment count"; and (2) "harms caused by the

Memorandum's deterrent effect on census participation."  Pls.' Reply 29.  With respect to the

first category, the Presidential Memorandum's express goal is to stop "[a]ffording congressional

representation, and therefore formal political influence, to States on account of" their illegal alien

population.  Presidential Memorandum, 85 Fed. Reg. at 44,680.  In particular, the Memorandum

itself anticipates that excluding illegal aliens from the apportionment count could reduce the

number of representatives in States with large immigrant populations, noting explicitly that in

"one State . . . home to more than 2.2 million illegal aliens," *id.* — apparently, California, *see*

Pls.' Rule 56.1 Statement ¶¶ 3-4  — the inclusion of illegal aliens could "result in the allocation

of two or three more congressional seats than would otherwise be allocated," Presidential

Memorandum, 85 Fed. Reg. at 44,680.  In addition to the Memorandum itself, Plaintiffs proffer

an expert analysis that concludes that the wholesale exclusion of illegal aliens from the

apportionment base "is likely to have substantial effects on the population counts of each state"

and, more specifically, "will almost certainly lead Texas to lose a seat in Congress"; would

"likely . . . lead California and New Jersey to lose a congressional seat"; and "could lead other

states, such as Arizona, Florida, New York, or Illinois, to lose seats."  ECF No. 76-58

("Warshaw Decl."), ¶ 11.

    With respect to the second category of harm, Plaintiffs submit a number of declarations

— uncontested by Defendants — demonstrating the Presidential Memorandum's deterrent effect

on participation in the decennial census, particularly among noncitizens, immigrants, and their

family members, and, in turn, the adverse consequences that are likely to flow from that deterrent

effect.[7]  The Presidential Memorandum deters census participation for at least two distinct

reasons.  First, the Presidential Memorandum engenders fear and distrust among illegal aliens

---

[7]    Although Defendants do not dispute the facts in Plaintiffs' declarations, they argue that
the declarations are "impermissibly conjectural, conclusory, and hearsay."  Defs.' Mem.
12.  Defendants are correct to point out that we "may consider affidavits and other materials
beyond the pleadings to resolve the jurisdictional issue," but "may not rely on conclusory or
hearsay statements contained in the affidavits." *New York v. U.S. Dep't of Commerce*, 315 F.
Supp. 3d 766, 780 (S.D.N.Y. 2018) (internal quotation marks omitted).  But Plaintiffs'
declarations are not conclusory insofar as they describe with concrete detail the specific
experience of various non-governmental and governmental entities.  By way of example, several
NGO Plaintiffs give specific and concrete evidence of the ways in which their operations have
shifted to respond to the Memorandum.  *See, e.g.*, ECF No. 76-18 ("Espinosa Decl."), ¶ 14; ECF
No. 76-14 ("Choi Decl."), ¶¶ 17, 20-21; ECF No. 76-26 ("Khalaf Decl."), ¶ 15; ECF No. 76-36
("Oshiro Decl."), ¶ 12; ECF No. 76-47 ("Torres Decl."), ¶¶ 22-23.
    Furthermore, although the declarations do contain some inadmissible hearsay (e.g., where
they report information secondhand), Defendants are incorrect in suggesting that, without it, the
declarations are insufficient to support a showing that "the Presidential Memorandum would
have an appreciable effect on the participation of illegal aliens" in the census.  Defs.' Mem. 14-
15.  Many of the statements in Plaintiffs' declarations recount comments made by immigrants in
response to the Presidential Memorandum, *see, e.g.*, ECF No. 76-17 ("Cullinane Decl."), ¶ 8;
ECF No. 149-3 ("Espinosa Supp. Decl."), ¶ 5, which are admissible to prove state of mind, *see*
Fed. R. Evid. 803(3).  Additionally, references in the declarations to third-party statements are
admissible to demonstrate the effect that these statements had on others — for example, that
NGO Plaintiffs diverted resources in response to deterred census participation.  *See, e.g.*, *United
States v. Reed*, 639 F.2d 896, 907 (2d Cir. 1981).  Finally, the declarations also contain
information about the general atmosphere of fear, confusion, and apathy towards the census in
various communities, information that is based on declarants' personal experiences working with
and in those communities; this information is not a "statement" and, thus, not hearsay.  *See* Fed.
R. Evid. 801(a).  In the discussion that follows, we rely on the declarations only to the extent
they are admissible.

and their families (and, more broadly, all noncitizens and their families), and deters these groups

from participating in the census out of fear of providing the federal government with information

by which their citizenship status may be ascertained (and any resulting adverse consequences).

Second, because the Presidential Memorandum announces that it is United States policy "to

exclude from the apportionment base aliens who are not in a lawful immigration status,"

Presidential Memorandum, 85 Fed. Reg. at 44,680 — the "primary purpose of the census," *New

York v. Dep't of Commerce*, 351 F. Supp. 3d at 561 — illegal aliens may decide not to participate

in the census on the theory that they do not count for any purpose or on the theory that there is

little upside to being counted.

      Several agency and non-profit organization leaders in charge of census outreach

programs attest that many illegal aliens have expressed concern over, or outright refused to

participate in, the census as a result of the Presidential Memorandum, both because they are

apprehensive that the data will be used in immigration enforcement and because they perceive

their participation as ultimately futile in light of the President's explicit exclusion of illegal aliens

for the purposes of apportionment.  *See, e.g.*, ECF No. 76-4 ("Baldwin Decl."), ¶ 8; ECF No. 76-

5 ("Banerji Decl."), ¶ 5; Brower Decl. ¶ 11; Cullinane Decl. ¶ 8.  Other immigrant respondents

have expressed concern that "the Trump Administration would punish undocumented persons

who filled out the Census by tracking and deporting them."  *See, e.g.*, ECF No. 76-30 ("Matos

Decl."), ¶¶ 9-13 (describing Delaware-based census advocacy program's increased need to quell

community fears that, in light of the Presidential Memorandum, responding to the census will

result in deportation or bar Latinos from obtaining citizenship).

      Notably, Plaintiffs' evidence indicates that the effects of the Presidential Memorandum

are likely to be felt beyond the *illegal* alien population.  "Excluding undocumented immigrants

from the apportionment base will deter Census participation among the broader immigrant community, including family and household members of undocumented immigrants who are actually citizens or non-citizens with legal status."  Espinosa Decl. ¶ 11; *see also* Khalaf Decl. ¶ 12 ("[S]ignificant fear and increased distrust about the Census . . . [is] not limited to undocumented immigrants or other non-citizens, but also to family, household members, friends, and community members of non-citizens, people for whom the new policy articulated in the Memorandum has generated fear about responding at all . . . .").  Of particular concern is the response in "mixed status households" — that is, households consisting of illegal aliens and residents with lawful status — where concerns about the security of identifying information being shared with the federal government are prevalent.  *See, e.g.*, Espinosa Decl. ¶ 12 (describing a fear among individuals from mixed status households that "the Presidential Memorandum's exclusion of people 'not in lawful immigration status' from the census base count indicates that the Administration will use information from the census to attempt to identify undocumented immigrants for deportation or other adverse consequences").  "Even U.S.-born citizen Puerto Rican residents are confused" by the Presidential Memorandum.  ECF No. 76-16 ("Colón Decl."), ¶ 11.

In addition to this extensive — and undisputed — record of fact witness testimony, Plaintiffs provide expert analyses describing the fear and confusion generated by the Presidential Memorandum among hard-to-count communities and the resultant chilling effect on census participation.  *See* ECF No. 76-56 ("Barreto Decl."), ¶ 14 (surveying research on the impact of media messages on immigrant communities' trust in government and the impact of those communities' trust on census response rates and concluding that "the July 21 [Presidential Memorandum] will reduce participation in the 2020 census, and ultimately will reduce the

accuracy of the 2020 census"); ECF No. 76-57 ("Thompson Decl."), ¶ 3 (concluding that the

Presidential Memorandum "will significantly increase the risk of larger total and differential

undercounts, relative to previous censuses, for the hard-to-count populations, including

immigrant communities").[8]

In short, the record supports a conclusion that the Presidential Memorandum has created,

and is likely to create, widespread confusion among illegal aliens and others as to whether they

should participate in the census, a confusion which has obvious deleterious effects on their

participation rate.  *See* ECF No. 76-1 ("Alvarez Decl."), ¶ 10 (reporting "an increase in

confusion amongst immigrant communities after" Memorandum was issued); *see also* Baldwin

Decl. ¶ 8; ECF No. 76-9 ("Bird Decl."), ¶ 9.  As John Thompson, the former Director of the

Census Bureau, predicts, "the effects of the Memorandum on the current macro environment are

*likely to be as great if not greater than the addition of a citizenship question*."  Thompson Decl.

¶ 23 (emphasis added); *see also* Barreto Decl. ¶ 29.  And the Census Bureau's own advertising

---

[8]     Defendants fault Dr. Barreto for failing to consider a 2019 study conducted by the Census
Bureau, ELIZABETH A. POEHLER ET AL., U.S. CENSUS BUREAU, 2019 CENSUS TEST REPORT: A
NEW DESIGN FOR THE 21ST CENTURY (Jan. 3, 2020), https://www2.census.gov/programs-
surveys/decennial/2020/program-management/census-tests/2019/2019-census-test-report.pdf
("2019 Census Test Report"), which found "no statistically significant difference in overall self-
response rates" resulting from the inclusion of a citizenship question on the census questionnaire.
*Id.* at ix; *see* Defs.' Mem. 13.  But that study, which is not directly relevant to the issues before
us, is less useful for Defendants than their arguments suggest, as there are findings that both
sides can and do point to in support of their positions.  In fact, the same study did find
statistically significant drops in response rates "in some areas and for some subgroups,"
including "[t]racts with greater than 4.9 percent noncitizens," "[t]racts with greater than 49.1
percent Hispanic residents," "[t]racts with between 5.0-20.0 percent Asian residents," and
"[h]ousing units within the Los Angeles Regional Census Center and New York Regional
Census Center boundaries."  *Id.* at ix-x.  Furthermore, "the results of this [study] [we]re limited
to the self-response timeframe prior to the start of" Non-Response Follow-Up operations, *id.* at
12, and there is reason to believe that each of Non-Response Follow-Up's steps would replicate
or exacerbate the effects of the net differential decline in self-response rates among noncitizen
households, *see New York v. Dep't of Commerce*, 351 F. Supp. 3d at 583.

initiatives will struggle to ward off these effects even with "messag[ing] that respondent information is confidential" and that "[t]he Census Bureau will not share it with any outside entities, including law and immigration enforcement."  Thompson Decl. ¶ 21.

These deterrent effects have far-reaching ramifications, including increasing costs for census outreach programs run by NGOs and governments.  Indeed, the NGO Plaintiffs have already diverted resources from their other important programs to shore up their census engagement efforts.  For example, Plaintiff FIEL "has recently had to refocus its programming and commit additional resources to its Census work," and "expects that it will need to interact with its constituents multiple times to answer questions and try to convince them to participate in the 2020 Census."  Espinosa Decl. ¶ 14; *see also* ECF No. 76-44, ("Sivongxay Decl."), ¶ 18 ("[A]dditional one-on-one conversations and relational outreach are necessary to maintain trust among communities and census partners to ensure confidence that census information will remain confidential and that there are still important benefits to responding to the census, such as ensuring receipt of critical federal funding.").  Because the Presidential Memorandum "dilutes the efficacy" of the efforts by Plaintiff New York Immigration Coalition ("NYIC") to ensure immigrants are counted in the census, NYIC will have "to divert resources from other programmatic areas to conduct additional education and outreach to get the same number of people to respond to the Census questionnaire."  Choi Decl. ¶ 17.  Specifically, NYIC has had to "make new materials"; "conduct new outreach"; "engage[] in member updates, press releases, [and] press briefings"; "develop[] messaging and social media campaigns"; and "respond to inquiries from local media . . . to assure people" that every person should respond to the Census. *Id.*  In other words, "NYIC expects that it will need to interact with its constituents more times than previously planned to try to convince them to participate in the 2020 census" as a result of

the Presidential Memorandum. *Id.* ¶ 20. It estimates that the organization "will have to increase staff time and spending devoted to its Census education and outreach efforts by approximately 20% percent over previously anticipated levels." *Id.* ¶ 21.

Plaintiffs American-Arab Anti-Discrimination Committee ("ADC") and ADC Research Institute ("ADRCI") have also had to divert resources away from other programmatic areas, including critical programs responding to COVID-19 issues. Khalaf Decl. ¶ 15. In response to the Presidential Memorandum's messaging, ADC and ADRCI will "increase staff time and spending devoted [to] its Census education and outreach efforts by approximately 25[] percent over current levels," *id.* ¶ 14, while the national president of both organizations reports that he "personally spent at least 35 hours on Census-related work since the release of the [Presidential] Memorandum" that he would have otherwise spent on other tasks related to the operation and mission of both organizations, *id.* ¶ 15. Plaintiff Ahri similarly will increase staff time and spending devoted to census education and outreach by approximately fifteen percent in response to the chilling effects of the Presidential Memorandum. ECF No. 76-43 ("Seon Decl."), ¶ 17. According to Theo Oshiro, Deputy Director at the non-profit Make the Road New York ("MRNY), the Presidential Memorandum also "dilutes the efficacy of [MRNY's] existing materials and programming, which requires MRNY to divert resources from other programmatic areas to strategize around how to make [its] education and outreach effective and to get the same number of people to respond to the Census questionnaire" as they would have absent the Memorandum. Oshiro Decl. ¶ 12. Finally, Plaintiff CASA also has had to "devote additional resources to addressing the confusion and fear that have resulted" from the Presidential Memorandum, including having "to reorganize its communication team, reassign staff to Census outreach and education, and revise and redistribute messaging materials." Torres Decl. ¶¶ 22-23.

The Governmental Plaintiffs have also had to divert resources from other programs to mitigate the confusion caused by the Presidential Memorandum. Plaintiff Illinois, for example, has already had to spend funds on digital ads specifically designed to address misinformation about the census, has created printed materials to be distributed, and has produced social media videos and other digital communications to reassure the immigrant community about the importance of the census. Alvarez Decl. ¶ 12. Plaintiff Vermont, through its 2020 Complete Count Committee, has — in direct response to the Presidential Memorandum — provided "mini-grants" to increase outreach to hard-to-count communities, conducted additional open educational meetings, provided additional multilingual public service announcements, and otherwise promoted census participation. ECF No. 76-10 ("Broughton Decl."), ¶ 7. Plaintiff Monterey County will "have to dedicate significant resources to ensure participation without fear" so that the County receives its proper census-based funding. ECF No. 76-28 ("Lopez Decl."), ¶ 18; *see also* ECF No. 76-12 ("Bysiewicz Decl."), ¶ 11 (describing efforts by Plaintiff Connecticut to encourage full census participation after the Presidential Memorandum caused "confusion").

The Memorandum's chilling effect on census participation will likely also degrade the census data, harming state and local governments that rely on the data to carry out their public functions. As Dr. Joseph Salvo, Chief Demographer of New York City, explained, "the July 21, 2020 Presidential memorandum is likely to make the Census Bureau resort to less-reliable methods, including statistical imputation, more frequently in immigrant communities than it otherwise would." Salvo Decl. ¶ 12. Specifically, when individuals fail to participate in the census themselves, the Census Bureau will sometimes rely on "proxy respondents," like neighbors, landlords, and postal workers. *See* GLENN WOLFGANG ET AL., U.S. CENSUS BUREAU,

ANALYSIS OF PROXY DATA IN THE ACCURACY AND COVERAGE EVALUATION 1 (2003), https://
www.census.gov/pred/www/rpts/O.5.PDF.  Reliance on proxy responses "degrade[s] the quality
of the data" and its usability, since proxy respondents often leave some questions unanswered
and report information less accurately than household respondents.  Brower Decl. ¶¶ 12-13
(discussing, for example, the phenomenon of "age heaping" where data on the age of individuals
tends to be reported in numbers ending in 5 or 0 when a proxy is the respondent because the
proxy merely estimates the age of the individual).  Further, if census data are not available
through proxy responses, demographers are forced to resort to data imputation, which itself is
reliable only when calculated using a sufficiently high self-response rate.  *See* ECF No. 76-21
("Hardcastle Decl."), ¶ 5.  Lower response rates also increase the margins of error in statistical
calculations, degrading the utility of census response data and restricting Plaintiffs' ability to rely
on the data for, *inter alia*, governmental planning purposes.  *See* ECF No. 76-25 ("Kaneff
Decl."), ¶¶ 3-5.

Indeed, degraded census data jeopardizes various sovereign interests in allocating funds
and administering public works through programs that rely on quality census data.  Connecticut,
for example, relies on accurate characteristic data, meaning data on subgroups within the
population, for a wide variety of purposes, including deciding where to locate COVID-19 testing
sites, the evaluation of requests for school construction funds, the promulgation of affirmative
action plans for state agencies using data-driven goals and benchmarks, effective forecasting for
public transit planning, and others.  *See* ECF No. 76-31 ("McCaw Decl.") ¶¶ 4-7.  Similarly, Dr.
Salvo explains that "[t]he decennial census is the statistical backbone of our country" and that,
like Connecticut, New York City relies on accurate characteristic data about subgroups to make

decisions about public health programs and education investments, as well as emergency preparedness planning and provision of targeted services for the elderly.  Salvo Decl. ¶¶ 13-17.

Other examples abound in the record.  In Monterey County, California, for example, the Department of Social Services is responsible for administering cash and non-cash programs that, among other things, provide supplemental food assistance, California's Medicaid program, foster care, adoption and aging assistance, and temporary assistance to needy families.  ECF No. 76-32 ("Medina Decl."), ¶ 2.  That department relies on accurate census data in making its funding allocation decisions.  *Id*. ¶ 4.  Any undercounting of undocumented immigrants caused by the Presidential Memorandum will not only "impact the formulas used for funding allocations" for these basic living assistance programs, but will also result in the loss of federal funding, "which, in turn, will add extra financial burden on local governments, resulting in even fewer available resources to assist families with food, housing, health, and other support and safety net services." *Id*.; *see also, e.g.*, ECF No. 76-33 ("Mohammed Decl."), ¶¶ 5-6 (describing how the census directly impacts funding for the City of Pittsburgh and "provides the most reliable and complete data for research, decision making and planning in City government"); ECF No. 76-39 ("Rodriguez Decl."), ¶ 3 (describing how Illinois's Workforce Innovation and Opportunity Act Program, which provides services to help certain populations overcome barriers to employment, depends on accurate census data to identify the targeted population levels); ECF No. 76-46 ("Sternesky Decl."), ¶ 5 ("Census data deeply influences the way that [the New Jersey Housing and Mortgage Finance Agency] designs and plans for the allocation of housing funds across the state.  For example, the Agency uses income, poverty, employment, housing density, and housing vacancy data from the Census to direct its annual $20 million to $25 million allocation of federal 9% Low-Income Housing Tax Credits (LIHTC).  These credits are then used to

leverage roughly a ten-fold influx of private investment into equity for development costs to both high-opportunity and high-need areas of New Jersey."); ECF No. 76-50 ("Wortman Decl."), ¶¶ 3, 6 (describing how Illinois determines funding for each county based on an "index of need" and how "[u]nderrepresentation of areas with a higher percentage of immigrants will result in disproportionate levels of funding being allocated to counties with less demographic diversity").

Plaintiff Washington State will also be negatively impacted if it is forced to use inaccurate census data.  Washington allocates $200 million "of state shared revenues . . . to counties and cities on a per capita basis annually" and uses decennial census data for its demographic estimates and annual population forecasts.  Baldwin Decl. ¶¶ 14, 17.  "[B]ad data will certainly lead to inaccurate distribution of funding within Washington, impacting all levels of government for a decade."  *Id.* ¶ 15.  "Poor quality census data will [also] harm Washington's ability to carry out the population data functions required by law both in the short term and the long term."  *Id.* ¶ 28.  In particular, Washington annually creates a *thirty*-year population forecast, meaning that the 2020 census data will be used in forecasting until at least the 2050 census data is available, if not longer.  *See id.* ¶ 25.  Because "many estimate and forecast models rely on information about changes in trends over time," "[a]n inaccurate census this year will change the relationships in the data between censuses and make all future estimates and forecasts based on these trends less accurate."  *Id.*

Finally, the undisputed facts in the record also reflect that judicial relief invalidating the Presidential Memorandum would likely reduce the confusion felt by immigrant communities and therefore alleviate some of the injuries being felt by Plaintiffs.  For example, Plaintiff FIEL anticipates that "a court order that stops the exclusion of undocumented immigrants from the census would make [its] efforts to encourage census participation easier by allowing [FIEL] to

clarify the confusion and help ease the fear caused by" the Presidential Memorandum, and that "it would take FIEL less time and fewer resources to convince" the community "to participate in the census." Espinosa Supp. Decl. ¶ 3. Relief would also help Plaintiff MRNY "conduct more efficient and effective census outreach" because MRNY could clarify to community members that everyone should, in fact, be counted. ECF No. 194-4 ("Oshiro Supp. Decl."), ¶ 5. And relief from this Court would also allow Plaintiff Ahri to "publicize the Court's order to encourage [its] community to open their doors to census outreach workers, rather than hiding out of confusion or fear and avoiding the census completely." ECF No. 194-5 ("Seon Supp. Decl."), ¶¶ 6-7.

## C.  Standing Analysis

As noted, Plaintiffs allege two types of harm: apportionment harms stemming directly from the exclusion of illegal aliens from the apportionment base and harms caused by the deterrent effect on census participation. We have considerable doubt that the former suffices to establish jurisdiction. To be sure, if any Plaintiff could show that, as a result of the Presidential Memorandum, it was likely to lose one or more seats in the House of Representatives, it would surely have standing. *See, e.g.*, *House of Representatives*, 525 U.S. at 331 (holding that the loss of a seat or seats in the House of Representatives "undoubtedly satisfies the injury-in-fact requirement of Article III standing"). But as of today, it is not known whether that harm will come to pass, as the Secretary has not yet determined how he will calculate the number of illegal aliens in each State or even whether it is "feasible" to do so at all. Oral Arg. Tr. 35-37. In the absence of that information, Plaintiffs' first theory of harm is likely "too speculative for Article III purposes." *Clapper*, 568 U.S. at 409 (internal quotation marks omitted). Nor, for these purposes, would there be any harm in waiting until January 2021, when the impact, if any, of the

Presidential Memorandum would be known, as the Supreme Court has held that an illegal apportionment can be remedied even after the apportionment process has taken place. *See Utah v. Evans*, 536 U.S. 452, 462-63 (2002).

Ultimately, however, we need not, and do not, decide the issue because we conclude that Plaintiffs' second theory of harm — that the Presidential Memorandum will have and, indeed, is already having, an effect on the census count itself — suffices to establish standing. Critically, this theory of harm does not depend on what, if anything, the Secretary does *in the future* to implement the President's mandate in the Presidential Memorandum. Instead, it is based on Plaintiffs' undisputed evidence that the Presidential Memorandum is affecting the census count *in the present*. That is, while the apportionment harms may well be too remote and hypothetical to support standing, the harms to the census count are "certainly impending" and do not depend on "a highly attenuated chain of possibilities." *Clapper*, 568 U.S. at 410. Notably, Defendants do not argue otherwise. Instead, they contend that Plaintiffs' second theory of harm is too "speculative" in a different sense: because Plaintiffs' evidence is inadequate to prove that the Presidential Memorandum has caused (or will cause) anyone to opt out of participating in the census or that judicial relief would redress that harm. *See* Defs.' Mem. 11-19. In defense counsel's view, Plaintiffs should be required "to identify some subset of people who would not have been chilled . . . from answering the census between April 1st and July 21st, then became chilled on July 21st after the memorandum was issued, and then will be unchilled in [the time remaining before the census ends] by an order of this Court." Oral Arg. Tr. 38; *see also* Defs.' Mem. 52 (citing lack of "rigorous survey[s] or statistical stud[ies] measuring whether [the Presidential Memorandum] . . . has any effect on response rates within immigrant communities").

Defendants' vastly overstate Plaintiffs' burden.  The law does not require Plaintiffs to submit a randomized control trial or other rigorous statistical analysis demonstrating beyond peradventure that there are people who would have participated in the census but for the Presidential Memorandum and who would participate again if we were to grant Plaintiffs the relief they seek.  Nor do Plaintiffs need to submit declarations specifically identifying such people, let alone submit declarations from such people.  Instead, Plaintiffs need only demonstrate that "there is no genuine dispute as to any" fact material to the standing analysis.  Fed. R. Civ. P. 56(a).  Notably, in determining whether this standard has been met, we may rely not only on the declarations submitted by Plaintiffs in support of their motion, but also on common sense, basic economics, and reasonable inferences.  *See, e.g.*, *Friends of the Earth*, 528 U.S. at 183-85 (determining that "sworn statements . . . adequately documented injury in fact" where the proposition they were offered for was "entirely reasonable"); *Citizens for Responsibility & Ethics in Wash. v. Trump (CREW)*, 953 F.3d 178, 198 (2d Cir. 2019) (noting that a court may rely on "common sense and basic economics" in evaluating standing (internal quotation marks omitted)); *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 104-05 (2d Cir. 2018) (relying on the defendant agency's "own pronouncements," as well as "[c]ommon sense and basic economics," to find standing (internal quotation marks omitted)); *Carpenters Indus. Council v. Zink*e, 854 F.3d 1, 6 (D.C. Cir. 2017) (Kavanaugh, J.) ("When performing that inherently imprecise task of predicting or speculating about causal effects [in standing analysis], common sense can be a useful tool."); *Texas v. United States*, 809 F.3d 134, 156 (5th Cir. 2015) (finding that Texas had established the necessary causal connection between the Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") program and a future injury because DAPA would have "enable[d]" third parties "to apply for driver's licenses" and

there was "little doubt that many would do so"), *aff'd by an equally divided Court*, 136 S. Ct.

2271 (2016) (per curiam).

      Requiring Plaintiffs to do more would be particularly inappropriate here for two reasons.

First, "the integrity of the census is a matter of national importance.  As noted, the population

count has massive and lasting consequences.  And it occurs only once a decade, with no

possibility of a do-over if it turns out to be flawed."  *New York v. Dep't of Commerce*, 351 F.

Supp. 3d at 517; *see* Departments of Commerce, Justice, and State, the Judiciary, and Related

Agencies Appropriations Act, 1998 ("1998 Appropriations Act"), § 209(a)(8), Pub. L. No. 105-

119, 111 Stat. 2440, 2480-81 (1997) ("Congress finds that . . . the decennial enumeration of the

population is a complex and vast undertaking, and if such enumeration is conducted in a manner

that does not comply with the requirements of the Constitution or laws of the United States, it

would be impracticable for the States to obtain, and the courts of the United States to provide,

meaningful relief after such enumeration has been conducted.").  Second, Defendants' *own*

*conduct* has forced Plaintiffs' hands.  That is, for reasons that are unclear, the President waited

until July 21, 2020, when the census was in full swing, to issue his Presidential Memorandum.

Compounding matters, Defendants announced less than two weeks later that they were ending

the census earlier than previously planned.  The combination of the two meant that Plaintiffs had

to rush to court and seek immediate relief; had they waited to develop more rigorous proof of

their standing, their arguments about harms to the census count itself would have become moot.

Between the sheer enormity of what is at stake and the fact that Defendants' own conduct gave

Plaintiffs only a narrow window in which to seek effective relief, it would be the height of

unfairness to hold Plaintiffs to the heightened burden of proof that Defendants endorse.

      In light of the undisputed facts in the record, common sense, and basic economics, we are

satisfied that — with their second theory of harm — Plaintiffs adequately show injury in fact,

traceability, and redressability and that we have before us an actual case or controversy "of the

sort traditionally amenable to, and resolved by, the judicial process." *Steel Co.*, 523 U.S. at 102.

Moreover, Defendants "have failed to set forth any specific facts showing that there is a genuine

issue of standing for trial." *House of Representatives*, 525 U.S. at 330.

## 1. Injury in Fact

To begin, Plaintiffs have proved that, in the wake of the Presidential Memorandum, some

number of people will not participate in, and thus not be counted in, the census.  As of August 3,

2020 — the day the Census Bureau announced that field operations would end a month earlier

than previously planned, and approximately two weeks after the Presidential Memorandum was

issued — the Census Bureau had counted only about sixty-three percent of households in the

2020 census.  *See Statement from U.S. Census Bureau Director Steven Dillingham: Delivering a*

*Complete and Accurate 2020 Census Count*, U.S. CENSUS BUREAU (Aug. 3, 2020), https://www.

census.gov/newsroom/press-releases/2020/delivering-complete-accurate-count.html.  Many of

those not counted are undoubtedly in the "hard to count" population, which includes immigrant

and Hispanic populations as well as illegal aliens.  *See New York v. Dep't of Commerce*, 351 F.

Supp. 3d at 577.  The record in the citizenship question litigation and the declarations here make

clear that this population is even "harder" to count during this census due to widespread

concerns, fueled by the policies and rhetoric of this Administration, that census data will be used

for immigration enforcement purposes.  *See id.* at 562, 579-83; Colón Decl. ¶ 11; Oshiro Decl.

¶¶ 12, 14; Seon Decl. ¶ 16; Barreto Decl. ¶¶ 60-62.  Plaintiffs' uncontested declarations and

common sense indicate that the Presidential Memorandum has compounded, and will compound,

these concerns, and that some number of people in these communities will choose not to

participate in the census and take steps to avoid being counted.  *See, e.g.*, Cullinane Decl. ¶ 8;
Espinosa Supp. Decl. ¶ 5.  To be sure, on the present record, the Court cannot calculate with
precision the number of people that will be so affected.  But there is no doubt that that number is
greater than zero, and there is a substantial likelihood that an appreciable number of people will
be dissuaded from participating in the census.  *See* Barreto Decl. ¶¶ 60-65.

From these ongoing and direct effects on the census flow several forms of injury to
Plaintiffs and their members or citizens.  First, insofar as Plaintiffs include or represent high
concentrations of immigrant and Hispanic populations, the effects on the census undoubtedly
create a risk of a net differential undercount that could result in the loss of political power and
federal funds, two classic forms of Article III injury.  *See New York v. Dep't of Commerce*, 351
F. Supp. 3d at 607-08; *Carey v. Klutznick*, 637 F.2d 834, 838 (2d Cir. 1980) (per curiam);
Barreto Decl. ¶¶ 70-71; Thompson Decl. ¶¶ 13-17.  Given the time sensitivities inherent in their
claims of census-related injuries — there were little more than two months remaining for census
operations when the President issued the Presidential Memorandum and, less than two weeks
later, Defendants shortened that period by a full month — Plaintiffs have obviously not had an
opportunity to perform any sort of empirical study on the size of the likely effects on the census
that would reveal the likelihood of such injuries.  In any event, the likelihood of two other forms
of injury are more certain on the current record: degradation of the quality of, and ability to have
confidence in, census data and diversion by the NGO Plaintiffs of organizational resources.

### a.  Degradation of Census Data

First, if a portion of the population does not participate in the census count, it will
inevitably degrade the quality and accuracy of census data, even if only at the subgroup or local
level.  Salvo Decl. ¶¶ 8-12.  That is particularly true if, as is the case here, the people who are not

counted are not evenly distributed across the population, but are concentrated, either geographically or demographically.  *See* Barreto Decl. ¶ 83; Thompson Decl. ¶¶ 15-17, 23.  The degradation of census data, in turn, harms the Governmental Plaintiffs' ability to allocate resources, such as educational and public health resources, efficiently and effectively.  *See* McCaw Decl. ¶¶ 3-6; Medina Decl. ¶¶ 2-4; Baldwin Decl. ¶¶ 15-28.  Separate and apart from that, it harms confidence in the census data.  *See* Kaneff Decl. ¶ 5 ("The lower the response rate, the larger the margin of error in the demographic characteristics.").  Crucially, these harms will occur *whether or not there is a net differential undercount* — meaning that this theory of injury does not depend on connecting the deterrent effect of the Presidential Memorandum on immigrant households and the like to a net differential undercount of people who live in such households.  *See New York v. Dep't of Commerce*, 351 F. Supp. 3d at 610-11; Salvo Decl. ¶¶ 14-18.

        As explained in *New York v. Department of Commerce*, the degradation of census data is a legally cognizable form of injury sufficient to support standing.  *See* 351 F. Supp. 3d at 610-15.  In particular, a State or local government that relies on the information provided by the federal government under an existing statutory arrangement suffers a sufficiently "concrete" and "particularized" injury for purposes of Article III when the federal government degrades the quality of that information.  States are sovereign entities with sovereign interests in the making and enforcement of their own laws.  *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982); *cf. Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers) (concluding that Maryland suffered an injury to its "law enforcement and public safety interests" from a lower-court order preventing the State from utilizing DNA samples for law enforcement purposes pursuant to a state statute).  But they frequently do so in collaboration

with, or in reliance on, the federal government — such is the genius of the federal system, which has historically embraced various creative models of "cooperative federalism." *See, e.g.*, *New York v. United States*, 505 U.S. 144, 167-69 (1992); *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 286-89 (1981). States have long relied on federal decennial census data for countless sovereign purposes, and indeed many of the State Plaintiffs here even *require* the use of such data by law; in some instances, it is written into their state constitutions. *See, e.g.*, Rapoza Decl. ¶ 5 (explaining that the Rhode Island Constitution mandates using census data to establish the House and Senate districts); Brower Decl. ¶¶ 17, 22-23 (explaining that Minnesota law requires the use of census data to determine funding for roads and education).

Meanwhile, by virtue of the Constitution and the Census Act, it is, of course, the federal government's job to collect and distribute accurate federal decennial census data. *See* U.S. Const. art. I, § 2, cl. 3; *see also Evans*, 536 U.S. at 478 (explaining that the Framers had a "strong constitutional interest in [the] accuracy" of the census); *Wisconsin v. City of New York*, 517 U.S. 1, 20 (1996) (holding that the conduct of the census must bear a "reasonable relationship to the accomplishment of an actual enumeration of the population, keeping in mind the constitutional purpose of the census," namely, obtaining an accurate count of the population in each State); 1998 Appropriations Act, Pub. L. No. 105-119, § 209(a)(6), 111 Stat. at 2481 ("Congress finds that . . . it is essential that the decennial enumeration of the population be as accurate as possible, consistent with the Constitution and laws of the United States . . . ."). When the federal government degrades the quality of that data, it therefore inflicts a cognizable injury on the sovereign interests of reliant States.[9]

---

[9]     That does not mean that, in every case, a State will have a "right" to such data — or a right to data of a certain quality — sufficient to support a valid cause of action to obtain it. But it

An example may be helpful in illustrating the point.  Suppose a State were to premise certain of its policies on a person's lawful presence in the United States — for example, suppose that it chose to deny certain benefits to undocumented immigrants or required its law-enforcement officials to inquire into the immigration status of any person detained in state custody for any reason.  "The accepted way" for States "to perform [such] status checks" — and surely the most reliable — is to contact the DHS's Immigration and Customs Enforcement ("ICE"), the federal agency that accepts and responds to such inquiries from interested States. *Arizona v. United States*, 567 U.S. 387, 411 (2012).  Now suppose that ICE were to degrade the quality of its data set, thereby undermining its usefulness to the State as a tool for implementing its policy priorities.  If this hypothetical State were to challenge the decisions causing the degradation in immigration-status data, the federal agency could certainly defend its actions on the grounds that they were lawful.  But could it seriously deny that the State had suffered a cognizable injury for purposes of standing?  Surely not.

Indeed, ample case law supports the proposition that a State has a strong sovereign interest in conducting its own policy, the burdening of which causes an injury in fact for Article III purposes.  One such sovereign interest is a State's "exercise of sovereign power over individuals and entities within [its] jurisdiction — this involves the power to create and enforce a legal code, both civil and criminal."  *Alfred L. Snapp & Son*, 458 U.S. at 601.  Another such sovereign interest — which, in light of the frequent prohibition on *parens patriae* suits against the federal government, *see Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923), is "distinct from . . . the general well-being of its residents" — is a State's "interest in securing observance

---

does mean that a State suffers a concrete and particularized injury when the federal government degrades important tools of sovereignty — or takes those tools away altogether.

of the terms under which it participates in the federal system," *Alfred L. Snapp & Son*, 458 U.S. at 607-08; *cf. Maine v. Taylor*, 477 U.S. 131, 137 (1986) ("[A] State clearly has a legitimate interest in the continued enforceability of its own statutes."); *Diamond v. Charles*, 476 U.S. 54, 65 (1986) ("Because the State alone is entitled to create a legal code, only the State has the kind of 'direct stake' . . . in defending the standards embodied in that code.").

The Fifth Circuit's decision in *Texas v. United States*, 809 F.3d 134, is instructive on this front.  In that case, Texas led a coalition of States in a challenge to the Obama Administration's DAPA program.  The Court held that the States had suffered a cognizable injury for purposes of standing because DAPA would have entitled its recipients to obtain driver's licenses under existing state law and providing those licenses would have come at a financial cost to Texas.  *See id.* at 155-56.  In denying a stay of the district court's preliminary injunction pending appeal, the Fifth Circuit cited *Alfred L. Snapp & Son*, explained that Texas possessed a sovereign interest in the maintenance of its own legal code, and held that "Texas's forced choice between incurring costs and changing its laws is an injury because those laws exist for the administration of a state program, not to challenge federal law, and Texas did not enact them merely to create standing." *Texas v. United States*, 787 F.3d 733, 749 (5th Cir. 2015).  The court reasoned that "if pressure to change state law in some substantial way were not injury, States would have no standing to challenge *bona fide* harms because they could offset most financial losses by raising taxes or fees."  *Id.*  Several months later, the Fifth Circuit affirmed the preliminary injunction on the merits, reiterating and confirming its conclusions as to standing.  The court held that "states may have standing based on . . . federal interference with the enforcement of state law, at least where the state statute at issue regulates behavior or provides for the administration of a state program and does not simply purport to immunize state citizens from federal law."  *Texas*, 809 F.3d at

45

153 (alterations, footnotes, and internal quotation marks omitted).  Such "intrusions," the court explained, "are analogous to pressure to change state law."  *Id.*

Like the state plaintiffs in *Texas*, many Governmental Plaintiffs here have enacted their reliance on federal census data into law — in some cases, as noted, even into their constitutions. Moreover, as in *Texas*, "there is no allegation," let alone proof, that those jurisdictions enacted their laws or ratified their constitutions "to manufacture standing" in these cases.  *Id.* at 159.  If the census data is degraded (or even perceived to be degraded), these Plaintiffs will be subjected to a forced choice: They can use the degraded data, resulting in worse policy; they can spend money to compensate for the damage; or they can change their laws to relieve themselves of the legal obligation to use federal census data in making and enforcing their laws (which would presumably necessitate the expenditure of additional resources to collect data of their own anyway).  Such "pressure[] to change state law constitutes an injury" within the meaning of Article III.  *Texas*, 787 F.3d at 749; *see Texas*, 809 F.3d at 153.  Accordingly, most, if not all, of the Governmental Plaintiffs have proved an imminent injury to their sovereign interests due to the degradation in quality of census data.

### b.  Diversion of Resources

Additionally, the risk that some hard to count population will not participate in census results in another form of injury: the diversion of resources.  In *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), the Supreme Court held that an organization can establish Article III injury in fact by proving "concrete and demonstrable injury to [its] activities — with the consequent drain on [its] resources."  *See also id.* at 379 n.21 (holding that an organization that proves it "has indeed suffered impairment" in its activities has proved an Article III injury); *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011); *Ragin v. Harry Macklowe Real Estate Co.*, 6

F.3d 898, 904-06 (2d Cir. 1993).  In particular, "a nonprofit organization establishes an injury-in-fact if . . . it establishes that it spent money to combat activity that harms its organization's core activities."  *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 111 (2d Cir. 2017) (internal quotation marks omitted).  "An organization need only show a 'perceptible impairment' of its activities in order to establish injury in fact."  *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d at 61 (quoting *Ragin*, 6 F.3d 898 at 905).

As they did in *New York v. U.S. Department of Commerce*, Defendants appear to suggest that *Havens Realty* recognizes Article III injuries arising from organizational expenditures only where those expenditures are made in response to injuries that are themselves sufficiently imminent and impending to satisfy Article III.  *See* Defs.' Reply 3; Oral Arg. Tr. 42-43; *see also New York v. Dep't of Commerce*, 351 F. Supp. 3d at 616.  Organizations asserting standing based on the diversion-of-resources theory do indeed need to "show that both the anticipated expenditures and ensuing harm to their organizations' activities are 'certainly impending,'" *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 389 (2d Cir. 2015) (quoting *Clapper*, 568 U.S. at 409), lest these plaintiffs be permitted to "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm," *Clapper*, 568 U.S. at 416.  But that standard does not mean that a plaintiff must allege a second form of independently adequate injury in fact, which "would render the category of plaintiffs that could establish standing under a *Havens Realty* theory a null set" and make *Havens Realty* a dead letter.  *New York v. Dep't of Commerce*, 351 F. Supp. 3d at 616.  Instead, however "inexact" the standard may be, "courts are inclined to find standing if it can be said that there is no better time to resolve the issues raised by the parties — that is, when they will be in no better position later than now."  *Young Advocates for Fair Educ. v. Cuomo*, 359 F. Supp. 3d 215, 237 (E.D.N.Y. 2019) (internal quotation marks omitted).

Plaintiffs satisfy these standards.  First, Defendants do not dispute, and the Court has little trouble concluding, that the impairment alleged by NGO Plaintiffs goes to their core activities.  *See, e.g.*, *Common Cause Ind. v. Lawson*, 937 F.3d 944, 955 (7th Cir. 2019) ("The Organizations in this case have shown that Act 442's effect on their work goes far beyond 'business as usual.'  They have done so through concrete evidence showing that Act 442 is already disrupting their operations . . . ."); *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017) ("The undisputed summary-judgment evidence established that [the plaintiff's] primary mission is voter outreach and civic education, particularly 'getting out the vote' among its members.").  Each of the NGO Plaintiffs is primarily dedicated to serving and advocating for communities that have traditionally been undercounted by the census, and each is dedicated to promoting census participation in these communities.  *See* Choi Decl. ¶¶ 3-6; Oshiro Decl. ¶¶ 2-5; Espinosa Decl. ¶¶ 2, 5-7; Khalaf Decl. ¶¶ 4-8; Seon Decl. ¶¶ 2-6; Torres Decl. ¶¶ 1, 5-11.  In fact, several NGO Plaintiffs partner with the Census Bureau and/or state and local governments to promote census participation within these communicates.  *See, e.g.*, Torres Decl. ¶ 11; Espinosa Supp. Decl. ¶ 6.

Second, Plaintiffs' uncontested declarations demonstrate that the NGO Plaintiffs have diverted resources in response to the Presidential Memorandum's chilling effects on participation in the census and the risks that poses for their members and their core activities.  *See* Choi Decl. ¶¶ 14-27; Espinosa Decl. ¶¶ 14-17; Khalaf Decl. ¶¶ 8-16; Oshiro Decl. ¶¶ 15-17; Seon Decl. ¶¶ 17-19; Torres Decl. ¶¶ 2, 21-23; ECF No. 149-1 ("Awadeh Decl."), ¶¶ 4-5; Espinosa Supp. Decl. ¶¶ 7-8; Oshiro Supp. Decl. ¶¶ 2, 4; Seon Supp. Decl. ¶ 4.[10]  For example, Steven Choi, the

---

[10]     Plaintiffs provide evidence of similar resource diversions by similarly situated organizations, albeit not Plaintiffs here.  *See* Banerji Decl. ¶¶ 5-6; Matos Decl. ¶¶ 9-14; Sivongxay Decl. ¶¶ 16-20, 23-24; ECF No. 76-51 ("Aranda-Yanoc Decl."), ¶ 8.

executive director of Plaintiff New York Immigration Coalition ("NYIC"), states that his organization had to develop new messaging and social media campaigns, and issue new member updates and press releases, to counter the Presidential Memorandum's contradiction of themes that had previously been core to NYIC's census outreach efforts.  Choi Decl. ¶ 17.  NYIC expects to increase staff time and spending by twenty percent over previously anticipated levels to achieve its census outreach and advocacy goals.  *See id.* ¶ 21.  Similarly, Plaintiff Ahri had to develop entirely new outreach materials, train staffers with new scripts, and respond to media inquiries; it expects to increase staff time and spending devoted to these efforts by fifteen percent as a result of the Presidential Memorandum.  *See* Seon Decl. ¶¶ 17-19.  Meanwhile, Plaintiffs ADC and ADRCI anticipate increasing staff time and spending devoted to Census efforts by approximately twenty-five percent as a result of the Memorandum, *see* Khalaf Decl. ¶ 14, and Plaintiff FIEL "anticipates having to divert approximately $5,000 from other mission critical programs and services to the 2020 Census education and outreach as a result of the Presidential Memorandum," Espinosa Decl. ¶ 15.

These resource diversions may not be large in absolute terms, but they constitute a "perceptible impairment" of the NGO Plaintiffs' activities and thus qualify as injuries in fact. *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d at 61 (internal quotation marks omitted); *see OCA-Greater Hous.*, 867 F.3d at 612 ("[T]he injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an identifiable trifle." (internal quotation marks omitted)).  In short, the NGO Plaintiffs "are dedicated to providing an array of legal and social services to non-citizens and they have expended significant resources to mitigate the [Presidential Memorandum's] impact on those they serve.  In so doing, they have diverted resources that would otherwise have been available for other programming, a perceptible

opportunity cost that suffices to confer standing." *New York v. U.S. Dep't of Homeland Sec.*, 969

F.3d at 61 (internal quotation marks omitted); *see also Common Cause Ind.*, 937 F.3d at 952

("According to the evidence put forward by the Organizations, Act 442 has created a culture of

voter confusion, and it has already inflicted costs on them."); *OCA-Greater Hous.*, 867 F.3d at

612 ("[The plaintiff] went out of its way to counteract the effect of Texas's allegedly unlawful

voter-interpreter restriction . . . with a view toward . . . mitigating its real-world impact on [the

plaintiff's] members and the public . . . an undertaking that consumed its time and resources in a

way they would not have been spent absent the Texas law.  Hence, the Texas statutes at issue

'perceptibly impaired' OCA's ability to 'get out the vote' among its members.").

### 2.  Traceability

Next, we have little trouble finding that these injuries in fact are fairly traceable to the

Presidential Memorandum.  Once again, the uncontested record and common sense satisfy

Plaintiffs' burden.  Plaintiffs demonstrate that the Presidential Memorandum's chilling effect on

immigrant census participation is at least partially responsible for a degradation in the quality of

census data.  *See, e.g.*, ECF No. 76-24 ("Jimenez Decl."), ¶¶ 3-5 (explaining that the

Memorandum's deterrence effect on immigrant household census participation will cause an

undercount and a subsequent reduction in federal healthcare, infrastructure, and education

funding for Plaintiff Monterey County); Salvo Decl. ¶ 12 (noting that the Presidential

Memorandum "is likely to make the Census Bureau resort to less-reliable methods, including

statistical imputation, more frequently in immigrant communities than it otherwise would" which

will "result[] in poorer quality (less accurate) data both in terms of demographic characteristics

as well as the actual count of persons").  NGO Plaintiffs have also made clear that the

Presidential Memorandum is responsible for their diversion of resources; in other words, they are

expending resources they would not otherwise precisely because of the Presidential

Memorandum.  *See, e.g.*, Choi Decl. ¶¶ 20-21; Khalaf Decl. ¶¶ 14-15; Seon Decl. ¶ 17; Oshiro

Supp. Decl. ¶¶ 3-4; Torres Decl. ¶¶ 22-23; Espinosa Supp. Decl. ¶ 4.  This undisputed evidence

satisfies Plaintiffs' burden to demonstrate the "*de facto* causality" that Article III demands.

*Dep't of Commerce v. New York*, 139 S. Ct. at 2566 (internal quotation marks omitted).

       In arguing otherwise, Defendants point out that Plaintiffs' theory of causation relies in

part on the intervening actions of third-party actors, such as Spanish-language media

disseminating information about the Presidential Memorandum.  *See* Defs.' Mem. 16.  "It makes

little sense," they argue, "for Plaintiffs to attribute whatever harm is caused by those independent

actors to the Memorandum itself, particularly if their messages convey the incorrect impression

that the Memorandum increases the risk of individuals' information being linked to immigration

records and those individuals facing immigration enforcement."  *Id.* (internal quotation marks

and alterations omitted).  More broadly, they assert that Plaintiffs' injuries are traceable to the

"macro environment" of fear in the immigrant and Hispanic communities that predated the

Presidential Memorandum, not to the Memorandum itself.  *Id.* at 15-19.

       These arguments are unpersuasive.  For one thing, they ignore entirely Plaintiffs'

evidence that the Presidential Memorandum has deterred, and will continue to deter, people from

participating in the census because they conclude "that they don't see a benefit in filling out the

census form if they will not be counted."  Pls.' Mem. 43 (internal quotation marks and alterations

omitted); *see, e.g.*, Choi Decl. ¶ 17; Cullinane Decl. ¶ 9; Matos Decl. ¶¶ 11, 13; Oshiro Decl.

¶¶ 10-12; ECF No. 76-38 ("Roche Decl."), ¶ 9; Torres Decl. ¶ 19; Espinosa Supp. Decl. ¶¶ 5-6.

For such people, the chain of causation between the Presidential Memorandum and non-

participation has only a single link.  Thus, Plaintiffs need not and do not rely on the

dissemination of information by third parties to establish that certain illegal aliens will plausibly — even rationally — decide not to participate based *directly* on a correct understanding of the Presidential Memorandum's import.

Second, as noted above, the Supreme Court has long made clear that the defendant's conduct need not be "the very last step in the chain of causation." *Bennett*, 520 U.S. at 169. Indeed, the traceability requirement may be met even where several steps on the causal chain stand between the defendant's conduct and the plaintiff's injury. *Davis v. Federal Election Commission*, 554 U.S. 724, for example, involved a challenge to a campaign finance law that increased campaign contribution limits for any candidate whose opponent's personal campaign expenditures exceeded his own by a certain amount. At the time of filing, the plaintiff was at least three steps away from suffering any concrete harm: He had to spend a sufficient amount of his own money; his opponent had to refrain from a comparable level of self-funding; and his opponent had to then take advantage of the law by accepting heightened contributions. Even so, the Court found that the plaintiff faced a "real, immediate, and direct [injury] . . . when he filed suit." *Id*. at 734. Notably, the Court deemed that assumption valid based on little more than evidence that "*most* candidates who had the opportunity to receive expanded contributions had done so." *Id.* at 735 (emphasis added). Moreover, the Court did not require proof that the government conduct had a coercive effect on the third party's action; evidence that allowed the Court to predict how the third party would likely act in response to the government action was sufficient. *See id.*; *see also Lujan*, 504 U.S. at 562 (noting that, when injury depends on the conduct of third parties, it is sufficient to show "choices have been or *will be* made in such manner as to produce causation and permit redressability" (emphasis added)); *Nat. Res. Def. Council*, 894 F.3d at 104-05 (finding "the agency's own pronouncements," as well as "[c]ommon

sense and basic economics," supported a conclusion that an "increased penalty has the potential to affect [third parties'] business decisions and compliance approaches" in a manner that would result in harm to the petitioners (internal quotation marks omitted)).

In light of these principles and cases, Defendants' arguments are unpersuasive. At the end of the day, they are little more than a rehash of Defendants' arguments in the citizenship question litigation, which were rejected. There, like here, Defendants argued that Plaintiffs' injuries were not "fairly traceable" to their conduct because the injuries depended on the intervening acts of third parties influenced by misinformation — namely, that the federal government could use their census answers for law enforcement and immigration enforcement purposes. *New York v. Dep't of Commerce*, 351 F. Supp. 3d at 623-24. There, like here, Defendants argued that Plaintiffs' injuries were not "fairly traceable" to their conduct because the injuries were attributable to an independently existing macro environment of fear permeating the immigrant and Hispanic communities. *Id.* at 621-22. Yet the Supreme Court rejected those arguments. As that Court reaffirmed, "Article III requires no more than *de facto* causality," a standard that is met where Government action has a "predictable effect . . . on the decisions of third parties." *Dep't of Commerce v. New York*, 139 S. Ct. at 2566 (internal quotation marks omitted). Here, as in the citizenship question litigation, Plaintiffs have proved that their injuries arise from the predictable effects of Government action, however rational or reasonable those effects may be.

### 3. Redressability

Finally, we conclude that Plaintiffs satisfy the redressability requirement as well. To be sure, Plaintiffs have not proved — and perhaps could not prove — that a favorable ruling would lead everyone who has decided, or will decide, not to participate in the census as a result of the

Presidential Memorandum to change course. But Plaintiffs' burden is not to show that a

favorable court ruling would fully remedy the injuries that they have suffered or will suffer.

Instead, they need show only that the "risk [of harm] would be reduced *to some extent* if [they]

receive[] the relief they seek." *Massachusetts v. E.P.A.*, 549 U.S. at 526 (emphasis added); *see

also CREW*, 953 F.3d at 194 (finding the redressability requirement satisfied because "it

logically follows that relief would redress [the plaintiffs'] injury — at least to some extent");

*Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 716 (6th Cir. 2015) ("[I]t need not be likely that

the harm will be *entirely* redressed, as partial redress can also satisfy the standing requirement.").

      The Supreme Court's decision in *Massachusetts v. E.P.A.* is instructive. There,

Massachusetts and other States challenged the EPA's decision not to regulate four greenhouse

gases within the United States. On appeal, the Supreme Court held that the States had standing

to challenge the EPA's decision based on their showing, through "unchallenged affidavits," that

climate change was caused by greenhouse gases and caused various harms. 549 U.S. at 522.

The Court did so despite the EPA's contention that there was no "realistic possibility" that the

relief sought "would mitigate global climate change and remedy their injuries," particularly

"because predicted increases in greenhouse gas emissions from developing nations" were "likely

to offset any marginal domestic decrease." *Id.* at 523-24. The Court explained:

> While it may be true that regulating motor-vehicle emissions will not by itself
> *reverse* global warming, it by no means follows that we lack jurisdiction to decide
> whether EPA has a duty to take steps to *slow* or *reduce* it. Because of the
> enormity of the potential consequences associated with manmade climate change,
> the fact that the effectiveness of a remedy might be delayed . . . is essentially
> irrelevant. Nor is it dispositive that developing countries . . . are poised to
> increase greenhouse gas emissions substantially over the next century: A
> reduction in domestic emissions would slow the pace of global emissions
> increases, no matter what happens elsewhere.

*Id.* at 525-26 (citation and footnote omitted). Notably, the Court did not demand empirical proof

that the remedy sought would have any marginal effect on global warming. The causal

connection between greenhouse gases and climate change, combined with the EPA's "ardent support for various voluntary emission-reduction programs" (with which the "EPA would presumably not bother . . . if it thought emissions reductions would have no discernable impact on future global warming"), was enough.  *Id.* at 526 (internal quotation marks omitted).  Because the relief sought would reduce the risk of injury "to some extent," the States had standing.  *Id.*

Here too, Plaintiffs' uncontested affidavits show that the relief they seek — a declaration that the Presidential Memorandum is unlawful and an injunction barring any effort to implement it — would reduce "to some extent" their risk of suffering injuries relating to the census.  If anything, the record here provides even more support for a finding of redressability than the record in *Massachusetts v. E.P.A.* did.  First, as discussed above, Plaintiffs have provided proof that there are likely people who have decided, or will decide, not to participate in the census for the simple reason that, under the Presidential Memorandum, they will not count for apportionment purposes.  A court order invalidating the Presidential Memorandum would redress that harm in a straightforward manner.  *See, e.g.*, *Carpenters Indus. Council*, 854 F.3d at 6 n.1 (Kavanaugh, J.) ("[I]f a government action causes an injury, enjoining the action usually will redress that injury.").  Second, Plaintiffs' uncontested declarations provide evidence supporting a finding of redressability.  Plaintiff Ahri, for example, explains that the injunction barring the citizenship question was useful in quelling concerns in the community it serves and that an order granting relief in this case would similarly make its census outreach efforts more efficient and effective.  Seon Supp. Decl. ¶¶ 4-7; *see also* Oshiro Supp. Decl. ¶ 5; Espinosa Supp. Decl. ¶ 8.  And Plaintiffs submit an expert report noting that injunctions barring implementation of other immigration-related executive actions have had "measurable consequences on promoting trust among immigrant communities and influencing behavioral interactions with various aspects of

government." *See* Barreto Decl. ¶¶ 66-69.  In short, we find that Plaintiffs' requested relief

would "likely . . . at least diminish further instance of" Plaintiffs' census-related harms.  *CREW*,

953 F.3d at 194.  Indeed, "[b]ecause Plaintiffs have successfully alleged" that these harms are

"ongoing, it logically follows that relief would redress their injury — at least to some extent,

which is all that Article III requires."  *Id.*

      Only two of Defendants' counterarguments warrant further discussion.  First, Defendants

maintain that Plaintiffs' census-related injuries would not be remedied by a ruling in Plaintiffs'

favor because the alleged "'macro environment' of mistrust around immigration" would remain.

Defs.' Mem. 19.  But that is akin to the argument the EPA made, and the Supreme Court

rejected, in *Massachusetts v. E.P.A.*: that granting relief would not remedy the States' injuries

because there were other, independent causes for those injuries — namely, the emissions of

developing nations — that would persist.  *See* 549 U.S. at 524.  Put differently, the mere fact that

the Presidential Memorandum causes only incremental harms, and that there are other causes of

those same harms, does not defeat a finding of redressability.  *See id.* ("EPA overstates its case.

Its argument rests on the erroneous assumption that a small incremental step, because it is

incremental, can never be attacked in a federal judicial forum.").

      Second, Defendants suggest that Plaintiffs cannot show redressability because "appellate

review would likely last well past the end of the conduct of the census."  Defs.' Reply 4.

Conspicuously, however, Defendants cite no authority for the novel proposition that the

availability of higher court review and the possibility of reversal can render a dispute

nonjusticiable.  Taken to its logical conclusion, that argument would suggest that a plaintiff

could never obtain emergency relief in the face of a looming deadline.  Far from rejecting such

claims, courts routinely hear them on an expedited basis (as we have done here).  *See, e.g.,*

*League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)
(noting that in the election context, "once the election occurs, there can be no do-over and no
redress" making "injur[ies] to . . . voters real and completely irreparable if nothing is done").
Finally, it bears mentioning that it is *Defendants' own conduct* that has put Plaintiffs in such a
precarious position.  The President could have issued his Presidential Memorandum well before
the census began, in which case Plaintiffs would have had ample time to obtain a definitive
ruling on their claims to preempt any chilling effect.  Or he could have waited until census
operations were over, in which case there would have been no risk of the census-related harms
that Plaintiffs seek to remedy.  Instead, for unknown reasons, the President waited more than a
year after the Supreme Court rejected the citizenship question to issue his Presidential
Memorandum, at which point the census was (and still is) in full swing.  It would be perverse to
conclude that, through their own conduct, Defendants could prevent Plaintiffs from even
obtaining a hearing on their claims.

### 4. Conclusion

In the final analysis, "the gist of the question of standing" (and constitutional ripeness)
"is whether [the plaintiffs] have 'such a personal stake in the outcome of the controversy as to
assure that concrete adverseness which sharpens the presentation of issues upon which the court
so largely depends for illumination.'"  *Massachusetts v. E.P.A.*, 549 U.S. at 517 (quoting *Baker
v. Carr,* 369 U.S. 186, 204 (1962)).  That is, the standing requirement "preserves the vitality of
the adversarial process by assuring both that the parties before the court have an actual, as
opposed to professed, stake in the outcome, and that the legal questions presented . . . will be
resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context
conducive to a realistic appreciation of the consequences of judicial action."  *Id.* (quoting *Lujan,*

504 U.S. at 581 (Kennedy, J., concurring).  Based on our thorough review of the record —

including the uncontested declarations submitted in support of Plaintiffs' motion — and the well-

established standards for determining whether a plaintiff has standing, we are confident we have

jurisdiction to proceed.[11]

## D.  Prudential Ripeness

As noted, Defendants also invoke the prudential ripeness doctrine.  *See* Defs.' Mem. 6-

10; Defs.' Reply 1-2.  Unlike standing and constitutional ripeness, prudential ripeness does not

relate to the Court's jurisdiction.  Instead, "when a court declares that a case is not prudentially

ripe, it means that the case will be *better* decided later and that the parties will not have

constitutional rights undermined by the delay."  *Simmonds*, 326 F.3d at 357.  The "ripeness

requirement is designed 'to prevent the courts, through avoidance of premature adjudication,

from entangling themselves in abstract disagreements over administrative policies, and also to

protect the agencies from judicial interference until an administrative decision has been

formalized and its effects felt in a concrete way by the challenging parties.'"  *Ohio Forestry*

---

[11]    Defendants do not argue that we should engage in a zone-of-interests analysis, which the
Supreme Court has sometimes described as a component of "prudential standing."  *Lexmark
Int'l*, 572 U.S. at 127 n.3.  Accordingly, they have waived the argument.  *See Fed. Defs. of N.Y.,
Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 128 (2d Cir. 2020) (holding, after *Lexmark*, that
the zone-of-interests test is not jurisdictional); *see also, e.g.*, *Young v. Conway*, 698 F.3d 69, 85 (2d
Cir. 2012) ("It is well-settled that non-jurisdictional arguments and defenses may be waived
. . . .").  In any event, in light of *Lexmark*'s observation that "the zone-of-interests analysis . . .
asks whether this particular class of persons has a right to sue under this substantive statute" and
"whether a *legislatively conferred* cause of action encompasses a particular plaintiff's
claim," 572 U.S. at 127 (emphasis added) (alterations, citations, and internal quotation marks
omitted), we doubt that it has any application here, as the claims on which Plaintiffs move are
constitutional and equitable in nature.  *See, e.g.*, *Sierra Club v. Trump*, 929 F.3d 670, 700-02 (9th
Cir. 2019).

*Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732-33 (1998) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)); *see Nat'l Org. for Marriage*, 714 F.3d at 691.[12]

"To determine whether to abstain from a case on prudential ripeness grounds, we proceed with a two-step inquiry," evaluating "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Nat'l Org. for Marriage*, 714 F.3d at 691 (internal quotation marks omitted). The first step of the inquiry "is concerned with whether the issues sought to be adjudicated are contingent on future events or may never occur." *N.Y. Civil Liberties Union v. Grandeau*, 528 F.3d 122, 132 (2d Cir. 2008) (internal quotation marks and alterations omitted). "In assessing th[e] possibility of hardship, we ask whether the challenged action creates a direct and immediate dilemma for the parties." *Id.* at 134 (internal quotation marks omitted). The two-step inquiry requires consideration, in turn, of three factors: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n*, 523 U.S. at 733.

Considering these factors here, we conclude that the test for prudential ripeness is "easily satisfied." *Susan B. Anthony List*, 573 U.S. at 167. First, given that Plaintiffs' alleged census-related harms are occurring now, and can be remedied only if we rule on their claims before census operations conclude in a matter of days or weeks, delaying review would cause Plaintiffs

---

[12]      In recent years, the Supreme Court has cast doubt on the "continuing vitality of the prudential ripeness doctrine," on that ground that it "'is in some tension with . . . the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Susan B. Anthony List*, 573 U.S. at 167 (internal quotation marks omitted). But because neither the Supreme Court nor the Second Circuit has abandoned the doctrine yet, we are bound to consider Defendants' arguments here.

grave hardship. *See Chamber of Commerce of U.S. v. Reich*, 57 F.3d 1099, 1100 (D.C. Cir. 1995) (per curiam) (finding a challenge to an Executive Order announcing a policy of the executive branch ripe where "the injury alleged . . . [is that] the mere existence of the Order alters the balance of bargaining power between employers and employees by creating a disincentive for employers to hire replacement workers"). Justice delayed would indeed be justice denied. Moreover, because there are no do-overs for the census, the adverse consequences of that delay could resonate for a decade, until the next decennial census. Second, although Defendants assert in conclusory fashion that judicial intervention "would inappropriately interfere with the Bureau's ongoing process by hindering agency efforts to refine its policies and to apply its expertise," Defs.' Reply 2 (internal quotation marks omitted), that assertion borders on frivolous. On its face, the Presidential Memorandum does not purport to regulate the actual conduct of the census, *see* Presidential Memorandum, 85 Fed. Reg. at 44,679 ("Excluding Illegal Aliens From the Apportionment Base *Following* the 2020 Census" (emphasis added)), and Defendants themselves concede that it "does *not* affect how the Census Bureau is conducting its remaining enumeration operations," Defs.' Mem. 12. Moreover, as discussed below, relief can be crafted to minimize, if not eliminate, interference with administrative action. And finally, although the standing-related question of whether or to what extent Plaintiffs would suffer apportionment-related harms would benefit from further factual development, the gravamen of Plaintiffs' claims — that the President lacks the authority to exclude illegal aliens from the apportionment base — "presents an issue that is 'purely legal, and will not be clarified by further factual development.'" *Susan B. Anthony List*, 573 U.S. at 167 (quoting *Thomas*, 473 U.S. at 581).

Thus, we conclude there is no basis to defer consideration of Plaintiffs' claims on ripeness ground. The fact that the Presidential Memorandum contains something akin to a "savings clause" — namely, that it is "the policy of the United States to exclude" illegal aliens from the apportionment base "*to the maximum extent feasible and consistent with the discretion delegated to the executive branch*," Presidential Memorandum, 85 Fed. Reg. at 44,680 (emphasis added) — does not alter that conclusion. Where, as here, the President's proclamation "unambiguously commands action" such that "there is more than a 'mere possibility that some agency might make a legally suspect decision,'" such a "savings clause does not and cannot override" the proclamation's "meaning." *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018) (quoting *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002)). Indeed, savings clauses must be "read in their context, and they cannot be given effect when the Court, by rescuing the . . . measure, would override clear and specific language." *Id.* at 1239. In this case, the President explicitly declares that "it is the policy of the United States to exclude" illegal aliens "from the apportionment base," an unambiguous directive that, as discussed above, is having immediate and ongoing effects. Moreover, the Presidential Memorandum mandates that this policy be effected "*to the maximum extent*" feasible and consistent with law. Presidential Memorandum, 85 Fed. Reg. at 44,680 (emphasis added). Given that "a presumption of regularity attaches to the actions of Government agencies," *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001), we must and do presume that the Secretary and the Census Bureau will abide by the President's directives and work diligently to help exclude illegal aliens from the apportionment base to the maximum extent possible. Whether doing so would be a lawful exercise of the President's authority is a pure legal question that can be addressed now.

## THE MERITS

In their motion, Plaintiffs seek relief on two grounds: first, they argue that the Presidential Memorandum violates Article I and the Fourteenth Amendment to the Constitution; and second, they contend that it constitutes an *ultra vires* violation of the laws governing the census and apportionment.  Pls.' Mem. 1-2.  On the latter front, Plaintiffs insist that the Presidential Memorandum exceeds the powers delegated by Congress in 13 U.S.C. § 141 and 2 U.S.C. § 2a in at least two ways: (1) because it contemplates calculating apportionment using tabulations other than those produced by the census and (2) because it seeks to exclude illegal aliens from the apportionment base regardless of whether they are "persons in" a "State" as those terms are used in Section 2a(a).  *Id.* at 27-36.

Although Plaintiffs urge us to decide both their constitutional claims and their statutory claims, and the parties focus mostly on the constitutional issues, courts have long been admonished not to "pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of." *Ashwander v. TVA,* 297 U.S. 288, 347 (1936) (Brandeis, J., concurring); *accord Slack v. McDaniel*, 529 U.S. 473, 485 (2000); *House of Representatives*, 525 U.S. at 343-44. Accordingly, we begin — and, as it turns out, end — with Plaintiffs' statutory claims.  In doing so, of course, "we start with the text of the statute." *Babb v. Wilkie*, 140 S. Ct. 1168, 1172 (2020).  "Where the statute's language is plain, the sole function of the courts is to enforce it according to its terms." *United States v. Kozeny*, 541 F.3d 166, 171 (2d Cir. 2008) (internal quotation marks omitted).  We may look to legislative history and other tools of statutory construction if the statutory terms are ambiguous or "to corroborate and fortify our

understanding of the text." *Dig. Realty Tr., Inc.* v. *Somers*, 138 S. Ct. 767, 783 (2018)

(Sotomayor, J., concurring).

## A.  Apportionment Must Be Based on the Results of the Census Alone

Plaintiffs' first argument is that the Presidential Memorandum violates the statutes

governing the census and apportionment by producing apportionment figures that are not based

solely on the decennial census.  This argument relies on the interplay between Section 141 and

Section 2a.  Subsection (a) of the former requires the Secretary to conduct the "decennial census

of population."  13 U.S.C. § 141(a).  Subsection (b) then requires the Secretary to report to the

President "[t]he tabulation of total population by States under subsection (a) of this section" —

that is, *under* the "decennial census" — "as required for the apportionment of Representatives in

Congress."  *Id.* § 141(b).  Section 2a(a), in turn, requires the President to transmit to Congress "a

statement showing the whole number of persons in each State . . . as ascertained under the . . .

decennial census of the population, and the number of Representatives to which each State

would be entitled . . . by the method known as the method of equal proportions . . . ."  2 U.S.C.

§ 2a(a).  By its terms, therefore, Section 141 calls for the Secretary to report a single set of

numbers — "[t]he tabulation of total population by States" under the "decennial census" — to

the President.  And Section 2a, in turn, "expressly require[s] the President to use . . . the data

from the 'decennial census'" in determining apportionment.  *Franklin*, 505 U.S. at 797.  That is,

once the final decennial census data is in hand, the President's role is purely "ministerial."  *Id.* at

799.

Legislative history and the longstanding understanding of the Executive Branch itself

confirm that the Secretary's "tabulation," and the President's apportionment calculations, must

be based on decennial census data alone.  Significantly, the statutes first took their current form

in 1929, after a decade-long stalemate over the method for calculating the reapportionment

following the 1920 census.  *See id.* at 791-92.  Congress responded to this problem by creating

an "automatic reapportionment" scheme that would be "virtually self-executing."  *Id.* at 792.  In

particular, the scheme created an "automatic connection between the census and the

reapportionment"; indeed, that was "*the* key innovation of the Act."  *Id.* at 809 (Stevens, J.,

concurring in part and concurring in the judgment) (emphasis added).  The Senate Report

accompanying the bill explained in reference to the next census:

> The census would be taken in November, 1929.  One year later, *with these figures in hand*, the President would report *the census figures*, together with a table showing how, *under these figures*, the House would be apportioned . . . pursuant to a purely ministerial and mathematical formula . . . .  Precisely the same process would protect reapportionment in each subsequent decennium.

S. Rep. No. 71-2, at 4 (1929).  Along similar lines, the House Report explained that, under the

bill, "the House is reapportioned in accordance with the tabulation transmitted by the Secretary

of Commerce . . . ; the tabulations transmitted to Congress are on the basis of the 1930 census

. . . ."  H. Rep. No. 70-2010, at 4 (1929); *see also id.* at 7 (explaining that the Secretary, to whom

the bill also originally assigned the task of reapportionment later assigned to the President, "is

left with no discretionary power.  He must use absolutely, without deviation, the population of

each State *as gathered and reported by the Director of the Census*." (emphasis added)).[13]

---

[13]     Although we are wary of relying too heavily on floor statements by members of Congress, it is worth noting that Senator Vandenberg of Michigan, the principal sponsor the bill, reaffirmed that the legislation required the President "to report the result of a census" and to apply the reapportionment formula to "the result of the census."  71 Cong. Rec. 1613 (1929) (statement of Sen. Vandenberg).  Elsewhere, he and Senator Walsh of Montana confirmed in a colloquy with Senator Swanson of Virginia "that the President is bound and has no discretion" but "to make the apportionment *according to the census*."  *Id.* at 1845 (statement of Sen. Swanson) (emphasis added).

Similarly, its position in this litigation notwithstanding, the Department of Justice (the "Justice Department" or "DOJ") has long adhered to the view that the President's statement to Congress regarding apportionment has to be based solely on the tabulation of total population produced by the census.  As the Justice Department explained more than forty years ago in *Federation for American Immigration Reform (FAIR) v. Klutznick*, "every inhabitant of a state the Census counts is included in the apportionment base. . . .  The total resident population of the states is the apportionment base."  Defs.' Reply Mem. & Opp'n at 11, 486 F. Supp. 564 (D.D.C. 1980) (No. 79-CV-3269), 1980 WL 683642, at *7 (citing H.R. Rep. No. 91-1314 (1970)).[14] Along similar lines, the Government acknowledged during oral argument in *Franklin v. Massachusetts* that "[t]he law directs [the President] to apply, of course, a particular mathematical formula to the population figures he receives" and that "[i]t would be unlawful . . . just to say, these are the figures, they are right, but I am going to submit a different statement." Oral Arg. Tr. at 12, *Franklin v. Massachusetts*, 505 U.S. 788 (No. 91-1502).  "I think under the law he is supposed to base his calculation on the figures submitted by the Secretary."  *Id.* at 13; *see also*, Reply Br. Appellants, *Franklin*, 505 U.S. 788  (No. 91-1502), 1992 WL 672612, at *15 (Apr. 20, 1992) ("[T]he method of equal proportions calls for application of a set mathematical formula to the state population totals *produced by the census*." (emphasis added)).

In short, this history confirms our reading of the statutes' plain terms: The Secretary is required to report a single set of figures to the President — namely, "[t]he tabulation of total

---

[14]     The House Report to which DOJ cited noted unambiguously that "the enumerated decennial census population is the basis for the apportioning of [the House] among the several States."  H.R. Rep. No. 91-1314, at 3 (1970).  Elsewhere, it summarized the three "elements" of the President's statement under Section 2a(a): "(1) The population of each State *as determined by the decennial census*; (2) The existing total number of Representatives (435); and (3) The apportionment which results from using a mathematical method known as the method of equal proportions."  *Id.* at 2 (emphasis added).

population by States" under the "decennial census" — and the President is then required to use those same figures to determine apportionment using the method of equal proportions.

The Presidential Memorandum deviates from, and thus violates, these statutory requirements.  Whereas the statute calls for the Secretary to include only the census figures in his report to the President, the Presidential Memorandum mandates that the Secretary provide a second set of figures as well: namely, the population of each State "exclud[ing]" illegal aliens. Presidential Memorandum, 85 Fed. Reg. at 44,680.  The Presidential Memorandum leaves it to the Secretary how to come up with those figures, but they will necessarily be derived from something other than the census itself, as the 2020 census is not gathering information concerning citizenship or immigration status, and the 2020 census itself is counting illegal aliens. *See* Order at 1-2, *New York v. Dep't of Commerce*, 18-CV-2921 (JMF), ECF No. 653 (permanently enjoining the inclusion of a citizenship question on the 2020 census questionnaire); *see also* Presidential Memorandum, 85 Fed. Reg. at 44,680 (noting that "data on illegal aliens . . . relevant for the purpose of conducting the apportionment" may be available as a result of Executive Order 13880, which directed executive agencies "to share information with the Department of Commerce" regarding "the number of citizens, non-citizens, and illegal aliens in the country").  By doing so, the Presidential Memorandum violates Congress's mandate to use the results of the census — and only the results of the census — in connection with the apportionment process and the counting of them in the census pursuant the Residence Rule.

In arguing otherwise, Defendants rely almost exclusively on the Supreme Court's decision in *Franklin*, *see* Defs.' Mem. 40-42; Oral Arg. Tr. 48-54, but that reliance is misplaced. In *Franklin*, the plaintiffs brought two discrete challenges, one a constitutional challenge to the formula used in connection with reapportionment and one a challenge under the Constitution and

the APA to the conduct of the census — specifically, to the Census Bureau's decision to count federal employees serving overseas as residents of the State listed as their home of record in their personnel files. *See Massachusetts v. Mosbacher*, 785 F. Supp. 230, 233 (D. Mass. 1992). A three-judge district court rejected the first challenge, but agreed with the second. *See id.* at 267-68. On appeal from the latter ruling alone, the Supreme Court reversed. With respect to the plaintiffs' constitutional claim, the Court held that the Secretary's judgment "that many federal employees temporarily stationed overseas had retained their ties to the States and could and should be counted toward their States' representation in Congress" was "consonant with, though not dictated by, the text and history of the Constitution." *Franklin*, 505 U.S. at 806. With respect to the plaintiffs' APA claim, the Court held that the decision could not be challenged because the only final action affecting the States was the President's Section 2a(a) statement and the President does not qualify as an "agency" for purposes of the APA. *See id.* at 796-801. The Secretary's Section 141(b) report, the Court explained, "carries no direct consequences for the reapportionment" and, thus, "serves more like a tentative recommendation than a final and binding determination." *Id.* at 798.

While addressing the question of whether the plaintiffs could bring a claim under the APA, the Court described the interplay between Section 2a and Section 141:

> After receiving the Secretary's report, the President is to "transmit to the Congress a statement showing the whole number of persons in each State . . . as ascertained under the . . . decennial census of the population." 2 U.S.C. § 2a(a). Section 2a does not expressly require the President to use the data in the Secretary's report, but, rather, the data from the "decennial census." There is no statute forbidding amendment of the "decennial census" itself after the Secretary submits the report to the President. For potential litigants, therefore, the "decennial census" still presents a moving target, even after the Secretary reports to the President. . . . Moreover, there is no statute that rules out an instruction by the President to the Secretary to reform the census, even after the data are submitted to him. It is not until the President submits the information to Congress

that the target stops moving, because only then are the States entitled by § 2a to a
particular number of Representatives.

505 U.S. at 797-98.  The Court acknowledged that the President's role under Section 2a was

"admittedly ministerial," but that "d[id] not answer the question whether the apportionment is

foreordained by the time the Secretary gives her report to the President."  *Id.* at 799.  Put simply,

the Court concluded, "§ 2a does not curtail the President's authority" — pursuant to "his

accustomed supervisory powers over his executive officers" — "to direct the Secretary in

making policy judgments that result in 'the decennial census'; he is not expressly required to

adhere to the policy decisions reflected in the Secretary's report."  *Id.* at 799-800.

Defendants seize on this language to argue that the President has discretion to define who

should be considered inhabitants — or "persons in each State," 2 U.S.C. § 2a(a); *see* U.S. Const.

Art. I § 2, cl. 3 — for purposes of the census.  Presidential Memorandum, 85 Fed. Reg. at

44,679; *see* Defs.' Mem. 40-42; Def. Reply 9-10; Oral Arg. Tr. 47.  That may or may not be true

— we address it below — but it is beside the point for present purposes.  *Franklin* does not

suggest, let alone hold, that the President has authority to use something other than the census

when calculating the reapportionment; indeed, the Court did not even consider the plaintiffs'

challenge to the apportionment.  At most, *Franklin* establishes that the President retains his

"usual superintendent role" with respect to the conduct of the census — and can direct the

Secretary to make "policy judgments *that result in 'the decennial census*.'"  *Id.* at 799-800

(emphasis added); *see also id.* at 797-98 (referring to "amendment of the 'decennial census'

itself" and "instruction by the President to the Secretary to reform the census").[15]  But by

---

[15]    Thus, defense counsel is wrong in suggesting that the *Franklin* Court blessed the use of a
tabulation that was based on both the census and "separate records outside the census."  Oral
Arg. Tr. 52.  The overseas personnel were counted as part of the census itself, resulting in a
single "tabulation of total population by States" under the "decennial census."  13 U.S.C.
§ 141(a)-(b).  That they were counted using administrative records rather than a questionnaire is

Defendants' own admission, that is not what the President did here.  *See, e.g.*, Joint Pre-

Conference Ltr. 5 ("Plaintiffs are not challenging some procedure that will be used in the actual

census, but an apportionment number that will be chosen by the President after the census is

complete."); Defs.' Mem. 12 ("[T]he Memorandum does *not* affect how the Census Bureau is

conducting its remaining enumeration operations . . . ."); ECF No. 120 (Decl. of Albert E.

Fontenot, Jr.) ¶ 12 ("The Presidential Memorandum . . . has had no impact on . . . the Census

Bureau's commitment to count each person in their usual place of residence, as defined in the

[Residence Rule].").

In short, contrary to Defendants' arguments, the statutory scheme enacted by Congress

does not give the President authority to "choose" any set of numbers he wants "to plug into the

'method of equal proportions.'"  Defs.' Mem. 42.  Instead, Congress mandated that the President

use a specific set of numbers — those produced by the decennial census itself — for purposes of

the reapportionment.  By deviating from that mandate, the Presidential Memorandum exceeds

the authority of the President and constitutes an *ultra vires* violation of the statutes.

## B.  The Apportionment Base Cannot Exclude Illegal Aliens Who Reside in a State

The Presidential Memorandum also deviates from Section 2a(a) in defining "the whole

number of persons in each State" to categorically exclude illegal aliens residing in each State.

Once again, we begin with the plain language of the statute.  Defendants do not dispute — in the

Presidential Memorandum or in their briefs — that illegal aliens are "persons" within the

meaning of the Section 2a(a), and for good reason.  The ordinary meaning of the word "person"

is "human" or "individual" and surely includes citizens and non-citizens alike.  *See Plyler v.*

---

of no moment, as Section 141(a) broadly delegates to the Secretary the authority to conduct the
census "in such form . . . as he may determine."  *Id.* § 141(a).

*Doe*, 457 U.S. 202, 210 (1982) ("Whatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term.").  Moreover, the U.S. Code is filled with other statutes that use terms that plainly exclude illegal aliens, such as "citizen" or "alien lawfully admitted."  *E.g.*, 5 U.S.C. § 552a(a)(2).  "Congress thus distinguishes between a 'citizen' and 'any person' when it wishes to do so."  *O'Rourke v. U.S. Dep't of Justice*, 684 F. Supp. 716, 718 (D.D.C. 1988) (holding that the phrase "any person" in the Freedom of Information Act, 5 U.S.C. §§ 551 *et seq.*, includes non-citizens); *accord Stone v. Exp.-Imp. Bank of U. S.*, 552 F.2d 132, 136 (5th Cir. 1977); *see also, e.g.*, *Suzlon Energy Ltd. v. Microsoft Corp.*, 671 F.3d 726, 729 (9th Cir. 2011) (holding that "any person" in the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 *et seq.*, "means any person, including foreign citizens").

Instead, Defendants hang their hats on the four-word phrase "persons in each State." Presidential Memorandum, 85 Fed. Reg. at 44,679; *see* Defs.' Mem. 2, 29-30; Defs.' Reply 11. That phrase, they argue, has been construed to mean "inhabitants" or to turn on "usual residence," terms that are not self-defining and call for "the exercise of judgment."  Presidential Memorandum, 85 Fed. Reg. at 44,679.  That is true enough.  *See Franklin*, 505 U.S. at 803-05 (noting that, since 1790, Congress and the Census Bureau have used words such as "inhabitant" and "[u]sual residence" to "describe the required tie to the State" and that defining the metes and bounds of these terms are not always clear).  But it does not follow that illegal aliens — a category defined by legal status, not residence — can be excluded from the phrase.  To the contrary, the ordinary definition of the term "inhabitant" is "one that occupies a particular place regularly, routinely, or for a period of time."  *See* MERRIAM-WEBSTER'S COLLEGE DICTIONARY 601 (10th ed. 1997).  And however ambiguous the term may be on the margins, it surely

encompasses illegal aliens who live in the United States — as millions of illegal aliens indisputably do, some for many years or even decades.[16]

The Presidential Memorandum provides two examples to support its conclusion that "[t]he discretion delegated to the executive branch to determine who qualifies as an 'inhabitant' includes authority to exclude from the apportionment base aliens who are not in a lawful immigration status," Presidential Memorandum, 85 Fed. Reg. at 44,679, but neither is remotely convincing. First, the Memorandum notes that "aliens who are only temporarily in the United States, such as for business or tourism, and certain foreign diplomatic personnel are 'persons' who have been excluded from the apportionment base." *Id.* True enough, but that is not based on their legal status. Instead, it is based on the fact that the United States is not their "usual residence." (Indeed, that is reflected in the Residence Rule.) Second, the Memorandum points to the fact that "overseas Federal personnel have, at various times, been included in" the apportionment base. *Id.* Once again, true enough. (Indeed, that was the issue in *Franklin*.) But that is based on the fact that the terms "usual residence" and "inhabitant" have "been used

---

[16]     Defendants argue that it is Plaintiffs' burden to show "that there is *no* category of illegal aliens that may be lawfully excluded from the apportionment," Defs.' Mem. 39, and suggest that Plaintiffs cannot meet that burden because some categories of illegal aliens (e.g., aliens residing in a detention facility after being arrested while crossing the border) can be lawfully excluded, *see id.* at 27. But the examples Defendants proffer are arguably excluded (or excludable) based on their "usual residence," not their legal status. In any event, Defendants cite no authority for applying the standards for facial challenges to the constitutionality of statutes to claims, like those here, that the President has exceeded the authority granted to him by Congress. Indeed, that arguably gets it backwards: If the President goes outside the bounds of the authority granted to him by Congress, a court's power to grant relief should not depend on how far outside the bounds he went. Notably, courts considering similar claims have not approached them in the manner Defendants propose. *See, e.g.*, *Hawaii v. Trump*, 878 F.3d 662, 690-92 (9th Cir. 2017) (concluding that a presidential proclamation exceeded the President's delegated authority under the Immigration and Nationality Act), *rev'd and remanded on other grounds*, 138 S. Ct. 2392 (2018); *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1324, 1337-39 (D.C. Cir. 1996) (concluding that an executive order announcing a "policy of the executive branch" was *ultra vires* and invalid).

broadly enough to include some element of allegiance or enduring tie to a place" and to "include 'persons absent occasionally for a considerable time on public or private business.'" *Franklin*, 505 U.S. at 804-05 (quoting 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 217 (Max Farrand ed., rev. ed. 1966) (statement of James Madison)).  It is simply a non sequitur to suggest, as the Presidential Memorandum does, that just because the phrase "persons in each State" can be construed to *include* people who are "temporarily stationed abroad" but "retain[] their ties to the States," *id.* at 806, it can also be construed to *exclude* people who indisputably inhabit or reside in a State.

Defendants are on no firmer ground in arguing that illegal aliens can be excluded from "the whole number of persons in each State," as that phrase is used in Section 2a, because they "may be removed from the country at any time."  Defs.' Mem. 39.  A person living in a State but facing future removal is no less a "person[] in that State," Defs.' Reply 4 (internal quotation marks and alteration omitted), than someone living in the State without the prospect of removal. Moreover, many people in immigration custody or removal proceedings actually have *lawful* immigration status, *see, e.g.*, *Ragbir v. Homan*, 923 F.3d 53, 57-58 (2d Cir. 2019), and their placement in custody or removal proceedings does not necessarily render them unlawfully present.  Notably, data reveal that immigration judges ultimately allow many aliens in custody or removal proceedings to remain in the United States.  *See Immigration Judges Decide 57 Percent Entitled to Remain in U.S.*, TRAC IMMIGRATION (Aug. 17, 2016),  https://trac.syr.edu/ immigration/reports/435/.  And many people initially designated as "undocumented" — including many intercepted at the border — ultimately obtain lawful status, such as asylum.  *See* EXEC. OFFICE FOR IMMIGRATION REVIEW, U.S. DEP'T OF JUSTICE, STATISTICS YEARBOOK FISCAL

YEAR 2018, at 27 (2019), https://www.justice.gov/eoir/file/1198896/download.  Nothing in Section 2a turns on such fluctuations and nuances in legal status.

Once again, legislative history and settled practice confirm our conclusion that "persons in each State" turns solely on residency, without regard for legal status.  In looking to legislative history, we look not to the history surrounding the framing of the Constitution or the Reconstruction Amendments, even though the words in the statute mirror those in Article I and the Fourteenth Amendment.  Instead, we look to 1929, when Section 2a was enacted and the words "whole number of persons in each State" entered the statutory lexicon.  *See* Act of June 18, 1929, Pub. L. No. 71-13 § 22, 46 Stat. 21, 26.  That is because our task is to interpret the statute itself, and we do so "in accord with the ordinary public meaning of its terms at the time of its enactment."  *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1738 (2020).  That is not to say that the constitutional language is irrelevant to our task: The drafters of Section 2a used the same words as those in the Constitution, so their understanding of the constitutional language sheds light on their understanding — and the "ordinary public meaning" — of the statutory text "at the time of its enactment."  *Id.*  But it is their *understanding* of the constitutional language, *not* whether their understanding was correct (on which we need and do not opine), that matters.  *Cf. Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1890 (2019) ("It is a commonplace of statutory interpretation that Congress legislates against the backdrop of existing law." (internal quotation marks omitted)).[17]

---

[17]     For this reason, we need not and do not delve into the meaning of the terms "inhabitant" and "usual residence" at the time of the Founding or of the Reconstruction Amendments, or consider whether the concept of unlawful status was known to the Framers of Article I or the Fourteenth Amendment.  There is no dispute that the concept of "illegal aliens" existed in 1929, when Section 2a was enacted.  *See* Defs.' Mem. 36.

Notably, in enacting the 1929 Act that used the phrase "whole number of persons in each State," the Senate and the House both considered and rejected amendments that would have excluded non-citizens from the apportionment base. *See* 71 Cong. Rec. 1907 (1929) (Sen. Sackett proposes amending S.B. 312 to require the President's statement to Congress to show "the whole number of persons in each State, exclusive of aliens and excluding Indians not taxed"); *id.* at 2065 (vote on amendment by Sen. Sackett fails); *id.* at 2360-63 (House adopts alienage exclusion as amendment to the apportionment bill); *id.* at 2448-2455 (House adopts amendment of Rep. Tilson to remove the previously adopted alienage exclusion). What is more, opposition to these amendments was based not only on a view that "the whole number of persons in each State" should include every resident of each State, without regard to legal status; it was based also on a view that the Constitution mandated inclusion of illegal aliens residing in the United States. Senator David Reed, for instance, voiced support for an amendment excluding illegal aliens from the apportionment base as a matter of policy but opposed it on grounds of constitutionality and consistent practice. "Every Congress that acted on that part of Article I of the original Constitution and every apportionment that was made in reliance upon that article," he explained, "included all free persons literally. It excluded Indians not taxed and it excluded slaves, but every apportionment inhabitant[] who" was not a "citizen[] w[as] included." *Id.* at 1958. "That construction," he noted then, "has been continuous and consistent." *Id*.

Further evidence of the understanding of the phrase "whole number of persons in each State" in Section 2a is revealed by the opinion of the Senate's legislative counsel on the issue. "That the fourteenth amendment was framed with the intention of including aliens," he wrote, "is indicated by the rejection by the Congress of proposals to base representation on the number of

citizens and on the number of voters." *Id.* at 1822.  Consistent with that understanding, Congress

had always included aliens in the apportionment base:

> The practical construction of the constitutional provision by Congress in its
> apportionment legislation has been uniformly in favor of inclusion of aliens.  No
> exception of noncitizens from the enumeration has been made under any past
> apportionment.  The term "persons" necessarily either includes or excludes aliens;
> its constitutional meaning can not be changed by Congress; and the fact that it has
> from the beginning been construed to include aliens should be conclusive if the
> meaning was open to dispute.

*Id.*  It was "therefore the opinion of [the legislative counsel's] office that there is no

constitutional authority for the enactment of legislation excluding aliens from enumeration for

the purposes of apportionment of Representatives among the States." *Id.*  This prevailing view

makes plain that when Congress directed the President to report the "whole number of persons in

each State," it understood the phrase to include all who lived in each State, without regard for

legal status, and that it did not grant to the President discretion to do by Memorandum what it

could not do by statute.[18]

Not for nothing, until the Presidential Memorandum, the Executive Branch had also

always taken the view that the 1929 Act, if not the Constitution, prohibited exclusion of illegal

aliens from the apportionment base due to legal status alone.  In defending against a 1980

challenge to *including* illegal aliens in the apportionment base, for example, the Department of

Justice argued that "[t]he plain language of [the Act] maintains the Constitutional requirement of

counting all inhabitants of the states, legal and illegal, for purposes of apportionment. . . .

---

[18]    For what it's worth, later Congresses took similar views.  *See FAIR v. Klutznick*, 486 F.
Supp. at 576-77 (three-judge court) (describing congressional debates); Stacy Robyn Harold,
Note, *The Right to Representation and the Census*, 53 WAYNE L. REV. 921, 923 & n.15 (2007)
(collecting congressional debates); *see also, e.g.*, *1980 Census: Counting Illegal Aliens: Hearing
on S. 2366 Before the Subcomm. on Energy, Nuclear Proliferation & Fed. Servs. of the S. Comm.
on Governmental Affairs*, 96th Cong. 12 (1980) (Senator Javits stating that the Constitution
requires "the aggregate number of inhabitants, which includes aliens, legal and illegal").

Moreover, the long-established practice of both Congress and the Census Bureau of reading the Constitution to require the counting of illegal aliens for apportionment purposes ratifies this construction."  Defs.' Reply Mem. & Opp. Pls.' Mot. Summ. J. 11, *FAIR*, 486 F. Supp. 564 (citing *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 380-82 (1967)).  In 1988, the Justice Department took the position in a letter to Congress that excluding illegal aliens from the census and apportionment base would be unconstitutional, *see* Letter from Thomas M. Boyd, Acting Assistant Attorney Gen., to Rep. William D. Ford (June 29, 1988) (reprinted in U.S. Gov't Printing Office, 1990 Census Procedures and Demographic Impact on the State of Michigan, 240-44 (1988)), a position it reaffirmed one year later, *see* Letter from Carol T. Crawford, Assistant Attorney Gen., to Sen. Jeff Bingaman (Sept. 22, 1989) (reprinted in 135 Cong. Rec. S22,521 (daily ed. Sept. 29, 1989)).  And the Census Bureau itself has long "interpreted its constitutional charge *and its statutory mandate* to require counting every person [irrespective of citizenship status] who has a usual residence in any State."  *Census Equity Act: Hearing on H.R. 2661 Before the Subcomm. on Census & Population of the H. Comm. on Post Office & Civil Serv.*, 101st Cong. 68 (1989) (statement of Michael R. Darby, Under Sec'y of Commerce for Econ. Affairs) (emphasis added); *accord* Letter from Robert A. Mosbacher, Sec'y of Commerce, to Sen. Jeff Bingaman (Sept. 25, 1989) (reprinted in 135 Cong. Rec. S22,522 (daily ed. Sept. 29, 1989)).

In fact, since 1929 (if not before), the consistent view of both political branches has been that Section 2a, if not the Constitution, requires the inclusion of all residents in the apportionment base, without regard for their legal status.  When pressed at oral argument to cite "any instance, any support . . . in the historical record" for the proposition that the President has discretion under Section 2a to exclude illegal aliens from the apportionment base, defense

counsel came up empty.  Oral Arg. Tr. 46 ("We have not been able to identify any.").  With admirable candor, albeit some understatement, he was compelled to concede that "[P]laintiffs' best argument is history, and that cuts the other way."  *Id.* at 47.

With neither text nor history on their side, the only thing Defendants have remaining is their assertion that excluding illegal aliens from the apportionment base is "more consonant with the principles of representative democracy underpinning our system of Government." Presidential Memorandum, 85 Fed. Reg. at 44,680.  That is certainly a defensible (though contestable) proposition.  But it is also irrelevant.  The Constitution gives to Congress the authority to regulate the census and to reapportion the House.  In exercising that authority, and delegating responsibility to the Executive Branch, Congress adopted a different theory of Government, in which the House of Representatives represents the whole population, not a subset of the population, and there is "equal representation for equal numbers of people." *Wesberry v. Sanders*, 376 U.S. 1, 14 (1964).  The President is not free to substitute his own view of what is most "consonant with the principles of representative democracy" for the view that Congress already chose.

The statutory command to use the "whole number of persons in each State" as the apportionment base does not give the President discretion to exclude illegal aliens on the basis of their legal status, without regard for their residency.  In declaring that "it is the policy of the United States" to do so, and commanding the Secretary to take steps to carry out that policy, the Presidential Memorandum deviates from, and thus violates, Section 2a.

## C.  Conclusion

In sum, the Presidential Memorandum deviates from, and thus violates, the statutory scheme in two independent ways: first, by requiring the Secretary to include in his Section

141(b) report a set of numbers other than "[t]he tabulation of total population by States" under the "decennial census" and contemplating reapportionment based on a set of numbers other than "the whole number of persons in each State . . . as ascertained under the . . . decennial census of the population"; and second, by excluding illegal aliens from the "whole number of persons in each State" that Section 2a(a) requires to be used as the apportionment base.

As Defendants implicitly concede, it follows that Plaintiffs are entitled to summary judgment on their statutory claims pursuant to the *ultra vires* doctrine, a cause of action that "is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). The doctrine provides that "[w]hen an executive acts *ultra vires*," as is the case here, "courts are normally available to reestablish the limits on his authority." *Reich*, 74 F.3d at 1328; *see also Stark v. Wickard*, 321 U.S. 288, 309-10 (1944) ("When Congress passes an Act empowering administrative agencies to carry on governmental activities, the power of those agencies is circumscribed by the authority granted. . . . The responsibility of determining the limits of statutory grants of authority in such instances is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction."); *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902) ("The acts of all [executive branch] officers must be justified by some law, and in case an official violates the law to the injury of an individual the courts generally have jurisdiction to grant relief."); *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002) ("Courts remain obligated to determine whether statutory restrictions have been violated."). In light of that conclusion, we need not and do not reach Plaintiffs' constitutional claims, let alone the Plaintiffs' claims that did not form the basis

for their motion.  Thus, Defendants' motion to dismiss those claims under Rule 12(b)(6) of the

Federal Rules of Civil Procedure is moot.

## REMEDIES

Having granted Plaintiffs summary judgment on their statutory claims, we turn to the

issue of remedies.  Plaintiffs seek a permanent injunction prohibiting all Defendants — including

the President himself — from implementing the Presidential Memorandum and a declaratory

judgment that the Presidential Memorandum is unlawful.  *See* Gov't Pls.' Compl. 44-45; NGO

Pls.' Compl. 88-89.

## A.  Injunctive Relief

It is well established that plaintiffs "seeking a permanent injunction must satisfy a four-

factor test before a court may grant such relief."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S.

388, 391 (2006).  Specifically, they must show: (1) that they have suffered an irreparable injury;

(2) that remedies available at law, such as monetary damages, are inadequate to compensate for

that injury; (3) that, considering the balance of hardships between the plaintiffs and defendants, a

remedy in equity is warranted; and (4) that the public interest would not be disserved by a

permanent injunction.  *See id.*  But because "the government's interest is the public interest,"

where, as here, the government is a party, the last two factors merge.  *Pursuing Am.'s Greatness*

*v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016); *accord Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiffs easily satisfy each factor and, thus, are entitled to an injunction.  First and

foremost, as discussed above, the census-related harms that Plaintiffs have demonstrated would

be irreparable absent an injunction.  That is, because there are no census do-overs, there would

be no way to remedy them after the fact.  And even if there were a way to correct for them after

the fact, the harms, by their nature, are difficult, if not impossible, to measure.  *See, e.g.*, *Salinger*

*v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) ("Harm might be irremediable, or irreparable, for many reasons, including that a loss is difficult to replace or difficult to measure . . . .").  Making matters worse, the harms caused by an inaccurate census would be felt for at least a decade, until the 2030 decennial census — if not longer.  *See, e.g.*, Baldwin Decl. ¶ 25 (explaining that because the State of Washington relies on thirty-year population forecasts, which requires "an indicator that goes back in time as far as you are forecasting forward in time," the "2020 census data will be used in forecasting until at least the 2050 census data is available, and probably longer").  For much the same reason, the remedies available at law would plainly be inadequate.  *See, e.g.*, *New York v. Dep't of Commerce*, 351 F. Supp. 3d at 675 (issuing an injunction and finding that "the degradation of information . . . would be irreparable, without any adequate remedy at law").

Finally, the balance of the hardships and the public interest both favor an injunction.  Indeed, "[t]here is generally no public interest in the perpetuation of unlawful agency action.  To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations."  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal quotation marks and citation omitted).  Moreover, both the Supreme Court's decision in *Department of Commerce v. House of Representatives* — affirming the Eastern District of Virginia's permanent injunction against the use of statistical sampling to enumerate the population in the 2000 census — and the Second Circuit's holding in *Carey* — affirming a preliminary injunction requiring the Census Bureau to process certain forms and to compare its list of New York City residents against other government records — confirm that the public interest favors an injunction in these cases.  *See House of Representatives*, 525 U.S. at 344; *Carey v. Klutznick*, 637 F.2d 834, 839 (2d Cir. 1980).

As the Second Circuit noted in *Carey*, "the public interest . . . requires obedience . . . to the requirement that Congress be fairly apportioned, based on accurate census figures.  Furthermore, it is in the public interest that the federal government distribute its funds, when the grant statute is keyed to population, on the basis of accurate census data."  *Id.*

Defendants' sole claim of hardship is that an injunction would "interfere with the Bureau's ongoing process by hindering agency efforts to refine its policies and to apply its expertise."  Defs.' Reply 2 (internal quotation marks and alterations omitted).[19]  They do not elaborate further, but it is plain that they are not referring to the operations of the census itself because, as noted above, they repeatedly concede that the Presidential Memorandum does "not in any way affect the conduct of the actual census."  *Id.*  Thus, Defendants must be referring to the Census Bureau's ongoing efforts to figure out how, if at all, to implement the President's directive in the Presidential Memorandum in time to meet the statutory deadline for the Secretary's report to the President.  *See* 13 U.S.C. § 141(b).  But it is against the public interest to comply with an unlawful directive.  And any suggestion that, in the event our decision is reversed on appeal, granting an injunction would hinder the Census Bureau's efforts to comply with the Presidential Memorandum by the deadline are undermined by Defendants' repeated

---

[19]     Referencing a point they made in passing in a footnote in their opening brief, Defendants also argue for the first time in their reply that an injunction prohibiting the Secretary from transmitting information would violate the Opinions Clause of the Constitution, *see* Defs.' Reply 11 (citing Defs.' Mem. 42 n.17), which empowers the President to "require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices," U.S. Const. art. 2, § 2, cl. 1.  A party may not raise an argument in a footnote or for the first time in reply, so we deem the argument to be waived.  *See, e.g.*, *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived . . . ."); *Levine v. Lawrence*, No. 03-CV-1694 (DRH) (ETB), 2005 WL 1412143, at *5 (E.D.N.Y. June 15, 2005) ("[F]ailure to adequately brief an argument constitutes waiver of that argument . . . .").  In any event, ensuring that the Secretary complies with the mandates of Section 141(b) — and, by extension, that the President complies with the mandates of Section 2a(a) — does not run afoul of the Opinions Clause.

assertions that "an erroneous or invalid apportionment number can be remedied after the fact." Defs.' Mem. 48.  Finally, any such hardship to Defendants can be mitigated, if not eliminated, by crafting the injunction — as we do below — to bar only the inclusion in the Secretary's Section 141 report of data concerning the number of illegal aliens in each State and to allow the Census Bureau to continue its research efforts.

Thus, a permanent injunction is warranted.  In an exercise of our discretion, however, we grant injunctive relief against all Defendants other than the President.  The parties vigorously dispute whether and under what circumstances a federal court can grant injunctive relief against the President.  *Compare* Defs.' Mem. 44-45, *and* Defs.' Reply 14-15, *with* Pls.' Reply 27 & n.13. At a minimum, however, it is plain that the "grant of injunctive relief against the President himself is extraordinary, and should . . . raise[] judicial eyebrows." *Franklin*, 505 U.S. at 802. Thus, "[a]s a matter of comity," if nothing else, "courts should normally direct legal process to a lower Executive official even though the effect of the process is to restrain or compel the President." *Nixon v. Sirica*, 487 F.2d 700, 709 (D.C. Cir. 1973) (en banc) (per curiam).  That is particularly true where the court can grant complete relief without enjoining the President, as is the case here.  *See, e.g.*, *Franklin*, 505 U.S. at 802 ("[W]e need not decide whether injunctive relief against the President [i]s appropriate, because we conclude that the injury alleged is likely to be redressed by declaratory relief against the Secretary alone."); *accord Evans*, 536 U.S. at 463-64.  In fact, if anything, the need to enjoin the President himself is even weaker here than it was in *Franklin* and *Evans*, which were litigated *after* the President had transmitted his apportionment statement to Congress.  For the plaintiffs in those cases to obtain meaningful relief, therefore, the President himself would have needed to calculate a new apportionment figure and to then submit a new report to Congress.  Here, by contrast, enjoining Defendants

other than the President (and granting a declaratory judgment, as discussed below) would provide Plaintiffs with complete relief, as the President cannot exclude illegal aliens from his apportionment calculations in his statement to Congress unless the Secretary gives him the relevant information in the Section 141 report.

Accordingly, the Court enjoins all Defendants other than the President from including in the Secretary's report to the President pursuant to Section 141(b) any "information permitting the President . . . to exercise the President's discretion to carry out the policy set forth in section 2" of the Presidential Memorandum — that is, any information concerning the number of aliens in each State "who are not in a lawful immigration status under the Immigration and Nationality Act." Presidential Memorandum, 85 Fed. Reg. at 44,680. Instead, consistent with the Census Act, the Secretary's Section 141(b) report shall include only "[t]he tabulation of total population by States under" Section 141(a) "as required for the apportionment of Representatives in Congress among the several States," 13 U.S.C. § 141(b) — that is, "information tabulated according to the methodology set forth in [the Residence Rule]," Presidential Memorandum, 85 Fed. Reg. at 44,680.[20] To be clear, as an exercise of its discretion, the Court does *not* enjoin Defendants from continuing to study whether and how it would be feasible to calculate the number of illegal aliens in each State. That ensures that in the event that a higher court disagrees

---

[20]     Separately, there is an active debate over the propriety of "nationwide" or "universal" injunctions. *See, e.g.*, *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600-01 (2020) (Gorsuch, J., concurring); *Trump v. Hawaii*, 138 S. Ct. 2392, 2425-29 (2018) (Thomas, J., concurring); *see also* Memorandum from the Attorney General to Heads of Civil Litigating Components & United States Attorneys, U.S. Dep't of Justice, *Litigation Guidelines for Cases Presenting the Possibility of Nationwide Injunctions* (Sept. 13, 2018), https://www.justice.gov/opa/press-release/file/1093881/download. That debate has no relevance to this case, for many of the same reasons that it had no relevance in the citizenship question litigation. *See New York v. Dep't of Commerce*, 351 F. Supp. 3d at 677-78. Not surprisingly, therefore, Defendants do not even raise the issue.

with our ruling (prior to the Section 141(b) deadline), the Secretary will be able to comply with

the Presidential Memorandum in a timely fashion.

## B.  Declaratory Relief

In addition, we grant Plaintiffs' request for declaratory relief.  The Declaratory Judgment

Act vests federal courts with discretion to "declare the rights and other legal relations of any

interested party seeking such declaration, whether or not further relief is or could be sought."  28

U.S.C. § 2201(a); *see Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995).  In exercising that

discretion, courts must consider (1) whether the judgment will serve a useful purpose in

clarifying or settling the legal issues involved; (2) whether a judgment would finalize the

controversy and offer relief from uncertainty; (3) whether the proposed remedy is being used

merely for procedural fencing or a race to *res judicata*; (4) whether the use of a declaratory

judgment would increase friction between sovereign legal systems or improperly encroach on the

domain of a state or foreign court; and (5) whether there is a better or more effective remedy.

*Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359-60 (2d Cir. 2003).  "The existence of

another adequate remedy does not preclude a declaratory judgment that is otherwise

appropriate," Fed. R. Civ. P. 57, and we may grant declaratory relief "whether or not further

relief is or could be sought," 28 U.S.C. § 2201(a); *see also Powell v. McCormack*, 395 U.S. 486,

518 (1969) ("[A] request for declaratory relief may be considered independently of whether

other forms of relief are appropriate.").

In our view, a declaration that the Presidential Memorandum is unlawful "would serve a

useful purpose here, settle the legal issues involved, finalize the controversy, and offer

[Plaintiffs] relief from uncertainty."  *Niagara Mohawk Power Corp. v. Hudson River-Black*

*River Regulating Dist.*, 673 F.3d 84, 105 (2d Cir. 2012).  Indeed, an unambiguous declaration

that the Presidential Memorandum is unlawful because the President does not have the authority

to exclude illegal aliens from the apportionment base would serve the further useful purpose of

"reasurr[ing] people they will be counted for the purpose of determining . . . congressional seats

and electoral votes," Espinosa Supp. Decl. ¶ 8, thereby directly addressing the chilling effect on

census participation that the Memorandum has caused. *Cf. Foretich v. United States*, 351 F.3d

1198, 1215 (D.C. Cir. 2003) ("[A] declaration will remove the imprimatur of government

authority from [the illegal a]ct . . . ."). Such a declaration is particularly useful given that, for the

reasons we discussed above, we decline to enjoin Defendants from taking steps to research

whether or how the Presidential Memorandum could be implemented. That is, an unambiguous

judicial declaration that the Presidential Memorandum is unlawful would help ensure that the

chilling effects on participation in the census are mitigated to the maximum extent possible.

## CONCLUSION

There is no dispute that the President has "accustomed supervisory powers over his

executive officers," *Franklin*, 505 U.S. at 800, and thus retains some discretion in the conduct of

the decennial census and resulting apportionment calculation. Nevertheless, where the authority

of the President (or other members of the Executive Branch) to act is derived from statutes

passed by Congress, the President must act in accordance with, and within the boundaries of, the

authority that Congress has granted. For the reasons discussed above, we conclude that the

President did not do so here and that the Presidential Memorandum is an *ultra vires* violation of

Congress's delegation of its constitutional responsibility to count the whole number of persons in

each State and to apportion members of the House of Representatives among the States

according to their respective numbers under 2 U.S.C. § 2a and 13 U.S.C. § 141. Accordingly,

Plaintiffs' motion for summary judgment with respect to their statutory *ultra vires* claims is

GRANTED, Defendants (other than the President) are ENJOINED as set forth above, and the

Presidential Memorandum is DECLARED unlawful.  We need not and do not reach the merits of

Plaintiffs' other claims and need not address their request, in the alternative, for a preliminary

injunction.  Finally, Defendants' motion to dismiss for lack of jurisdiction is DENIED and their

motion to dismiss for failure to state a claim is DENIED as moot.[21]

The Clerk of Court is directed to terminate ECF Nos. 74 and 117 and to close this case.

SO ORDERED.

Dated: September 10, 2020
       New York, New York              _____/s/_____
                                             RICHARD C. WESLEY
                                          United States Circuit Judge


                                       _____/s/_____
                                             PETER W. HALL
                                          United States Circuit Judge


                                       _____/s/_____
                                             JESSE M. FURMAN
                                          United States District Judge

---

[21]     We believe that this matter was properly heard by a three-judge panel for the reasons set forth in Judge Furman's request to then-Chief Judge Katzmann for the appointment of such a panel.  *See* ECF No. 68.  Nevertheless, mindful that the issue is not clear-cut and that the Second Circuit has determined that it is jurisdictional, *see Kalson v. Paterson*, 542 F.3d 281, 286-87 (2d Cir. 2008), we follow the lead of prior three-judge panels by certifying that Judge Furman, to whom these cases were originally assigned, individually arrived at the same conclusions that we have reached collectively.  *See Swift & Co. v. Wickham*, 382 U.S. 111, 114 n.4 (1965) (noting with approval that "[t]his procedure for minimizing prejudice to litigants when the jurisdiction of a three-judge court is unclear has been used before" (citing *Query v. United States*, 316 U.S. 486 (1942))); *FAIR v. Klutznick*, 486 F. Supp. at 578 (three-judge court) ("District Judge Gasch additionally certifies that he individually arrived at the same conclusion that we collectively reached . . . out of abundant caution, so that in the event we are mistaken, an appeal can still be expeditiously taken in the appropriate forum."  (internal quotation marks and citation omitted)); *cf. Massachusetts v. Mosbacher*, 785 F. Supp. 230, 238 n.6 (D. Mass.) (three-judge court) ("Because the author of this opinion is the single district judge to whom this case was initially assigned, this opinion stands as certification that the author has individually arrived at the conclusions expressed collectively in the opinion and the judgment of this three-judge court."), *rev'd on other grounds sub nom. Franklin v. Massachusetts*, 505 U.S. 788 (1992).