# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE OF NEW YORK, et al., | |
| Plaintiffs, | 20-CV-5770 (JMF) |
| v. | |
| DONALD J. TRUMP, *in his official capacity as President of the United States*, et al., | |
| Defendants. | |
| | |
| NEW YORK IMMIGRATION COALITION, et al., | |
| Plaintiffs, | 20-CV-5781 (JMF) |
| v. | |
| DONALD J. TRUMP, *in his official capacity as President of the United States*, et al., | |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR A STAY

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................I

TABLE OF AUTHORITIES .......................................................................................II

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................... 1

   I.   DEFENDANTS WILL NOT SUFFER IRREPARABLE INJURY ABSENT A STAY... 1

   II.  THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST WEIGH
       AGAINST A STAY.............................................................................................. 7

   III.  DEFENDANTS ARE NOT LIKELY TO SUCCEED ON THE MERITS...................... 10

      A.   Defendants' "Mismatch" Argument Is Not Preserved and Lacks Merit...................... 10

      B.   Defendants Are Not Likely to Succeed on the Merits with Respect to Plaintiffs'
          Statutory Claims ............................................................................................. 13

CONCLUSION .................................................................................................... 16

# TABLE OF AUTHORITIES

## CASES

*Barrientos v. 1801 1825 Morton LLC*,
  583 F.3d 1197 (9th Cir. 2009) .............................................................. 11

*Campbell-Ewald Co. v. Gomez*,
  136 S. Ct. 663 (2016) ............................................................................ 13

*Carey v. Klutznick*,
  637 F.2d 834 (2d Cir. 1980)................................................................... 9

*Chevron Corp. v. Donziger*,
  No. 11 CIV. 0691 LAK, 2011 WL 1560926, (S.D.N.Y. Apr. 18, 2011)............... 11

*Clark v. Martinez*,
  543 U.S. 371 (2005)................................................................................ 16

*Conkright v. Frommert*,
  556 U.S. 1401 (2009).............................................................................. 1

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*,
  528 U.S. 167 (2000)................................................................................ 13

*Heffernan v. City of Paterson, New Jersey*,
  136 S. Ct. 1412 (2016)........................................................................... 7

*In re Adelphia Recovery Trust*,
  634 F.3d 678 (2d Cir. 2011).................................................................. 5

*In re Aimster Copyright Litigation*,
  334 F.3d 643 (7th Cir. 2003) ................................................................ 11

*Intellivision v. Microsoft Corp.*,
  484 F. App'x 616 (2d Cir. 2012) .......................................................... 4

*League of Women Voters of the United States v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016).................................................................. 8

*Lia v. Saporito*,
  541 F. App'x 71 (2d Cir. 2013) ............................................................ 5

*National Urban League v. Ross*,
  Case No. 20-cv-05799-LHK, ECF No. 142 (N.D. Cal. Sept. 17, 2019)................ 12

*New Hampshire v. Maine*,
  532 U.S. 742 (2001)................................................................................ 4, 5

*New York v. United States Department of Commerce*,
  18-CV-2921 (JMF), ECF No. 613 (S.D.N.Y. July 3, 2019); ECF No. 616 (S.D.N.Y.
  July 5, 2019).......................................................................................................................... 7

*Nken v. Holder*,
  556 U.S. 418 (2009) ..................................................................................................... 1, 3, 7, 13

*Utah v. Evans*,
  536 U.S. 452 (2002) ................................................................................................................... 5

*Weider Health and Fitness v. AusTex Oil Ltd.*,
  2019 WL 1533434 (S.D.N.Y. Apr. 9, 2019) ........................................................................... 11

**STATUTES**

13 U.S.C. § 141(a)-(b) .................................................................................................................. 14

2 U.S.C. § 2a(a) ...................................................................................................................... 14, 15

**OTHER AUTHORITIES**

*Hearing on Census Count*,
  House Committee on Oversight and Reform (July 29, 2020) ................................................ 15

Statement from the White House Press Secretary,
  Sept. 18, 2020 ............................................................................................................................ 3

## INTRODUCTION

None of the factors for a stay pending appeal, see *Nken v. Holder*, 556 U.S. 418, 434 (2009), remotely tilt in Defendants' favor.  Defendants represent that they "*may* suffer irreparable injury without a stay," ECF No. 172 at 6 (emphasis added, capitalization omitted), but they do not in fact suffer any immediate injury at all.  This Court's carefully crafted injunction imposes no immediate obligations on Defendants; and Defendants have represented throughout this litigation that "an erroneous or invalid apportionment number can be remedied after the fact," a claim that is inconsistent with their demand for immediate relief here.  ECF No. 118 at 59.  Moreover, any delay Defendants may suffer in implementing their "preferred policy," ECF No. 172 at 8, pales in comparison to Plaintiffs' and the public's interest in an accurate census count.  Finally, as to the merits, this Court has already correctly determined that they are "not particularly close or complicated."  ECF No. 164 at 6.  Defendants' motion for a stay should be denied.

## ARGUMENT

## I.  DEFENDANTS WILL NOT SUFFER IRREPARABLE INJURY ABSENT A STAY.

Defendants' motion should be denied on the basis of their failure to demonstrate irreparable harm alone.  To obtain the "extraordinary" relief of a stay pending appeal, "the applicant *must* demonstrate … *irreparable* harm."  *Conkright v. Frommert*, 556 U.S. 1401, 1402 (2009) (Ginsburg, J., in chambers) (emphasis added).  Defendants' motion—which asserts only that "Defendants *may* suffer irreparable injury without a stay"—utterly fails to do so here.  ECF No. 172 at 6 (emphasis added, capitalization omitted).  Defendants assert that the injunction creates a problem "of timing," ECF No. 172 at 7—*i.e.*, that absent a stay, the Commerce Secretary "may" be unable to submit Defendants' "preferred" population totals in his Section

141(b) report by the December 31 deadline, *id.* at 6, 8, such that "changes may be necessary afterwards if the government subsequently prevails in the Supreme Court." *Id.* at 7.  But that assertion is based on a misrepresentation of the injunction in this case and is contradicted both by Defendant Trump's public statements and by Defendants' own representations throughout this litigation.

While Defendants assert that this Court's judgment "prevents the Secretary of Commerce" from "reporting" state-by-state undocumented immigrant population totals, ECF No. 172 at 6, that is not correct.  *First*, this Court carefully tailored its injunction to permit Defendants to continue collecting such information, and does not prohibit Defendants from reporting that information publicly: "To be clear, as an exercise of discretion, this Court does *not* enjoin Defendants from continuing to study whether and how it would be feasible to calculate the number of illegal aliens in each State."  ECF No. 164 at 83 (emphasis in original).  The injunction only prohibits Defendants from using that information as the basis for the Secretary's calculation of the apportionment population in his Section 141(b) report.  *Id.* at 83-84.  This limited restriction in no way prevents the Commerce Secretary from continuing to collect state-by-state totals of the undocumented population, or from "reporting" that information generally. There is no immediate harm to Defendants, let alone an irreparable one.[1]

Indeed, notwithstanding Defendants' protestations that this Court's judgment will leave them "unable to comply with the reporting requirements set forth in the Presidential

---

[1] The narrow scope of injunctive relief also ensures that this Court's "unambiguous declaration that the Presidential Memorandum is unlawful" achieves the targeted purpose of mitigating chilling effects on census participation without otherwise inhibiting "Defendants from taking steps to research whether or how the Presidential Memorandum could be implemented."  ECF No. 164 at 85.  Defendants' motion articulates no irreparable injury arising out of the grant of declaratory relief because there is none.

Memorandum" if they were to prevail on appeal, ECF No. 172 at 6, Defendant Trump, through a

public statement from the White House Press Secretary, subsequently admitted there is no such

harm:

> **[T]he district court's order does not prevent the Department of Commerce from
> continuing preparations to execute the President's policy** not to include illegal aliens
> in the apportionment base. **Nor does it affect . . . the Department of Commerce's
> efforts to compile citizenship and immigration status data** to achieve an accurate
> count of the number of illegal aliens in the country. **Accordingly, the Federal
> Government's work** . . . **continues unabated**.

Statement from the White House Press Secretary, Sept. 18, 2020 (emphases added).[2]

*Second*, this Court issued its injunction expeditiously in part to "ensure[] that in the event

that a higher court disagrees with our ruling (prior to the Section 141(b) deadline), the Secretary

will be able to comply with the Presidential Memorandum in a timely fashion." ECF No. 164 at

83-84. As such, Defendants' assertion that they "may" sufferable irreparable injury based on the

Court's "timing" is facially insufficient to support a stay motion. *See Nken*, 556 U.S. at 434

(finding that granting a stay requires the movant to demonstrate "more than a mere possibility of

irreparable injury") (brackets omitted). And while Defendants purport to express concern that

"Congress's statutory deadlines will be undermined," ECF No. 172 at 7, their concern for

congressional prerogatives is belied by this Court's ruling that the Presidential Memorandum

"violates the statutes governing the census and apportionment," ECF No. 164 at 5, and the fact

that the House of Representatives filed an amicus brief in this case in support of *Plaintiffs*. *See*

ECF No. 107.

 And even if Defendants might be unable to report their "preferred" population totals as

part of a timely Section 141(b) report, ECF No. 172 at 8, they are estopped from asserting that

---

[2] *Available at* https://www.whitehouse.gov/briefings-statements/statement-press-secretary-091820/.

the need to make "changes" to the 141(b) report or the resulting apportionment "afterwards"

constitutes *irreparable* injury.  ECF No. 172 at 7.  Throughout this litigation, Defendants'

repeatedly argued that resolution of this case is not urgent because an incorrect 141(b) report or

apportionment cannot amount to *irreparable* injury, so long as it is addressed prior to the *2022*

*elections cycle*. For example, Defendants stated:

- "There is **no extreme time urgency** to deciding this matter. More specifically, there is no need to resolve this lawsuit before the submission of the enumeration numbers to the President."  Ltr. to Judge Furman, ECF No. 37, at 5 (emphasis added).

- "**[A] decision would be optimal with sufficient time to reach the Supreme Court**— and, if necessary, **for relief to be effectuated—before the 2022 elections**. Therefore, if the Court decided the case soon after the President sent the enumeration and apportionment to Congress in January 2021 (or later, if Congress responds to the Census Bureau's request for an extension to complete the 2020 Census), that should provide more than enough time for any relief the Court ordered to be effectuated."  *Id.* (emphasis added).

- Arguing that, after judicial resolution of this dispute, "relief could simply involve apportionment based on" a different population total.  *Id.*

- Arguing that resolution of Plaintiffs' "challenge should await the actual apportionment." ECF No. 118, at 20-21.

- "**[A]ny purported apportionment injury** that Plaintiffs could suffer **is, as a legal matter, not irreparable**. The Supreme Court has regularly decided census cases that, like this one, contest the relative apportionment of representatives post-apportionment, **because an erroneous or invalid apportionment number can be remedied after the fact**. . . . This case is not different."  ECF No. 118, at 59 (emphasis added).

- "[T]his Court could order adequate relief after apportionment … **a post-apportionment remedy would be easy to craft**."  *Id.* (emphasis added).

The doctrine of judicial estoppel "protect[s] the integrity of the judicial process" by

prohibiting parties from deliberately changing positions according to the exigencies of the

moment."  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).  It is "designed to prevent

improper use of judicial machinery" and may be "invoked by a court at its discretion."

*Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 619 (2d Cir. 2012) (quotation marks omitted).

4

Judicial estoppel applies where: (1) the party's position is "clearly inconsistent with its earlier position"; (2) "the party has succeeded in persuading a court to accept that party's earlier position"; and (3) "the party seeking to assert an inconsistent position would derive an unfair advantage . . . if not estopped." *New Hampshire*, 532 U.S. at 750–51 (internal quotation marks omitted).

All three factors are easily met here.  First, Defendants have repeatedly emphasized that "an erroneous or invalid apportionment number can be remedied after the fact" and that a remedy would be "easy to craft."  ECF No. 118 at 59.  Defendants' new position—that having to make "changes" to the apportionment after submission of the Secretary's 141(b) report would constitute irreparable harm—directly contradicts their prior representations in this case.  *See supra.*  Defendants have thus "deliberately chang[ed] positions according to the exigencies of the moment."  *New Hampshire*, 532 U.S. at 749-50.

Second, this Court agreed with Defendants' previous representations, and relied on them in ruling that there would not "be any harm in waiting until January 2021" to address Plaintiffs' apportionment-related injuries because "an illegal apportionment can be remedied even after the apportionment process has taken place."  ECF No. 164 at 36-37 (citing *Utah v. Evans*, 536 U.S. 452, 462-63 (2002)).[3]  That reliance suffices for estoppel purposes.  Judicial estoppel requires only that "the party's former position has been adopted in some way by the court in the earlier proceeding."  *In re Adelphia Recovery Tr.*, 634 F.3d 678, 695-96 (2d Cir. 2011) (internal

---

[3] To the extent this Court gives credence to Defendants' new argument that altering the apportionment after-the-fact constitutes irreparable harm, the Court should amend its summary judgment ruling to find that Plaintiffs have standing based on the impact of the Presidential Memorandum on the apportionment, and that risk of malapportionment based on unlawful population totals that exclude undocumented immigrants constitutes yet another basis for the injunction, and for denial of a stay.  Based on either set of Defendants' contradictory representations, it is inescapable that this Court's judgment is appropriate, and a stay is not.

quotation marks omitted).  The position need not have been "essential to [the] judgment."  *Lia v. Saporito*, 541 F. App'x 71, 74 (2d Cir. 2013).

Third, Defendants now seek an unfair advantage by repudiating their prior positions to evade immediate application of this Court's judgment with a stay.  But there is more.  Despite previously arguing that "a post-apportionment remedy would be easy to craft," ECF No. 118 at 59, Defendants now urge the Supreme Court to expedite appeal of this case, asserting that "[s]uch a post-apportionment remedy . . . would undermine the point of the deadlines established by Congress, which is to provide prompt notice to the Nation about the new apportionment that will govern the next congressional elections."  Mot. for Expedited Consideration of the Jurisdictional Statement, *Trump v. New York*, No. 20-366 (Sept. 22, 2020).[4]  And, in previously arguing that the apportionment can always be changed after-the-fact, Defendants convinced this Court to rule on standing only as to Plaintiffs' census count and resource diversion injuries, which Defendants now argue will be moot before appellate review is complete.  ECF No. 172 at 2-3, 8.  While Defendants are wrong as to mootness, their attempt to leverage this Court's decision not to rule on the apportionment injury is a paradigmatic example of an unfair advantage.

This Court should stop Defendants' jurisdictional shell games.  If, in Defendants words, an "erroneous or invalid apportionment number" triggering the malapportionment of the House of Representatives does not constitute irreparable injury, ECF No. 118 at 59, then it follows that preventing Defendants from including their "preferred" figures in the Secretary's Section 141(b) apportionment report cannot be an irreparable injury either.  Put another way, whether post-

---

[4] *Available at* https://www.supremecourt.gov/DocketPDF/20/20-366/154593/20200922102043363_Trump%20v.%20NY%20Mot.%20Expedite.pdf.

apportionment relief is adequate to prevent irreparable injury cannot turn simply on whether

Defendants win or lose.  Having argued that post-apportionment relief is good enough for

Plaintiffs and having induced this Court to rely on that argument, Defendants cannot now

contend that such relief is inadequate to prevent irreparable harm to *them*.  "After all, in the law,

what is sauce for the goose is normally sauce for the gander."  *Heffernan v. City of Paterson,*

*N.J.*, 136 S. Ct. 1412, 1418 (2016).[5]

## II.     THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST WEIGH AGAINST A STAY.

The balance of the equities and the public interest also weigh decisively against a stay.  In

the context of a motion seeking a stay of an injunction against the government, the inquiries into

balance of hardships and the public interest merge.  *See Nken*, 556 U.S. at 435.  Here, a stay

would cause significant damage to the accuracy of the ongoing census—with irreparable, long-

term consequences for Plaintiffs and the country as a whole.

First, this Court has already correctly rejected Defendants' conclusory assertion that

Plaintiffs' alleged injuries are "speculative" and that Plaintiffs will thus not be harmed by a stay.

*See* ECF No. 172 at 7; ECF No. 164 at 37-50.  Second, there is no merit to Defendants' argument

that "a stay serves the public interest by allowing the government's preferred and legitimate

policy to be put into effect."  ECF No. 172 at 7-8.  This Court has squarely rejected the

---

[5] This is not the first time Defendants have reversed their position on the urgency of census-related relief for litigation advantage.  As this Court is well aware, in the citizenship question case, Defendants succeeded in rushing litigation at a breakneck pace by making repeated representations to courts at all levels of the federal judiciary that the dispute between the parties had to be resolved by June 30, 2019—only to suddenly backtrack when they lost in the Supreme Court and announce that they were considering "a new decision to include the citizenship question" *after* the supposedly immutable June 30 deadline for finalizing the 2020 Census questionnaire.  *See New York v. United States Dep't of Commerce*, 18-CV-2921 (JMF), ECF No. 613 (S.D.N.Y. July 3, 2019); ECF No. 616 (July 5, 2019).

"legitima[cy]" of that policy as "not particularly close or complicated."  ECF No. 164 at 6.  And
"[t]here is generally no public interest in the perpetuation of unlawful agency action.  To the
contrary, there is a substantial public interest in having governmental agencies abide by the
federal laws that govern their existence and operations."  *League of Women Voters of U.S. v.
Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

Finally, Defendants argue that a stay serves the public interest "by promoting clarity . . .
as to exactly what will happen in the upcoming census process[.]". ECF No. 172 at 10.  That is a
bizarre assertion given Defendants' conduct and the circumstances of this case.  "Throughout the
Nation's history, the figures used to determine the apportionment of Congress . . . have included
every person residing in the United States at the time of the census, whether citizen or non-
citizen and whether living here with legal status or without."  ECF No. 164 at 3.  The
Presidential Memorandum, however, abruptly reversed that uniform centuries-long practice with
no warning to the public or even the Census Bureau, just a few weeks before the beginning of
non-response follow-up operations—a move that, according to the "extensive — and undisputed
— record of fact witness testimony" and "expert analyses" in this case, has caused "fear and
*confusion*" amongst the public as to the purpose of census participation.  *Id.* at 28 (emphasis
added).  This Court issued its judgment based on uncontested evidence that doing so would
"reduce" that confusion "in a straightforward manner."  *Id.* at 55.  Staying the judgment—and
changing the policy as to the inclusion of undocumented immigrants in the population count used
for apportionment for a third time—would only cause the very confusion and irreparable harms
that relief was intended to redress.

In any event, Defendants' own purported confusion as to the actual effect of the
Presidential Memorandum belies any notion that reinstating it would "promot[e] clarity."  ECF.

No. 172 at 10.  Throughout this litigation, Defendants have represented that they themselves do not know whether and to what extent it is even feasible to implement the policy stated in the Presidential Memorandum *at all*:

- "[I]t is far from clear the extent to which it will be feasible for the Secretary to report an enumeration excluding undocumented immigrants," ECF No. 37 at 5.

- "The extent to which it will be feasible for the Census Bureau to provide the Secretary of Commerce a second tabulation is, at this point, unknown."  ECF No. 118 at 18.

- Referring to a "currently unknown subset of illegal aliens [that the President may exclude] from the apportionment base." ECF No. 154 at 6-7.

Even during oral argument, in response to the question, "[Y]ou're telling me right now as an officer of this Court you have received no information with regard to any particular set of figures that the Secretary proposes to deliver to the President?," counsel for Defendants responded "That is correct. As I stand here today I have not received that."  Tr. of Oral Arg. at 36:14-19 (Sept. 3, 2020).  Permitting Defendants to issue a 141(b) report containing numbers that Defendants profess they do not know, and which Defendants claim they may not actually include in the report, will undermine rather than promote the goal of "clarity."

Finally, the public interest in census accuracy strongly weighs against a stay.  "[T]he public interest . . . requires obedience . . . to the requirement that Congress be fairly apportioned, based on *accurate* census figures. Furthermore, it is in the public interest that the federal government distribute its funds, when the grant statute is keyed to population, on the basis of *accurate* census data." *Carey v. Klutznick*, 637 F.2d 834, 839 (2d Cir. 1980) (emphasis added). As this Court recognized, "there are no census do-overs" and "the harms caused by an inaccurate census would be felt for at least a decade, until the 2030 decennial census — if not longer." ECF No. 164 at 80.

In considering the equities, the injury to the public interest from Defendants' efforts to sow confusion and undermine the Census bear emphasis.  The Presidential Memorandum— issued mere days before the start of non-response follow up field operations—undermined the outreach efforts of the Census Bureau and its trusted partners, causing significant confusion among hard-to-count populations.  ECF 164 at 26-32.  Indeed, shortly after issuing the Presidential Memorandum, Defendants sowed further confusion by announcing they would be truncating field operations by a full month—30 percent of the planned effort—a decision the Department of Commerce Inspector General concluded "poses a myriad of risks to [the] accuracy and completeness" of the census.[6]  The Inspector General confirmed with Census Bureau officials that "the decision to accelerate the Census Schedule was not the Bureau's decision," but instead "likely came from the White House" or the Commerce Department, and that "the Presidential Memorandum had to have played some role" in that decision.  OIG Report at 5, 6-7.  Staying the judgment would reward Defendants' inequitable conduct while allowing the census count harms to resume unabated and irreparable even if the judgment is affirmed on appeal.

## III.    DEFENDANTS ARE NOT LIKELY TO SUCCEED ON THE MERITS

Beyond Defendants' failure to show irreparable injury, their motion for a stay independently should be denied because Defendants are not likely to prevail on appeal.

### A.    Defendants' "Mismatch" Argument Is Not Preserved and Lacks Merit

Defendants first argue that they will likely prevail on appeal based on a supposed "mismatch between the asserted injury on which the Court relied (the chilling effect) and the

---

[6] U.S. Dep't of Commerce, Office of the Inspector General, *The Acceleration of the Census Schedule Increases the Risks to a Complete and Accurate 2020 Census*, Final Management Alert No. OIG-20-050-M, at 10 (Sept. 18, 2020) ("OIG Report"), *available at* https://www.oig.doc.gov/OIGPublications/OIG-20-050-M.pdf.

relief that it ordered (an injunction of conduct after census field operations end)."  ECF No. 172 at 5.  Defendants are wrong for multiple reasons.

As a threshold matter, Defendants did not present this "mismatch" argument prior to the Court's summary judgment ruling and thus failed to preserve it.  Defendants' briefs did not raise the issue.  Nor did Defendants mention any "mismatch" at the hearing before this Court, even after this Court's pre-hearing order specifically directed the Parties to be prepared to address the issue.  *See* ECF No. 158 ("assuming Plaintiffs are correct that the Presidential Memorandum has a chilling effect on Census participation, whether and how would the requested relief redress that injury?  How effective must a remedy be to meet the redressability requirement?").  Defendants are not likely to succeed on appeal on the basis of an argument they waived.  Although parties cannot waive standing arguments, they *can* waive arguments about the scope of a remedial injunction, and Defendants have done so here.  *See Barrientos v. 1801 1825 Morton LLC*, 583 F.3d 1197, 1215 (9th Cir. 2009) ("[Defendant] did not object to the scope of the injunction before the district court and, therefore, has waived the issue."); *In re Aimster Copyright Litig.*, 334 F.3d 643, 656 (7th Cir. 2003) ("[Defendant] objects to the injunction's breadth. But having failed to suggest alternative language either in the district court or in this court, it has waived the objection."); *Weider Health and Fitness v. AusTex Oil Ltd.*, 2019 WL 1533434, at *3 (S.D.N.Y. Apr. 9, 2019) (quoting *Barrientos*, 583 F.3d at 1215).  *Chevron Corp. v. Donziger*, No. 11 CIV. 0691 LAK, 2011 WL 1560926, at *2 (S.D.N.Y. Apr. 18, 2011) (where party failed to object to scope of injunction, "they effectively waived any quarrel with the form of the proposed order" on appeal).

In any event, there is no mismatch because this Court's judgment directly addresses the injuries suffered by Plaintiffs.  This Court held that there is no genuine dispute of fact that

Plaintiffs, and their constituents and members, have suffered and would continue to suffer injury "by virtue of the harm that the Presidential Memorandum is causing to the accuracy of the census count." ECF No. 164 at 6; *see id* at 26-36. As this Court found, the uncontested evidence established that the Presidential Memorandum chills census participation—thereby undermining the accuracy of the census—by sowing confusion, fear, and distrust about the purpose and effect of census responses. *See id.* at 26-30. And the uncontested evidence further demonstrated that the reduction in census participation caused by the Presidential Memorandum harms the overall quality of census data, *see id.* at 30-35 and has required Plaintiffs to divert resources to encourage census self-response, *see id.* at 30-32. Absent the Court's injunction, these harms would no doubt continue, as the enumeration period remains ongoing. *See Nat'l Urban League v. Ross*, Case No. 20-cv-05799-LHK, ECF No. 142 (N.D. Cal. Sept. 17, 2019) (extending temporary restraining order against winding down Census operations).

Defendants' argument that the Court's judgment "does not actually redress any 'chilling effect'" on census response rates (ECF No. 172 at 9) is an unsupported attempt to wish away this Court's finding that "judicial relief invalidating the Presidential Memorandum would likely reduce the confusion felt by immigrant communities and therefore alleviate some of the injuries felt by Plaintiffs," ECF No. 164 at 35. Given that it is the Presidential Memorandum's directive to unlawfully exclude undocumented immigrants from the census count for purposes of apportionment that chills census participation, it is no surprise that Defendants do not say what alternative judgment, besides the one the Court issued, could possibly redress that injury.

Although couched in terms of a purported "mismatch," Defendants' argument boils down to a speculative assertion that this case supposedly will become moot when the Census count ends. ECF No. 172 at 3. Those contentions are speculative, wrong, and disputed. Indeed, if

Defendants raise mootness, they will not be able to meet their heavy burden of showing that "it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016). *Cf. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (the standards for mootness and standing are distinct). More importantly, Defendants are not entitled to a stay pending appeal—or to reversal of this Court's judgment—on the basis of a hypothetical future mootness motion that they have not filed.

What is indisputable is that this matter is not moot right now, and the Court's judgment is currently redressing an otherwise ongoing injury to the Plaintiffs. Defendants cannot obtain a stay of a judgment that is presently redressing Plaintiffs' injury on the ground that things may change at some later time. As the Court noted, "[t]aken to its logical conclusion, [such an] argument would suggest that a plaintiff could never obtain emergency relief in the face of a looming deadline." ECF No. 164 at 56-57. That is not the law.

### B. Defendants Are Not Likely to Succeed on the Merits with Respect to Plaintiffs' Statutory Claims

Defendants cannot plausibly demonstrate a "strong showing that [they are] likely to succeed on the merits," *Nken*, 556 U.S. at 426, sufficient to warrant the extraordinary remedy of a stay pending appeal.

Defendants have no meaningful chance of success on appeal given that "[t]he merits of the parties' dispute are not particularly close or complicated." ECF No. 164 at 6. As this Court correctly determined, the plain language of the Census Act, along with its legislative history and consistent application for more than two hundred years, demonstrate that the Presidential Memorandum violates "the statutory scheme in two independent ways." ECF No. 164 at 77.

Defendants' stay motion fails to engage meaningfully with the Court's reasoning or the statutory provisions at issue.

*First*, the Presidential Memorandum violates the Census Act's clear command "to use the results of the census—and only the results of the census—in connection with the apportionment process." *Id.* at 66.  As Defendants do not dispute, the Census Act's plain terms require "the Secretary to report a single set of numbers—the tabulation of total population by States under the decennial census—to the President," and require the President to then use "the data from the decennial census in determining apportionment."  *Id.* (quotation marks omitted); *see* 13 U.S.C. § 141(a)-(b); 2 U.S.C. § 2a(a).  But the Presidential Memorandum violates these statutory requirements: it is titled "Excluding Illegal Aliens From the Apportionment Base *Following the 2020 Census*," (emphasis added), and requires the Secretary to report to the President not only the total population in each State ascertained by the decennial census—numbers that will indisputably include undocumented immigrants who the Census Bureau determines usually reside here—but also "a second set of figures" compiled separately, namely, the population of each State excluding undocumented immigrants.  ECF No. 164 at 66.  This second set of numbers, which the Presidential Memorandum itself states will be produced "[f]ollowing the 2020 Census," "will necessarily be derived from something other than the census itself" given that the decennial census is not ascertaining anyone's citizenship or immigration status, and is instead counting everyone who usually resides in each State regardless of their immigration status.  *Id.*

Rather than engage with the applicable statutes or the ways in which the Presidential Memorandum fundamentally violates them, Defendants obfuscate by asserting that the Executive Branch has discretion to use administrative records to conduct the decennial census.  *See* ECF

No. 172 at 4-5.  But using administrative records to determine the results of the decennial census is starkly different from what Defendants seek to do here, which is to use a second set of figures distinct from the results of the decennial census to *alter* the population figures used solely for apportionment.  This Court's decision does not prevent Defendants from conducting the total population count through both in-person enumeration and administrative records; as Defendants have repeatedly admitted, the Presidential Memorandum does not alter any "procedure that will be used in the actual census."  ECF No. 37 at 5; *see also, e.g.*, *H'rg on Census Count*, H. Committee on Oversight & Reform (July 29, 2020) (Director Dillingham testifying that Presidential Memorandum has "nothing to do with our operation right now with the census. We're counting everyone. It has to do with a tabulation that has been requested on apportionment").  The sole effect of this Court's decision is to prevent Defendants from taking the unprecedented and unlawful step of using a second set of numbers, not derived through the decennial census itself, for purposes of apportioning House seats among the States.  That subsequent, post-census step is unlawful regardless of whether the Secretary uses administrative records or another means to adjust "the results of the census."

*Second*, the Presidential Memorandum's exclusion of undocumented immigrants from the apportionment base also violates Congress's command to include "the whole number of persons in each State" in calculating and transmitting the apportionment figures to Congress.  2 U.S.C. § 2a(a).  As this Court correctly explained, the plain meaning of the statutory term "persons in each State" includes the millions of undocumented immigrants who Defendants will determine live and sleep here most of the time.  ECF No. 164 at 69-78.  The legislative history of the Census Act and more than two-hundred years of settled practice further confirm that "'persons in each State' turns solely on residency, without regard for legal status."  *Id.* at 73.  Contrary to

15

Defendants' contention (ECF No. 172 at. 6), this history and practice make clear that Congress considered not only immigrants in general but also undocumented immigrants in particular when it required that all persons living here must be included for apportionment purposes.  *See* ECF No. 150 at 19-20; *see also* ECF No. 164 at 76 (since 1929, if not before, considered view of both Congress and Executive Branch "has been that Section 2a, if not the Constitution, requires the inclusion of all residents in the apportionment base without regard for their legal status").

Although this Court did not reach Plaintiffs' constitutional claim, principles of constitutional avoidance also support its statutory analysis.  As Plaintiffs have explained, the debates both at the Founding and at the time of the Fourteenth Amendment's adoption show that immigrants residing here were intended to be enumerated by the decennial census and included in the resulting apportionment base.  ECF No. 77 at 10-18; ECF No. 150 at 13-16.  Both Supreme Court precedent and more than two centuries of practice further establish that every person living here must be included for purposes of apportionment, regardless of their immigration status.  ECF No. 77 at 17-21; ECF No. 150 at 16-19.  Defendants' interpretation of the Census Act as authorizing them to exclude undocumented immigrants, in violation of the Constitution's text, the Framers' intent, and Supreme Court precedent would, at minimum, "raise[] serious constitutional doubts."  *Clark v. Martinez*, 543 U.S. 371, 381 (2005).  Given that Defendants' arguments about the Constitution's meaning are ultimately incorrect, this alternative ground for affirmance further establishes that Defendants have no likelihood of success on the merits of their appeal.

## CONCLUSION

For the reasons stated above, Defendants' motion for a stay should be denied.

DATED:  September 23, 2020                    Respectfully submitted,


/s/ John A. Freedman                          /s/ Dale Ho
John A. Freedman                              Dale E. Ho
R. Stanton Jones*                             Davin Rosborough
Daniel F. Jacobson*                           Adriel I. Cepeda Derieux
Chase Raines**                                Sophia Lin Lakin*
ARNOLD & PORTER KAYE SCHOLER                  American Civil Liberties Union Foundation
LLP                                           125 Broad St.
601 Massachusetts Ave., N.W.                  New York, NY 10004
Washington, D.C.  20001                       (212) 549-2693
(202) 942-5000                                dho@aclu.org
John.Freedman@arnoldporter.com                drosborough@aclu.org
Stanton.Jones@arnoldporter.com                acepedaderieux@aclu.org
Daniel.Jacobson@arnoldporter.com              jtopaz@aclu.org
Chase.Raines@arnoldporter.com                 slakin@aclu.org


/s/ Sarah Brannon* ***                        /s/ Perry Grossman
Ceridwen Cherry*                              Perry Grossman
American Civil Liberties Union                pgrossman@nyclu.org
Foundation                                    New York Civil Liberties Union
915 15th Street, NW                           Foundation
Washington, DC 20005-2313                     125 Broad Street
(202) 675-2337                                New York, NY 10004
sbrannon@aclu.org                             Phone: (212) 607-3329
ccherry@aclu.org                              Andre Segura**
                                              Edgar Saldivar*
Julia A. Gomez                                Thomas Buser-Clancy*
Peter Eliasberg*                              ACLU Foundation of Texas, Inc.
ACLU Foundation of Southern California        P.O. Box 8306
1313 West 8th Street                          Houston, TX 77288
Los Angeles, CA 90017                         Telephone: (713) 942-9146
(213) 977-9500                                Fax: (713) 942-8966
jgomez@aclusocal.org                          asegura@aclutx.org
peliasberg@aclusocal.org                      esaldivar@aclutx.org
                                              tbuser-clancy@aclutx.org

* Admitted *pro hac vice*
** Designates *pro hac vice* application
forthcoming.
*** Not admitted in the District of
Columbia; practice limited pursuant to
D.C. App. R. 49(c)(3).


*Attorneys for the Plaintiffs in* 20-CV-5781

17

LETITIA JAMES
*Attorney General of the State of New York*

By: */s/ Matthew Colangelo*

Steven C. Wu
   *Deputy Solicitor General*
Judith N. Vale
   *Senior Assistant Solicitor General*
Eric R. Haren*, Special Counsel*

*Of Counsel*

Matthew Colangelo
   *Chief Counsel for Federal Initiatives*
Morenike Fajana, *Special Counsel*
Elena Goldstein
   *Deputy Chief, Civil Rights Bureau*
Fiona J. Kaye, *Assistant Attorney General*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6057
Matthew.Colangelo@ag.ny.gov

*Attorneys for the Plaintiffs in* 20-CV-5770