UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                       :

STATE OF NEW YORK, et al.,                       :

                Plaintiffs,              :        20-CV-5770 (RCW) (PWH) (JMF)

       -v-                                 :        <u>OPINION AND ORDER</u>

DONALD J. TRUMP, *in his official capacity as*  :
*President of the United States*, et al.,

                Defendants.       :
------------------------------------------------------------------X

Before:    RICHARD C. WESLEY, United States Circuit Judge
             PETER W. HALL, United States Circuit Judge
             JESSE M. FURMAN, United States District Judge

PER CURIAM.

On July 21, 2020, the President of the United States issued a Memorandum declaring that, "[f]or the purpose of the reapportionment of Representatives following the 2020 census" — which is still ongoing — "it is the policy of the United States to exclude from the apportionment base aliens who are not in a lawful immigration status." Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census § 2, 85 Fed. Reg. 44,679, 44,680 (July 23, 2020) (ECF No. 1-1) (the "Presidential Memorandum"). Within days, Plaintiffs filed these consolidated cases, familiarity with which is assumed, alleging that the Presidential Memorandum violates the Constitution, statutes governing the census and apportionment, and other laws. In an Opinion and Order entered September 10, 2020, we granted summary judgment to Plaintiffs on the ground that the Presidential Memorandum constituted an "*ultra vires* violation of Congress's delegation of its constitutional responsibility to count the whole

number of persons in each State and to apportion members of the House of Representatives among the States according to their respective numbers under 2 U.S.C. § 2a and 13 U.S.C. § 141." *New York v. Trump*, — F. Supp. 3d —, No. 20-CV-5770 (RCW) (PWH) (JMF), 2020 WL 5422959, at *36 (S.D.N.Y. Sept. 10, 2020) (ECF No. 164); *see* ECF No. 165 ("Judgment"). We declared the Presidential Memorandum to be unlawful. And we also entered an injunction barring the Secretary of Commerce (the "Secretary") and other Defendants from "including in the Secretary's report to the President pursuant to Section 141(b) [of the Census Act] . . . any information concerning the number of aliens in each State who are not in a lawful immigration status under the Immigration and Nationality Act." *New York*, 2020 WL 5422959, at *35 (internal quotation marks and citation omitted). We confirmed, however, that Defendants were "*not* enjoin[ed] . . . from continuing to study whether and how it would be feasible to calculate the number of illegal aliens in each State." *Id.*

On September 16, 2020, Defendants filed a notice of appeal of our judgment to the Supreme Court and, the same day, moved for a stay of judgment pending appeal. *See* ECF Nos. 170-71; *see also* ECF No. 172 ("Defs.' Mem."). Plaintiffs filed their opposition on September 23. *See* ECF No. 176. Upon review of the parties' submissions, and for the reasons that follow, we DENY Defendants' motion as meritless.

## LEGAL STANDARD

In deciding whether to issue a stay pending appeal, a court must consider four factors: (1) whether the movant has "made a strong showing" that it "is likely to succeed on the merits"; (2) whether the movant "will be irreparably injured absent a stay"; (3) whether a stay "will substantially injure the other parties interested in the proceeding"; and (4) "where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009). The first two factors — the likelihood

of success and irreparable harm — "are the most critical," *id.*, and "have typically been evaluated on a sliding scale, so that a strong showing that the applicant is likely to succeed excuses a weaker showing of irreparable injury," *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 884 F. Supp. 2d 108, 122 (S.D.N.Y. 2012); *accord Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006). Nevertheless, as the Supreme Court has emphasized (in the parallel context of issuing a preliminary injunction), "the applicant must demonstrate that both factors are satisfied, so that even if a party makes a robust showing that it is likely to succeed on appeal, it *must* also show that 'irreparable injury is likely.'" *Nat. Res. Def. Council*, 884 F. Supp. 2d at 122 & n.12 (emphasis added) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). Notably, "[a] stay is not a matter of right, even if irreparable injury might otherwise result. It is instead an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case." *Nken*, 556 U.S. at 433 (internal quotation marks and citations omitted). Ultimately, the party or parties seeking the stay bear "the heavy burden of demonstrating that a stay is warranted." *U.S. Commodity Futures Trading Comm'n v. eFloorTrade, LLC*, No. 16-CV-7544 (PGG), 2020 WL 2216660, at *2 (S.D.N.Y. May 7, 2020) (internal quotation marks omitted); *accord Nken*, 556 U.S. at 433-44. Defendants fall well short of carrying their burden. In fact, they satisfy none of the four factors relevant to the analysis.

### IRREPARABLE HARM

First and foremost, Defendants fail to show that they will suffer any irreparable injury absent a stay. In fact, they do not even purport to make the necessary showing. They say only that they "*may* suffer irreparable injury without a stay of the judgment." Defs.' Mem. 6 (emphasis added) (capitalization altered). But that is not the relevant standard. *See Nken*, 556 U.S. at 434 ("*will* be irreparably injured" (emphasis added)); *see also, e.g.*, *Rubin v. United*

*States*, 524 U.S. 1301, 1301 (1998) (Rehnquist, C.J., in chambers) ("An applicant for stay first *must* show irreparable harm if a stay is denied." (emphasis added)).

By itself, that failure is enough to deny Defendants' motion. But even if Defendants were correct about the applicable standard, their arguments about irreparable harm are frivolous. First, by their own admission, our injunction will not "actually constrain[] Defendants' actions" until at least December 31, 2020 — the statutory deadline for the Secretary's Section 141(b) report. Defs.' Mem. 3.[1] At a minimum, therefore, Defendants would have to show that they could not obtain appellate relief by that date. Yet they make no such showing.[2]

Even if Defendants could not obtain appellate relief by the statutory deadline for the Section 141(b) report, their own prior representations and arguments make plain that they would not face *any* harm, let alone irreparable harm, absent a stay. Defendants have repeatedly maintained (in service of their arguments that resolution of these cases was not urgent and that Plaintiffs could not show apportionment-based irreparable harm) that "an erroneous or invalid apportionment number can be remedied *after the fact*." ECF No. 118 ("Defs.' Original Mem."), at 48 (emphasis added); *see also* ECF No. 79 ("Aug. 5, 2020 Tr."), at 16 ("[T]he case could be decided after the president submits the numbers to Congress."); Defs.' Original Mem. 9-10 ("[Plaintiffs'] challenge should await the actual apportionment . . . ."); ECF No. 154 ("Defs.'

---

[1] Due to events since Defendants' motion, the injunction may not constrain Defendants' actions until later. On September 24, 2020, the United States District Court for the Northern District of California granted a preliminary injunction staying the "U.S. Census Bureau's . . . September 30, 2020 deadline for the completion of data collection and December 31, 2020 deadline for reporting the tabulation of total population to the President" and enjoining the Secretary, the Department of Commerce, the Director of the U.S. Census Bureau, and the U.S. Census Bureau "from implementing these two deadlines." *Nat'l Urban League v. Ross*, — F. Supp. 3d —, No. 5:20-CV-5799 (LHK), 2020 WL 5739144, at *48 (N.D. Cal. Sept. 24, 2020).

[2] Notably, we entered final judgment only 48 days after these lawsuits were filed (and 51 days after the Presidential Memorandum was issued), at which time there were 112 days remaining until the statutory deadline.

Original Reply"), at 2 ("[A]pportionment challenges have historically been decided post-apportionment without spurring the 'chaos' that Plaintiffs allege (without factual support) will occur here if the Court waits."). "[T]here is no need," they asserted, "to resolve this lawsuit before the submission of the enumeration numbers to the President" — so long as it was resolved in time for "the *2022 elections*." ECF No. 37 ("Joint Pre-Conf. Ltr."), at 5 (emphasis added).

That position is surely correct, *see, e.g.*, *Utah v. Evans*, 536 U.S. 452, 462 (2002); *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992), and, regardless, is binding on Defendants here, *see, e.g.*, *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position . . . ." (brackets and internal quotation marks omitted)). And it is fatal to any claim of irreparable harm. As Defendants admit, there is no magic to the deadline for the Secretary's Section 141(b) report; in the event Defendants obtain appellate relief thereafter, they can implement the Presidential Memorandum.

## LIKELIHOOD OF SUCCESS ON THE MERITS

Defendants also fail to make a showing, let alone a "strong showing," that they are "likely to succeed on the merits." *Nken*, 556 U.S. at 434. Defendants make three arguments: (1) that, in holding that "the Presidential Memorandum violates Congress's mandate to use the results of the census — and only the results of the census — in connection with the apportionment process," *New York*, 2020 WL 5422959, at *27, we failed to consider that *Franklin* approved the use of "administrative records when conducting the enumeration," Defs.' Mem. 4-5; (2) that, in holding that "[t]he statutory command to use the 'whole number of persons in each State' as the apportionment base does not give the President discretion to

exclude illegal aliens on the basis of their legal status, without regard for their residency," *New York*, 2020 WL 5422959, at *32, we "mistakenly suggested that the meaning of 2 U.S.C. § 2a is different from the substantive standard under the Constitution," and that the Constitution leaves room for the President to exclude illegal aliens from the "whole number of persons in each State," Defs.' Mem. 5-6 (citation omitted); and (3) that there is "a mismatch between the asserted injury on which the Court relied (the chilling effect [on the census count]) and the relief that it ordered (an injunction of conduct after census field operations end)," *id.* at 3.

We will address each argument in turn.

**A. Apportionment Must Be Based on the Results of the Census Alone**

Defendants' first argument rests on either a mischaracterization or a serious misunderstanding of our Opinion and Order, as well as additional disregard of their own prior concessions. We did not overlook that the census count in *Franklin* was based in part on administrative records, let alone suggest that the Secretary, in exercising his discretion with respect to the census under Section 141(a), could not use administrative records "to subtract people" in reaching a final census count even though they were enumerated. Defs.' Mem. 5 (emphasis omitted). To the contrary, we explicitly acknowledged Defendants' argument that the overseas personnel at issue in *Franklin* "were counted using administrative records rather than a questionnaire" and explained that that fact "was of no moment" because there, unlike here, "[t]he overseas personnel were counted as part of the census itself, resulting in a single 'tabulation of total population by States' under the 'decennial census.'" *New York*, 2020 WL 5422959, at *28 n.15 (quoting 13 U.S.C. §§ 141(a)-(b)).

The Secretary might have discretion under the Census Act to use administrative records as a method of not counting people in the census. But for whatever strategic reason, that is not

what the Presidential Memorandum does.  Instead, the Presidential Memorandum directs the Secretary to report "[t]he tabulation of total population by States" under the previously adopted "Residence Rule" that governs the "decennial census" *and* a second set of numbers based on something other than the census.[3]  Indeed, during this litigation, Defendants themselves repeatedly admitted as much.  *See, e.g.*, Joint Pre-Conf. Ltr. 5 ("Plaintiffs are not challenging some procedure that will be used in the actual census, but an apportionment number that will be chosen by the President after the census is complete.").[4]  They cannot now — or on appeal — retreat from those admissions.  And for the reasons we have already explained, those admissions render the Presidential Memorandum an *ultra vires* violation of the statutes governing the census and apportionment.  *See New York*, 2020 WL 5422959, at *25-29.

**B.  The Apportionment Base Must Include Illegal Aliens Who Reside in a State**

Defendants' second claim — that we erred in finding that illegal aliens who reside in the United States qualify as "persons in" a "State" under Section 2a — fares no better.  For one thing, the argument assumes that Defendants have the better of the constitutional argument — that the same language in the Constitution might carry a different meaning.  Although we did not

---

[3]     *See* Presidential Memorandum, 85 Fed. Reg. at 44,679 (titled "Excluding Illegal Aliens From the Apportionment Base *Following* the 2020 Census" (emphasis added); *id.* at 44,680 § 3 (requiring the Secretary "to provide information permitting the President, to the extent practicable, to exercise the President's discretion to carry out the policy set forth in section 2 of this memorandum.  The Secretary *shall also* include in that report information tabulated according to the methodology set forth in *Final 2020 Census Residence Criteria and Residence Situations*, 83 [Fed. Reg.] 5525 (Feb. 8, 2018)." (emphasis added)).

[4]     *See also, e.g.*, ECF No. 120 ¶ 12 ("The Presidential Memorandum . . . has had no impact on . . . the Census Bureau's commitment to count each person in their usual place of residence, as defined in the [Residence Rule]."); ECF No. 118, at 4 ("The Presidential Memorandum directs the Secretary of Commerce to submit to the President two tabulations."); *id.* at 12 ("[T]he Memorandum does *not* affect how the Census Bureau is conducting its remaining enumeration operations . . . ." (emphasis in original)); Defs.' Original Reply 2 "([T]he Memorandum itself [does] not in any way affect the conduct of the actual census . . . .").

reach the constitutional question in our Opinion and Order — and need not do so here — that proposition is certainly debatable.  By their own admission, Defendants cannot cite a *single* example in the historical record where any branch of the Government adopted the interpretation of the Constitution that they now advance.  *See* Oral Arg. Tr. 46; *New York*, 2020 WL 5422959, at *32; *see also, e.g.*, *N.L.R.B. v. Noel Canning*, 573 U.S. 513, 524 (2014) (holding that "*historical practice*" was entitled to "*significant weight*" in interpreting the Recess Appointments Clause); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010) (observing that "[p]erhaps the most telling indication of the severe constitutional problem with" the structure of the independent agency at issue was its "lack of historical precedent" (quoting *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 537 F.3d 667, 699 (D.C. Cir. 2008) (Kavanaugh, J., dissenting))).

In any event, Justice Frankfurter's axiom that "if a word is obviously transplanted from another legal source . . . it brings the old soil with it," Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527, 537 (1947) (cited at Defs.' Mem 5), does not get Defendants very far, for at least two reasons.  First, as we noted in our Opinion and Order, a court's principal task in interpreting a statute is to apply its terms "in accord with the ordinary public meaning . . . at the time of its enactment."  *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738 (2020); *accord Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2362-63 (2019) (citing cases).  The "old soil" axiom is a means to that end; at bottom, it is an application of the well-established principle that when Congress adopts the language of an earlier legal source, it is presumed to have also adopted the settled understanding given to such language "and made it a part of the enactment."  *United States v. Kwai Fun Wong*, 575 U.S. 402, 425 (2015) (Alito, J., dissenting) (citation omitted); *see Stokeling v. United States*, 139 S. Ct. 544, 551 (2019).  As we

previously demonstrated, to the extent that there was a settled understanding of the constitutional language in 1929, when the precursor to Section 2a was enacted, it was that the "whole number of persons in each State" used for apportionment included all persons residing in a State, without regard for legal status. *See New York*, 2020 WL 5422959, at *30-32.[5] At best, Defendants maintain that the constitutional question was unsettled in 1929 (and, indeed, that it remains unsettled today). If so, the old soil does not answer the relevant question.

Moreover, as we explained in our Opinion and Order, there was a good reason not to plow the "old soil" in this case: Doing so would run contrary to the equally well-established principle that courts should not "pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of." *New York*, 2020 WL 5422959, at *25 (quoting *Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring).[6] The Supreme Court has never followed the "old soil" axiom in interpreting a statute where, as here, the "old soil" was the Constitution itself, let alone where, as here also, doing so would entail passing upon a constitutional question for the first time. Doing so would be inconsistent with "the fundamental principle of judicial restraint." *Wash.*

---

[5] Defendants argue that, in our Opinion and Order, we "appeared to rely on statements suggesting a view only that *aliens* (writ large) cannot be excluded from the enumeration count for apportionment," which "does not answer the question whether a smaller subset — some or all aliens *who are here unlawfully* — may be excluded." Defs.' Mem. 6 (citation omitted). But Defendants do not identify a single statement or source in 1929 that differentiated between legal and illegal aliens with respect to the statutory phrase "whole number of persons in each State." That silence is fatal to Defendants' argument.

[6] Thus, Defendants' assertion in the Jurisdictional Statement they filed in the Supreme Court, that we "gave no reason for departing from the presumption that when 'a word is obviously transplanted from another legal source,' it 'brings the old soil with it,'" is wrong. Jurisdictional Statement 32, *Trump v. New York*, No. 20-366 (Sept. 22, 2020) ("Jurisdictional Statement") (quoting *Hall v. Hall*, 138 S. Ct. 1118, 1128 (2018)). Likely because it flies in the face of our Opinion and Order, Defendants do not make the same assertion in their brief seeking relief from us here.

*State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008). And doing so *here* would have unnecessarily complicated our task, as the meaning of the phrase "whole number of persons in each State" in 1929 was and is clear without the need to delve into Founding and Reconstruction era sources. *See Ashwander*, 297 U.S. at 347 (Brandeis, J., concurring) ("It is not the habit of the [C]ourt to decide questions of a constitutional nature unless absolutely necessary to a decision of the case." (citation omitted)).

## C. Defendants' Mismatch Argument Was Waived and Does Not Justify a Stay

Finally, Defendants' mismatch argument does not merit a stay for several reasons. First, they waived the argument by not pressing it earlier. *See, e.g.*, *Barrientos v. 1801-1825 Morton LLC*, 583 F.3d 1197, 1215 (9th Cir. 2009) ("[The defendant] did not object to the scope of the injunction before the district court and, therefore, has waived the objection."); *In re Aimster Copyright Litig.*, 334 F.3d 643, 656 (7th Cir. 2003) ("[Defendant] objects to the injunction's breadth. But having failed to suggest alternative language either in the district court or in this court, it has waived the objection.").[7] Defendants try to evade the consequences of their earlier silence by suggesting (and arguing more explicitly in their Jurisdictional Statement in the Supreme Court) that the issue relates to standing or mootness and, thus, jurisdiction. *See* Defs.' Mem. 2-3; *see also* Jurisdictional Statement 12-16. But that suggestion is meritless. It is black letter law that "the standing inquiry" is "focused on . . . when the suit was filed," *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008), and census operations were in full swing when

---

[7] This issue was foreseeable well before our decision. The prospect that, in finding standing and granting relief, we might rely solely on the harms caused by the Presidential Memorandum to the census count was apparent as early as the initial conference on August 5, 2020. *See* Aug. 5, 2020 Tr. 25-35. That we had multiple avenues available through which we could find a violation and craft relief does not excuse Defendants' failure to recognize and address the issue in their brief or during oral argument.

these suits were filed. And there is certainly no mootness issue now (let alone at the time we issued our Opinion and Order), as census operations are ongoing as of today and may continue for at least a month. *See Nat'l Urban League*, 2020 WL 5739144, at *48; *see also, e.g.*, 2020 Census Deadline Extensions Act, S. 4571, 116th Cong. (2020) (bipartisan bill introduced in the Senate on September 15, 2020 that would extend census operations to October 31, 2020).

Second, to the extent that Defendants are correct that, upon the end of census operations, our injunction would no longer be needed to prevent census-related harms, they seek the wrong form of relief and at the wrong time. Instead, Defendants must move to modify or dissolve the injunctive portion of our judgment at the end of census operations, pursuant to Rules 60(b)(5) and 62(d) of the Federal Rules of Civil Procedure. *See, e.g.*, Fed. R. Civ. P. 62(d) ("While an appeal is pending from . . . [a] final judgment that grants . . . an injunction, the court may suspend, modify, restore, or grant an injunction . . . ."); *Horne v. Flores*, 557 U.S. 433, 447 (2009) ("Rule [60(b)(5)] provides a means by which a party can ask a court to modify or vacate a judgment or order if a significant change either in factual conditions or in law renders continued enforcement detrimental to the public interest." (internal quotation marks and citation omitted)); *see also* Fed. R. App. P. 8(a)(1) ("A party must ordinarily move first in the district court for . . . an order suspending, modifying, restoring, or granting an injunction while an appeal is pending."). Staying the injunction now would be inappropriate in this respect, because the factual circumstances could be materially different at the end of census operations — and not necessarily in Defendants' favor.[8] Put differently, Defendants' confident assertion that there will

---

[8] For example, if the Census Bureau and the Secretary have determined by that time the methodology they will use to count the number of "aliens who are not in a lawful immigration status" as directed in the Presidential Memorandum, Plaintiffs' asserted apportionment harms might no longer be speculative and could well justify maintaining the injunction.

11

be no factual basis for an injunction following the end of census operations is entirely speculative and thus can't serve as the basis for a stay at this point.

Finally, the real "mismatch" here is between Defendants' arguments and the relief they seek, namely a stay of our judgment *in its entirety*. Injunction aside, Defendants' argument on appeal provides absolutely no basis to disturb the declaratory judgment (thus undermining Defendants' assertion that our Opinion and Order constitutes an impermissible "advisory opinion"). *See, e.g.*, *Richardson v. Ramirez*, 418 U.S. 24, 34-40 (1974) (holding that a case was not moot based in part on the fact that the lower court had granted declaratory relief); *cf. Brockington v. Rhodes*, 396 U.S. 41, 42 (1969) ("[*I*]*n view of the limited nature of the relief sought*, we think the case is moot because the congressional election is over. The appellant did not allege that he intended to run for office in any future elections. . . . *He did not seek a declaratory judgment, although that avenue too was open to him.*" (emphases added)). We assume — just as the Supreme Court did in *Utah* and *Franklin* — that it is "substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute . . . by the District Court . . . ." *Franklin*, 505 U.S. at 803 (plurality opinion), *quoted with approval in Utah*, 536 U.S. at 463-64 (majority opinion). To the extent that this assumption is valid, there is no basis for a stay because, so long as the declaratory judgment stands, the Secretary will not include the second set of numbers in his Section 141(b) report anyway. And to the extent that this assumption is invalid, there is no basis for a stay because the injunction is needed to prevent Defendants from acting unlawfully.

## HARM TO PLAINTIFFS AND THE PUBLIC INTEREST

Finally, the third and fourth stay factors — whether a stay "will substantially injure" Plaintiffs and "where the public interest lies," *Nken*, 556 U.S. at 434; *see, e.g.*, *Sierra Club v.*

*Trump*, 929 F.3d 670, 704-05 (9th Cir. 2019) (holding that where, as here, the government seeks a stay, the third and fourth factors merge) — also weigh heavily against a stay. Defendants' argument on the third prong is limited to two sentences, *see* Defs.' Mem 7, and barely merits commentary. Defendants would not suffer any harm in the absence of a stay. But if a stay were granted, Plaintiffs would suffer the irreparable injuries detailed at length in our Opinion and Order: the "massive and lasting consequences" of an inaccurate census count, which "occurs only once a decade, with no possibility of a do-over if it turns out to be flawed." *New York*, 2020 WL 5422959, at *16 (citation omitted); *see also id.* at *9-23. Moreover, we fail to see how, as Defendants argue, "a stay serves the public interest by promoting clarity for the public (and for the parties) as to exactly what will happen in the upcoming census process," Defs.' Mem. 8 — given that Defendants have not articulated how, if at all, the Secretary plans to fulfill his directive under the Presidential Memorandum. *See* Defs.' Original Mem. 7 ("The extent to which it will be feasible for the Census Bureau to provide the Secretary of Commerce a second tabulation is, at this point, unknown."); *see also id.* at 4, 8; Joint Pre-Conf. Ltr. 5; Defs.' Original Reply 1-2, 6-7; Sept. 3, 2020 Oral Arg. Tr. 36. And, of course, "[t]here is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal quotation marks and citations omitted).

## CONCLUSION

In sum, Defendants have not come close to carrying "the[ir] burden of showing that the circumstances justify an exercise" of our discretion to grant a stay. *Nken*, 556 U.S. at 433-34. They fail to show that they are likely to succeed on the merits or that a stay would be in the

public interest. And more significantly, in the face of their own prior admissions that a final resolution of these cases in 2021 would cause no harm because the President could revise his apportionment statement to Congress, Defendants' arguments about irreparable harm and urgency are frivolous. Accordingly, Defendants' motion for a stay is DENIED.

The Clerk of Court is directed to terminate ECF No. 171.

SO ORDERED.

Dated: September 29, 2020
      New York, New York

_____/s/_____
RICHARD C. WESLEY
United States Circuit Judge

_____/s/_____
PETER W. HALL
United States Circuit Judge

_____/s/_____
JESSE M. FURMAN
United States District Judge